CIRCUIT COURT FOR BALTIMORE CITY
Marilyn Bentley
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389


W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )

Case Number: 24-C-20-002952 OT
C I V I L

The Cordish Companies Inc vs Affiliated FM Insurance Company

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:

        To: AFFILIATED FM INSURANCE COMPANY


    You are hereby summoned to file a written response by pleading or motion,
within 60  days after service of this summons upon you, in this court, to
the attached Complaint filed by:   The Cordish Companies Inc


WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of
Maryland

Date Issued:  07/14/20

Marilyn Bentley
Clerk of the Circuit Court  per


To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT
BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.


**EXHIBIT A**

Daniel J. Healy, Esq.
MD Bar No. 0512120010
ANDERSON KILL, LLP
1717 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006
Tel.:   (202) 416-6547
dhealy@andersonkill.com

Marshall Gilinsky, Esq.
Pamela D. Hans, Esq.
Maria Brinkmann, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Tel.:   (212) 278-1500
mgilinsky@andersonkill.com
phans@andersonkill.com
mbrinkmann@andersonkill.com

Attorneys for Plaintiff
The Cordish Companies, Inc.

| | |
|---|---|
| THE CORDISH COMPANIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> AFFILIATED FM INSURANCE COMPANY, <br><br> Defendant. | **IN THE CIRCUIT COURT** <br><br> **FOR BALTIMORE CITY** <br><br> Case No.: 24-i-20-002952 <br><br> COMPLAINT FOR: <br><br> 1. DECLARATORY JUDGMENT <br><br> 2. BREACH OF CONTRACT <br><br> DEMAND FOR JURY TRIAL |

The Cordish Companies, Inc. ("Cordish") brings this action for declaratory judgment and damages for breach of contract against Defendant Affiliated FM Insurance Company ("FM"), demanding a trial by jury, and as its complaint alleges as follows:

# ANDERSON KILL L.L.P.

Attorneys and Counselors at Law

1717 PENNSYLVANIA AVENUE SUITE 200 ■ WASHINGTON, DC 20006
TELEPHONE: 202-416-6500 ■ FAX:  202-416-6555
www.andersonkill.com

Daniel J. Healy, Esq.
Dhealy@andersonkill.com
202-416-6547

*By USPS Priority Mail*                                                July 7, 2020

Clerk of the Court, Circuit Court - Civil Division
Clarence M. Mitchell, Jr. Courthouse
111 North Calvert Street
Courthouse East, Room 462
Baltimore, MD  21202

Re:   The Cordish Companies, Inc.. v. Affiliated FM Insurance Company,
New Filing – Civil Complaint

Dear Sir/Madam:

Enclosed for filing please find an original of a complaint with exhibits by Plaintiff The
Cordish Companies, Inc., along with a duplicate copy of the same.  Please docket the complaint
and exhibits as a new civil case and stamp the duplicate copy as filed and return it to me.  For
your convenience, we have included a pre-addressed envelope with postage that you can use to
send the stamped duplicate to me.

Also enclosed, is a signed Civil-Non-Domestic Case Information Report and a check in
the amount of $185.00 made out to the Clerk of the Court, for the filing and appearance fees.

Please call me at 202-416-6547 if you have any questions or concerns regarding this
matter.

Very truly yours,

Daniel J. Healy

Enclosures

cc:   Marshall Gilinsky, Anderson Kill, P.C. (By E-mail)

New York, NY ■ Los Angeles, CA ■ Stamford, CT ■ Washington, DC ■ Newark, NJ ■ Philadelphia, PA

## INTRODUCTION

1.     Cordish brings this complaint to redress FM's wrongful denial of its claim for hundreds of millions of dollars in business interruption losses that are covered by the insurance policy Cordish purchased from FM.

2.     Affiliates of Cordish have developed and operate numerous commercial real estate properties throughout the United States, including without limitation casinos, dining and entertainment venues, retail malls, hotels, meeting and conference venues, office and residential buildings, and other locations that host large numbers of people. These real estate assets have a particular focus on entertainment venues and other venues that attract and depend upon gatherings of large numbers of consumer visitors.

3.     Unlike a retail store selling a product, or a traditional restaurant selling food and beverages, the sports and entertainment businesses primarily sell experiences that involve customers coming onto and moving about the premises and interacting with one another there. Indeed, these businesses successfully have obtained unique "arena" liquor licenses in many jurisdictions that allow guests to carry alcoholic beverages between and among different bar and restaurant concepts, creating a stadium-like experience and positioning the businesses as the primary sports-watching and entertainment gathering places in each of their cities.

4.     To protect the investments made in all of these various properties, Cordish purchased from FM at significant expense an "all-risk" insurance policy that specifically covers 97 separately listed properties (the "Covered Properties"). Approximately 33 of the Covered Properties are in Maryland.

5.      FM touts the insurance policy that it sold to Cordish as providing "broad coverage," with policy limits of $1,000,000,000 for the policy period from February 28, 2020 through February 28, 2021, as set forth in policy no. SS987, a copy of which is attached hereto as Ex. 1 (the "Policy").

6.      Further broadening the Policy's "all-risk" coverage, Cordish purchased from FM broad business interruption coverage for lost gross earnings or gross profits, lost rental income, and extra expense.

7.      Importantly, Cordish also purchased sixteen further extensions of its business interruption coverage, including the following three specific extensions germane to this matter:

    (a) "Attraction Property" coverage for business interruption losses resulting from physical loss or damage to property within a mile of a Covered Property, and certain delineated venues regardless of distance, that attract business to the Covered Properties;

    (b) "Civil Authority" coverage for business interruption losses when an order of civil authority prohibits access to a Covered Property, where that order is a direct result of physical damage of the type insured at a Covered Property or within five miles of it; and

    (c) "Supply Chain" coverage for business interruption losses resulting from physical loss or damage of the type insured to property at the premises of suppliers, customers or contract service providers, including losses resulting from situations where such suppliers or customers are affected by an order of civil authority as set forth in the Civil Authority coverage.

8.      The broad and various extensions of coverage included in the Policy that Cordish purchased – for nearly $2,000,000 in premiums – provide a menu of different coverages that independently insure against business interruption losses sustained at the Covered Properties.

9.     SARS-CoV-2 (commonly known as the coronavirus) and COVID-19 (the communicable disease caused by SARS-CoV-2) cause physical loss or damage of the type insured under the Policy.  Indeed, the Policy specifically provides coverage for losses associated with communicable disease, and affirmatively declares that such diseases constitute property damage in a provision specifically entitled "Communicable Disease – Property Damage."

10.     The damage from SARS-CoV-2 and COVID-19 has led hundreds of state and local governments to issue orders that have prohibited access by customers, patrons, suppliers, vendors and employees to the Covered Properties.  Among the Covered Properties that have been worst hit is the Live! Casino in Hanover, Maryland, which typically has 18 million visitors annually and produces revenues in excess of $50 million per month, but was completely closed by various orders of civil authority.  The orders across the country have resulted in hundreds of millions of dollars in business interruption losses for Cordish, which are covered under the Civil Authority coverage in the Policy.

11.     The damage from SARS-CoV-2 and COVID-19 includes damage at "Attraction Properties" that attract business to the Covered Properties – especially stadiums and similar venues that are the lifeblood of the sports and entertainment businesses among the Covered Properties like Texas Live!, Kansas City Live! and Ballpark Village – all of which are located in close proximity to, and depend upon a customer base attracted by, major sports venues.

12.     The numerous orders of civil authority also have prohibited access to these stadiums, other "Attraction Properties" as well as the Covered Properties' other suppliers, customers and contract service providers.

4

13.     The damage to and closure of these stadiums and other properties have resulted in extensive business interruption losses that are covered under both the Attraction Property and Supply Chain coverages in the Policy.

14.     The Covered Properties also include dozens of strip center retail businesses across the country that have suffered damage from SARS-CoV-2 and COVID-19 and have been impacted by the various orders of civil authority – all of which has resulted in further business interruption losses, including lost rent.  The business interruption losses at these properties are covered under the Policy, including the Rental Income coverage.

15.     The Attraction Property, Civil Authority, and Supply Chain coverage extensions and the Rental Income business interruption coverage each provide separate and independent bases by which the business interruption losses at the Covered Properties are covered under the Policy.

16.     The extensions of the business interruption coverage in the Policy also include an Extended Period of Liability that affords coverage not just until the time that the damaged *property* is repaired, but extends the coverage further for the time required to restore the Covered Properties' *business* to the condition that the *business* would have been in had no loss occurred.

17.     Accordingly, the Policy expressly provides coverage for Cordish from the onset of its business interruption losses following the damage caused by SARS-CoV-2 and COVID-19, including the losses resulting from orders of civil authority, and until such time that the Covered Properties are restored to their pre-loss condition.

18.     The risks associated with viruses, communicable diseases, and pandemics have been known to the insurance industry for a century and have been evident to FM in recent decades through outbreaks and pandemics involving SARS, MERS, H1N1 and Zika.

19.     Because these risks are well known, there are exclusions in common usage in the insurance industry that specifically reference losses caused by viruses, communicable diseases and pandemics.   However, FM did not include any such exclusion in the Policy it sold to Cordish.   To the contrary, it is otherwise stated in the Policy that losses from communicable disease are covered.

20.     The terms of the Policy, coupled with the absence of any applicable exclusion (despite commonly used exclusions for losses caused by virus, communicable disease or pandemic), establish that the Policy provides insurance coverage for the business interruption losses at the Covered Properties.

21.     FM's refusal to honor the promises it made in the Policy it sold to Cordish – for which Cordish paid FM nearly $2,000,000 in premiums – has compelled Cordish to commence this lawsuit.

## THE PARTIES

22.     Cordish is a Maryland corporation with its principal place of business in Baltimore, Maryland.[1]

23.     Defendant FM is a Rhode Island corporation with a principal place of business in Johnston, Rhode Island and is licensed to do business in the State of Maryland.

---

[1] The Cordish Companies, Inc. is a trade name or holding company which owns no assets and operates no businesses.  Cordish is the "First Named Insured" under the Policy, which provides that "[l]oss or damage will be adjusted with the First Named Insured and payable to or as the First Named Insured directs . . . ." Policy at 33 of 44.

**JURISDICTION AND VENUE**

24.     This Court has personal jurisdiction over Defendant FM because FM regularly conducts business in Maryland, including, without limitation, by selling insurance policies to policyholders such as Cordish in Maryland and to insure properties in Maryland.  Md. Code Ann., Cts. and Jud. Pro., § 6-103.

25.     Venue is proper before this Court in accordance with Maryland Code Ann., Cts. and Jud. Pro., § 6-202.  FM is a corporation with a principal place of business outside the State and Cordish is headquartered in Baltimore.  FM regularly conducts business in Baltimore, several of the Covered Properties are located in Baltimore and FM contracted to perform contractual obligations in Baltimore.  The alleged wrongs occurred, in part, in Baltimore.

**FACTUAL BACKGROUND**

**A.     SARS-CoV-2 and COVID-19 Have Caused Widespread Physical Loss and Damage Across the United States.**

26.     SARS-CoV-2 is a physical substance that causes physical loss or damage to property.

27.     A virus or communicable disease might be very small and invisible to the naked eye, but are "physical" and certainly cause "physical loss or damage."

28.     In addition to being transmitted by interpersonal contact, SARS-CoV-2 physically rests and remains on surfaces of objects or materials, or "fomites," for up to twenty-eight days. Human contact with such surfaces and fomites is known to transmit the disease-causing virus, making property impacted by SARS-CoV-2 dangerous and potentially fatal.

29.     The World Health Organization explains that COVID-19 "spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a

7

person with COVID-19 coughs, sneezes, or speaks. . . .  People can catch COVID-19 if they breathe in these droplets from a person infected with the virus. . . .  These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[2]

30.    The *New England Journal of Medicine* reported a scientific study conducted by researchers from UCLA, Princeton University, the National Institute of Allergy and Infectious Diseases, and the Centers for Disease Control and Prevention that analyzed the aerosol and surface stability of SARS-CoV-2 and compared it with SARS-CoV-1, the most closely related human coronavirus.  The study found that SARS-CoV-2 persisted on plastic and stainless steel surfaces for up to seventy-two hours in laboratory studies.[3]

31.    Scientists also have studied the persistence of SARS-CoV-2 on surfaces in cruise ships with documented outbreaks of COVID-19.  One such study, reported by the CDC on March 17, 2020, found that SARS-CoV-2 was "identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated," but before disinfection procedures had been conducted.[4]

32.    There have been hundreds of thousands of confirmed cases of COVID-19 in proximity to the Covered Properties, and the number of cases and geographic presence of SARS-CoV-2 continues to grow and spread.  Currently, the number of confirmed cases of COVID-19 nationwide is over 2,400,000 and growing.  And as has been widely reported and acknowledged

---

[2] "How does COVID-19 spread?," World Health Organization (last visited July 7, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses
[3] Neeltje van Doremalen, *et al.*, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, N. ENGL. J. MED. (March 17, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMc2004973.
[4] Leah F. Moriarty, *et al.*, Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020, CDC Morbidity and Mortality Weekly Report (Mar. 27, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm.

by civil and government authorities, there are even larger numbers of infected people that are not counted as "confirmed" cases due, in part, to the at-times asymptomatic nature of some COVID-19 carriers and a lack of widespread testing.

33.     Accordingly, the physical loss and damage to property from SARS-CoV-2 and COVID-19 is ubiquitous and widespread across the United States.

34.     Businesses generally buy property and business interruption insurance to protect the ability to generate profits using their insured property.  When property is impacted in a way that makes it incapable of producing profits, it does not matter whether it is from a fire, flood, toxic spills or fumes, or a virus – the loss or damage from any of these causes is the same.

35.     When the SARS-CoV-2 impacts property, it renders the property dangerous and potentially fatal.

36.     Property impacted by SARS-CoV-2 does not function for the purpose of generating business income. To the contrary, because contact with such property can kill a person, it undermines any productive business purpose.

37.     Like the impact of a fire or a toxic spill, the impact of a potentially fatal virus or communicable disease constitutes physical loss or damage to property, in that property impacted by any of them is rendered equally incapable producing revenues or profits.

38.     FM knows that viruses and communicable diseases result in physical loss or damage, and FM knew it when it sold the Policy to Cordish.   Indeed, the Policy includes a specific provision entitled: "Communicable Disease – <u>Property Damage</u>".  *See* Policy at 7 of 44 (emphasis added).

9

39.     Furthermore, the deductible provision that applies to the coverage for "Communicable Disease" states that it applies based on the "business interruption value that would have been earned had no loss occurred at the location <u>where the physical damage happened</u> . . . ." Policy Declarations at 7 of 15 (emphasis added).

40.     Further still, the Policy includes coverage for "Data, Programs or Software" that covers "physical loss or damage" to data, programs or software, "including physical loss or damage" caused by malicious introduction of code (*i.e.*, computer viruses).  Policy at 7 of 44. Further still, the Policy includes an additional coverage entitled "Off-Premises Data Services – Property Damage" that covers "physical loss or damage" to insured property where such "physical loss or damage" results from the interruption of off-premises data processing or transmission services (*e.g.*, cloud storage).  Policy at 13 of 44.

41.     Put simply, given that FM's Policy clearly acknowledges that a computer virus can cause "physical loss or damage" via its impact on computer code, it is disingenuous in the extreme for FM to take the position that an organic, physical virus or communicable disease that turns property into a deadly hazard does not cause "physical loss or damage" as well.

**B.     Civil Authorities Nationwide Have Prohibited Access to Property Because of the Physical Damage Caused by SARS-CoV-2 and COVID-19.**

42.     Orders have been issued by states, counties, cities and other government bodies across the United States that have prohibited access to properties, including the Covered Properties, in part because of physical loss or damage from SARS-CoV-2 and COVID-19.

43.     For example, Governor Larry Hogan declared a state of emergency and catastrophic health emergency in the State of Maryland on or about March 5, 2020.  Ex. 2.

44.     On March 15, 2020, in connection with Maryland's State of Emergency Order, Governor Hogan issued an Order closing all casinos, racetracks, and simulcast betting facilities in Maryland to the general public.   This order specifically identified one of the Covered Properties, the Live! Casino in Hanover, Maryland, as a facility affected by the Order.  Ex. 3.

45.     On March 16, 2020, Governor Hogan issued Order No. 20-03-19-01, which closed bars, restaurants, theaters and malls, thereby restricting access to the Covered Properties in Maryland.  Ex. 4

46.     On March 23, 2020, Governor Hogan issued Order No. 20-03-23-01, which amended the March 16, 2020 Order to close all non-essential businesses.  Ex. 5.

47.     On March 30, 2020, Governor Hogan issued Order No. 20-03-30-01, which amended the March 23, 2020 Order to include a requirement that citizens stay at home except to perform certain limited functions.  Ex. 6.

48.     The March 30, 2020 Order was extended on May 6, 2020, under Order No. 20-05-06-01.  Ex. 7.

49.     The May 6, 2020 Order states, among other things, that "[a]ll persons living in the State of Maryland are hereby ordered, effective as of 8:00 p.m. on March 30, 2020, to stay in their homes or places of residences ("Homes") except . . . to conduct or participate in Essential Activities . . . or Permitted Outdoor Activities . . . ."

50.     The May 6 Order goes on to ban "[s]ocial, community, spiritual, religious, recreational, leisure, and sporting gatherings and events of more than 10 people," and it orders the cancellation or postponement of all planned large gatherings.

11

51.     The May 6 Order further specifically states that bars, restaurants, theatres, malls all are required to remain closed.

52.     One way SARS-CoV-2 and COVID-19 spread is via surfaces on real and personal property.

53.     Such damage to property, and the potential for people to come into contact with it, is a direct reason why state and local civil authorities have issued orders placing significant restrictions on individuals and businesses across the nation.

54.     State, local, and municipal authorities throughout the country have specifically stated that such orders were issued in part because of the damage SARS-CoV-2 causes to property.  Representative examples are attached as Exhibits 8-13 (emphasis added below).  For example:

- On March 7, 2020, the Governor of New York issued Executive Order No. 202 based on his authority to act to "to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety." Ex. 8;

- On March 16, 2020, the Mayor of New York City issued an emergency executive order closing non-essential businesses in the city and declaring, "this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage[.]" Ex. 9;

- On March 16, 2020, the Mayor of the City of New Orleans issued an emergency order suspending large gatherings and closing certain categories of businesses, stating "there is reason to believe that COVID-19 may be spread amongst the population by various means of exposure, including the propensity to spread person to person and the propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances[.]" Ex. 10;

12

- On March 19, 2020, the Mayor of the City of Los Angeles issued a shutdown order, explaining "This Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time." Ex. 11;

- On April 1, 2020, in a supplement to a mayoral proclamation, the Mayor of the City of San Francisco extended coronavirus-related orders and stated, "This order and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time[.]" Ex. 12;

- On April 23, 2020, the Dallas County Judge issued an amended "Safer at Home Order" that states, "this Emergency Order is necessary because of the propensity of the virus to spread person to person and also because the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time[.]" Ex. 13.

55.     The foregoing orders and other orders issued by states and local governments, including counties, cities and other entities across the nation (collectively the "Orders") have prohibited access to the Covered Properties.

56.     The Orders were issued as a direct result of physical loss or damage caused by SARS-CoV-2 and COVID-19, including to prevent people from coming into contact with dangerous property impacted by SARS-CoV-2 or COVID-19.

**C.     The FM Insurance Policy**

57.     FM sold Cordish an "all-risk" insurance policy covering the policy period from February 28, 2020 to February 28, 2021.

13

58.     Cordish is the "First Named Insured" under the Policy, which provides that "[l]oss or damage will be adjusted with the First Named Insured and payable to or as the First Named Insured directs . . . ." Policy at 33 of 44.

59.     The Policy expressly states that it provides "All Risk Coverage" for all risks except those expressly excluded:

### ALL RISK COVERAGE

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

Policy at 1 of 44.

60.     When FM sold the Policy to Cordish, FM also promised to cover business interruption losses.

61.     The Business Interruption Coverage provisions in the Policy provide coverage, *inter alia*, as follows:

### BUSINESS INTERRUPTION

The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

### A. LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1. To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

       \*              \*              \*

### B. BUSINESS INTERRUPTION COVERAGE

#### 1. Gross Earnings

14

The recoverable Gross Earnings loss is the actual loss sustained by the Insured of Gross Earnings, less all charges and expenses that do not necessarily continue, plus all other earnings derived from the operations of the business, excluding loss covered under Rental Income, during the Period of Liability.

Gross Earnings means:

The net sales value of production or business operations or services less the cost of:

a) Raw stock;
b) Materials and supplies; and
c) Merchandise sold;
Used in production or business operations or services rendered by the Insured

*                    *                    *

**2.   Gross Profits**

The recoverable Gross Profits loss is the actual loss sustained by the Insured of the:

a) Reduction in Sales; and the

b) Increased Cost of Doing Business,

Resulting from the necessary interruption of business during the Period of Liability…

**3.   Rental Income**

The recoverable Rental Income loss is the actual loss sustained by the Insured of the following during the Period of Liability:

a)   The fair rental value of any portion of the property occupied by the Insured;

b)   Income reasonably expected from the rentals of unoccupied or unrented portions of such property;

c)   The rental income from the rented portions of such property, according to bona fide leases, contracts or agreements, in force at the time of loss;

All less charges and expenses that do not continue.

*                    *                    *

15

### 4. Extra Expense

The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:

a)   Temporarily continue as close to normal the conduct of the Insured's business; and

b)   Temporarily use the property or facilities of the Insured or others;

All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

Policy at 19-22 of 44.

62.   The Policy's Business Interruption Coverage Extensions also include an Extended Period of Liability that affords coverage not just from the time of the damage until the time that the *property* is repaired, but extends the coverage further for the time required for Cordish to restore its *business* to the condition that the *business* would have been in had no loss occurred:

### 7. Extended Period of Liability

The Gross Earnings and Rental Income coverage is extended to cover the reduction in sales resulting from:

a)   The interruption of business as covered by Gross Earnings or Rental Income;

b)   For such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened;".

Policy at 26 of 44.

63.   The purpose and nature of business interruption insurance is to protect policyholders like Cordish against losses arising from an inability to continue normal business operations due – as is the case here – to physical loss or damage sustained as a result of a peril insured against.   In other words, the goal is to preserve the continuity of the policyholder's earnings.

16

64.     The Business Interruption coverage in the Policy does not require Cordish or any of the Covered Properties to be entirely shut down.  Coverage is provided for partial interruption of business at any Covered Property.  Policy at 22 of 44.

65.     The Policy includes several broad "Business Interruption Coverage Extensions," including, without limitation, Attraction Property, Civil Authority and Supply Chain coverage, each of which provide an independent basis for business interruption coverage. *See* Policy at 24-31 of 44.

66.     The Policy provides Attraction Property coverage as follows:

1.  Attraction Property

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a described location and is within one (1) statute mile of the described location.

Policy at 24 of 44.

67.     The Attraction Property coverage is subject to a sublimit of $1,000,000,000. Policy Declarations at 4 of 15.

68.     In addition, the Policy identifies certain specified attraction properties, regardless of their distance from a Covered Property:

> Camden Yards, Baltimore, MD 21201
> MT&T Bank Stadium (Ravens), Baltimore, MD 21230
> Enterprise Center, St Louis, MO, 63103
> SunTrust Park, Atlanta, GA, 30339
> Little Caesars Arena, Detroit, MI, 48201
> Busch Stadium, St Louis, MO 63102
> Sprint Center, Kansas City, MO, 64106
> America's Convention Center Complex, St Louis, MO, 68101
> Churchill Downs, Louisville, KY 40206
> University of Louisville, Louisville, KY 40292
> Georgia International Convention Center, Atlanta, GA 30337

17

> Ford Field, Detroit, MI 48226
> Comerica Park (Detroit Tigers), Detroit, MI 48201
> Town Point Park, Norfolk, VA 23510
> AT&T Stadium, Arlington TX 76011
> Globe Life Park (Rangers Stadium), Arlington, TX 76011
> Arundel Mills Mall, Hanover, MD 21076
> BWI Airport and Rail Station, Hanover MD

Policy Declarations at 10-11 of 15.

69.   The Policy provides Civil Authority coverage as follows:

2.   Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a location provided such order is the direct result of physical damage of the type insured at a location or within five (5) statute miles of it.

Policy at 24 of 44.

70.   The Civil Authority coverage is subject to a sublimit of 60 days.   Policy Declarations at 4 of 15.

71.   The Policy provides "Supply Chain" coverage as follows:

16. Supply Chain

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory:

a)   Direct suppliers, direct customers or direct contract service providers to the Insured;

b)   Any company under any royalty, licensing fee or commission agreement with the Insured; or

c)   Any company that is a direct or indirect supplier, customer or contract service provider of those described in a) above.

\*                    \*                    \*

18

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions:

a) Civil or Military Authority ...

Policy at 31 of 44.

72.    The Supply Chain coverage is subject to a sublimit of $10,000,000 per "occurrence." Policy Declarations at 2, 4 of 15.

73.    The Policy defines "occurrence" to mean, in relevant part, "the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage . . . ." Policy at 43 of 44.

74.    The Policy's business interruption coverage also includes Rental Income and Extra Expense coverage, as noted above. *See* Policy at 21-22 of 44.

75.    The Policy's Rental Income coverage insures business interruption losses measured by the fair rental value of any portion of a property occupied by policyholder, income reasonably expected from the rentals of unoccupied or unrented portions of such property, and the rental income from the rented portions of such properties. Policy at 21 of 44.

76.    There are other coverages and coverage extensions in the Policy that provide coverage for losses at the Covered Properties, including business interruption losses.

77.    To date, Cordish has paid all premiums for the Policy and has satisfied all relevant and applicable obligations and conditions precedent to obtaining payments owed under the Policy, to the extent that such obligations and conditions have not been waived or abrogated by FM's conduct, omissions, actions or breaches.

19

**D.     The Policy Covers Business Interruption Losses at the Covered Properties**

78.     Viruses such as SARS-CoV-2 and communicable diseases such as COVID-19 are perils insured against under the Policy.  The Policy provides "all-risk" coverage and there is no exclusion for the losses caused by the risks or perils of pandemic, virus or communicable disease.

79.     FM did not exclude coverage for such perils when it sold Cordish the Policy, despite the common use of such exclusions in the insurance industry following the outbreaks of SARS, MERS, H1N1 and Zika.   FM cannot add any such exclusion or exclusionary interpretation now that the Covered Properties have suffered losses from the outbreak of SARS-CoV-2 and COVID-19.

80.     Far from excluding coverage for losses caused by virus, pandemic or communicable disease, the Policy actually includes coverage grants entitled "Communicable Disease – Property Damage" and "Communicable Disease – Business Interruption."

81.     The Attraction Property, Civil Authority, and Supply Chain business interruption coverage extensions, the Rental Income coverage, and other coverages in the Policy each independently provide Cordish with coverage for the business interruption losses sustained, and still being sustained, at the Covered Properties.

**i.     The Covered Properties Have Suffered Losses Covered Under the Attraction Property Coverage**

82.     The Covered Properties have suffered business interruption losses insured under the Policy's Attraction Property coverage.

83.     The Covered Properties have suffered business interruption losses directly resulting from physical loss or damage caused by SARS-CoV-2 and COVID-19 to real and

personal property that attracts business to Covered Properties and is within one mile of such Covered Properties.

84.     The Covered Properties have suffered business interruption losses directly resulting from physical loss or damage caused by SARS-CoV-2 and COVID-19 to the specific Attraction Properties listed in the Declarations section of the Policy.  Policy Declarations at 10-11 of 15.

85.     For example, SARS-CoV-2 and COVID-19 caused physical loss or damage at stadiums and similar venues that attract business to the sports and entertainment businesses like Texas Live!, Kansas City Live! and Ballpark Village.

86.     As another example, SARS-CoV-2 and COVID-19 caused physical loss or damage at the Arundel Mills Mall in Hanover, Maryland, which attracts business to the Live! Casino & Hotel adjacent to the Mall.

87.     The Covered Properties have suffered business interruption losses directly resulting from such physical loss or damage.

**ii.      The Covered Properties Have Suffered Losses Covered Under the Civil Authority Coverage**

88.     The Covered Properties have suffered business interruption losses insured under the Policy's Civil Authority coverage.

89.     The Covered Properties have suffered business interruption losses because, as a direct result of physical damage from SARS-CoV-2 and COVID-19 either at or within five miles of Covered Properties, the Orders have prohibited access to Covered Properties.

21

90.     For example, the ability of customers and potential customers to access and patronize Covered Properties has been prohibited by Orders that required Covered Properties to close.

91.     The Orders required all or part of the following Covered Properties to close:

| Name | Address | City | State |
|---|---|---|---|
| Live! Casino & Hotel | 7002 Arundel Mills Circle, Hanover, MD, 21076 | Hanover | MD |
| Texas Live! | 1650 E Randol Mill Road, Suite 100, 110, 120, 130, 140, 150 & 160, Arlington, TX, 76011 | Arlington | TX |
| Waterside District | 333 Waterside Drive, Norfolk, VA, 23510 | Norfolk | VA |
| Ballpark Village | 601, 655 Clark Ave and 329 South Broadway, Saint Louis, MO, 63102 | St Louis | MO |
| Fourth Street Live! | 411 and 446 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Power Plant Live! AND Spark Baltimore | 34 Market Place, 2-10 Market Place, 600-616 Water Street, 4-8 and 20-32 Market Place, 3 South Frederick, Baltimore, MD, 21202 | Baltimore | MD |
| Pier IV | 621 East Pratt Street, Baltimore, MD, 21202 | Baltimore | MD |
| Power Plant | 601 E Pratt Street Pier 4, Baltimore, MD, 21202 | Baltimore | MD |
| Bayou Place | 500 Texas Street & 315 Capitol Street, Houston, TX, 77002 | Houston | TX |
| Big Elk Mall | 100, 106, 108, 133-101, 161-137 Big Elk Mall, Elkton, MD, 21921 | Elkton | MD |

| Name | Address | City | State |
|---|---|---|---|
| Nylon Capital | 1004, 359-393, 900 West Stein Highway, 701-877 Sussex Avenue, 1000-1001 Atlanta Road, and 349-1085, 1087-1299 Tull Drive, Seaford, DE, 19973 | Seaford | DE |
| Bass Pro Outdoor World | 30 North Christopher Columbus Blvd., Atlantic City, NJ, 08401 | Atlantic City | NJ |
| Rehoboth Center | 18898-18914 Rehoboth Mall Blvd, Rehoboth Beach, DE, 19971 | Rehoboth Beach | DE |
| Power Plant Hampton Roads PBR - Hampton Roads | 1976 Power Plant Parkway, Hampton, VA, | Hampton | VA |
| Kent Landing | 110-200 Kent Landing, Stevensville, MD, 21666 | Stevensville | MD |
| North Carroll Plaza | 2320 - 2328 Hanover Pike, Hampstead, MD | Hampstead | MD |
| Northeast Plaza | 97, 108, 111, 116, 130, 510 North East Plaza, North East, MD, 21901 | North East | MD |
| Carroll Island Shopping Center | 115-168 Carroll Island Road, Middle River, MD, 21220 | Middle River | MD |
| Ballpark Village | 5 Cardinal Way, St. Louis, MO, 63102 | St. Louis | MO |
| Havre De Grace Plaza | 1000 - 1026 Pulaski Highway, Havre de Grace, MD, 21078 | Havre de Grace | MD |
| Riviera Plaza | 8471-83 Riviera Drive, Pasadena, MD, 21122 | Pasadena | MD |
| Joppatowne Plaza | 1002 Joppa Farm Rd, Joppa, MD, 21085-3604 | Joppa | MD |
| Sports & Social Club | 28 Henry Street, Detroit, MI, 48201 | Detroit | MI |
| Power Plant Hampton Roads | 1980 Power Plant Parkway, Hampton, VA, 23666 | Hampton | VA |

| Name | Address | City | State |
|---|---|---|---|
| Milford Landing | 941 North Dupont Boulevard, Milford, DE | Milford | DE |
| Ocean Landing | 11436 Samuel Bowen Boulevard, Berlin, MD, 21811 | Berlin | MD |
| Mike's Pizza Bar | 2515 Woodward Avenue, Detroit, MI, 48201 | Detroit | MI |
| Riverside on the James | 1001, 1101, 1201 Haxall Point, Richmond, VA, 23219 | Richmond | VA |
| Staples Building | 5835 York Road, Baltimore, MD, 21212 | Baltimore | MD |
| Walmart Building | 9750 Reisterstown Road, Owings Mills, MD, 21117 | Owings Mills | MD |
| Power Plant Hampton Roads | 2065 -2071 West Mercury Blvd., Hampton, VA, 23666 | Hampton | VA |
| Big Elk Mall | 259 South Bridge Street, Elkton, MD, 21921 | Elkton | MD |
| The Sports & Social Club | 427 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Havre De Grace Plaza | 1008 Pulaski Highway, Havre de Grace, MD, 21078 | Havre de Grace | MD |
| Power Plant Hampton Roads Lowe's | 2002 Powhatan Parkway, Hampton, VA, 23666-3152 | Hampton | VA |
| Tengo Sed Cantina / Marquee / Kill Devil Club | 432 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Birracibo | 445 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Power Plant Hampton Roads | 1990 Powhatan Pkwy, Hampton, VA, 23666 | Hampton | VA |

| Name | Address | City | State |
|---|---|---|---|
| Guy Fieri's Smokehouse | 434 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Tavern of Fourth | 427 B South Fourth Street, Louisville, KY, 40202 | Louisville | KY |
| Carroll Island Shopping Center | 112 Carroll Island Road, Middle River, MD, 21220 | Middle River | MD |
| Edgewater Village | 1875 Pulaski Highway, Edgewood, MD, 21040 | Edgewood | MD |
| Ocean Landing | 11416 Ocean Gateway, Berlin, MD, 21811 | Berlin | MD |
| Power Plant Hampton Roads BJ's | 2000 Powhatan Parkway, Hampton, VA, 23666 | Hampton | VA |
| Edgewater Village | 1919 Pulaski Highway, Edgewood, MD, 21040 | Edgewood | MD |
| Power Plant Hampton Roads | 1940 Power Plant Parkway, Hampton, VA, 23666 | Hampton | VA |
| Tollgate- Home Depot | Rtes 1 & 24 Tollgate Center, Bel Air, MD, 21014 | Bel Air | MD |
| Rainbow Square | 399 Rainbow Boulevard, Niagara Falls, NY, 14303 | Niagara Falls | NY |
| Riviera Plaza | 8483 Ft. Smallwood Rd., Pasadena, MD, 21122-2461 | Pasadena | MD |
| Carroll Island Shopping Center | 190 Carroll Island Rd Lot 24, Middle River, MD, 21220 | Middle River | MD |
| Edgewater Village | 1851 Pulaski Highway, Edgewood, MD, 21040 | Edgewood | MD |
| Carroll Island Shopping Center | 24 and 176 Carroll Island Road, Lot 22, Middle River, MD, 21220 | Middle River | MD |

| Name | Address | City | State |
|------|---------|------|-------|
| 4th Street Live | 4th Street between W Liberty St and W Muhammad Ali Blvd, Louisville, KY, 40202 | Louisville | KY |

92.     Such Orders were a direct result of physical damage from SARS-CoV-2 and COVID-19 either at or within five miles of Covered Properties.

93.     As another example, the ability of customers and potential customers to access patronize Covered Properties has been prohibited by Orders that required them to shelter in place or prohibited them from going to non-essential businesses.

94.     In this way, access to the following Covered Properties was prohibited under the Orders:

| Name | Address | City | State |
|------|---------|------|-------|
| Live! Casino & Hotel | 7002 Arundel Mills Circle, Hanover, MD, 21076 | Hanover | MD |
| Texas Live! | 1650 E Randol Mill Road, Suite 100, 110, 120, 130, 140, 150 & 160, Arlington, TX, 76011 | Arlington | TX |
| PWC Pennant Building | 6 Cardinal Way, Saint Louis, MO, 63102-2802 | St. Louis | MO |
| Waterside District | 333 Waterside Drive, Norfolk, VA, 23510 | Norfolk | VA |
| Ballpark Village | 601, 655 Clark Ave and 329 South Broadway, Saint Louis, MO, 63102 | St Louis | MO |
| Fourth Street Live! | 411 and 446 South 4th Street, Louisville, KY, 40202 | Louisville | KY |

| Name | Address | City | State |
|------|---------|------|-------|
| Power Plant Live! AND Spark Baltimore | 34 Market Place, 2-10 Market Place, 600-616 Water Street, 4-8 and 20-32 Market Place, 3 South Frederick, Baltimore, MD, 21202 | Baltimore | MD |
| Pier IV | 621 East Pratt Street, Baltimore, MD, 21202 | Baltimore | MD |
| Alamo Drafthouse Cinema | 1400 Main Street, Kansas City, MO, 64105 | Kansas City | MO |
| Power Plant | 601 E Pratt Street Pier 4, Baltimore, MD, 21202 | Baltimore | MD |
| Pier V Parking Garage | 711 East Pratt Street, Baltimore, MD, 21202 | Baltimore | MD |
| Bayou Place | 500 Texas Street & 315 Capitol Street, Houston, TX, 77002 | Houston | TX |
| Big Elk Mall | 100, 106, 108, 133-101, 161-137 Big Elk Mall, Elkton, MD, 21921 | Elkton | MD |
| Nylon Capital | 1004, 359-393, 900 West Stein Highway, 701-877 Sussex Avenue, 1000-1001 Atlanta Road, and 349-1085, 1087-1299 Tull Drive, Seaford, DE, 19973 | Seaford | DE |
| Kansas City Power and Light District | 1310-1382 Grand Boulevard; 100-170 East 14th Street; 1308-1374 Walnut Street; 101-181 East 13th Street, Kansas City, MO, 64105 | Kansas City | MO |
| Bass Pro Outdoor World | 30 North Christopher Columbus Blvd., Atlantic City, NJ, 08401 | Atlantic City | NJ |

| Name | Address | City | State |
|---|---|---|---|
| Rehoboth Center | 18898-18914 Rehoboth Mall Blvd, Rehoboth Beach, DE, 19971 | Rehoboth Beach | DE |
| Frederick Street Garage | 15 South Frederick Street, Baltimore, MD, 21202 | Baltimore | MD |
| Power Plant Hampton Roads<br>PBR - Hampton Roads | 1976 Power Plant Parkway, Hampton, VA, | Hampton | VA |
| Kent Landing | 110-200 Kent Landing, Stevensville, MD, 21666 | Stevensville | MD |
| North Carroll Plaza | 2320 - 2328 Hanover Pike, Hampstead, MD | Hampstead | MD |
| The Indie at Midland Theatre | 1228 Main Street, Kansas City, MO, 64105 | Kansas City | MO |
| Northeast Plaza | 97, 108, 111, 116, 130, 510 North East Plaza, North East, MD, 21901 | North East | MD |
| Carroll Island Shopping Center | 115-168 Carroll Island Road, Middle River, MD, 21220 | Middle River | MD |
| Kansas City Power and Light District | 1303-1355 Baltimore Avenue and 42-84, 1323-1361, 1370-1396 Main Street, Kansas City, MO, 64105 | Kansas City | MO |
| Ballpark Village | 5 Cardinal Way, St. Louis, MO, 63102 | St. Louis | MO |
| Havre De Grace Plaza | 1000 - 1026 Pulaski Highway, Havre de Grace, MD, 21078 | Havre de Grace | MD |
| Riviera Plaza | 8471-83 Riviera Drive, Pasadena, MD, 21122 | Pasadena | MD |

| Name | Address | City | State |
|---|---|---|---|
| Midland Apartments & Theatre | 1221 Baltimore Avenue, Kansas City, MO, 64105 | Kansas City | MO |
| Joppatowne Plaza | 1002 Joppa Farm Rd, Joppa, MD, 21085-3604 | Joppa | MD |
| Sports & Social Club | 28 Henry Street, Detroit, MI, 48201 | Detroit | MI |
| Kansas City Power and Light District | 101-354 East 14th Street, Kansas City, MO, 64106 | Kansas City | MO |
| Kansas City Power and Light District | 1350, 1360, 1370 Walnut Street, 1354 Main Street, and 14, 54, 74 East 14th Street, Kansas City, MO, 64105 | Kansas City | MO |
| Kansas City Power and Light District | 1350, 1360, 1370 Walnut Street, 1354 Main Street, and 14, 54, 74 East 14th Street, Kansas City, MO, 64105 | Kansas City | MO |
| Power Plant Hampton Roads | 1980 Power Plant Parkway, Hampton, VA, 23666 | Hampton | VA |
| Milford Landing | 941 North Dupont Boulevard, Milford, DE | Milford | DE |
| Ocean Landing | 11436 Samuel Bowen Boulevard, Berlin, MD, 21811 | Berlin | MD |
| Mike's Pizza Bar | 2515 Woodward Avenue, Detroit, MI, 48201 | Detroit | MI |
| Riverside on the James | 1001, 1101, 1201 Haxall Point, Richmond, VA, 23219 | Richmond | VA |
| Walmart Building | 9750 Reisterstown Road, Owings Mills, MD, 21117 | Owings Mills | MD |

29

| Name | Address | City | State |
|------|---------|------|-------|
| Kansas City Power and Light District McFadden's Sports Saloon | 1330 Grand Boulevard, Kansas City, MO, 64106-2907 | Kansas City | MO |
| Kansas City Power and Light District No Other Pub | 1370 Grand Boulevard, Kansas City, MO, 64106-2907 | Kansas City | MO |
| Power Plant Hampton Roads | 2065 -2071 West Mercury Blvd., Hampton, VA, 23666 | Hampton | VA |
| Big Elk Mall | 259 South Bridge Street, Elkton, MD, 21921 | Elkton | MD |
| The Sports & Social Club | 427 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Kansas City Power and Light District | 111 East 13th Street, Kansas City, MO, 64106-2923 | Kansas City | MO |
| Havre De Grace Plaza | 1008 Pulaski Highway, Havre de Grace, MD, 21078 | Havre de Grace | MD |
| Power Plant Hampton Roads Lowe's | 2002 Powhatan Parkway, Hampton, VA, 23666-3152 | Hampton | VA |
| Kansas City Power and Light District One Light Residential | 50-10 East 13th Street, 1201-1221 Main Street, 11-21 East 12th Street, Kansas City, MO, 64106 | Kansas City | MO |
| Tengo Sed Cantina / Marquee / Kill Devil Club | 432 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Kansas City Power and Light District Guy's Dive | 1333 Walnut Street, Kansas City, MO, 64106 | Kansas City | MO |

| Name | Address | City | State |
|---|---|---|---|
| Kansas City Power and Light District Shark Bar | 1340 Grand Boulevard, Kansas City, MO, 64106-2907 | Kansas City | MO |
| Kansas City Power and Light District Leinenkugel's Kansas City | 1323 Walnut Street, Kansas City, MO, 64106-2916 | Kansas City | MO |
| Kansas City Power and Light District The Gallery/Kill Devil Club | 61 & 31 East 14th Street, Kansas City, MO, 64106 | Kansas City | MO |
| Kansas City Power and Light District Pizza Bar | 1320 Grand Boulevard, Kansas City, MO, 64106-2907 | Kansas City | MO |
| Kansas City Power and Light District Living Room/Elements | Plaza between Main St and Walnut St & 13th St and 14th St / Plaza between Walnut St and Grand Blvd & 13th and 14th St, Kansas City, MO, 64105 | Kansas City | MO |
| Power Plant Hampton Roads | 1990 Powhatan Pkwy, Hampton, VA, 23666 | Hampton | VA |
| Guy Fieri's Smokehouse | 434 South 4th Street, Louisville, KY, 40202 | Louisville | KY |
| Tavern on Fourth | 427 B South Fourth Street, Louisville, KY, 40202 | Louisville | KY |
| Kansas City Power and Light District Mosaic Lounge | 1331 Walnut Street, Kansas City, MO, 64106-2916 | Kansas City | MO |
| Kansas City Power & Light District | 1228 Main Street, Kansas City, MO, 64105 | Kansas City | MO |

31

| Name | Address | City | State |
|---|---|---|---|
| Carroll Island Shopping Center | 112 Carroll Island Road, Middle River, MD, 21220 | Middle River | MD |
| Edgewater Village | 1875 Pulaski Highway, Edgewood, MD, 21040 | Edgewood | MD |
| Ocean Landing | 11416 Ocean Gateway, Berlin, MD, 21811 | Berlin | MD |
| Kansas City Power & Light District Flying Saucer | 101 E. 13th Street, Kansas City, MO, 64106 | Kansas City | MO |
| Kansas City Power & Light District | 1323 Grand Boulevard, Kansas City, MO, 64106 | Kansas City | MO |
| Power Plant Hampton Roads BJ's | 2000 Powhatan Parkway, Hampton, VA, 23666 | Hampton | VA |
| Edgewater Village | 1919 Pulaski Highway, Edgewood, MD, 21040 | Edgewood | MD |
| Power Plant Hampton Roads | 1940 Power Plant Parkway, Hampton, VA, 23666 | Hampton | VA |
| Tollgate- Home Depot | Rtes 1 & 24 Tollgate Center, Bel Air, MD, 21014 | Bel Air | MD |
| Kansas City Power & Light District The Pool at One Light / Bottle Rocket | 50 E 13th Street, Kansas City, MO, 64106 | Kansas City | MO |
| Rainbow Square | 399 Rainbow Boulevard, Niagara Falls, NY, 14303 | Niagara Falls | NY |
| Riviera Plaza | 8483 Ft. Smallwood Rd., Pasadena, MD, 21122-2461 | Pasadena | MD |

| Name | Address | City | State |
|---|---|---|---|
| Carroll Island Shopping Center | 190 Carroll Island Rd Lot 24, Middle River, MD, 21220 | Middle River | MD |
| Edgewater Village | 1851 Pulaski Highway, Edgewood, MD, 21040 | Edgewood | MD |
| Kansas City Power & Light District Garment District | 1350 Main Street, Kansas City, MO, 64106 | Kansas City | MO |
| Carroll Island Shopping Center | 24 and 176 Carroll Island Road, Lot 22, Middle River, MD, 21220 | Middle River | MD |
| 4th Street Live | 4th Street between W Liberty St and W Muhammad Ali Blvd, Louisville, KY, 40202 | Louisville | KY |
| Kansas City Power and Light District PBR Big Sky | 111 E 13th Street, Kansas City, MO, 64106 | Kansas City | MO |
| Joppatowne Plaza | 1000 and 1006-1016 Joppa Farm Rd., Joppa, MD, 21085 | Joppa | MD |

95.    Such Orders were a direct result of physical damage from SARS-CoV-2 and COVID-19 either at or within five miles of Covered Properties.

96.    The Covered Properties have incurred business interruption losses because the Orders prohibited access to the Covered Properties.

**iii.    The Covered Properties Have Suffered Losses Covered Under the Supply Chain Coverage**

97.    The Covered Properties have suffered business interruption losses insured under the Policy's Supply Chain coverage.

33

98.     There has been physical loss or damage of the type insured to property of the type insured at or within five miles of the premises of suppliers, contract service providers and/or customers.

99.     The Covered Properties have suffered business interruption losses because access to the property of suppliers, contract service providers and/or customers was prohibited by the Orders as a direct result of physical damage from SARS-CoV-2 and COVID-19 either at or within five miles of such suppliers, service providers or customers.

100.     For example, the stadiums and related sports franchises associated with the sports and entertainment businesses like Texas Live!, Kansas City Live! and Ballpark Village are critical suppliers and contract service providers for those Cordish Properties.

101.     The Covered Properties have contracts with the owners of many of those venues and franchises. For example, there are Covered Properties adjacent to the stadiums for the Major League Baseball franchises for the St. Louis Cardinals, Texas Rangers and Atlanta Braves, and there are leases and contracts by which the franchises provide the Covered Properties with an array of services, such as property leases, parking, and sponsorship, marketing, media and advertising services.

102.     In addition, such venues and franchises are the most indispensable suppliers to the sports and entertainment businesses, in that they supply the vast majority of the customers to those businesses.

103.     These venues and franchises are a critical part of the supply chain for the sports and entertainment businesses like Texas Live!, Kansas City Live! and Ballpark Village, as

illustrated by the fact that revenues at such Covered Properties typically are 15-20 times greater on home game days than on non home game days.

104.    The Orders required such suppliers' and contract service providers' properties to close, which resulted in significant business interruption losses at the Covered Properties that are covered under the Supply Chain coverage.

105.    The Covered Properties also have suffered business interruption losses because the ability of suppliers, contract service providers and/or customers to access the Covered Properties was prohibited by the Orders as a direct result of physical damage from SARS-CoV-2 and COVID-19 either at or within five miles of such suppliers, service providers or customers.

106.    The business interruption losses covered under the Supply Chain coverage arise out of or were caused by many discrete events of physical loss or damage that affected many different cities and counties all across the country and resulted in hundreds of orders of civil authority issued by state and local governments all across the country.

### iv.    The Covered Properties Have Suffered Losses Covered Under the Rental Income Coverage

107.    The Covered Properties have suffered business interruption losses insured under the Policy's Rental Income coverage.

108.    Upon information and belief, there has been direct physical loss or damage at all of the Covered Properties caused by SARS-CoV-2 or COVID-19.

109.    The Covered Properties have suffered business interruption losses as a result of the damage at nearly all of the Covered Properties and those losses are insured under the Policy and recoverable under the Rental Income coverage.

110.    The Covered Properties have suffered business interruption losses recoverable under the Rental Income coverage based on the loss of rental income due to physical loss or damage caused by SARS-CoV-2 and COVID-19 to Covered Properties that are rented to tenants.

111.    The Covered Properties have suffered business interruption losses recoverable under the Rental Income coverage based on the fair rental value of those portions of the Covered Properties that are occupied by policyholders and due to physical loss or damage caused by SARS-CoV-2 and COVID-19.

**E.      FM's Wrongful Denial of Cordish's Claim for Insurance Coverage**

112.    Cordish provided timely notice to FM that it was presenting a claim for coverage of its business interruption losses under the Policy.

113.    By letter dated April 22, 2020, Cordish provided additional information regarding the Covered Properties and the loss, based on the facts known at the time.

114.    By letter dated May 6, 2020, FM denied coverage, including under the Attraction Property, Civil Authority and Supply Chain Business Interruption Coverage Extensions in the Policy, even though FM acknowledged that "COVID-19 meets the Policy's definition of a 'communicable disease.'" Ex. 14.

115.    In denying coverage, FM contended that an exclusion in the Policy for "contamination, and any cost due to contamination" bars coverage for losses claimed under the Business Interruption Extensions of Coverage.

116.    In a letter dated May 15, 2020, Cordish advised FM that the "contamination" exclusion did not apply because: (1) the exclusions section of the Policy expressly states that the exclusions only apply "unless otherwise stated" in the Policy, and the Policy clearly covers

losses from communicable disease; and (2) the "Group III" exclusions where FM placed the "contamination" exclusion expressly do _not_ exclude losses "caused by or resulting from" contamination, as would have been the case if FM had placed the exclusion in "Group I", and the "Group III" exclusions only apply to specified conditions of property (e.g., "contamination," "shrinkage" or "changes in color") located at the Covered Properties, but not to losses resulting from "contamination" away from the Covered Properties. Ex. 15.

117.    In a letter dated June 1, 2020, FM responded to Cordish's May 15, 2020 letter and had absolutely no response to the first point in Cordish's May 15, 20202 letter – that the exclusions only apply "unless otherwise stated" – and even acknowledged _again_ that the Policy _does_ cover loss from communicable disease. Ex. 16.

118.    FM's June 1, 2020 letter also admitted the second point made in Cordish's May 15, 2020 letter – that the exclusion applies to "contamination" at the Covered Properties as opposed to away from the Covered Properties, stating: "the presence of COVID-19 _at an insured location_ is excluded." Ex. 16, at p. 2 (emphasis added).

119.    The "contamination" exclusion does not bar coverage for the Covered Properties under the Business Interruption Extensions of Coverage for losses caused by or resulting from SARS-CoV-2, COVID-19 or any communicable disease.

120.    The "contamination" exclusion relied upon by FM does not apply, _inter alia_, because coverage for direct physical loss or damage from the perils of SARS-CoV-2, COVID-19, or any communicable disease is otherwise stated in the Policy.

121.    The "contamination" exclusion also does not apply because Cordish is not seeking coverage for "cost due to contamination." To the contrary, the Covered Properties have

37

suffered, continue to suffer, and seek coverage for, "Business Interruption Coverage loss" covered under the Business Interruption Coverage Extensions and other provisions in the Policy.

122.   In denying coverage under the Business Interruption Coverage Extensions, FM contended that SARS-CoV-2 and COVID-19 do not cause "physical loss or damage of the type insured."

123.   FM's assertion that SARS-CoV-2 and COVID-19 do not cause "physical loss or damage or the type insured" is inconsistent with the terms of the Policy itself – which expressly provides coverage, *inter alia*, for "Communicable Disease – Property Damage."

124.   Furthermore, given that FM's Policy acknowledges that a computer virus can cause "physical loss or damage" via its impact on computer code, it is disingenuous in the extreme for FM to take the position that an organic, physical virus or communicable disease that turns property into a deadly hazard does not cause "physical loss or damage" as well.

125.   Upon information and belief, FM is taking coverage positions contrary to its own understanding of the nature of the loss and damage at issue based on FM's coordination with other insurance companies, insurance industry trade organizations, insurance industry claims adjusters and other intermediaries and agents.

126.   Upon information and belief, FM is coordinating its coverage position to align with other insurance companies and insurance industry trade organizations, rather than based on the terms of the Policy it sold to Cordish and FM's own understanding of the loss and damage at issue, as well as the coverage for such loss or damage under first party property insurance policies.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

127.    Cordish repeats and re-alleges the allegations set forth in paragraphs 1 through 126 as though fully set forth herein.

128.    The Policy constitutes a valid contract of insurance between Cordish and FM.

129.    Defendant FM sold the Policy to Cordish.

130.    Cordish paid all insurance premiums due under the Policy.

131.    Cordish has complied with all conditions and satisfied all obligations, to the extent that they have not been waived or abrogated by FM's conduct, omissions, actions or breaches.

132.    Cordish is entitled to the coverage benefits of the Policy.

133.    The Policy was in effect during time that the damage, Orders and business interruption losses at issue occurred.

134.    The Covered Properties have suffered business interruption losses, including in the form of loss of earnings, profits and rental income and by incurring extra expense, all of which are expressly covered in the Policy

135.    The Covered Properties have suffered business interruption losses that are covered under the terms of the Policy, including, *inter alia* the: (a) Attraction Property Coverage; (b) Civil Authority Coverage; and (c) Supply Chain Coverage.

136.    There is no exclusion, condition, definition or other provision in the Policy that excludes or eliminates coverage for the losses at the Covered Properties.

137.    Despite the fact that the Policy covers Cordish's Claim, Defendant FM wrongfully has denied coverage for the Claim and refused honor its contractual obligation to indemnify Cordish for its covered losses.

138.    An actual and justiciable controversy has arisen between Cordish and Defendant FM as to FM's obligation to indemnify Cordish for the actual losses sustained at the Covered Properties and covered under the Policy.

139.    By reason of the foregoing, an actual, substantial and justiciable controversy exists between Cordish and Defendant FM regarding the covered business interruption losses, and a judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights and duties.

140.    Cordish seeks a judicial declaration by the Court, pursuant to Maryland Code Ann., Cts. and Jud. Pro., § 3-409, that Defendant has a duty to indemnify Cordish under the Policy for the business interruption losses at the Covered Properties.

### SECOND CAUSE OF ACTION
(Breach of Contract)

141.    Cordish repeats and re-alleges the allegations set forth in paragraphs 1 through 140 as if fully set forth herein.

142.    The Policy constitutes a valid contract of insurance coverage between Cordish and Defendants.

143.    Defendant FM sold the Policy to Cordish.

144.    Cordish paid all insurance premiums due under the Policy.

145.    Cordish has complied with all conditions and satisfied all obligations to the extent that they have not been waived or abrogated by Defendant FM's conduct, omissions or actions.

146.    Cordish is entitled to the coverage benefits of the Policy.

147.    The Policy was in effect during time that the damage, Orders and business interruption losses at issue occurred.

148.    The Covered Properties have suffered business interruption losses, including in the form of loss of earnings, profits and rental income and by incurring extra expense, all of which is are expressly covered in the Policy

149.    The Covered Properties have suffered business interruption losses that are covered under the terms of the Policy, including, *inter alia* the: (a) Attraction Property coverage; (b) Civil Authority coverage; and (c) Supply Chain coverage.

150.    There is no exclusion, condition, definition or other provision in the Policy that excludes coverage for the losses at the Covered Properties.

151.    Under the Policy, FM is obligated to indemnify Cordish and pay for the losses sought in the Claim.

152.    Defendant FM has breached its contractual obligations under the Policy by wrongfully failing and refusing to cover the losses at the Covered Properties.

153.    As a direct and proximate result of Defendant FM's breach of its obligations under the Policy, the Covered Properties have sustained and continue to sustain substantial damages in an amount to be determined at trial.


**[ *REMAINDER OF PAGE INTENTIONALLY LEFT BLANK* ]**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cordish prays for judgment as follows:

A. Enter declaratory judgment on Count I in favor of Cordish and against Defendant FM as to the Policy language, including a declaration that Defendant FM has a duty to cover the losses at the Covered Properties; and

B. Enter judgment on Count II in favor of Cordish and against Defendant FM in an amount to be determined at trial for general and special damages, including without limitation economic and consequential damages, compensatory damages, punitive damages, and pre- and post-judgment interest;

C. Enter judgment on all Counts awarding Cordish fees and costs, including attorneys' fees, and

D. Enter such other relief as this Court may deem appropriate.

Dated:    July 7, 2020                        ANDERSON KILL L.L.P.

By:

Daniel J. Healy, Esq.
MD Bar No. 0512120010
ANDERSON KILL, LLP
1717 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006
Tel.:    (202) 416-6547
dhealy@andersonkill.com

Marshall Gilinsky, Esq.
Pamela D. Hans, Esq.
Maria Brinkmann, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Tel.:    (212) 278-1000
mgilinsky@andersonkill.com
phans@andersonkill.com
mbrinkmann@andersonkill.com

Attorneys for Plaintiff
*The Cordish Companies, Inc.*

42

43

IN THE CIRCUIT COURT FOR Baltimore City _____ 2020 JUL -9 PM 4:02
_____(City or County)

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

CIVIL DIVISION

### DIRECTIONS

*Plaintiff*: This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant*: You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

| | |
|---|---|
| **FORM FILED BY:** ☑PLAINTIFF ☐DEFENDANT | **CASE NUMBER** |
| | (Clerk to insert) |

**CASE NAME:** The Cordish Companies, Inc. _____ vs. Affiliated FM Insurance Company
Plaintiff                                                                   Defendant

**PARTY'S NAME:** The Cordish Companies, Inc. _____ **PHONE:** _____

**PARTY'S ADDRESS:** 601 East Pratt Street, 6th Floor, Baltimore, MD 21202

**PARTY'S E-MAIL:** c/o dhealy@andersonkill.com

**If represented by an attorney:**

**PARTY'S ATTORNEY'S NAME:** Daniel J. Healy _____ **PHONE:** 201-416-6547

**PARTY'S ATTORNEY'S ADDRESS:** 1717 Pennsylvania, Avenue, Suite 200 Washington, DC 20006 171

**PARTY'S ATTORNEY'S E-MAIL:** dhealy@andersonkill.com

**JURY DEMAND?** ☑Yes ☐No

**RELATED CASE PENDING?** ☐Yes ☑No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours    21    days

### PLEADING TYPE

**New Case:** ☑Original ☐Administrative Appeal ☐Appeal

**Existing Case:** ☐Post-Judgment ☐Amendment

*If filing in an existing case*, skip Case Category/ Subcategory section - go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.*)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint - DOB of Youngest Plt:
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

- ☐ Government
- ☑ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☐ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Workers' Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. - Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

**CC-DCM-002** (Rev. 04/2017)

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☑ Judgment-Interest | ☐ Return of Property |
| ☐ Administrative Action | ☐ Enrollment | ☑ Judgment-Summary | ☐ Sale of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☑ Liability | ☐ Specific Performance |
| ☐ Arbitration | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Asset Determination | ☐ Foreclosure | ☐ Order | ☐ Writ-Execution |
| ☐ Attachment b/f Judgment | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Cease & Desist Order | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Condemn Bldg | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☐ Contempt | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☑ Court Costs/Fees | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☑ Damages-Compensatory | ☑ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |
| ☑ Damages-Punitive | ☐ Judgment-Default | ☐ Reinstatement of Employment | |

*If you indicated **Liability** above*, mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.  ☐ Liability is not conceded, but is not seriously in dispute. ☑ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000      ☐ $10,000 - $30,000      ☐ $30,000 - $100,000      ☑ Over $100,000

☐ Medical Bills $_____      ☐ Wage Loss $_____      ☐ Property Damages $_____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101?  (Check all that apply)

A. Mediation        ☐ Yes   ☑ No        C. Settlement Conference   ☐ Yes   ☑ No
B. Arbitration      ☐ Yes   ☑ No        D. Neutral Evaluation      ☐ Yes   ☑ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*        ***(Case will be tracked accordingly)***

☐ 1/2 day of trial or less        ☐ 3 days of trial time

☐ 1 day of trial time             ☐ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

***For all jurisdictions**, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited**- Trial within 7 months of Defendant's response        ☐ **Standard** - Trial within 18 months of Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

❏ **Expedited** - Trial within 7 months of Defendant's response          ❏ **Standard** - Trial within 18 months of Defendant's response

### *IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | | |
|---|---|---|
| ❏ | Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ❏ | Civil-Short | Trial 210 days from first answer. |
| ❏ | Civil-Standard | Trial 360 days from first answer. |
| ☑ | Custom | Scheduling order entered by individual judge. |
| ❏ | Asbestos | Special scheduling order. |
| ❏ | Lead Paint | Fill in: Birth Date of youngest plaintiff _____ . |
| ❏ | Tax Sale Foreclosures | Special scheduling order. |
| ❏ | Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ❏ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ❏ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ❏ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ❏ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

July 7, 2020
_____
Date

1717 Pennsylvania Avenue NW, Suite 200
_____
Address

Washington           DC          20006
_____
City        State      Zip Code

_____
Signature of Counsel / Party

Daniel J. Healy
_____
Printed Name

# EXHIBIT 1



*Member of the FM Global Group*

270 Central Ave
Johnston, RI  02919
www.affiliatedfm.com

Thank you for placing your property insurance with AFM. We believe insurance should be straightforward and certain. That is why our proVision® 4100 policy is easy to read and navigate, while providing you broad coverage.

In addition to providing property insurance, AFM would like to help you protect your business and achieve your goals. In partnering with AFM, you have the strength of FM Global Group behind you, including a strong balance sheet and access to our market-leading loss prevention engineering products and services that are based on more than 180 years of experience as a property specialist. We are eager to work with you and your broker to choose how to best identify, prioritize and reduce future loss in a way that makes practical and affordable sense.

Our engineering services, combined with the comprehensive coverage of our proVision 4100, will give you peace of mind and allow you to focus on what matters most—making your business thrive. We are committed to maintaining a long-term, mutually beneficial relationship with you. And, it is our hope that you will take advantage of the many tools and resources we offer our clients, such as online training, onsite policy workshops and access to AFM Online, our powerful extranet that includes policy documents and data-driven risk management tools.

If you have any questions or concerns, please do not hesitate to contact your local account team.

Respectfully,

Gerardo L. Alonso
Senior Vice President, AFM

# Loss Reporting and Contact Information
# Los Angeles Operations



---

**Claims Manager:**

Jeffrey C. Casillas
Affiliated FM Insurance Company
6320 Canoga Avenue, Ste. 1100
Woodland Hills, CA 91367
Tel: 818 227-2250
Jeffrey.casillas@fmglobal.com

**Property Loss Reporting Procedure:**

To ensure that you receive prompt claims service, be sure to report a loss immediately. This enables us to provide you a professional property adjuster to examine your loss. Your loss may give rise to a claim under your Affiliated FM Insurance Company policy.

**Notice of Loss:**

The notice and report of any loss under an Affiliated FM Insurance Company policy should be communicated by calling the 24-hour claims hotline: **1-877-NEW-LOSS (1) 877 639 5677**

If this first notice and report is made orally, it should be confirmed in writing including at least the same information as was provided in the oral first notice and report.

**Leaving a Message:**

When leaving a message, please include the following information:

- Name and phone number of person to contact
- A brief description of the loss

A claims adjuster will return your call promptly.

---

**Account Engineer:**

Anisa Gillfillan
Affiliated FM Insurance Company
6320 Canoga Avenue, Ste. 1100
Woodland Hills, CA 91367
Tel: 818 227 2200 ext. 2278
Anisa.Gillfillan@affiliatedfm.com

**Jurisdictional Services:**

For more information on our jurisdictional inspections services, please contact the Account Engineer as listed above.

March 10, 2020

Rachel Taplin
Lockton Insurance Brokers, LLC
777 South Figueroa Street
Los Angeles, CA 90017

**RE:**    **The Cordish Companies, Inc.**
        **SS987-00**
        **New York Hazardous Materials Report Form**

Dear Rachel:

In accordance with section 3409 of the New York Insurance Code, Affiliated FM
Insurance Company is required to annually issue you, our broker, the enclosed Hazardous
Material Report form for reporting the presence of hazardous materials. You are required
to provide this form to the insured to be completed by them.

As someone doing business in New York, you should be familiar with the requirements
of New York General Municipal Law section 209-u. The Insured may be required to
complete and file the enclosed form with the Fire Chief of the fire department having
responsibility for fire protection of each New York location at which any hazardous
material may be found.

Please direct any questions or requests for additional information to your local Fire Chief.

Sincerely,

D. Harris-Anderson, ARM
Senior Account Administrator

Attachment: New York Hazardous Materials Report Form



NEW YORK STATE DEPARTMENT OF STATE
**OFFICE OF FIRE PREVENTION AND CONTROL**

## HAZARDOUS MATERIALS REPORT FORM
### (General Municipal Law, § 209-u)

The information entered herein is essential to your local fire chief for the protection of your employees, the fire-fighters and citizens in the immediate area, and to reduce damage to your property in the event of a fire or an emergency.

Every fire insurance policyholder, engaged in commerce in this state, is required by law to report the presence of hazardous materials at their business address.

Failure to file in accordance with the provisions of section 209-u of the General Municipal Law could result in a fine.

A separate report is required annually for each business address.

**WHEN COMPLETED, THIS FORM MUST BE SENT TO YOUR LOCAL FIRE DEPARTMENT.**

**Hazardous Materials Location\***

Firm Name _____    Street Add. Only _____

Bus. Add. _____    Bldg. Name or No. _____

City, State, Zip _____    City, State, Zip _____

Tel. No. _____    Policy Anniv. Date _____

Name
Emergency Contact _____    Bus. Tel. _____ Home Tel. _____

_____
(Signature and Title of Person Completing Form)

*It is suggested that a separate form be filled out for each building that contains hazardous materials.

## EXEMPTIONS

Requests for exemptions from this law must be made in writing, attached to this form, and filed annually with your local fire department not later than the anniversary date of your policy.

All exemptions approved shall expire on the next policy anniversary date.

Exemptions denied shall require that the insured file a completed hazardous materials report form within 15 days of denial.

## FOR FIRE DEPARTMENT USE ONLY

Exemptions:   Approved _____     Denied _____     Additional Information Needed _____

_____        _____
(Date)                                  (Signature of Fire Chief)

_____        _____
(Fire Department Name and Address)      (Print Name of Fire Chief)

New York State Department of State, Office of Fire Prevention and Control
DOS-0347 (12/02)

**V Hazardous Material Listing (attach additional sheets if necessary)**
Note: Definitions of symbols are on the second page of the instruction sheet.

| Identifying Symbol | Material Description & Proper Shipping Name | Total Amount | Identifying Symbol | Material Description & Proper Shipping Name | Total Amount |
|---|---|---|---|---|---|
| EXPLOSIVE / BLASTING AGENTS | | | NON-FLAMMABLE GAS | | |
| POISON GAS | | | OXIDIZER | | |
| POISON / IRRITANT | | | ORGANIC PEROXIDE | | |
| FLAMMABLE LIQUID | | | RADIOACTIVE | | |
| COMBUSTIBLE LIQUID | | | CORROSIVE | | |
| FLAMMABLE SOLID | | | DANGEROUS WHEN | | |
| FLAMMABLE GAS | | | ETIOLOGIC AGENTS BIOMEDICAL MATERIAL IN CASE OF DAMAGE OR LEAKAGE NOTIFY DIRECTOR CDC ATLANTA, GEORGIA 404/633-5313 | | |
| | | | | | |

**VI Special Considerations/Remarks:**

## Instructions for Hazardous Material Listing

**Identifying Symbol:** This area identifies different classes of hazardous material. Most material will fall within one of these classes. If a particular material falls within two or more classes, it should be listed in each applicable class.

Two additional boxes are provided for material that does not fall within any class. These boxes may also be used if additional space is needed to further identify previously listed categories.

Amounts to be reported are shown in Table 1 below.

NOTE:  SHIPPING AND PACKAGING LABELS MAY BE OF ASSISTANCE IN IDENTIFYING THE CLASS OF MATERIAL.

### Hazardous Material Description and Proper Shipping Name

This area is reserved for the description and name of any hazardous material within a given class. If there is more than one material within a certain class, at a given location, then the most prevalent or most common should be used (indicate "most common").

### Total Amount

List the total amount of reportable material within the given class. If the amounts vary from day to day, then the average amount should be listed.

| Identifying Symbol | Hazardous Material Description and Proper Shipping Name | Total Amount |
|---|---|---|
| FLAMMABLE LIQUID | Ethyl Chloride | 60 gals. |
| | (most common) | |
| | | |
| | | |

### Special Considerations/Remarks

This area is reserved for the policyholder and the fire chief for making any notes or comments they feel are pertinent. Several examples are listed below:

1. Building has a sprinkler system.
2. Adjacent building is a school.
3. Guard dogs are on the premises from 6:00 p.m. to 6:00 a.m.
4. Hazardous material amounts may vary greatly from day to day.
5. Poor water supply.
6. Access to the building is poor.
7. Flammable liquid is stored in the same building as oxidizer.

## Table 1

### Amounts to be Reported

1. Explosives and Blasting Agents - any amount
2. Poison Gas - any amount
3. Poison and Irritant - any amount
4. Flammable Liquid - over 5 gallons inside a building and over 10 gallons outside a building
5. Flammable Solid - any amount
6. Flammable Gas - over 2,000 cubic feet at normal temperature
7. Nonflammable Gas -  over 6,000 cubic feet at normal temperature

8. Oxidizer - over 50 pounds
9. Organic Peroxide - over 10 pounds
10. Combustible Liquid -  over 25 gallons inside a building and over 60 gallons outside a building
11. Radioactive Material - any amount
12. Corrosive Material - over 55 gallons
13. Dangerous When Wet Material - any amount
14. Etiologic Material - any amount

(OVER)

## Hazardous Material Definitions

The following definitions have been abstracted from the Code of Federal Regulations, Title 49- Transportation, Parts 100 to 199. Refer to the referenced sections for complete details.

NOTE: Rulemaking proposals are outstanding or are contemplated concerning some of these definitions.

**Hazardous Material** - Means a substance or material which has been determined by the Secretary of Transportation to be capable of posing an unreasonable risk to health, safety and property, when transported in commerce, and which has been so designated. (Sec. 171.8)

**Multiple Hazards** - A material meeting the definitions of more than one hazard class is classed according to the sequence given in Sec. 173.2.

| HAZARD CLASS | DEFINITIONS |
|---|---|
| EXPLOSIVES | **An Explosive** - Any chemical compound, mixture or device, the primary or common purpose of which is to function by explosion, i.e., with substantially instantaneous release of gas and heat, unless such compound, mixture or device is otherwise specifically classified in Parts 170-189. (Sec. 173.50) |
| CLASS A EXPLOSIVE | Detonating or otherwise of maximum hazard. The nine types of Class A explosives are defined in Sec. 173.53. |
| CLASS B EXPLOSIVE | In general, function by rapid combustion rather than detonation and include some explosive devices such as special fireworks, flash powders, etc. **Flammable hazard.** (Sec. 173.88) |
| CLASS C EXPLOSIVE | Certain types of manufactured articles containing Class A or Class B explosives, or both, as components but in restricted quantities, and certain types of fireworks. **Minimum hazard.** (Sec. 173.100) |
| BLASTING AGENTS | A material designed for blasting which has been tested in accordance with Sec. 173.114a(b) and found to be so insensitive that there is very little probability of accidental initiation to explosion or of transition from deflagration to detonation (Sec. 173.114a(a)) |
| COMBUSTIBLE LIQUID | Any liquid having a flash point above 100°F. and below 200°F. as determined by tests listed in Sec. 173.115(d). Exceptions to this are found in Sec. 173.115(b). |
| CORROSIVE MATERIAL | Any liquid or solid that causes visible destruction of human skin tissue or a liquid that has a severe corrosion rate on steel. See Sec. 173.240(a) and (b) for details. |
| FLAMMABLE LIQUID | Any liquid having a flash point below 100°F. as determined by tests listed in Sec. 173.115(d). Exceptions are listed in Sec. 173.115(a). |
| COMPRESSED GAS | **Compressed Gas** - Any material or mixture having in the container a pressure exceeding 40 psia at 70°F., or a pressure exceeding 104 psia at 130°F.; or any liquid flammable material having a vapor pressure exceeding 40 psia at 100°F. (Sec. 173.300(a)) |
| FLAMMABLE GAS | Any compressed gas meeting the requirements for lower flammability limit, flammability limit range, flame projection, or flame propagation criteria as specified in Sec. 173.300(b). |
| NONFLAMMABLE GAS | Any compressed gas other than a flammable compressed gas. |
| FLAMMABLE SOLID | Any solid material, other than an explosive, which is liable to cause fires through friction, retained heat from manufacturing or processing, or which can be ignited readily and when ignited burns so vigorously and persistently as to create a serious transportation hazard. (Sec. 173.150) |
| ORGANIC PEROXIDE | An organic compound containing the bivalent -0-0 structure and which may be considered a derivative of hydrogen peroxide where one or more of the hydrogen atoms have been replaced by organic radicals must be classed as an organic peroxide unless... (See Sec. 173.151(a) for details) |
| OXIDIZER | A substance such as chlorate, permanganate, inorganic peroxide, or a nitrate, that yields oxygen readily to stimulate the combustion of organic matter. (See Sec. 173.151) |
| POISON A (Poison Gas) | **Extremely Dangerous Poisons** - Poisonous gases or liquids of such nature that a very small amount of the gas, or vapor of the liquid, mixed with air is **dangerous to man.** (Sec. 173.326) |
| POISON B (Poison) | **Less Dangerous Poisons** - Substances, liquids, or solids (including pastes and semi-solids), other than Class A or Irritating materials, which are known to be so toxic to man as to afford a hazard to health during transportation; or which, in the absence of adequate data on human toxicity, are presumed to be **toxic to man.** (Sec. 173.343) |
| IRRITATING MATERIAL | A liquid or solid substance which upon contact with fire or when exposed to air gives off dangerous or intensely irritating fumes, but **not including any poisonous material, Class A.** (Sec. 173.381) |
| ETIOLOGIC AGENT | An "etiologic agent" means a viable micro-organism, or its toxin which causes or may cause human disease. (Sec. 173.386) (Refer to the Department of Health, Education and Welfare Regulations, Title 42, CFR, Sec. 72.25(c) for details.) |
| RADIOACTIVE MATERIAL | Any material, or combination of materials, that spontaneously emits ionizing radiation, and having a specific activity greater than 0.002 microcuries per gram. (Sec. 173.389) **NOTE:** See Sec. 173.389(a) through (1) for details. |
| WATER REACTIVE MATERIAL (SOLID) | Means any solid substance (including sludges and pastes) which, by interaction with water, is likely to become spontaneously flammable or to give off flammable or toxic gases in dangerous quantities. |



Member of the FM Global Group

**Multistate**
**RATE AND FORM FILING EXEMPTION NOTICE**

The following states require Affiliated FM Insurance Company to notify insureds that you may be receiving rates and forms that are not on file with the state Department of Insurance:

Georgia
Kentucky
Michigan
Missouri
Nebraska
Pennsylvania
South Dakota
Washington

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks.

If you have any questions or concerns, please contact your production underwriter at:

AFFILIATED FM INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*



*Member of the FM Global Group*

**Multistate**
**RATE AND FORM FILING EXEMPTION NOTICE**

The following states require Affiliated FM Insurance Company to notify insureds that you may be receiving rates and forms that are not on file with the state Department of Insurance:

Georgia
Kentucky
Michigan
Missouri
Nebraska
Pennsylvania
South Dakota
Washington

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks.

If you have any questions or concerns, please contact your production underwriter at:

AFFILIATED FM INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*



*Member of the FM Global Group*

**Multistate**
**RATE AND FORM FILING EXEMPTION NOTICE**

The following states require Affiliated FM Insurance Company to notify insureds that you may be receiving rates and forms that are not on file with the state Department of Insurance:

Georgia
Kentucky
Michigan
Missouri
Nebraska
Pennsylvania
South Dakota
Washington

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks.

If you have any questions or concerns, please contact your production underwriter at:

AFFILIATED FM INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*

AFM 7548 (01/20)                                                                 Page 1 of 1



Member of the FM Global Group

**Multistate**
**RATE AND FORM FILING EXEMPTION NOTICE**

The following states require Affiliated FM Insurance Company to notify insureds that you may be receiving rates and forms that are not on file with the state Department of Insurance:

Georgia
Kentucky
Michigan
Missouri
Nebraska
Pennsylvania
South Dakota
Washington

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks.

If you have any questions or concerns, please contact your production underwriter at:

AFFILIATED FM INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*



Member of the FM Global Group

## Multistate
## COMPLAINT NOTICE

The following states require Affiliated FM Insurance Company to notify insureds that should you have an inquiry or complaint about insurance in one of these states, you may contact your Insurance Company or the State Department of Insurance as listed below:

<u>Insurance Company</u>

AFFILIATED FM INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

<u>State Department of Insurance</u>

Arkansas Insurance Department
Consumer Service Division
1200 West Third Street
Little Rock, Arkansas 72201
1-800-252-5494 or (501) 371-2640
E-mail: Insurance.Consumers@Arkansas.gov

Texas Department of Insurance
MC 111-1A, P.O. Box 149091
Austin, TX 78714-9091
1-800-252-3439
http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.texas.gov

Illinois Department of Insurance
Consumer Affairs and Information
320 West Washington Street
Springfield, Illinois 62767-0001
1-866-445-5364
E-mail: consumer_complaints@ins.state.il.us
https://mc.insurance.illinois.gov/messagecenter.nsf

Virginia Bureau of Insurance
PO Box 1157
Richmond, VA 23218
1-877-310-6560 or 1-800-371-9185
www.scc.virginia.gov/boi

Indiana Department of Insurance
Consumer Services Division
311 West Washington Street, Suite 300
Indianapolis, Indiana 46204-2787
1-800-622-4461 or (317) 232-2385
www.in.gov/idoi

Wisconsin Office of the Commissioner
of Insurance
125 South Webster Street
PO Box 7873
Madison, WI 53707-7873
1-800-236-8517
(608) 266-0103 in Madison

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*

AFM 4028 (01/20)                                                                                      Page 1 of 1



Member of the FM Global Group

**Multistate**
**COMPLAINT NOTICE**

The following states require Affiliated FM Insurance Company to notify insureds that should you have an inquiry or complaint about insurance in one of these states, you may contact your Insurance Company or the State Department of Insurance as listed below:

<u>Insurance Company</u>

AFFILIATED FM INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

<u>State Department of Insurance</u>

Arkansas Insurance Department
Consumer Service Division
1200 West Third Street
Little Rock, Arkansas 72201
1-800-252-5494 or (501) 371-2640
E-mail: Insurance.Consumers@Arkansas.gov

Texas Department of Insurance
MC 111-1A, P.O. Box 149091
Austin, TX 78714-9091
1-800-252-3439
http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.texas.gov

Illinois Department of Insurance
Consumer Affairs and Information
320 West Washington Street
Springfield, Illinois 62767-0001
1-866-445-5364
E-mail: consumer_complaints@ins.state.il.us
https://mc.insurance.illinois.gov/messagecenter.nsf

Virginia Bureau of Insurance
PO Box 1157
Richmond, VA 23218
1-877-310-6560 or 1-800-371-9185
www.scc.virginia.gov/boi

Indiana Department of Insurance
Consumer Services Division
311 West Washington Street, Suite 300
Indianapolis, Indiana 46204-2787
1-800-622-4461 or (317) 232-2385
www.in.gov/idoi

Wisconsin Office of the Commissioner
of Insurance
125 South Webster Street
PO Box 7873
Madison, WI 53707-7873
1-800-236-8517
(608) 266-0103 in Madison

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*

AFM 4028 (01/20)





Affiliated FM Insurance Company
P.O Box 7500
Johnston, RI 02919

## DECLARATIONS PAGE

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| SS987 | SS611 | 10-Mar-2020 |
| **Account No.** | | |
| 1-57156 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and the premium charged, Affiliated FM Insurance Company, hereinafter referred to as the "Company", does insure:

> **INSURED:**
>
> The Cordish Companies, Inc.
> 601 East Pratt Street, 6th Floor
> Baltimore, MD  21202
>
>
> (For Complete Title See Policy)

The term of this Policy is from the **28th day of February 2020 to the 28th day of February 2021 at 12:01a.m.,** Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in Woodland Hills, California this 10th day of March 2020.

New York Fire Fee = $1.49

_____
Authorized Signature
MPB/dha

_____
Secretary

_____
President

PRO DEC 4100 (04/15)
© 2017 AFM. All rights reserved.

# DECLARATIONS

**A.** **POLICY TERM:**

28-February-2020 to 28-February-2021

**B.** **NAMED INSURED:**

The Cordish Companies, Inc., and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds.

**C.** **POLICY LIMIT:**

This Company's total limit of liability, including any insured Business Interruption loss, will not exceed the Policy Limit of $1,000,000,000 as a result of any one **occurrence** subject to the respective sub-limits of liability shown elsewhere in this Policy.

**D.** **POLICY TERRITORY:**

Coverage provided by this Policy is limited to property while located within the United States of America except as follows:

**Cyber Coverage Territory**

Coverage provided in Data Restoration; Data Service Provider Property Damage and Business Interruption and Owned Network Interruption is limited to anywhere in the world except Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

**Worldwide Unnamed Property Coverage Territory**

Coverage provided in ADDITIONAL COVERAGES, Unnamed Property is amended to read:

This Policy covers insured property, excluding property while in transit, anywhere in the world except in the following countries, provinces or jurisdictions:

Afghanistan; Albania; Algeria; Angola; Armenia; Azerbaijan; Bangladesh; Belarus; Belize; Benin; Bhutan; Botswana; Burkina Faso; Burundi; Cambodia; Cameroon; Central African Republic; Chad; Cote D'Ivoire; Cuba; Democratic Republic of the Congo; Djibouti; Egypt; Equatorial Guinea; Eritrea; Ethiopia; Fiji; Gabon; Gambia; Georgia; Ghana; Grenada; Guinea; Guinea-Bissau; Guyana; Haiti; Honduras; Jammu and Kashmir in India; Iran; Iraq; Israel; Gaza Strip, West Bank and territories north of Latitude 32.80 N in Israel; Kenya; Laos; Lebanon; Lesotho; Liberia; Libya; Madagascar; Malawi; Mali; Mauritania; Mauritius; Moldova; Mongolia; Montenegro; Montserrat; Mozambique; Myanmar; Namibia; Nepal; Niger; Nigeria; North Korea; Pakistan; Papua New Guinea; Aksai Chin and Trans-Karakoram Tract in People's Republic of China; Republic of the Congo; Chechen Republic of the Russian Federation; Rwanda; Senegal; Seychelles; Sierra Leone; Somalia; Sri Lanka; South Sudan; Sudan; Swaziland; Syria; Tajikistan; Tanzania; Timor-Leste; Togo; Agri, Batman, Bingol, Bitlis, Diyarbakir, Elazig, Hakkari, Igdir, Mardin, Mus, Sanliurfa, Siirt, Sirnak and Van in Turkey; Turkmenistan; Uganda; Ukraine; Crimea Region of Ukraine; Uzbekistan; Venezuela; Yemen; Zambia; and Zimbabwe.

**E.** **INSURANCE PROVIDED:**

1.  This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as follows:

    See Attached Location Schedule I.

PRO S-1 4100 (01/17)
Affiliated FM Policy No. SS987

© *2019 AFM. All rights reserved.*

# DECLARATIONS

2.  This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, not to exceed the limits of liability specified for the coverages indicated, while located as follows:

    See Attached Location Schedule II.


## F.  **SUB-LIMITS:**

Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, will be the maximum payable and will apply on a per **occurrence** basis.

The sub-limits stated below or elsewhere in this Policy are part of and not in addition to the Policy Limit.

When a limit of liability applies to a **location** or property, such limit of liability will be the maximum amount payable for all loss or damage.

If the same coverage(s) apply under separate endorsements below, the single largest sub-limit will be the maximum payable and will apply on a per **occurrence** basis.

There shall be no liability under this Policy when "NOT COVERED" is shown as a sublimit.

1.  $50,000,000  Earth Movement **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Earth Movement, not to exceed:

    $2,500,000  Earth Movement **annual aggregate** as respects Data Service Provider, Errors and Omissions, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined.

2.  $50,000,000  Flood **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Flood, not to exceed:

    $15,000,000  Flood **annual aggregate** for all coverages provided at the following **location**(s):

    5. 333 Waterside Drive, Norfolk, VA, 23510


    $10,000,000  Flood **annual aggregate** for all coverages provided at the following **location**(s):

    17. 30 North Christopher Columbus Blvd., Atlantic City, NJ, 08401

    $10,000,000  Flood **annual aggregate** for all coverages provided at the following **location**(s):

    46. 1001, 1101, 1201 Haxall Point, Richmond, VA, 23219

    $10,000,000  Flood **annual aggregate** for all coverages provided at the following **location**(s):

    8.  34 Market Place, 2-10 Market Place, 600-616 Water Street, 4-8 and 20-32 Market Place, 3 South Frederick, Baltimore, MD, 21202
    9.  621 East Pratt Street, Baltimore, MD, 21202
    11. 601 E Pratt Street Pier 4, Baltimore, MD, 21202
    12. 711 East Pratt Street, Baltimore, MD, 21202


    $5,100,000  Flood **annual aggregate** for all coverages provided at the following **location**(s):

    13. 500 Texas Street & 315 Capitol Street, Houston, TX, 77002

© 2019 AFM. All rights reserved.

# DECLARATIONS

| | | |
|---|---|---|
| | $2,500,000 | Flood **annual aggregate** for all coverages provided at the following **location**(s): |
| | | 24. 15 South Frederick Street, Baltimore, MD, 21202 |
| | $2,500,000 | Flood **annual aggregate** as respects Data Service Provider, Errors and Omissions, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined. |
| 3. | $1,000,000 | Worldwide Unnamed Property |
| 4. | $100,000 | Prizes and Giveaways |
| 5. | $50,000 | **Cyber event annual aggregate** as respects Data Restoration and Owned Network Interruption combined. |
| 6. | $50,000 | **Cyber event annual aggregate** for loss or damage to **stock in process** or finished goods manufactured by or for the Insured caused by or resulting from **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on. |

## Additional Coverages

| | |
|---|---|
| $50,000,000 | Accounts Receivable |
| $100,000 | Arson or Theft Reward |
| Policy Limit | Brand Protection |
| $5,000,000 | Change of Temperature |
| $500,000 | Communicable Disease - Property Damage **annual aggregate** |
| $500,000 | Data Restoration **annual aggregate** |
| $50,000 | Data Service Provider - Property Damage **annual aggregate** |
| Policy Limit | Debris Removal |
| Policy Limit | Decontamination Costs |
| $100,000 | Deferred Payment |
| Policy Limit | Demolition and Increased Cost of Construction |
| $25,000,000 | Errors and Omissions |
| $25,000,000 | Expediting Expenses |
| $50,000,000 | **Fine Arts** not to exceed $10,000 per item for **irreplaceable Fine Arts** |
| $50,000 | Green Coverage not to exceed 25% of the amount of the property damage loss |
| $1,000,000 | Land and Water Clean Up Expense **annual aggregate** |
| $1,000,000 | Locks and Keys |
| $2,500,000 | Money and Securities |
| $25,000,000 | Newly Acquired Property |
| $10,000,000 | Off-Premises Service Interruption - Property Damage |
| $500,000 | Professional Fees |
| Policy Limit | Property Removed from a Location |
| Policy Limit | Protection and Preservation of Property - Property Damage not to exceed $250,000 for security costs |
| $500,000 | Tax Treatment |
| $500,000 | Tenants Legal Liability |
| | Terrorism Coverage and the Supplemental United States Certified Act of Terrorism Endorsement |
| $1,000,000,000 | A.   United States Certified Act of Terrorism coverage |
| $100,000 | B.   Terrorism Coverage for Locations Outside of the United States **annual aggregate** not to exceed $100,000 **annual aggregate** for Property Removed from a Location, Unnamed Property and Flood |
| $5,000,000 | Transit not to exceed $250,000 for Business Interruption |
| $5,000,000 | Unnamed Property |
| $50,000,000 | **Valuable Papers and Records** not to exceed $10,000 per item for **irreplaceable Valuable Papers and Records** |

© *2019 AFM. All rights reserved.*

# DECLARATIONS

## Business Interruption Coverage

| | |
|---|---|
| Policy Limit | Gross Earnings not to exceed 90 days for **ordinary payroll** |
| Policy Limit | Gross Profits for 12 months Period of Liability not to exceed 90 days for **ordinary payroll** |
| Policy Limit | Rental Income |
| $25,000,000 | Extra Expense |

## Business Interruption Coverage Extensions

| | |
|---|---|
| $1,000,000,000 | Attraction Property |
| 60 Days | Civil or Military Authority |
| $500,000 | Communicable Disease - Business Interruption **annual aggregate** for a 12 Month Period of Liability |
| $100,000 | Contractual Penalties |
| $1,000,000,000 | Crisis Management not to exceed 30 Days |
| $50,000 | Data Service Provider - Business Interruption **annual aggregate** |
| 365 Days | Extended Period of Liability |
| $25,000,000 | Ingress/Egress |
| $10,000,000 | Leasehold Interest |
| $1,000,000 | Logistics Extra Cost |
| Included in OPSI-PD Limit | Off-Premises Service Interruption - Business Interruption |
| Included in **Cyber Event** Limit | Owned Network Interruption **annual aggregate** |
| Policy Limit | Protection and Preservation of Property - Business Interruption |
| Policy Limit | Research and Development |
| $5,000,000 | Soft Costs |
| $10,000,000 | Supply Chain |

## Real Estate Endorsement

| | |
|---|---|
| $2,500,000 | Contingent Real Property |
| $1,000,000 | Emergency Evacuation Expense |
| $1,000,000 | Innkeeper's Liability not to exceed $10,000 per Hotel Guest |
| $2,500,000 | Tenant Relocation Expense |

## Retail Endorsement

| | |
|---|---|
| $50,000 | Removal and Restocking Expenses |
| $100,000 | Spoilage |

## G.  DEDUCTIBLE AMOUNT:

This Company will not be liable for loss or damage, including any insured Business Interruption loss, in any one **occurrence** until the amount of loss or damage exceeds the deductible amount shown below and then this Company will only be liable for its share of the loss or damage in excess of the deductible amount.  If two or more deductibles apply to a single **occurrence**, then no more than the largest deductible amount will apply.  However, this Policy allows for the application of separate and distinct deductibles and deductibles for specific loss or damage as shown below.

The following deductible amounts shall apply per **occurrence**, unless otherwise stated, for insured loss or damage under this Policy:

# DECLARATIONS

1. Earthquake (per **location** for all coverages provided)

   A. $50,000 at all **locations**

   Except:

   B. $100,000 at the following **location**(s):

   4.  6 Cardinal Way, Saint Louis, MO, 63102-2802
   6.  601, 655 Clark Ave and 329 South Broadway, Saint Louis, MO, 63102
   32. 5 Cardinal Way, St. Louis, MO, 63102
   73. 620 Market Street, Saint Louis, MO, 63101
   88. 800 Market Street, Saint Louis, MO, 63101

2. Flood (per **location** for all coverages provided).

   A. $50,000 for all **locations**

   Except:

   B. $100,000 for Business Interruption at the following **location**(s):

   5.  333 Waterside Drive, Norfolk, VA, 23510
   13. 500 Texas Street & 315 Capitol Street, Houston, TX, 77002

   C. $500,000 for the following **locations**:

   8.  34 Market Place, 2-10 Market Place, 600-616 Water Street, 4-8 and 20-32 Market Place, 3 South Frederick, Baltimore, MD, 21202
   9.  621 East Pratt Street, Baltimore, MD, 21202
   11. 601 E Pratt Street Pier 4, Baltimore, MD, 21202
   12. 711 East Pratt Street, Baltimore, MD, 21202
   17. 30 North Christopher Columbus Blvd., Atlantic City, NJ, 08401
   24. 15 South Frederick Street, Baltimore, MD, 21202
   46. 1001, 1101, 1201 Haxall Point, Richmond, VA, 23219

3. Wind and/or Hail (per **location** for all coverages provided in this policy):

   A. $25,000 at the following **locations**:

   5.  333 Waterside Drive, Norfolk, VA, 23510
   15. 1004, 359-393, 900 West Stein Highway, 701-877 Sussex Avenue, 1000-1001 Atlanta Road, and 349-1085, 1087-1299 Tull Drive, Seaford, DE, 19973
   17. 30 North Christopher Columbus Blvd., Atlantic City, NJ, 08401
   23. 18898-18914 Rehoboth Mall Blvd, Rehoboth Beach, DE, 19971
   44. 11436 Samuel Bowen Boulevard, Berlin, MD, 21811
   76. 11416 Ocean Gateway, Berlin, MD, 21811
   91. 901 North Sea Colony East, Bethany Beach, DE, 19930

# DECLARATIONS

B. At the following states;

Georgia, Missouri, Texas

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 1% of the combined value of the property and annual business interruption value that would have been earned at the time such loss or damage at the **location** where loss or damage occurs plus that proportion of the 100% business interruption value at all other **locations** where business interruption loss ensues, in accordance with the valuation and business interruption sections of this policy, subject to a minimum deductible amount of $100,000 per **location**. If coverage is provided for more than one **location**, this deductible percentage or minimum deductible amount will be applied separately to each **location**.

Except:

C. At the following **locations**:

13. 500 Texas Street & 315 Capitol Street, Houston, TX, 77002

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 3% of the combined value of the property and annual business interruption value that would have been earned at the time such loss or damage at the **location** where loss or damage occurs plus that proportion of the 100% business interruption value at all other **locations** where business interruption loss ensues, in accordance with the valuation and business interruption sections of this policy, subject to a minimum deductible amount of $100,000 per **location**. If coverage is provided for more than one **location**, this deductible percentage or minimum deductible amount will be applied separately to each **location**.

4. Boiler and Machinery:

A. Property Damage: $10,000

B. Business Interruption Average Daily Value:

The business interruption deductible will be determined by multiplying the one hundred percent average daily value (ADV) by 1.

The ADV will be calculated by dividing the sum of the 100% actual annual business interruption values that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where Business Interruption loss ensues by the number of annual working days.

5. Communicable Disease Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless access is limited, restricted or prohibited in excess of 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A. Property Damage: $10,000

B. Business Interruption Day Equivalent Deductible:

# DECLARATIONS

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

6.  Data Restoration:

Qualifying Period: 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.  Property Damage: $10,000

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

7.  Data Service Provider - Property Damage and Business Interruption:

Qualifying Period: 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.  Property Damage: $10,000

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

8.  Off Premises Service Interruption Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless the Period of Liability exceeds 24 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to the deductible(s) that would have applied to the cause of the interruption of services, but not less than:

A.  Property Damage: $10,000

# DECLARATIONS

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 1.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

9.  Owned Network Interruption:

Qualifying Period: 48 hours.

The Qualifying Period for the cost to temporarily protect under Item 4. b) shall be waived.

Should this time be exceeded, the insured loss will be calculated beginning from the time of loss subject to a Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the loss happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

| | | |
|---|---|---|
| 10. | $2,500 | Golf Carts |
| 11. | $1,000 | Prizes and Giveaways |
| 12. | $10,000 | All Other Losses. |

## H.  <u>SPECIAL TERMS AND CONDITIONS:</u>

1.  <u>United States Certified Act of Terrorism - PRO 207 (01/20)</u>

As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that a **Certified Act of Terrorism** under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this Policy shall be considered **terrorism** within the terms of this Policy. Notwithstanding anything contained in this Policy to the contrary, this Policy provides coverage for direct physical loss or damage to insured property and any resulting BUSINESS INTERRUPTION loss, as provided in the Policy, caused by or resulting from a **Certified Act of Terrorism** only to the extent coverage is provided under the terms and conditions of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT and this Policy is not recoverable under this Policy.

*© 2019 AFM. All rights reserved.*

# DECLARATIONS

2. **Notice of Cancellation/Non-Renewal - PRO 53 (4/15)**

The time required by the Company for mailing or delivering notice of cancellation or non-renewal of this Policy to the First Named Insured as shown in GENERAL CONDITIONS, CANCELLATION/NON-RENEWAL, is extended from 60 days to 90, except the notice for non-payment of premium remains at ten (10) days.

3. **Application of Flood and Wind and/or Hail Deductibles**

If an occurrence involves loss or damage caused by or resulting from both:

**a. Wind** and/or hail; and

**b. Flood;**

Then:

1) A specific wind and/or hail deductible; and

2) A specific **flood** deductible;

Will apply separately to each location.

Such loss or damage will be adjusted separately and will be subject to its respective deductible.

4. **Combined Off-Premises Service Interruption Limit (OPSI)**

The Company's total liability for Off-Premises Service Interruption - Property Damage and Off-Premises Service Interruption - Business Interruption combined will not exceed $10,000,000 as a result of one occurrence and replaces the corresponding limits of liability shown in the sublimit section.

5. **Prizes and Giveaways - PRO 152 (4/15)**

This Policy covers motor vehicles and watercraft that are prizes and giveaways, in the Insured's fund raising activities or events, while anywhere within this Policy's Territory.

6. **Actual Cash Value Valuation - PRO 18 (4/15)**

LOSS ADJUSTMENT AND SETTLEMENT, VALUATION, item 1. is amended to:

1) Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

  a) The **actual cash value**;

  b) The cost to repair;

  c) The cost to rebuild or replace on the same site with new materials of like size, kind and quality;

# DECLARATIONS

**d)** The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

Applying to the following **described location(s)**:

15. 1004, 359-393, 900 West Stein Highway, 701-877 Sussex Avenue, 1000-1001 Atlanta Road, and 349-1085, 1087-1299 Tull Drive, Seaford, DE, 19973

7. **National Flood Insurance Program**

LOSS ADJUSTMENT AND SETTLEMENT, OTHER INSURANCE is amended by the addition of the following:

This Policy shall respond as excess over those terms and conditions concurrent with the Standard Flood Insurance Policy issued to the Insured, its renewal or replacement thereof.

It is agreed that the Insured will purchase flood insurance from the National Flood Insurance Program and will maintain the maximum amount of available flood insurance for building and contents under the National Flood Insurance Program for the following.

Locations

5. 333 Waterside Drive, Norfolk, VA, 23510
13. 500 Texas Street & 315 Capitol Street, Houston, TX, 77002

If for any reason the National Flood Insurance Program Standard Flood Insurance Policy should not be in force at the time of loss, this Policy will respond as if the terms and conditions of the Standard Flood Insurance policy were in force and the maximum amount of available flood insurance for building and contents coverage had been purchased from the National Flood Insurance Program.

8. **Specific Earth Movement Exclusion - PRO 126 (4/15)**

ADDITIONAL COVERAGES, **Earth Movement** does not apply to any property in the following state(s):

California, Hawaii, Alaska, Puerto Rico, Oregon, Washington

9. **Attraction Property**

This policy is extended to cover business interruption as a direct result of physical loss or damage of the type insured by this policy to property of the type not excluded by this policy at a business that attracts business to a described location and is within 1,000 feet of the described location. In addition, this coverage will extend to the following named locations:

Camden Yards, 333 West Camden Street, Baltimore, MD 21201
MT&T Bank Stadium (Ravens), 1101 Russell Street, Baltimore, MD 21230
Enterprise Center, 1401 Clark Avenue, St Louis, MO, 63103
SunTrust Park, 755 Battery Avenue, SE, Atlanta, GA, 30339
Little Caesars Arena, 2645 Woodward Avenue, Detroit, MI, 48201
Busch Stadium, 700 Clark Avenue, St Louis, MO 63102
Sprint Center, 1407 Grand Boulevard, Kansas City, MO, 64106
America's Convention Center Complex, 701 Convention Plaza, St Louis, MO, 68101
Churchill Downs, 700 Central Avenue, Louisville, KY 40206

# DECLARATIONS

University of Louisville, 2301 South 3rd Street, Louisville, KY 40292
Georgia International Convention Center, 2000 Convention Center Concourse, Atlanta, GA 30337
Ford Field, 2000 Brush Street, Detroit, MI 48226
Comerica Park (Detroit Tigers), 2100 Woodward Avenue, Detroit, MI 48201
Town Point Park, Norfolk, VA 23510
AT&T Stadium, 1 AT&T Way, Arlington TX 76011
Globe Life Park (Rangers Stadium), 1000 Ballpark Way, Arlington, TX 76011
Arundel Mills Mall, 7000 Arundel Mills Cir, Hanover, MD 21076
BWI Airport and Rail Station, Hanover MD

Loss sustained by the Insured resulting from wind and/or hail, flood and/or earth movement, whether or not such coverage is provided elsewhere in this policy, is not covered.

Such loss or damage will be adjusted separately and will be subject to its respective deductible.

The Period of Liability for this Business Interruption Extension will be:

a) The period of time starting at the time of physical loss or damage, but not to exceed 30 consecutive days.

© 2019 AFM. All rights reserved.

# DECLARATIONS

## I.  **INDEX OF FORMS:**

The following forms are made part of this Policy:

| Title | Form No. | Edition |
|---|---|---|
| Declarations Page | PRO DEC 4100 | (04/15) |
| Declarations | PRO S-1 4100 | (01/17) |
| All Risk Coverage | PRO AR 4100 | (01/17) |
| Real Estate Endorsement | PRO RE CRP 4100 | (01/17) |
| Retail Endorsement | PRO RT 4100 | (01/17) |
| Cyber Event Endorsement | PRO CYBER EVENT 4100 | (06/19) |
| Cyber Optimal Recovery Endorsement | PRO CYBER OPTIMAL 4100 | (01/17) |
| Supplemental United States Certified Act of Terrorism Endorsement | 7312 | (01/20) |
| Georgia State Amendatory Endorsement | AFM 2376 | (11/19) |
| Kentucky Amendatory Endorsement | AFM 6504 | (04/15) |
| Maryland Amendatory Endorsement | AFM 6498 | (04/15) |
| Michigan Amendatory Endorsement | AFM 6730 | (04/15) |
| Missouri Amendatory Endorsement | AFM 6447 | (01/17) |
| New Jersey Mandatory Endorsement | AFM 6261 | (04/15) |
| New York Amendatory Endorsement | AFM 6497 | (04/15) |
| Texas Special Mandatory Endorsement | AFM 6810 | (04/15) |
| Virginia Amendatory Endorsement | AFM 6512 | (04/15) |

# Location Schedule I

**Location Schedule**
1. 7002 Arundel Mills Circle, Hanover, MD, 21076, Index No. 000229.40
2. 1401 Walnut Street, Kansas City, MO, 64106, Index No. 069630.78
3. 1650 E Randol Mill Road, Suite 100, 110, 120, 130, 140, 150 & 160, Arlington, TX, 76011, Index No. 074755.77
4. 6 Cardinal Way, Saint Louis, MO, 63102-2802, Index No. 003682.09
5. 333 Waterside Drive, Norfolk, VA, 23510, Index No. 045025.26
6. 601, 655 Clark Ave and 329 South Broadway, Saint Louis, MO, 63102, Index No. 002849.69
7. 411 and 446 South 4th Street, Louisville, KY, 40202, Index No. 054619.52
8. 34 Market Place, 2-10 Market Place, 600-616 Water Street, 4-8 and 20-32 Market Place, 3 South Frederick, Baltimore, MD, 21202, Index No. 002582.20
9. 621 East Pratt Street, Baltimore, MD, 21202, Index No. 043160.30
10. 1400 Main Street, Kansas City, MO, 64105, Index No. 069630.78
11. 601 E Pratt Street Pier 4, Baltimore, MD, 21202, Index No. 043160.30
12. 711 East Pratt Street, Baltimore, MD, 21202, Index No. 003282.53
13. 500 Texas Street & 315 Capitol Street, Houston, TX, 77002, Index No. 000017.97
14. 100, 106, 108, 133-101, 161-137 Big Elk Mall, Elkton, MD, 21921, Index No. 043004.09
15. 1004, 359-393, 900 West Stein Highway, 701-877 Sussex Avenue, 1000-1001 Atlanta Road, and 349-1085, 1087-1299 Tull Drive, Seaford, DE, 19973, Index No. 042269.46
16. 1310-1382 Grand Boulevard; 100-170 East 14th Street; 1308-1374 Walnut Street; 101-181 East 13th Street, Kansas City, MO, 64105, Index No. 069630.78
17. 30 North Christopher Columbus Blvd., Atlantic City, NJ, 08401, Index No. 003282.61
18. 711 Washington Avenue, Chestertown, MD, 21620, Index No. 043016.14
19. 1901 - 1815 Pulaski Highway, Edgewood, MD, 21040, Index No. 043204.24
20. 825 Battery Ave SE, Atlanta, GA, 30339, Index No. 003287.33
21. 1972 - 1974 Power Plant Parkway, Hampton, VA, 23666, Index No. 003282.63
23. 18898-18914 Rehoboth Mall Blvd, Rehoboth Beach, DE, 19971, Index No. 042273.19
24. 15 South Frederick Street, Baltimore, MD, 21202, Index No. 002582.20
25. 1976 Power Plant Parkway, Hampton, VA, 23666
26. 110-200 Kent Landing, Stevensville, MD, 21666, Index No. 043568.81
27. 2320 - 2328 Hanover Pike, Hampstead, MD, 21074, Index No. 003282.54
28. 1228 Main Street, Kansas City, MO, 64105, Index No. 069630.78
29. 97, 108, 111, 116, 130, 510 North East Plaza, North East, MD, 21901, Index No. 043003.81
30. 115-168 Carroll Island Road, Middle River, MD, 21220, Index No. 043099.76
31. 1303-1355 Baltimore Avenue and 42-84, 1323-1361, 1370-1396 Main Street, Kansas City, MO, 64105, Index No. 069630.78
32. 5 Cardinal Way, St. Louis, MO, 63102, Index No. 003682.09
33. 1000 - 1026 Pulaski Highway, Havre de Grace, MD, 21078, Index No. 001310.71
34. 11-71 East 14th Street, Kansas City, MO, 64106-2918, Index No. 069630.78
35. 8471-83 Riviera Drive, Pasadena, MD, 21122, Index No. 002582.24
36. 1221 Baltimore Avenue, Kansas City, MO, 64105, Index No. 069630.78
37. 1002 Joppa Farm Rd, Joppa, MD, 21085-3604, Index No. 043235.61
38. 28 Henry Street, Detroit, MI, 48201, Index No. 003437.75
39. 101-354 East 14th Street, Kansas City, MO, 64106, Index No. 069630.78
40. 1350, 1360, 1370 Walnut Street, 1354 Main Street, and 14, 54, 74 East 14th Street, Kansas City, MO, 64105, Index No. 069630.78
41. 425 South 5th Street, Louisville, KY, 40202, Index No. 054619.52
42. 1980 Power Plant Parkway, Hampton, VA, 23666, Index No. 003282.63
43. 941 North Dupont Boulevard, Milford, DE, 19963
44. 11436 Samuel Bowen Boulevard, Berlin, MD, 21811
45. 2515 Woodward Avenue, Detroit, MI, 48201
46. 1001, 1101, 1201 Haxall Point, Richmond, VA, 23219
47. 7270 Park Circle Drive, Hanover, MD, 21076, Index No. 043377.66
48. 5835 York Road, Baltimore, MD, 21212, Index No. 043065.03
49. 9750 Reisterstown Road, Owings Mills, MD, 21117
50. 1330 Grand Boulevard, Kansas City, MO, 64106-2907, Index No. 069630.78

PRO S-1 4100 (01/17)
Affiliated FM Policy No. SS987

© 2019 AFM. All rights reserved.

## Location Schedule I

51. 1370 Grand Boulevard, Kansas City, MO, 64106-2907, Index No. 069630.78
52. 2065 -2071 West Mercury Blvd., Hampton, VA, 23666, Index No. 003282.63
53. 259 South Bridge Street, Elkton, MD, 21921
54. 427 South 4th Street, Louisville, KY, 40202, Index No. 054619.52
55. 111 East 13th Street, Kansas City, MO, 64106-2923, Index No. 069630.78
56. 1008 Pulaski Highway, Havre de Grace, MD, 21078, Index No. 001310.71
57. 1444 Grand Boulevard, Kansas City, MO, 64106
58. 2002 Powhatan Parkway, Hampton, VA, 23666-3152, Index No. 003282.63
59. 50-10 East 13th Street, 1201-1221 Main Street, 11-21 East 12th Street, Kansas City, MO, 64106, Index No. 069630.78
60. 432 South 4th Street, Louisville, KY, 40202, Index No. 054619.52
61. 1333 Walnut Street, Kansas City, MO, 64106
62. 1340 Grand Boulevard, Kansas City, MO, 64106-2907, Index No. 069630.78
63. 1323 Walnut Street, Kansas City, MO, 64106-2916, Index No. 069630.78
64. 445 South 4th Street, Louisville, KY, 40202, Index No. 054619.52
65. 61 & 31 East 14th Street, Kansas City, MO, 64106, Index No. 069630.78
66. 1320 Grand Boulevard, Kansas City, MO, 64106-2907, Index No. 069630.78
67. Plaza between Main St and Walnut St & 13th St and 14th St / Plaza between Walnut St and Grand Blvd & 13th and 14th St, Kansas City, MO, 64105
68. 1990 Powhatan Pkwy, Hampton, VA, 23666, Index No. 003282.63
69. 434 South 4th Street, Louisville, KY, 40202, Index No. 054619.52
70. 427 B South Fourth Street, Louisville, KY, 40202, Index No. 054619.52
71. 1331 Walnut Street, Kansas City, MO, 64106-2916, Index No. 069630.78
72. 1228 Main Street, Kansas City, MO, 64105
73. 620 Market Street, Saint Louis, MO, 63101
74. 112 Carroll Island Road, Middle River, MD, 21220, Index No. 043099.76
75. 1875 Pulaski Highway, Edgewood, MD, 21040, Index No. 043204.24
76. 11416 Ocean Gateway, Berlin, MD, 21811
77. 101 E. 13th Street, Kansas City, MO, 64106
78. 1323 Grand Boulevard, Kansas City, MO, 64106
79. 2000 Powhatan Parkway, Hampton, VA, 23666, Index No. 003282.63
80. 1919 Pulaski Highway, Edgewood, MD, 21040, Index No. 043204.24
81. 1100 Walnut Street Suite 3000, Kansas City, MO, 64106-2254, Index No. 069630.78
82. 1940 Power Plant Parkway, Hampton, VA, 23666, Index No. 003282.63
83. Rtes 1 & 24 Tollgate Center, Bel Air, MD, 21014
84. 749 Benfield Boulevard, Severna Park, MD, 21146
85. 50 E 13th Street, Kansas City, MO, 64106
86. 6730 Santa Barbara Court Suite H-K, Elkridge, MD, 21075
87. 399 Rainbow Boulevard, Niagara Falls, NY, 14303
88. 800 Market Street, Saint Louis, MO, 63101
89. 8483 Ft. Smallwood Rd., Pasadena, MD, 21122-2461
90. 190 Carroll Island Rd Lot 24, Middle River, MD, 21220, Index No. 043099.76
91. 901 North Sea Colony East, Bethany Beach, DE, 19930
92. 1851 Pulaski Highway, Edgewood, MD, 21040, Index No. 043204.24
93. 1350 Main Street, Kansas City, MO, 64106, Index No. 069630.78
94. 24 and 176 Carroll Island Road, Lot 22, Middle River, MD, 21220, Index No. 043099.76
95. 106 Carroll Island Road, Middle River, MD, 21220, Index No. 043099.76
96. 4th Street between W Liberty St and W Muhammad Ali Blvd, Louisville, KY, 40202
97. 111 E 13th Street, Kansas City, MO, 64106

# Location Schedule II

| Location Schedule | Limits of Liability |
|---|---|
| 22. 1000 and 1006-1016 Joppa Farm Rd., Joppa, MD, 21085, Index No. 043235.61 | |
| | |
| Real Property | $12,700,000 |
| Personal Property | $25,000 |
| Rental Income | $1,282,600 |





# ALL RISK COVERAGE

## Table of Contents

**PROPERTY INSURED**................................................................................................................1

   Real Property.............................................................................................................................1

   Personal Property ......................................................................................................................1

**PROPERTY EXCLUDED**...........................................................................................................1

**EXCLUSIONS**...............................................................................................................................2

   Group I .......................................................................................................................................2

   Group II......................................................................................................................................3

   Group III.....................................................................................................................................4

**ADDITIONAL COVERAGES** ...................................................................................................5

   Accounts Receivable ................................................................................................................5

   Arson or Theft Reward..............................................................................................................5

   Brand Protection........................................................................................................................6

   Change of Temperature ............................................................................................................6

   Communicable Disease – Property Damage ............................................................................6

   Data, Programs or Software ......................................................................................................7

   Debris Removal .........................................................................................................................8

   Decontamination Costs.............................................................................................................8

   Deferred Payment......................................................................................................................8

   Demolition and Increased Cost of Construction......................................................................9

   Earth Movement......................................................................................................................10

   Errors and Omissions .............................................................................................................10

   Expediting Expenses ...............................................................................................................10

   Fine Arts and Valuable Papers and Records ..........................................................................11

   Flood .......................................................................................................................................11

   Green Coverage.......................................................................................................................11

   Land and Water Clean Up Expense........................................................................................12

   Locks and Keys ......................................................................................................................12

   Money and Securities .............................................................................................................12

   Newly Acquired Property........................................................................................................12



*proVision*

Off-Premises Data Services – Property Damage.................................................................13

Off-Premises Service Interruption – Property Damage ....................................................13

Professional Fees ..................................................................................................................13

Property Removed from a Location ...................................................................................14

Protection and Preservation of Property – Property Damage ..........................................14

Tax Treatment .....................................................................................................................14

Tenants Legal Liability ........................................................................................................15

Terrorism...............................................................................................................................15

Transit ...................................................................................................................................16

Unnamed Property ...............................................................................................................18

**BUSINESS INTERRUPTION** ......................................................................................... 19

Loss Insured ..........................................................................................................................19

Business Interruption Coverage ..........................................................................................20

    Gross Earnings .................................................................................................................20

    Gross Profits .....................................................................................................................20

    Rental Income ..................................................................................................................21

    Extra Expense ..................................................................................................................22

    BI Select ...........................................................................................................................22

Period of Liability ................................................................................................................22

Business Interruption Exclusions .......................................................................................23

**BUSINESS INTERRUPTION COVERAGE EXTENSIONS** .......................................... 24

Attraction Property ..............................................................................................................24

Civil or Military Authority ..................................................................................................24

Communicable Disease – Business Interruption................................................................ 24

Computer Systems Non-Physical Damage .........................................................................25

Contractual Penalties ...........................................................................................................25

Crisis Management ...............................................................................................................26

Extended Period of Liability ...............................................................................................26

Ingress/Egress.......................................................................................................................27

Leasehold Interest ................................................................................................................27

Logistics Extra Cost .............................................................................................................27

Off-Premises Data Services – Business Interruption.........................................................28

Off-Premises Service Interruption – Business Interruption..............................................29

Protection and Preservation of Property – Business Interruption ...................................30

Research and Development ...................................................................................................30



_proVision_

Soft Costs ............................................................................................................ 30

Supply Chain ...................................................................................................... 30

**LOSS ADJUSTMENT AND SETTLEMENT** ........................................... 32

    Abandonment ................................................................................................. 32

    Appraisal ......................................................................................................... 32

    Collection From Others ................................................................................. 32

    Company Option ............................................................................................ 32

    Currency for Loss Payment ........................................................................... 32

    Legal Action Against this Company .............................................................. 33

    Loss Adjustment and Payable ...................................................................... 33

    Other Insurance ............................................................................................. 33

    Requirements in Case of Loss ....................................................................... 33

    Settlement of Claims ..................................................................................... 34

    Subrogation .................................................................................................... 35

    Valuation ........................................................................................................ 35

**GENERAL CONDITIONS** ..................................................................... 37

    Application of Policy to Date or Time Recognition ...................................... 37

    Cancellation/Non-Renewal ........................................................................... 37

    Conformity to Statute ................................................................................... 37

    First Named Insured ..................................................................................... 37

    Increase in Hazard ........................................................................................ 38

    Inspections ..................................................................................................... 38

    Liberalization Clause .................................................................................... 38

    Misrepresentation and Fraud ....................................................................... 38

    Mortgagee/Lenders Loss Payable ................................................................ 38

    Policy Modification ....................................................................................... 40

    Reinstatement of Limits after a Loss ........................................................... 40

    Suspension ..................................................................................................... 40

    Transfer or Rights and Duties under this Policy .......................................... 40

**DEFINITIONS** ....................................................................................... 41

_© 2017 AFM. All rights reserved._

 

# ALL RISK COVERAGE

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## A. PROPERTY INSURED

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, at or within 1,000 feet of a **described location,** to the extent of the interest of the Insured in such property.

1. Real Property in which the Insured has an insurable interest.

2. Personal Property:

   a) Owned by the Insured.

   b) Consisting of improvements and betterments in which the Insured has an insurable interest.

   c) Of directors, officers and employees of the Insured.

   d) Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   e) Of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to such Personal Property.

   This Company may defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage to such Personal Property. This Company may, without prejudice, investigate, negotiate and settle any claim or suit as this Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction, while at or within 1,000 feet of a **described location,** to the extent that the Insured has agreed, prior to loss, to keep such interest insured for insured physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and will not extend to any Business Interruption coverage provided in this Policy.

## B. PROPERTY EXCLUDED

This Policy excludes the following except as otherwise stated in this Policy:

1. Land, water or any substance in or on land.

2. Growing crops, standing timber or animals.

3. Bridges and tunnels intended for use by motor vehicles licensed for highway use.

4. Reservoirs, canals, dikes or dams.

5. Docks, piers or wharves which are not a structural part of a building.

6. Currency, money, notes or securities, except as provided by the Money and Securities coverage in this Policy.

7. Motor vehicles licensed for highway use or owned by directors, officers or employees of the Insured.

 

8. Satellites, aircraft or watercraft, except if on land, unfueled and manufactured by the Insured.

9. Property sold by the Insured under conditional sale, trust agreement, installment payment or other deferred payment plan after delivery to the customer, except as provided by the Deferred Payment coverage in this Policy.

10. Underground mines or mine shafts or any property within such mine or shaft.

11. Property while in transit, except as otherwise provided in this Policy.

12. Electronic data, programs or software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured or as provided by the Data, Programs or Software coverage in this Policy.

13. Property while located **offshore**, except as provided by the Transit coverage in this Policy.

## C. <u>EXCLUSIONS</u>

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

**GROUP I:** This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss or damage:

1. Nuclear reaction or nuclear radiation or radioactive contamination. However:

   a) If physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b) This Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the **location**. This coverage does not apply to any act, loss or damage excluded in Group I Item 2f of this Exclusions clause.

   This exclusion Group I Item 1 and the exceptions in Group I Item 1a and Group I Item 1b above do not apply to any act, loss or damage which also comes within the terms of exclusion Group I Item 2b of this Exclusions clause.

2. a) Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

      i) Government or sovereign power (de jure or de facto);

      ii) Military, naval or air forces; or

      iii) Agent or authority of any party specified in i) or ii) above.

   b) Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

   c) Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

   d) Seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

   e) Risks of contraband, or illegal transportation or trade.





**f) Terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the Terrorism coverage of this Policy. However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to insured property. This coverage exception for such resulting fire loss or damage does not apply to:

**i)** Direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

**ii)** Any coverage provided in the Business Interruption section of this Policy or to any other coverages provided by this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2a of this Exclusions clause then Group I Item 2a applies in place of this Group I Item 2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2b of this Exclusions clause then Group I Item 2b applies in place of this Group I Item 2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2c of this Exclusions clause then Group I Item 2c applies in place of this Group I Item 2f exclusion.

If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this Group I Item 2f exclusion applies in place of Group I Item 1 of this Exclusions clause.

**3.** Any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time by:

**a)** An Insured or any proprietor, partner, director, trustee, officer or employee of an Insured; or

**b)** Any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in Group I Item 2f of this Exclusions clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

**4.** Lack of incoming electricity, fuel, water, gas, steam or refrigerant; outgoing sewerage; or incoming or outgoing voice, data or video; all when caused by an event off the **location**, except as provided by the Off-Premises Data Services and Off-Premises Service Interruption coverages in this Policy. If the lack of such a service directly causes insured physical damage at the **location**, then only that resulting damage is insured.

**5. Earth movement**, except as otherwise provided in this Policy.

**6. Flood,** except as otherwise provided in this Policy.

**7.** Seepage or influx of water from natural underground sources.

**GROUP II:** This Policy excludes the following, however, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

 

1.  Wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice or latent defect.

2.  Faulty workmanship, material, construction or design.

3.  Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested or otherwise worked on.

4.  Loss or damage caused by or resulting from:

    a)  Changes of temperature, except damage to machinery or equipment including fire protective equipment;

    b)  Changes in relative humidity,

    All whether atmospheric or not, except as provided by the Change of Temperature and Off-Premises Service Interruption coverages in this Policy.

5.  Settling, cracking, shrinking, bulging or expansion of:

    a)  Foundations.

    b)  Walls.

    c)  Floors.

    d)  Pavements or roadways.

    e)  Roofs.

    f)  Ceilings.

6.  Loss or damage to personal property in the open from rain, sleet, snow, sand or dust.

7.  Theft of precious metal or stones, except when such property is used by the Insured for industrial purposes.

8.  Insect, animal or vermin damage.

**GROUP III:** This Policy excludes:

1.  Indirect or remote loss or damage.

2.  Interruption of business, except to the extent provided in this Policy.

3.  Loss of market or loss of use.

4.  Loss or damage or deterioration arising from any delay.

5.  Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6.  Loss from enforcement of any law or ordinance:

    a)  Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    b)  Requiring the demolition of any property, including the cost in removing its debris;

 

Except as provided by the Decontamination Costs and Demolition and Increased Cost of Construction coverages in this Policy.

7. Loss or damage resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

8. **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

9. Shrinkage, evaporation or loss of weight, unless directly resulting from other physical damage not excluded by this Policy.

10. Changes in color, flavor, texture or finish, unless directly resulting from other physical damage not excluded by this Policy.

## D. <u>ADDITIONAL COVERAGES</u>

The Additional Coverages below are subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

### 1. Accounts Receivable

This Policy covers amounts which the Insured is unable to collect as a direct result of insured physical loss or damage to accounts receivable records at a **location**.

Coverage includes:

a) Interest charges on any loan to offset impaired collections pending repayment of sums that cannot be collected. Unearned interest charges and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted.

b) Collection expenses in excess of normal collection costs.

c) Other reasonable expenses incurred by the Insured in recreating records of accounts receivable.

After payment of loss by this Company, all amounts recovered by the Insured on accounts receivable for which the Insured has been indemnified will belong to and be paid to this Company by the Insured up to the total amount of loss paid by this Company. All recoveries in excess of such amounts will belong to the Insured.

Accounts Receivable Exclusions: As respects Accounts Receivable, the following additional exclusions apply:

This Policy does not cover shortage resulting from:

a) Bookkeeping, accounting, or billing error or omission.

b) Alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property.





## 2. Arson or Theft Reward

This Policy covers payment of any reward offered by the Insured or on the Insured's behalf for information that leads to conviction of the perpetrator(s) of insured:

**a)**   Arson to; or

**b)**   Theft of;

Insured property.

## 3. Brand Protection

This Policy gives control of physically damaged property consisting of finished goods or merchandise manufactured by or for the Insured as follows:

**a)**   The Insured will have full rights to the possession and control of damaged property in the event of insured physical loss or damage to such property provided proper testing is done to show which property is physically damaged.

**b)**   The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

Physically damaged property judged by the Insured to be:

**i)**   Unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

**ii)**   Fit for reprocessing or selling and this Company elects to take all or any part of physically damaged branded and labeled property, the Insured may at this Company's expense:

(a)      Stamp "salvage" on the property or its containers; or

(b)      Remove or obliterate the brands or labels,

If doing so will not damage the property.

The Insured must relabel the property or containers in compliance with the applicable requirements of law.

**c)**   Any salvage proceeds received will go to the:

**i)**   Company at the time of loss settlement; or

**ii)**   Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

## 4. Change of Temperature

This Policy covers spoilage of insured stock and supplies due to:

**a)**   Changes of temperature or changes in relative humidity,

Directly resulting from the interruption, in whole or part, of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at a **location**.

 

## 5. Communicable Disease – Property Damage

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a) Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Property Damage Exclusions: As respects Communicable Disease – Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 6. Data, Programs or Software

This Policy covers insured **physical loss or damage to electronic data, programs or software**, including physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this Policy's Territory, including while in transit.

This coverage includes:

a) The cost of the following reasonable and necessary actions taken by the Insured due to actual insured **physical loss or damage to electronic data, programs or software**:

   i) To temporarily protect and preserve insured electronic data, programs or software.

   ii) For the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   iii) To expedite the permanent repair or replacement of such damaged property.

b) The reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**. In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when they are **stock in process**, finished goods manufactured by the Insured, **raw materials**, supplies or other merchandise not manufactured by the Insured.

 

Data, Programs or Software Exclusions: As respects Data, Programs or Software, the following additional exclusion applies:

This Policy excludes the following but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

**a)** Errors or omissions in processing or copying.

**b)** Loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

Data, Programs or Software Valuation: On property insured under this coverage, the loss amount will not exceed:

**a)** The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer; or

**b)** The blank value of the media if not repaired, replaced or restored within two years from the date of loss.

## 7. Debris Removal

This Policy covers the reasonable and necessary costs incurred to remove debris from a **location** that remains as the direct result of insured physical loss or damage.

This coverage does not cover the costs of removing:

**a)** Contaminated uninsured property; or

**b)** The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

This coverage includes the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

## 8. Decontamination Costs

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing:

**a)** Contaminated uninsured property; or

**b)** The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.





### 9. Deferred Payment

This Policy covers the Insured's interest in personal property of the type insured that has been sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan, if such property sustains physical loss or damage insured by this Policy and only to the extent the Insured is unable to collect the unpaid balance of such interest.

This coverage applies from the time the property is delivered to the buyer until the Insured's interest in it has ceased or the policy terminates or expires, whichever is first.

Deferred Payment Exclusion: As respects Deferred Payment, the following additional exclusion applies:

This Policy excludes:

**a)** Theft or conversion by the buyer of the property after the buyer has taken possession of such property.

**b)** Property not within this Policy's Territory.

Deferred Payment Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

**a)** The total amount of unpaid installments less finance charges.

**b)** The **actual cash value** of the property on the date of loss or damage.

**c)** The cost to repair or replace with material of like size, kind and quality.

### 10. Demolition and Increased Cost of Construction

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

**a)** Such law or ordinance is enforced as a direct result of insured physical loss or damage at a **location**;

**b)** Such law or ordinance is in force at the time of such loss or damage; and

**c)** Such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that Regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

**a)** Demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

**b)** Repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

 

The Company's maximum liability for this Coverage A at each location in any occurrence will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

**a)**  The reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

**b)**  The cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

Demolition and Increased Cost of Construction Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

**a)**  The **actual cash value**; and

**b)**  The cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

Demolition and Increased Cost of Construction Exclusions: As respects Demolition and Increased Cost of Construction, the following additional exclusions apply:

This Policy does not cover:

**a)**  Any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

**b)**  Any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## 11. Earth Movement

This Policy covers physical loss or damage caused by or resulting from **earth movement**.

## 12. Errors and Omissions

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

**a)**  In the address of a property insured by this Policy which existed at the inception date of this Policy or in any subsequent amendments to this Policy;

**b)**  That fails to include any **location**:

    **i)**  Owned; or

    **ii)**  Occupied by the Insured; or

**c)**  That results in cancellation of insured property under this Policy;

Then coverage applies to the extent this Policy would have provided coverage had the error or unintentional omission not been made.





It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

### 13. Expediting Expenses

This Policy covers the reasonable and necessary costs incurred to:

**a)**   Temporarily repair or replace; and

**b)**   Expedite the permanent repair or replacement of;

Insured property that has sustained insured physical loss or damage.

This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

### 14. Fine Arts and Valuable Papers and Records

This Policy covers **fine arts** and **valuable papers and records** while anywhere within this Policy's Territory including while in transit.

Fine Arts and Valuable Papers and Records Exclusion: As respects Fine Arts and Valuable Papers and Records, the following additional exclusion applies:

This Policy excludes:

**a)**   Loss or damage to any **fine arts** as a result of restoring, repairing or retouching processes.

**b)**   Errors or omissions in the processing or copying of **valuable papers and records.**

Fine Arts and Valuable Papers and Records Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

**a)**   The cost to repair or restore the article to the condition that existed immediately prior to the loss;

**b)**   The cost to replace the article; or

**c)**   The value designated for the article as shown in the Declarations section of this Policy or on a schedule on file with this Company.

In case of physical loss or damage to a **fine arts** or **valuable papers and records** article that is part of a pair or a set, this Company will pay the lesser of the full value or the amount scheduled, if any, of the value of such pair or set only if the damaged article cannot be repaired or restored to its condition before the loss and the Insured surrenders the remaining article or articles of the pair or set to this Company.

### 15. Flood

This Policy covers physical loss or damage caused by or resulting from **flood.**

### 16. Green Coverage

This Policy covers the reasonable and necessary additional costs incurred by the Insured, as a direct result of insured physical loss or damage:





a) To repair or replace physically damaged insured property with material of like kind and quality which qualifies as **Green**.

b) To replace the insured physically damaged portions of insured roofing systems with vegetative roof(s), including but not limited to the addition of trees, shrubs, plants and lawns to those roof(s), which qualify as **Green**, if this Policy covers Real Property.

c) As part of **Green** reconstruction, to flush out the air in the area of the physically damaged insured property with 100 percent outside air and to provide replacement filtration media for the building's ventilation system that controls the damaged area.

d) For an accredited professional certified by a **Green Authority** to participate in the design and construction for repairing or rebuilding the physically damaged insured property as **Green**.

e) For the process of certification or recertification of the repaired or replaced insured property as **Green**.

f) For **Green** removal, disposal or recycling of the damaged insured property.

Notwithstanding any other provision in this Policy, the Insured must repair or replace the insured real and/or personal property lost, damaged or destroyed as a condition of this coverage.

Green Coverage Exclusions: As respects Green Coverage, the following additional exclusions apply:

This Policy excludes:

a) Stock, **raw materials**, work in process, finished goods, merchandise, **production machinery and equipment**, electronic data processing equipment not used in the functional support of the real property, molds and dies, property in the open, property of others for which the insured is legally liable, personal property of directors, officers or employees of the Insured.

b) Any property adjusted on other than repair or replacement per the Valuation clauses of this Policy.

c) Any loss recoverable elsewhere in this Policy.

## 17. Land and Water Clean Up Expense

This Policy covers the reasonable and necessary costs to remove, dispose of or clean up the actual but not the suspected presence of **contaminant(s)** from uninsured land or water or any substance in or on land, at a **location**, when such property is contaminated as a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to clean up, remove and dispose of **contamination** from such property:

a) At any **location** insured for Personal Property only.

b) When the Insured fails to give written notice of loss to this Company within 180 days after the inception of the loss.

## 18. Locks and Keys

This Policy covers the reasonable and necessary cost incurred by the Insured to replace undamaged keys and to replace, adjust or reprogram undamaged locks to accept new keys or entry codes as a result of insured physical loss or damage.





### 19. Money and Securities

This Policy covers physical loss or damage to money and securities at a **location** resulting from:

**a)** Fire, explosion or sprinkler leakage.

### 20. Newly Acquired Property

This Policy covers property of the type insured that is newly acquired while located anywhere within this Policy's Territory, excluding while in transit.

This coverage terminates:

**a)** When the newly acquired property is bound by this Company; or

**b)** When agreement is reached that the property will not be insured under this Policy; or

**c)** 120 days after the date of acquisition of the property; or

**d)** At the termination or expiration of this Policy;

Whichever occurs first.

### 21. Off-Premises Data Services - Property Damage

This Policy covers insured physical loss or damage to insured property at a **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.
For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Off Premises Data Services - Property Damage Exclusions: As respects Off-Premises Data Services - Property Damage , the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

### 22. Off-Premises Service Interruption - Property Damage

This Policy covers insured physical loss or damage at a **location** caused by or resulting from the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, or outgoing sewerage.





The interruption of such services must be by reason of an accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the service provider to shed load to maintain system integrity.

Off-Premises Service Interruption - Property Damage Exclusion: As respects Off-Premises Service Interruption - Property Damage the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

### 23. Professional Fees

This Policy covers the reasonable and necessary expenses incurred by the Insured of:

**a)** Auditors;

**b)** Accountants;

**c)** Architects;

**d)** Engineers; or

**e)** Other professionals; and

**f)** The Insured's own employees,

For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.

This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

### 24. Property Removed from a Location

This Policy covers insured property when removed from a **location** to avoid or prevent immediately impending insured physical loss or damage to such property. This Policy covers such property for physical loss or damage as provided at the **location** from which the property was removed.

This coverage applies for a period:

**a)** Of 120 days from the date of removal; but

**b)** Not beyond the termination or expiration date of this Policy.

### 25. Protection and Preservation of Property - Property Damage

This Policy covers the reasonable and necessary costs incurred for:





**a)** Actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

**b)** Fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

**c)** Restoring and recharging fire protection systems following an insured loss.

**d)** The water used for fighting a fire in, on or exposing the insured property.

**e)** Temporary security for a period of time not to exceed 30 consecutive days due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

This coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by the Terrorism coverage of this Policy.

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 26. Tax Treatment

This Policy covers the increased tax liability as a direct result of insured physical loss or damage to insured property. When such tax liability is greater than the tax liability that would have been incurred had there been no such loss or damage, then this Policy will cover only the increased tax liability for the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured and/or the profit portion of the Business Interruption loss payment.

## 27. Tenants Legal Liability

This Policy covers direct physical loss or damage, caused by or resulting from **named perils**, to that part of buildings of others, including permanently attached building fixtures, leased to and occupied by the Insured at a **described location** to the extent of the Insured's legal liability for such loss or damage.

This coverage also includes the following:

**a)** The reasonable expenses of defending the Insured against only that part of any suit alleging the Insured's legal liability for such physical loss or damage;

**b)** The reasonable expenses incurred by this Company, this Company's proportionate share of costs taxed against the Insured in any such suit, and this Company's proportionate share of interest accruing after entry of judgment until this Company has paid, tendered or deposited into court its proportionate share of such judgment; and

**c)** The reasonable expenses, other than loss of earnings, incurred at this Company's request.

This coverage does not include:

**a)** That part of any settlement by the Insured to which this Company has not given its prior written consent; or

**b)** Any legal liability for loss or damage assumed by the Insured under any contract or agreement, whether oral or written, expressed or implied.

Additional Provisions: This Company may:

**a)** Investigate, negotiate and settle any claim or suit as this Company deems expedient and will not be prejudiced under this coverage for failure to settle for any amount within the Company's applicable limit of liability.





b) Pay, tender or deposit into court the Company's applicable limit of liability, less any expenses incurred by the Company, in full satisfaction of its liability under this coverage, and thereby terminate any further liability for any expense amount described in paragraphs a, b or c above.

Tenants Legal Liability Exclusion: As respects Tenants Legal Liability, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 28. Terrorism

This Policy covers physical loss or damage caused by or resulting from **terrorism** only at a **described location**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this coverage are excluded from coverage elsewhere in this Policy.

This coverage does not cover loss or damage which also comes within the terms of either Group I Item 2a or Group I Item 2c of the Exclusions clause of this Policy.

This coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

a) That involves the use, release or escape of nuclear materials or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act; or

b) That is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

c) In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

d) That involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## 29. Transit

This Policy covers the following insured personal property:

a) Owned by the Insured;

b) Of others to the extent of the Insured's interest or legal liability while in the actual or constructive custody of the Insured;

c) Shipped to others on Free on Board (FOB), Cost and Freight (C&F) or similar terms. The Insured's contingent interest in such shipments is admitted,

d) Of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

 

**i)** When shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer;

**ii)** When shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer,

While in transit within the Policy's Territory:

**a)** From the time the property leaves the original point of shipment for transit; and

**b)** Continuously in the due course of transit until delivered at the destination.

**c)** Coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft.

This coverage:

**a)** Insures physical loss or damage caused by or resulting from:

**i)** Unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts by the Insured or the Insured's agent, customer or consignee.

**ii)** Any unauthorized person(s) representing themselves to be the proper party(ies) to receive the property for shipment or to accept it for delivery.

**b)** Covers general average and salvage charges on shipments covered while waterborne.

Additional Conditions:

**a)** Permission is granted to the Insured, without prejudice to this insurance, to accept ordinary bills of lading used by carriers, including:

**i)** Released and/or undervalued bills of lading; or

**ii)** Shipping or messenger receipts.

**b)** The Insured may waive subrogation against railroads under sidetrack agreements.

**c)** The Insured may not enter into any special agreement with carriers releasing them from their common law or statutory liability.

**d)** This coverage shall not inure directly or indirectly to the benefit of any carrier or bailee.

Transit Exclusions: As respects Transit, the following additional exclusions apply:

This Policy excludes:

**a)** Property shipped by mail.

**b)** Shipments by air unless made by regularly scheduled airlines.

**c)** Waterborne shipments via the Panama Canal or waterborne shipments to and from:

**i)** Alaska.




    **ii)** Hawaii.

    **iii)** Commonwealth of Puerto Rico.

    **iv)** Virgin Islands.

**d)** Any transporting vehicle.

**e)** Property of others, including the Insured's legal liability, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

**f)** Property insured under any import or export ocean marine insurance.

Transit Valuation: On property insured under this coverage, the loss amount will not exceed the following:

**a)** For property shipped to or for the account of the Insured: the actual invoice to the Insured, including such costs and charges (including the commission of the Insured as selling agent) as may have accrued and become legally due on such property.

**b)** For property that has been sold by the Insured and shipped to or for the account of the purchaser (if covered by this Policy), the amount of the Insured's selling invoice, including prepaid or advanced freight.

**c)** For property not under invoice:

    **i)** For property of the Insured, at the valuation provisions of the Policy applying at the place from which the property is being transported; or

    **ii)** For other property, the **actual cash value** at point of destination on the date of loss,

    Less any charges saved which would have become due and payable upon arrival at destination.

## 30. Unnamed Property

This Policy covers insured property anywhere within this Policy's Territory, excluding property while in transit.

Unnamed Property Exclusion: As respects Unnamed Property, the following additional exclusion applies:

This Policy excludes:

**a)** **Transmission and distribution systems**, except at a premises owned, leased or rented by the Insured.





# BUSINESS INTERRUPTION

The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

## A. LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1. To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2. Used by the Insured;

3. While at a **location** or while in transit as provided by this Policy; and

4. During the Period of Liability as described elsewhere in this Policy.

This Policy insures Business Interruption loss only to the extent it cannot be reduced through:

1. The use of any property or service owned or controlled by the Insured;

2. The use of any property or service obtainable from other sources;

3. Working extra time or overtime; or

4. The use of inventory;

All whether at a **location** or at any other premises. This Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the amount of loss.

In determining the amount of loss payable, this Company will consider:

1. Any amount recovered elsewhere under this Policy for loss or damage to finished goods or merchandise at selling price as having been sold to the Insured's regular customers and credited against net sales.

2. The experience of the business before and after and the probable experience during the Period of Liability. The probable experience will also consider any increase or decrease in demand for the Insured's goods or services during the Period of Liability, even if such increase or decrease is from the same event that caused physical loss or damage starting the Period of Liability.

3. The continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or business operations or services.

This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.





## B. <u>BUSINESS INTERRUPTION COVERAGE</u>

### 1. Gross Earnings

The recoverable Gross Earnings loss is the actual loss sustained by the Insured of **Gross Earnings**, less all charges and expenses that do not necessarily continue, plus all other earnings derived from the operations of the business, excluding loss covered under Rental Income, during the Period of Liability.

**Gross Earnings** means:

The net sales value of production or business operations or services less the cost of:

**a)**   Raw stock;

**b)**   Materials and supplies; and

**c)**   Merchandise sold;

Used in production or business operations or services rendered by the Insured

The recoverable Gross Earnings loss payable is limited to the extent the Insured is:

**a)**   Wholly or partially prevented from producing goods or continuing business operations or services;

**b)**   Unable to make up lost production within a reasonable amount of time, not limited to the period during which production is interrupted;

**c)**   Unable to continue such operations or services during the Period of Liability; and

**d)**   Able to demonstrate a loss of sales for the production or business operations or services prevented.

### 2. Gross Profits

The recoverable Gross Profits loss is the actual loss sustained by the Insured of the:

**a)**   **Reduction in Sales;** and the

**b)**   **Increased Cost of Doing Business,**

Resulting from the necessary interruption of business during the Period of Liability.

As respects Gross Profits, Business Interruption Exclusion Items 2a, 2c and 3 do not apply.

For purposes of measuring the loss:

**Gross Profits** means:

The sum produced by adding the **Net Profit** to the **Insured Fixed Charges**. If there is no **Net Profit** the amount of all **Insured Fixed Charges** less that proportion of any loss from business operations as the amount of the **Insured Fixed Charges** bears to all fixed charges.

**Increased Cost of Doing Business** means:

 

The reasonable and necessary costs incurred to avoid or diminish a reduction in sales but not to exceed the sum produced by applying the **Rate of Gross Profit** to the amount of the reduction avoided; all less any sums saved as may cease or be reduced during the Period of Liability.

**Insured Fixed Charges** means:

All fixed charges unless specifically excluded in the Declarations section.

**Net Profit** means:

The net operating profit excluding:

**a)** Capital receipts and accruals; and

**b)** Outlay properly chargeable to capital;

Resulting from the business of the Insured after due provision has been made for all fixed charges and any other expenses, including depreciation, but before deduction of any taxes on profits.

**Rate of Gross Profit** means:

The rate of **Gross Profit** earned on **Sales** during the twelve (12) full months immediately before the date of the loss or damage to the insured property.

**Reduction in Sales** means:

The amount produced by applying the **Rate of Gross Profit** to the amount by which the **Sales** during the Period of Liability fall short of the **Standard Sales**.

**Sales** means:

The money, excluding loss covered under Rental Income, paid or payable to the Insured for:

**a)** Goods sold and delivered; and

**b)** Services rendered;

In the conduct of the Insured's business.

**Standard Sales** means:

The **Sales** during the period of the twelve (12) months immediately before the date of the loss or damage to the insured property which corresponds with the Period of Liability.

### 3. Rental Income

The recoverable Rental Income loss is the actual loss sustained by the Insured of the following during the Period of Liability:

**a)** The fair rental value of any portion of the property occupied by the Insured;

**b)** Income reasonably expected from the rentals of unoccupied or unrented portions of such property;

**c)** The rental income from the rented portions of such property, according to bona fide leases, contracts or agreements, in force at the time of loss;





All less charges and expenses that do not continue.

Rental Income Exclusion: As respects Rental Income, the following additional exclusion applies:

This Policy does not insure:

a)   Any loss of rental income during any period in which the insured property would not have been rented for any reason other than an insured loss.

### 4.  Extra Expense

The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:

a)   Temporarily continue as close to normal the conduct of the Insured's business; and

b)   Temporarily use the property or facilities of the Insured or others;

All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the BI Select clause, the Period of Liability for Extra Expense coverage will be the Period of Liability applicable to the Business Interruption Coverage option selected.

Extra Expense Exclusions: As respects Extra Expense, the following additional exclusions apply:

This Policy does not insure:

a)   Any loss of income.

b)   Expenses that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)   The cost of permanent repair or replacement of property that has been damaged or destroyed.

d)   Any expense recoverable elsewhere in this Policy.

### 5.  BI Select™

If this Policy insures Gross Earnings and Gross Profit the Insured has the option to make claim based on either:

a)   Gross Earnings; or

b)   Gross Profit.

If such claim involves more than one **location**, including interdependency at one or more **locations**, all such claims will be adjusted using the coverage option chosen above.

This option may be exercised any time prior to meeting the conditions set forth in the Settlement of Claims provisions in the Loss Adjustment and Settlement section of this Policy.

 

## C. <u>PERIOD OF LIABILITY</u>

The Period of Liability for Business Interruption Coverage and Business Interruption Coverage Extensions, unless otherwise stated elsewhere in this Policy, is as follows:

The Gross Earnings, Rental Income or Extra Expense Period of Liability is:

1. The period starting from the time of physical loss or damage of the type insured; and

2. Ending when, with due diligence and dispatch,

    a) The lost or damaged property could be repaired or replaced and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the loss or damage; or

    b) The lost or damaged property under the course of construction or renovation could be repaired or replaced to the same or equivalent degree of completion that existed prior to the loss or damage. This period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened.

3. For **raw materials** or supplies, the period of time:

    a) Resulting from the inability to procure suitable **raw materials** or supplies to replace those physically lost or damaged, but

    b) For no more than the period of time for which such physically lost or damaged **raw materials** or supplies would have supplied production or business operating or servicing needs.

The Gross Profit Period of Liability is:

The period starting from the time of physical loss or damage of the type insured and ending no later than the period of time shown in the Declarations section during which the results of the business shall be directly affected by such damage.

Period of Liability Conditions:

The Period of Liability will not include any additional time:

1. Due to the Insured's inability to resume production or business operations or services regardless of the reason, including but not limited to:

    a) Making change(s) to the buildings, structures or equipment, for any reason except as provided by the Demolition and Increased Cost of Construction coverage in this Policy; or

    b) Restaffing or retraining employees. However, this item does not apply to additional time needed to train staff to use new machinery or equipment which replaces machinery or equipment that suffered insured physical loss or damage, provided that such training is completed within 90 days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative and will not be limited by the expiration of this Policy.

## D. <u>BUSINESS INTERRUPTION EXCLUSIONS</u>

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss:

This Policy does not insure:





1.  Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

    a)  Physical loss or damage not insured by this Policy.

    b)  Planned or rescheduled shutdown.

    c)  Strike or other work stoppage.

    d)  Any other reason other than physical loss or damage insured under this Policy.

2.  Any increase in loss due to:

    a)  The suspension, cancellation, or lapse of any lease, contract, license or order.

    b)  Damages for breach of contract, or for late or non-completion of orders.

    c)  Fines or penalties of any nature, except as provided by the Contractual Penalties coverage in this Policy.

    d)  Any other consequential or remote loss.

3.  Any loss resulting from physical loss or damage to merchandise or finished goods valued at the regular cash selling price or the time required for their reproduction.

4.  Any loss resulting from the actual cash value portion of direct physical loss or damage by fire caused by or resulting from terrorism.

# E. <u>BUSINESS INTERRUPTION COVERAGE EXTENSIONS</u>

## 1. Attraction Property

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location**.

Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a)  Physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

## 2. Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:





a) The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 3. Communicable Disease - Business Interruption

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating such presence of **communicable disease**; or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:

This Policy does not insure loss resulting from:

a) The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

b) Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a) Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

b) Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,

This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section.

## 4. Computer Systems Non-Physical Damage

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from:

a) The failure of the Insured's **electronic data processing equipment or media** to operate provided that such failure is the direct result of a malicious act directed at the Named Insured; or

b) The Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending malicious act directed at the Named Insured, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

While anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

 

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period of time starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when, with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure; and

b) Does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## 5. Contractual Penalties

This Policy covers contractual penalties incurred by the Insured during the Period of Liability due to late or non-completion of orders as a direct result of insured physical loss or damage to property of the type insured.

This extension of coverage applies provided that such contractual penalties:

a) Are written in the provisions of a contract prior to the time of such direct physical loss or damage, and

b) Will be limited to the contractual sales value of such late or non-completed orders.

## 6. Crisis Management

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **described location,** provided such order is a direct result of:

a) A violent crime, suicide, attempted suicide or armed robbery; or

b) A death or bodily injury caused by a **workplace accident;**

At that **described location.**

For the purpose of this Business Interruption Coverage Extension only, a violent crime, suicide, attempted suicide or armed robbery at a **described location** will be considered direct physical loss or damage insured by this Policy.

Crisis Management Exclusion: As respects Crisis Management, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 7. Extended Period of Liability

The Gross Earnings and Rental Income coverage is extended to cover the reduction in sales resulting from:

a) The interruption of business as covered by Gross Earnings or Rental Income;

b) For such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and





c) Commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Business Interruption Coverage Extension had not been included in this Policy.

However, this Business Interruption Coverage Extension does not apply to Gross Earnings or Rental Income loss resulting from physical loss or damage caused by or resulting from **terrorism**.

As respects Extended Period of Liability, Business Interruption Exclusion Item 2a does not apply.

Coverage under this Business Interruption Coverage Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Business Interruption Coverage Extension does not apply for more than the number of consecutive days shown in the Limits of Liability clause of the Declarations section of this Policy.

## 8. Ingress/Egress

This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a **described location(s)** is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a **described location**.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

## 9. Leasehold Interest

This Policy covers the loss incurred by the Insured of Leasehold Interest as follows:

If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the **Lease Interest** for the first three months following the loss; and the **Net Lease Interest** for the remaining unexpired term of the lease. Leasehold Interests Exclusions: As respects Leasehold Interest, the following applies:

a) Business Interruption Exclusions 1, 2 and 3 do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

b) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

As used above, the following terms mean:

**Net Lease Interest:**





That sum which placed at 6 percent interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

**Lease Interest:**

The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

## 10. Logistics Extra Cost

This Policy covers the extra cost incurred by the Insured during the Period of Liability due to disruption of the normal movement of goods or materials:

**a)**   Directly between **described locations**; or

**b)**   Directly between a **location** and the premises of a direct supplier, direct customer or direct contract service provider to the Insured;

Provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured within the Policy's Territory.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

**a)**   Extra costs to temporarily continue as close to normal the movement of goods or materials.

Logistics Extra Cost Exclusions: As respects Logistics Extra Cost, the following shall apply:

This Policy does not insure any loss resulting from:

**a)**   Disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

**b)**   Disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

**c)**   Disruption caused by physical loss or damage to personal property of the Insured while in transit.

**d)**   Disruption in the movement of goods or materials between the premises of a supplier, customer or contract service provider to the Insured and the premises of another supplier, customer or contract service provider to the Insured.

**e)**   Costs that usually would have been incurred in conducting the business during the same period had there been no disruption of normal movement of goods or materials; or

**f)**   Loss of income

**g)**   Costs of permanent repair or replacement of property that has been damaged or destroyed.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

**a)**   Starting at the time of physical loss or damage causing the disruption of the normal movement of goods or materials; and




b) Ending not later than when with due diligence and dispatch the normal movement of goods or materials could be resumed.

## 11. Off-Premises Data Services - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at a **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services. For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

a) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover the Business Interruption Coverage loss incurred by the Insured covered by Computer Systems Non-Physical Damage coverage as provided in this section of this Policy.

Off-Premises Data Services - Business Interruption Exclusions: As respects Off- Premises Data Services - Business Interruption, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

As used above, Period of Liability of **off-premises data processing or data transmission services**:

a) Is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the Period of Liability clause in this section.

b) Is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

c) Does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## 12. Off-Premises Service Interruption - Business Interruption

This Policy covers Business Interruption Coverage loss incurred by the Insured during the Period of Liability caused by the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, and outgoing sewerage services at a **location**.

The interruption of such services must be by reason of any accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.





This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the supplying utility to shed load to maintain system integrity.

Off-Premises Service Interruption - Business Interruption Exclusion: As respects Off-Premises Service Interruption - Business Interruption the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period starting with the time when an interruption of specified services happens; and

b) Ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations under the same or equivalent physical and operating conditions. Resultant and concurrent interruptions are considered as one event.

## 13. Protection and Preservation of Property - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Business Interruption Coverage Extension does not cover loss sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by Terrorism coverage as provided in this Policy.

This Business Interruption Coverage Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 14. Research and Development

Gross Earnings and Gross Profits coverages are extended to cover the actual loss sustained by the Insured of continuing fixed charges and **ordinary payroll** directly attributable to the interruption of research and development activities that in themselves would not have produced income during the Period of Liability.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a) Starting at the time of physical loss or damage of the type insured; and

b) Ending when the property could be repaired or replaced and made ready for operations.

## 15. Soft Costs

This Policy covers **soft costs** incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.

 

## 16. Supply Chain

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory:

**a)** Direct suppliers, direct customers or direct contract service providers to the Insured;

**b)** Any company under any royalty, licensing fee or commission agreement with the Insured; or

**c)** Any company that is a direct or indirect supplier, customer or contract service provider of those described in a) above,

But not at the premises of entities directly or indirectly supplying to or receiving from a **location** electricity, fuel, water, steam, refrigeration, sewerage, voice, data or video.

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions:

**a)** Civil or Military Authority

**b)** Crisis Management

**c)** Extended Period of Liability

**d)** Ingress/Egress

**e)** Off-Premises Service Interruption - Business Interruption

**f)** Supply Chain

Supply Chain Exclusions: As respects Supply Chain coverage, the following additional exclusion applies:

This Policy does not insure loss resulting from:

**a)** Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

 

# LOSS ADJUSTMENT AND SETTLEMENT

## A. ABANDONMENT

There shall be no abandonment to this Company of any property.

## B. APPRAISAL

If the Insured and this Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

**1.** The Insured has fully complied with all provisions of this Policy.

**2.** This Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or this Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for Business Interruption loss, the amount of loss for each Business Interruption coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and this Company will each:

**1.** Pay its chosen appraiser; and

**2.** Bear equally the other expenses of the appraisal and umpire.

A demand for Appraisal shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under Requirements in Case of Loss.

This Company will not be held to have waived any of its rights by any act relating to appraisal.

## C. COLLECTION FROM OTHERS

This Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## D. COMPANY OPTION

This Company has the option to take all or any part of damaged property at the agreed or appraised value. This Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## E. CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the First Named Insured.





## F. <u>LEGAL ACTION AGAINST THIS COMPANY</u>

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1. The Insured has fully complied with all the provisions of this Policy; and

2. Legal action is started within two years after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such two-year limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

## G. <u>LOSS ADJUSTMENT AND PAYABLE</u>

Loss or damage will be adjusted with the First Named Insured and payable to or as the First Named Insured directs subject to the Mortgagee/Lenders Loss Payable clause in the General Conditions section of this Policy.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee on a Certificate of Insurance issued by this Company prior to the loss.

When named on a Certificate of Insurance issued by the Insured's broker with this Company's permission, such additional interests are added to this Policy as their interests may appear when such Certificate of Insurance is issued prior to the loss and on file with this Company. The effective date of any such interest will be the issue date of the certificate unless a later date is specified on the Certificate of Insurance. The Certificate of Insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

## H. <u>OTHER INSURANCE</u>

1. If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

2. In no event will this Policy apply as contributing insurance.

3. The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy. The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy. Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

4. The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

5. If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with this Company.

## I. <u>REQUIREMENTS IN CASE OF LOSS</u>

The Insured will:

1. Give immediate written notice to this Company of any loss.

2. Protect the property from further loss or damage.





3. Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4. Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by this Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) The time and origin of the loss.

   b) The Insured's interest and that of all others in the property.

   c) The **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) By whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5. Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6. Further, the Insured, will as often as may be reasonably required:

   a) Exhibit to any person designated by the Company all that remains of any property;

   b) Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) Produce for examination at the request of the Company:

      i) All books of accounts, business records, bills, invoices and other vouchers; or

      ii) Certified copies if originals are lost,

   At such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## J. <u>SETTLEMENT OF CLAIMS</u>

The amount of loss for which this Company may be liable will be paid within 30 days after:

1. Proof of loss as described in this Policy is received by this Company; and

2. When a resolution of the amount of loss is made either by:

   a) Written agreement between the Insured and this Company; or

   b) The filing with this Company of an award as provided in the Appraisal clause of this section.

In the event of insured physical loss or damage determined by this Company's representatives to be in excess of the applicable policy deductible, this Company will advance mutually agreed-upon partial payment(s), subject to the Policy's





provisions. To obtain such partial payments, the Insured will submit a signed and sworn proof of loss as described in this Policy, with adequate supporting documentation.

## K. SUBROGATION

The Insured shall cooperate in any subrogation proceedings. This Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of this Company's payment.

This Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss. No such waiver will affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by this Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1.   Any applicable deductible; and/or

2.   Any provable uninsured loss,

Bears to the entire provable loss amount.

## L. VALUATION

Adjustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured.

1.   Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

   a)   The cost to repair.

   b)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

   c)   The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

   d)   On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

2.   On **raw materials**, supplies and merchandise not manufactured by the Insured, the replacement cost.

3.   On **stock in process**, the value of **raw materials** and labor expended plus the proper proportion of overhead charges.

4.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which such finished goods would have been subject had no loss happened.

5.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from backup or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

6.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss. Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) of the Policy and shall be subject to the limit(s) of liability for Terrorism, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the Limits of Liability clause in the Declarations section.





7. On personal property that is part of a pair or set, and the physically damaged personal property cannot be replaced or repaired, the reduction in value of the undamaged portion of insured personal property. If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such property to this Company.

8. On unrepairable electrical or mechanical equipment, including computer equipment, the cost to replace such equipment with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

9. On property scheduled for demolition, the increased cost of demolition, if any, directly resulting from insured loss.

10. On improvements and betterments, the unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

11. On property that is useless to the Insured, the **actual cash value.**

12. On property if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company, the **actual cash value.**

The Insured may elect not to repair or replace the insured real or personal property under Item 1 above that is lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at a **described location** under this Policy. This item does not extend to Demolition and Increased Cost of Construction.





# GENERAL CONDITIONS

## A. APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows:

1. This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property. This Policy does not pay for any business interruption loss resulting from the foregoing remediation, change, correction, repair or assessment.

2. Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage. This Policy does not pay for any such incident or for any business interruption loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000. Such covered resulting physical loss or damage does not include any loss, cost or expense described in a) or b) above. If such covered resulting physical loss or damage happens, and if this Policy provides business interruption coverage, then, subject to all of its terms and conditions, this Policy also covers any insured business interruption loss directly resulting therefrom.

## B. CANCELLATION/NON-RENEWAL

This Policy may be:

1. Cancelled at any time at the request of the First Named Insured by surrendering this Policy to this Company or by giving written notice to this Company stating when such cancellation will take effect; or

2. Cancelled by this Company by giving the First Named Insured not less than:

   a) 60 days written notice of cancellation; or

   b) 10 days written notice of cancellation if the First Named Insured fails to remit, when due, payment of premium for this Policy; or

3. Non-renewed by this Company by giving the First Named Insured not less than 60 days written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the First Named Insured cancels and on a pro-rata basis if the Company cancels this Policy. Return of any unearned premium will be made by the Company as soon as practicable.

## C. CONFORMITY TO STATUTE

Terms of this Policy that conflict with the statutes of the jurisdiction where the insured property is located, are amended to conform to such statutes.

## D. FIRST NAMED INSURED

The First Named Insured shown in the Declarations section:

 

1. Is responsible for the payment of all premiums.

2. Will be the payee for any return premiums.

3. May authorize changes in the terms and conditions of this Policy with the consent of this Company.

## E. INCREASE IN HAZARD

This Policy will not apply to any **location** where there is an increase in hazard over which the Insured has control and knowledge. Any increase in hazard at one or more **locations** will not affect coverage at other **locations** where, at the time of loss or damage, the increase in hazard does not exist.

## F. INSPECTIONS

This Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property. This Company does not address life, safety or health issues.

This Company's:

1. Right to make inspections; or

2. Making of inspections; or

3. Providing recommendations or other information in connection with any inspections,

Will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.

This Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When this Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

## G. LIBERALIZATION CLAUSE

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## H. MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:

1. Willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

2. Made any attempt to defraud this Company.

3. Made any false swearing.

 

# I. <u>MORTGAGEE/LENDERS LOSS PAYABLE</u>

Loss or damage, if any, to specified property insured under this Policy shall be payable to each specified Lenders Loss Payable (hereinafter referred to as Lender) and specified Mortgagee as its interest may appear.

This insurance as to the interest of the Lender or Mortgagee shall not be invalidated by:

1.  Any act or neglect of the debtor, mortgagor or owner (as the case may be) of the property.

2.  Foreclosure, notice of sale or similar proceedings with respect to the property.

3.  Change in the title or ownership of the property.

4.  Change to a more hazardous occupancy.

The Lender or Mortgagee will notify this Company of any known change in ownership, occupancy or hazard and, within 10 days of written request by this Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

If the Insured fails to render proof of loss within the time provided in this Policy, the Lender or Mortgagee shall render proof of loss within sixty days after having knowledge of the Insured's failure in the form and manner provided by this Policy, and, further, shall be subject to the provisions of this Policy relating to Appraisal, Legal Action Against this Company, and Settlement of Claims.

If this Policy is cancelled at the request of the First Named Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1.  Sooner terminated by authorization, consent, approval, acceptance or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2.  This Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

This Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor or owner has failed to pay any premium due under this Policy, this Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

Whenever this Company shall pay the Lender or Mortgagee for loss or damage under this Policy and shall deny payment to the debtor, mortgagor or owner, this Company shall, to the extent of such payment, be subrogated to the rights of the Lender or Mortgagee under all collateral held to secure the debt or mortgage. No subrogation shall impair the right of the Lender or Mortgagee to recover the full amount due. At its option, this Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to this Company, and the remaining debt or mortgage will be paid to this Company.

This Company may invoke this Policy's Suspension clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel subject to the suspension. This Company will provide the Lender or Mortgagee at the last reported address a copy of the suspension notice.

All notices sent to the Lender shall be sent to its last reported address.





Other provision relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## J. POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

1. Create a waiver, or change any part of this Policy; or

2. Prevent the Company from asserting any rights under the provisions of this Policy.

## K. REINSTATEMENT OF LIMITS AFTER A LOSS

Except for an **annual aggregate** limit of liability, any loss or payment of any claim will not reduce the amount payable under this Policy.

## L. SUSPENSION

Upon discovery of a dangerous condition, this Company may immediately suspend the **boiler and machinery** insurance with respect to any machine, vessel or part thereof by giving written notice to the Insured. The insurance that is suspended may be reinstated by this Company. The Insured will be allowed the return of the unearned portion of the premium resulting from the suspension of insurance.

## M. TRANSFER OF RIGHTS AND DUTIES UNDER THIS POLICY

The Insured's rights, interests and duties under this Policy may not be transferred or assigned without this Company's written consent.

 

# DEFINITIONS

**actual cash value** means the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation.

**annual aggregate** means the Company's maximum amount payable during any policy year.

**boiler and machinery** means:

1. Direct physical loss or damage originating within:

   a) Boilers, fired or unfired pressure vessels, vacuum vessels and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

      i) Waste disposal piping;

      ii) Any piping forming part of a fire protective system;

      iii) Furnaces; and

      iv) Any water piping other than:

         (a) Boiler feed water piping between the feed pump or injector and the boiler;

         (b) Boiler condensate return piping; or

         (c) Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes.

   b) All mechanical, electrical, electronic or fiber optic equipment;

2. And caused by, resulting from or consisting of:

   a) Mechanical breakdown; or

   b) Electrical or electronic breakdown; or

   c) Extremes or changes of temperature; or

   d) Rupture, bursting, bulging, implosion or steam explosion.

3. **boiler and machinery** as used in this Policy does not mean:

   Physical loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

   a) Combustion explosions, except from within combustion gas turbines; or

   b) Explosions from liquids coming in contact with molten materials; or

   c) Accidental discharge, escape, leakage, backup or overflow to the open of any material from confinement within piping, plumbing systems or tanks except from property described in Item 1a above; or

   d) Fire, or from the use of water or other means to extinguish a fire.





**communicable disease** means disease which is:

1. Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

2. Legionellosis.

**contaminant** means anything that causes **contamination.**

**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**date or time recognition** means the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**described location(s)** means the locations described in the Insurance Provided clause of the Declarations section of this Policy.

**earth movement** means any natural or man-made earth movement, including but not limited to earthquake or landslide regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media** means any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts** means paintings; etchings; pictures; tapestries; rare or art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money and securities.

**flood** means flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer backup resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss. Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**Green** means products, materials, methods and processes certified by a **Green Authority** that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

**Green Authority** means an authority on **Green** buildings, products, materials, methods or processes that are certified and accepted by Leadership in Energy and Environmental Design (LEED®), Green Building Initiative Green Globes®, Energy Star Rating System or any other recognized **Green** rating system.

**irreplaceable** means an item which cannot be replaced with other of like kind and quality.

**location** means a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property coverages.





**named perils** means: fire, lightning, **wind**, hail, explosion, smoke, impact from aircraft and vehicles, objects falling from aircraft, strike, riot, civil commotion, vandalism, theft, attempted theft, sprinkler leakage or collapse of buildings.

**occurrence** means the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

1. **terrorism: occurrence** will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

2. **earth movement: occurrence** will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services** means the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**offshore** means away from the shore but not connected to the shore by docks, piers or any other physical connection other than pipelines.

**ordinary payroll** means:

1. Wages of all employees except officers, executives, department managers, and employees under contract or similar key employees; and

2. Includes taxes and charges dependent on the payment of those wages.

**physical loss or damage to electronic data, programs or software** means the destruction, distortion or corruption of electronic data, programs or software.

**production machinery and equipment** means any production or process machine(s) or apparatus that processes, forms, cuts, shapes, grinds or conveys **raw materials**, materials in process or finished goods and any associated equipment utilized in production including but not limited to electrical cabling, transformers, HVAC and any equipment or apparatus that is mounted upon or used exclusively with any one or more production or process machine(s) or apparatus.

**raw materials** mean materials and supplies in the state in which the Insured receives them for conversion by the Insured into finished goods.

**soft costs** means the expenses over and above normal expenses at **locations** undergoing alterations or additions to existing property and property in the course of construction limited to the following:

1. Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, and charges by the lenders for the extension or renewal of loans necessary.

2. Commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of releasing and marketing of the Insured Project due to loss of tenant(s) or purchaser(s).

3. Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

4. Carrying costs - building permits, additional interest on loans, insurance premiums and property and realty taxes.




**stock in process** means **raw materials** or stock, which has undergone any aging, seasoning, mechanical or other process or manufacture, but which is not finished goods.

**terrorism** means:

1. Any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

2. When the effect or apparent purpose is:

   To influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or to further, or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems** means transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data and video. Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records** means inscribed, printed or written: documents; manuscripts or records including abstracts; and, books, deeds, drawings, films, maps or mortgages, all of which must be of value to the Insured. **Valuable papers and records** are not: money, securities and stamps; converted data programs or instructions used in the Insured's data processing operations; or, materials on which data is recorded.

**wind** means direct action of wind including substance driven by wind. **Wind** does not mean or include anything defined as **flood** in this Policy.

**workplace accident** means a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.





# Real Estate Endorsement

This Endorsement is a part of this Policy and the terms and conditions of this Policy are amended as described herein. All other terms and conditions of this Policy remain unchanged.

## 1. Contingent Real Property

This Policy covers Real Property that is the contractual responsibility of the Insured's lessee to insure for physical loss or damage of the type insured. Coverage under this Policy shall apply only after the coverage provided under the lessee's policy has been exhausted. The lessee's policy will be the first policy to respond in the event of loss or damage. Upon exhaustion of coverage under the lessee's policy, this Policy will cover:

**a)** The difference in definitions, perils, conditions or coverages between the lessee's policy and this Policy; and

**b)** The difference between the limit(s) of liability stated in the lessee's policy and this Policy;

Provided that:

**a)** The coverage is provided under this Policy;

**b)** The limit(s) of liability has been exhausted under the lessee's policy; and

**c)** The deductible(s) applicable to such claim for loss or damage under the lessee's policy has been applied. If the deductible applied in the lessee's policy is different from the deductible that would have been applied for such loss under this Policy, then this Policy will provide for such difference in deductible.

Notwithstanding the foregoing, in the event that the lessee has not placed coverage, or has allowed a policy to lapse, be non-renewed or cancelled, then this Policy shall act as primary insurance as respects the loss or damage. In the event this Policy shall become primary insurance, each claim for loss or damage under this Policy shall be subject to the applicable deductible(s) under this Policy.

This Policy will not cover any loss due to insolvency or bankruptcy of the insurance company issuing the lessee's policy.

Any coverage provided by the lessee's policy that is not provided in this Policy does not extend to this Policy.

## 2. Emergency Evacuation Expense

This Policy covers the reasonable and necessary costs incurred by the Insured for the emergency evacuation and subsequent return of tenants or lawful occupants when the Insured's management, using reasonable discretion, or a civil authority orders the emergency evacuation of a **described location** as a direct result of immediately impending physical loss or damage of the type insured by this Policy.

Emergency Evacuation Expense Exclusions: As respects Emergency Evacuation Expense, the following additional exclusions apply:

This Policy excludes:

**a)** The cost to move personal property of tenants or lawful occupants.

**b)** The cost of temporary or permanent housing or lodging.

**c)** Loss caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

**PRO RE CRP 4100 (01/17)**
*© 2017 AFM. All rights reserved.*

Page 1 of 2

 

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

### 3. Innkeeper's Liability

This Policy covers personal property of the type insured of hotel guests while at a **described location**, when such personal property is not in the Insured's custody.

### 4. Tenant Relocation Expense

This Policy covers the reasonable and necessary **tenant relocation expenses** incurred by the Insured to relocate and return tenants or lawful occupants to other quarters within this Policy's Territory when rented space or living quarter(s) at a **described location** are made uninhabitable as a direct result of physical loss or damage insured by this Policy.

Tenants Relocation Expense Exclusions: As respects Tenant Relocation Expense, the following additional exclusions apply:

This Policy excludes:

**a)** Loss caused by the termination of a lease or other agreement.

**b)** Security deposits, rent or other payments made to the landlord or lessors of the new quarters.

**c)** Down payments, purchase price, legal fees and closing costs for the purchase of new quarters.

**d)** The cost of permanent housing or lodging.

**e)** Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

For purposes of this coverage, **tenant relocation expenses** means the cost to:

**a)** Pack and transport personal property of the type insured of tenants or lawful occupants.

**b)** Store such personal property while awaiting possession of other quarters or restoration of existing quarters.

**c)** Search for new quarters.

**d)** Disconnect and reconnect fixtures and equipment.

**e)** Re-establish new utility services less refunds from discontinued services.

 

# Retail Endorsement

This Endorsement is a part of this Policy and the terms and conditions of this Policy are amended as described herein. All other terms and conditions of this Policy remain unchanged.

## 1.  Removal and Restocking Expenses

This Policy covers the reasonable and necessary expenses incurred by the Insured for the removal and restocking of finished goods and other merchandise held for sale resulting from the recall of such property by the product's manufacturer or by an order of a governmental authority.

Coverage is limited to such expenses incurred in the first 90 consecutive days following the recall.

Removal and Restocking Exclusions: With respect to Removal and Restocking Expenses, the following additional exclusions apply:

This Policy does not cover:

**a)**   Expenses for the recall of such property manufactured by the Insured, including products that the Insured incorporates into other products.

**b)**   Expenses for the recall of such property recalled prior to the inception date of this Policy.

**c)**   The cost to recall such property.

**d)**   The cost to replace such property.

## 2.  Spoilage

Change of Temperature under Additional Property Damage Coverages in the Property Damage section of this Policy is replaced with the following:

This Policy covers spoilage of insured finished goods and other merchandise held for sale due to:

**a)**   Changes of temperature or changes in relative humidity,

Directly resulting from an accidental event at a **location**.

## 3.  Valuation

Items 2 and 4 under the Valuation clause in the Loss Adjustment and Settlement section of this Policy are replaced with the following:

**2.**   On raw materials and supplies, the replacement cost.

**4.**   On finished goods and other merchandise held for sale, the regular cash selling price, less all discounts and charges to which such finished goods or other merchandise held for sale would have been subject had no loss happened.





# CYBER EVENT ENDORSEMENT

This Endorsement is a part of this Policy and the terms and conditions of this Policy are amended as described herein. All other terms and conditions of this Policy remain unchanged.

1. **Cyber Event Definition**

   The following definition is added to this Policy:

   **cyber event** means any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** is not considered to be loss by **cyber event** within the terms and conditions of this Policy.

2. **Exclusions**

   PROPERTY EXCLUDED item **12.** is replaced with the following:

   12. Electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

       a)      Finished goods manufactured by the Insured; or

       b)      Other merchandise not manufactured by the Insured;

       or as provided by the Data Restoration coverage in this Policy.

   EXCLUSIONS Group I item **4.** is replaced with the following:

   4. Lack of incoming electricity, fuel, water, gas, steam or refrigerant; outgoing sewerage; or incoming or outgoing voice, data or video; all when caused by an event off the **location**, except as provided by the Data Service Provider and Off-Premises Service Interruption coverages in this Policy. If the lack of such a service directly causes insured physical damage at the **location**, then only that resulting damage is insured.

3. **Additional Coverages**

   ADDITIONAL COVERAGES items **6.** and **21.** are replaced with the following:

   6. **Data Restoration**

      This Policy covers insured **physical loss or damage to electronic data, programs or software**, while anywhere within this Policy's Territory, including while in transit.

      With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of the Qualifying Period shown in the Declarations section of this Policy.

      This coverage includes:

      a)      The cost of the following reasonable and necessary actions taken by the Insured due to actual insured **physical loss or damage to electronic data, programs or software**:

              i)      To temporarily protect and preserve insured electronic data, programs or software.

 

     **ii)**     For the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

     **iii)**     To expedite the permanent repair or replacement of such damaged property.

**b)**     The reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**. In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

**a)**     Finished goods manufactured by the Insured, or

**b)**     Other merchandise not manufactured by the Insured.

Data Restoration Exclusions: As respects Data Restoration, the following additional exclusion applies:

This Policy excludes the following but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

**a)**     Errors or omissions in processing or copying.

**b)**     Loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

**c)**     Deterioration, inherent vice, vermin or wear and tear.

The Period of Liability for this Additional Coverage Extension will be:

**a)**     The period of time starting from the time of insured **physical loss or damage to electronic data, programs or software**; and

**b)**     Ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the physical loss or damage.

Data Restoration Valuation: On property insured under this coverage, the loss amount will not exceed:

**a)**     The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer; or

**b)**     The blank value of the media if not repaired, replaced or restored within two years from the date of loss.

**21. Data Service Provider - Property Damage**

This Policy covers insured physical loss or damage to insured property at a **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.

© 2019 AFM. All rights reserved.




For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage will apply when such interruption of **off-premises data processing or data transmission services** is in excess of the Qualifying Period shown in the Declarations section of this Policy. Such interruption is the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Conditions:

1)   The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Data Service Provider - Property Damage Exclusions: As respects Data Service Provider - Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 4.   **Business Interruption Coverage**

BUSINESS INTERRUPTION COVERAGE EXTENSIONS items **4.** and **11.** are replaced with the following:

### 4.   **Owned Network Interruption**

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from:

a)   The failure of the Insured's **electronic data processing equipment or media** to operate provided that such failure is the direct result of a **cyber event** directed at the Named Insured; or

b)   The Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the Named Insured, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

While anywhere within this Policy's Territory.

As respects item **a)** above, this coverage will apply when the Period of Liability below is in excess of the Qualifying Period shown in the Declarations section of this Policy.

The Period of Liability for this Business Interruption Coverage Extension will be:

a)   The period of time starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure; and

 

b) Does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## 11. Data Service Provider - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at a **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage will apply when the Period of Liability of **off-premises data processing or data transmission services** below is in excess of the Qualifying Period shown in the Declarations section of this Policy.

Additional General Conditions:

a) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover the Business Interruption Coverage loss incurred by the Insured covered by Owned Network Interruption coverage as provided in this section of this Policy.

Data Service Provider - Business Interruption Exclusions: As respects Data Service Provider - Business Interruption, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the Period of Liability clause in this section.

b) Is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

c) Does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

 

## CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein.  All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1)   The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2)   Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3)   The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.

**PRO CYBER OPTIMAL 4100 (01/17)**                                                                                                    **Page 1 of 1**
*© 2017 AFM. All rights reserved.*

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for Certified Act of Terrorism Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of $40,000, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a **Certified Act of Terrorism**.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a **Certified Act of Terrorism** as defined herein. This amendment does not apply to any limit of liability for a **Certified Act of Terrorism**, if any, stated under any Sub-Limits clause in the Declarations section of this Policy.

With respect to any one or more **Certified Act(s) of Terrorism**, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed $100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed $100,000,000,000. If the aggregate insured losses for all insurers exceed $100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for a **Certified Act of Terrorism** will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 80% of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The premium charged for this coverage is provided above.

The terms and limitations of any **terrorism** exclusion, or the inapplicability or omission of **terrorism** exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a **Certified Act of Terrorism**.

**Certified Act of Terrorism** means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended. The criteria contained in that Act for a **Certified Act of Terrorism** include the following:

    a.   The act resulted in aggregate losses in excess of $5,000,000; and

    b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.





# GEORGIA

# STATE AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Georgia this policy is amended:

**CANCELLATION** - This policy shall be cancelled at any time at the request of the Insured in which case this Company shall upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for expired time.

This policy is subject to cancellation by this Company as follows:  This Company will give not less than forty-five (45) days' written notice of cancellation or nonrenewal.  In the event this Company shall fail to give to the Insured not less than forty-five (45) days' written notice of cancellation or nonrenewal, the Insured may require this Company to continue coverage under the same premium rate and policy terms and conditions for not more than thirty (30) days from the expiration date stated in this policy.  The Insured must tender the premium amount, computed on a pro rata basis, to this company on or before the expiration date stated in this policy.

However, this policy may be cancelled by this Company if the Insured fails to remit, when due, the payment of premium for such policy, by giving the Insured not less than ten (10) days' written notice of cancellation.

If this Company decides to increase the premium rates more than 15% of the expiring policy premium or to restrict the coverage, this company will give the Named Insured written notice of the changes at least forty-five (45) days prior to the effective date of the changes.  When the increase in premium exceeds 15% of the expiring policy premium, the notice will indicate the dollar amount of the increase.  This provision does not apply to an increase due to change in risk, exposure, experience modification or audit.

**NOTICE -** The laws of the State of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family violence.

**SUIT** – No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within four (4) years next after inception of the loss.

**OTHER INSURANCE** is deleted and replaced with the following:

If there is other insurance covering the same loss or damage that is covered:

a)   Under this policy; or

b)   Any other policy;

Then this insurance will apply only as pro rata so that this Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not.

In **REQUIREMENTS IN CASE OF LOSS** clause, the word "immediate" is replaced with the word "prompt".

In **MISREPRESENTATION AND FRAUD**, the lead-in sentence is replaced with:

The Company may cancel this Policy, whether before or after a loss, and may deny coverage if an Insured has:

The following additional provision is added:
Wherever the words "null and void" appear in this Policy, the words "not applicable" shall be substituted.

**AFM 2376 (11/19)**                                                                                                            **Page 1 of 2**
*© 2017 AFM. All rights reserved.*

 

**MOLD AND MILDEW REMEDIATION**: This Policy covers the cost to remediate mold directly resulting from other physical damage not excluded by this Policy, including:

    a)  the cost to:

        i)  remove the mold from covered property or to repair, restore or replace that property;

        ii)  contain, treat, detoxify, neutralize or dispose of or in any way respond to or assess the effect of the mold;

    b)  the cost of any necessary testing or monitoring of air or property to confirm the type, absence, presence or level of mold, whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

The **INCREASE IN HAZARD** provision is hereby deleted from the policy.

The following additional provision is added:
Wherever the words "Terrorism Risk Insurance Act of 2002" appear in this Policy, the words "Terrorism Insurance Act of 2002, as amended and extended" shall be substituted.

 

# KENTUCKY

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Kentucky this policy is amended:

**CANCELLATION**

The Cancellation provision of this policy is amended as follows:

**A.**   We may cancel this Policy by delivering to the Named Insured, or mailing to the Named Insured at the last known address, written notice of cancellation. The notice of cancellation shall be mailed or delivered at least 14 days prior to the cancellation date if the cancellation occurs within 60 days of the issuance of the Policy. The notice shall be mailed or delivered at least 75 days prior to the cancellation date if the Policy has been in effect more than 60 days. Notice of cancellation will include the reason for such cancellation.

**B.**   If this Policy has been in effect 60 days or more, or if it is a renewal of a Policy issued by us effective immediately, we may cancel this Policy on an anniversary date or if one or more of the following reasons apply:

   1.   Nonpayment of premium;

   2.   Discovery of fraud or material misrepresentation made by or with the knowledge of the Named Insured in obtaining the Policy, continuing the Policy, or in presenting a claim under the Policy;

   3.   Discovery of willful or reckless acts or omissions on the part of the Named Insured which increase any hazard insured against;

   4.   A change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed;

   5.   A violation of any local fire, health, safety, building or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

   6.   The insurer is unable to reinsure the risk covered by the Policy; or

   7.   A determination by the commissioner that the continuation of the Policy would place the insurer in violation of the Kentucky insurance code or regulations of the commissioner.

**NONRENEWAL** - If we decide not to renew this Policy, we will mail or deliver to the Named Insured at the last address known to us, our notice of non-renewal at least 75 days before the end of the policy period or anniversary date. Notice of non-renewal will include the reason for such non-renewal.

**RENEWAL** - If we elect to renew this Policy, we will deliver or mail to the Named Insured at the last known address, and to the agent, our notice of the renewal premium amount and its due date.

The notice of renewal will be delivered or mailed at least 30 days before the end of the Policy period if the Policy has been in effect more than 30 days. If the Policy has been in effect 30 days or less, the notice of renewal will be delivered or mailed at least seven days before the end of the Policy period.

If the premium for renewal is to be increased more than 25 percent of the premium for the preceding Policy term for like coverage or risks, we will mail or deliver to the Insured at the last known address, and to the agent, a notice of the increase, or a bill for increased premium, at least 75 days before the end of the Policy period.

We may extend the current Policy at the expiring premium to comply with these requirements.

**AFM 6504 (04/15)**                                                                                    Page 1 of 2



If the premium is not received on or before the due date, the Policy will expire and terminate on the due date. Within 15 days we will deliver or mail to the Named Insured, at the last known address, our notice that the Policy was not renewed and the date on which the coverage under it ceased.

Proof of delivery or mailing will be sufficient proof of notice.

**KENTUCKY FIRE LIEN LAWS - NOTICE TO THE POLICYHOLDER**

The Kentucky Legislature has passed legislation, effective July 15, 1980, requiring insurance companies to withhold the payment of fire losses of ten thousand ($10,000) dollars or greater until the company determines through the county clerk, where the loss occurs, of the existence of any lien(s) against the damaged or destroyed property. The town clerk has fifteen (15) days to respond to the insurance company's inquiry. This Legislature does not apply to one-family dwelling property.

When a notice of lien is received by the insurance company, it will subtract the amount of the lien(s) from the proceeds payable under the fire policy and pay that amount to the taxing district. If no notice is received, after fifteen days, the company can proceed with the payment of the loss in accordance with the provisions of the policy.

An insurer shall not be liable to any insured owner, mortgagee, assignee or other interested party for any amounts paid by it to the state, county or other taxing district pursuant to the provisions of this Act and in reliance upon information contained in any statement provided by the state or any county, city or other taxing district pursuant to this act.

**CONFORMITY TO STATUTE**

The following words are hereby deleted from the policy to which this endorsement is attached: "Terms of this Policy that conflict with the statutes of the jurisdiction where the insured property is located, are amended to conform to such statutes."

**INCREASE IN HAZARD**

The Increase in Hazard provision is hereby deleted from the policy.

 

# MARYLAND

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Maryland this policy is amended:

**CANCELLATION** – The Company may cancel this policy by sending the Insured a written notice by certificate of mail or by commercial mail delivery at least 45 days prior to the date of cancellation. When cancellation is because of nonpayment of premium, the Company will send written notice by certificate of mail to the Insured at least 10 days prior to the date of cancellation.

**NONRENEWAL -** If the Company decides not to renew this policy, it will send the Insured a written notice at least 45 days prior to the expiration date.

**PREMIUM INCREASE -** If the Company increases the policy premium by 20 percent or more, it will give notice to the Insured and the agent at least 45 days prior to the expiration date.

**SUIT AGAINST THE COMPANY -** A civil action at law shall be filed within 3 years from the date it accrues.

**CONCEALMENT, FRAUD -** This Company will not pay for any loss or damage if, whether before or after a loss, an Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

 

# MICHIGAN

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Michigan this policy is amended:

**CANCELLATION** - This policy may be cancelled at any time at the request of the Insured, in which case the Company shall refund the excess of paid premium or assessment above the pro rata rates for the expired time.

This policy may be cancelled at any time by the Company by mailing to the Insured at the Insured's address last known to the Company or an authorized agent of the Company, with postage fully prepaid, a not less than 10 days' written notice of cancellation with or without tender of the excess of paid premium or assessment above the pro rata premium for the expired time. This policy may be cancelled by the Company if the Insured fails to remit, when due, the payment of premium for such policy, by giving the Insured not less than (10) days' written notice of cancellation.

The minimum earned premium shall not be less than the pro rata premium for the expired time or $25.00, whichever is greater.

Cancellation shall be without prejudice to any claim originating before the cancellation. The mailing of notice shall be prima facie proof of notice. Delivery of written notice shall be equivalent to mailing.

This policy may be nonrenewed by the Company by giving the Insured not less than 60 days' written notice of nonrenewal.

**NOTICE OF CLAIM** - If Boiler and Machinery coverage is added to this policy, notice by or on behalf of the Insured to any authorized agent of the company within this state, with particulars sufficient to identify the Insured, shall be deemed to be notice to the Company. Failure to give any notice required to be given by this policy within the time specified therein, shall not invalidate any claim made by the Insured, if it shall be shown not to have been reasonably possible to give such notice within the prescribed time, and that notice was given as soon as was reasonably possible.

**NOTICE OF EXEMPTION** - This Policy is exempt from the filing requirements of section 2236 of the insurance code of 1956, 1956 PA 218, MCL 500, 2236. The Notice is being provided in accordance with the state's requirement for the Company to notify the Insured who is affected by this law. If you have questions or concerns, please contact your Broker or Underwriter.

**SERVICE OF SUIT** - No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)   The Insured has fully complied with all the provisions of this Policy; and

2)   Legal action is started within 1 year after inception of the loss.

In the event that the Company formally denies liability for the loss, then during the period from the day when the Insured notifies the Company of that loss until the day when the Company formally denies it, the one year time period for commencing an action is suspended.

**AFM 6730 (04/15)**                                                                                          **Page 1 of 1**

 

# MISSOURI

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Missouri this policy is amended:

**CANCELLATION**

The Insured may cancel this Policy at any time by surrendering this Policy to the Company; or by giving written notice to the Company stating when such cancellation will take effect.

The Company may cancel this Policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the actual reason for cancellation, at least:

1.  10 days before the effective date of cancellation if cancellation is for nonpayment of premium.

2.  10 days before the effective date of cancellation if cancellation is based on evidence of incendiarism by the Insured.

3.  30 days before the effective date of cancellation if cancellation is for one or more of the following reasons:

    a.  Fraud or material misrepresentation affecting this Policy or a claim filed under this Policy or a violation of any of the terms or conditions of this Policy.

    b.  Changes in conditions after the effective date of this Policy which have materially increased the risk assumed;

    c.  The Company becomes insolvent; or,

    d.  The Company involuntarily loses reinsurance for this Policy.

4.  60 days before the effective date of cancellation if the Company cancels for any other reason.

Return of any unearned premium will be calculated:  on the customary short rate basis if the Insured cancels; or on a pro-rata basis if the Company cancels this policy.  Return of unearned premium will be made by the Company as soon as practicable.

**NONRENEWAL**

The Company may elect not to renew this Policy by mailing or delivering to the first Named Insured, at the last mailing address known to the Company, written notice of nonrenewal, stating the actual reason for nonrenewal, at least 60 days prior to the effective date of the nonrenewal.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**MISSOURI PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION COVERAGE LIMITATIONS**

1.  Subject to the provisions of the Missouri Property and Casualty Insurance Guaranty Association Act (to be referred to as the Act), the Missouri Property and Casualty Insurance Guaranty Association (to be referred to as the Association) will pay claims covered under the Act if we become insolvent.

2.  The Act contains various exclusions, conditions and limitations that govern a claimant's eligibility to collect payment from the Association and affect the amount of any payment.  The following limitations apply subject to all other provisions of the Act:

 

a. Claims covered by the Association do not include a claim by or against an insured of an insolvent insurer, if the Insured has a net worth of more than $25 million on the date the insurer becomes insolvent.

b. Payments made by the Association for covered claims will include only that amount of each claim which is less than $300,000. However, the Association will not:

    (1) Be obliged to pay an amount of insured loss in excess of the applicable limit of insurance of the policy from which a claim arises; or

    (2) Return to an Insured any unearned premium in excess of $25,000.

These limitations have no effect on the coverage the Company will provide under this policy.

**COMPANY OPTION** - Upon partial destruction or damage to insured property caused by fire, the Company shall pay the Insured a sum of money equal to the damage done or repair the same to the extent of such damage, not exceeding the amount written in this policy, so that said property shall be in as good condition as before the fire, at the option of the Insured, pursuant to Section 379.150. RSMo. 1969.

**COMMENCEMENT OF LEGAL ACTION** - Legal action against this Company as provided in the policy, to which this endorsement is attached, shall commence within ten years after the date on which the direct physical loss or damage occurred.

**TIME FOR REPORTING A CLAIM** – The Company may not deny a claim due to the Insured's failure to submit written notification within a specified time period following a loss insured under this policy unless the failure to submit such notice would result in prejudicing the rights of the company.

**NO DENIAL OF PAYMENT TO AN INNOCENT CO-INSURED NATURAL PERSON-** If an innocent coinsured natural person files a police report and completes a sworn affidavit for the Company that indicates both the cause of the loss and a pledge to cooperate in any criminal prosecution of the person committing the act causing the loss, then the company shall not deny payment to an innocent coinsured for a property loss claim insured under this policy due to any policy provision that excludes coverage for intentional acts. Payment to the innocent coinsured is limited to such innocent coinsured's ownership interest in the property as reduced by any payment to a mortgagor or other secured interest; however, the Company shall not be required to make any subsequent payment to any other Insured for the part of any loss for which the innocent coinsured has received payment. The Company, upon making payment to an Insured shall have all rights of subrogation to recover against the perpetrator of the loss.

**VACANT** – As used in this policy vacant means empty without contents.

**UNOCCUPIED** - As used in this policy unoccupied means without occupants; no longer utilized for the customary and usual purpose of the building.

**APPRAISAL** - If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1. the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2. the Company has received a signed and sworn proof of loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. The appraisers have 15 days to agree on an umpire. After that time, either the Insured or the Company may request that an umpire will be selected by a judge. The judge must be a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss. Each appraiser will state separately the Actual Cash Value and replacement cost value. Those values will be as of the date of loss and the amount of loss, for each item of physical loss or damage.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any

 

two will determine the amount of loss.

The Insured and the Company will each:

1.  pay its chosen appraiser; and

2.  bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

 

# NEW JERSEY

# MANDATORY ENDORSEMENT

With respect to any insured location in the State of New Jersey this policy is amended:

**CANCELLATION – NON-RENEWAL STATEMENT -** Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the Insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the Insured and/or the Insured's lawful representative upon written request.

This provision shall not apply to any policy which has been in effect for less than 60 days at the time notice of cancellation is mailed or delivered, unless the policy is a renewal policy.

**CANCELLATION -** The Company may cancel this policy by mailing or delivering to the Named Insured notice 10 days before the effective date of cancellation if the cancellation is for nonpayment of premium or moral hazard as defined in the New Jersey Insurance Regulations. If cancellation is for other reasons, notice will be given not more than 120 days, nor less than 30 days prior to the effective date of the cancellation. The Company notice will state the reason for cancellation.

**NONRENEWAL -** If the Company decides not to renew this policy, it will mail or deliver to the Named Insured its notice of nonrenewal not more than 120 days but at least 30 days before the end of the policy period. The notice will state the reason for nonrenewal.

**RENEWAL PREMIUM - CHANGE IN CONTRACT TERMS –** The Company will mail or deliver to the Named Insured notice of the amount of the renewal premium and any change in contract terms not more than 120 days but at least 30 days prior to the due date of the premium.

**NOTICES -** Notices are not required if the Insured has replaced coverage or has otherwise specifically requested termination.

 

# NEW YORK

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of New York this policy is amended:

**CANCELLATION OF POLICIES IN EFFECT FOR 60 DAYS OR LESS** – During the first 60 days the policy is initially in effect, except for the basis of cancellation set forth in the next paragraph, no cancellation shall become effective until 20 days after written notice is mailed to the first Named Insured at the mailing address shown in the policy and to such Insured's authorized agent or broker.  If the policy is cancelled for non payment of premium, the cancellation notice shall inform the first Named Insured of the amount due.  The policy may be cancelled by the Company by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at the address shown in this policy, and the authorized agent or broker, if any, at least:

1.  30 days before the effective date of cancellation if the policy is cancelled for any reason not included in paragraph 2 below;

2.  15 days before the effective date of cancellation if the policy is cancelled for any of the following reasons:

    a)  Nonpayment of premium - requires an inclusion of a statement that clearly informs the Insured of the amount due; (This statement shall also apply if the policy is in effect greater than 60 days.)

    b)  Conviction of a crime arising out of acts increasing the hazards insured against;

    c)  Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim thereunder;

    d)  After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

    e)  Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with the Company objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

    f)  Required pursuant to a determination by the Superintendent that continuation of the present premium volume of the Company would jeopardize the company's solvency or be hazardous to the interest of the company's policyholders, creditors or the public;

    g)  A determination by the Superintendent that the continuation of the policy would violate, or would place the company in violation of, any provision of the Insurance Code; or

    h)  Where the Company has reason to believe, in good faith and with sufficient cause, that there is a probable risk or danger that the Insured will destroy, or permit to be destroyed the insured property for the purpose of collecting the insurance proceeds, provided, however, that:

        i)  A notice of cancellation on this ground shall inform the insured in plain language that the insured must act within ten days if review by the department of the ground for cancellation is desired pursuant to item (iii) of this subparagraph (h);

        ii)  Notice of cancellation on this ground shall be provided simultaneously by the insurer to the department; and

AFM 6497 (04/15)                                                                                              Page 1 of 4



    **iii)** Upon written request of the insured made to the department within ten days from the insured's receipt of notice of cancellation on this ground, the department shall undertake a review of the ground for cancellation to determine whether or not the insurer has satisfied the criteria for cancellation specified in this subparagraph; if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground shall be deemed null and void.

**CANCELLATION OF POLICIES IN EFFECT FOR MORE THAN 60 DAYS -** If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy issued by the Company, the policy may be cancelled by the Company only for any reasons listed in paragraph 2 above provided a written notice stating the reason for cancellation is mailed or delivered to the first Named Insured at the address shown in this policy, and the authorized agent or broker, if any, at least 15 days before the effective date of cancellation.  After the policy has been in effect for 60 days, or upon the effective date if the policy is a renewal, no notice of cancellation shall become effective until 15 days after notice is mailed or delivered to the first Named Insured and to such Insured's authorized agent or broker stating the reason, and such cancellation is based on one or more of the following:

**1.** Nonpayment of premium - requires an inclusion of a statement that clearly informs the Insured of the amount due; (This statement shall also apply if the policy is in effect greater than 60 days.)

**2.** Conviction of a crime arising out of acts increasing the hazards insured against;

**3.** Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim thereunder;

**4.** After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

**5.** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with the Company objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

**6.** Required pursuant to a determination by the Superintendent that continuation of the present premium volume of the Company would jeopardize the Company's solvency or be hazardous to the interest of the Company's policyholders, creditors or the public;

**7.** A determination by the Superintendent that the continuation of the policy would violate, or would place the Company in violation of, any provision of the Insurance Code; or

**8.** Where the Company has reason to believe, in good faith and with sufficient cause, that there is a probable risk or danger that the Insured will destroy, or permit to be destroyed the insured property for the purpose of collecting the insurance proceeds, provided, however, that:

    **a)** A notice of cancellation on this ground shall inform the insured in plain language that the insured must act within ten days if review by the department of the ground for cancellation is desired pursuant to item (c) of this subparagraph (8);

    **b)** Notice of cancellation on this ground shall be provided simultaneously by the insurer to the department; and

    **c)** Upon written request of the insured made to the department within ten days from the insured's receipt of notice of cancellation on this ground, the department shall undertake a review of the ground for cancellation to determine whether or not the insurer has satisfied the criteria for cancellation specified in this subparagraph; if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground shall be deemed null and void.



If this policy is cancelled, the Company will send the first Named Insured any premium refund due. If the Company cancels, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the Company will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**NONRENEWAL** - If the Company elects not to renew this policy the Company will send notice as provided in Notices of Nonrenewal and Conditional Renewal below, along with the reason for nonrenewal.

**CONDITIONAL RENEWAL - If the company conditions renewal of this policy upon:**

1. Change of limits;

2. Change in type of coverage;

3. Reduction of coverage;

4. Increased deductible;

5. Addition of exclusion;

6. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added; or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit; the Company will send notice as provided in paragraph Notices of Nonrenewal and Conditional Renewal below.

**NOTICES OF NONRENEWAL AND CONDITIONAL RENEWAL**

1. If the Company elects not to renew this policy or to conditionally renew this policy as provided in Nonrenewal and Conditional Renewal above, the Company will mail or deliver written notice to the first Named Insured shown in the Declarations, at least 60 but not more than 120 days before:

   a) The expiration date; or

   b) The anniversary date if this is a continuous policy.

2. Notice, which shall contain the specific reason or reasons for nonrenewal or conditional renewal, will be mailed or delivered to the first Named Insured at the address shown in the policy and the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

   The Company will not send notice of nonrenewal or conditional renewal if the Named Insured, or the authorized agent or broker or another insurer authorized by the Named Insured mails or delivers notice that the policy has been replaced or is no longer desired.

**PAYMENT OF LIENS** - The following provision pertaining to payment of liens on proceeds of fire insurance shall be included in a policy providing coverage for peril of fire and insuring the interest of an owner in any residential, commercial or industrial building or structure except a one or two family residential structure:

Prior to the payment of any proceeds under this insurance otherwise payable to the Insured for damages resulting to the premises from a loss occasioned by fire, this Company will deduct there from an pay the claim of any tax district which renders a certificate of lien pursuant to the Insurance law.  Upon the payment of such claim this Company shall, to the extent of such payment, be released from any obligation to pay the same to the Insured and that the payment of any such claim within 30 days of receipt by this Company of the certificate of lien shall, as between the insured and this Company, operate as a conclusive presumption that such claim was valid and properly paid.



**EXAMINATION OF BOOKS AND RECORDS**

1.  This Company or its duly appointed representative will be permitted to inspect the covered property, examine and audit books and records as they relate to covered property any time during the policy period up to one hundred-eighty (180) days after expiration of the policy.  The audit may not be waived except in the following circumstances:

    a)  The total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1,500;

    b)  The policy requires notification to the company with the specific identification of any additional exposure units for which coverage is requested; or

    c)  The policy is a commercial umbrella for which the rate of premium is determined by the application of a factor to the rate or premium of an auditable underlying policy.

2.  This Company shall, as soon as practicable following such audit, refund or credit the Insured's account for any return premium due the Insured, or bill and make a good faith effort to collect any additional premium due the Company as a result of the audit.

3.  In an Insured fails to cooperate with the Company in its attempt to conduct such audit, including failure to return any questionnaires or self-audit worksheets, the Company shall non-renew such Insured upon completion of the current policy period, in accordance with the provisions of Section 3426 of the Insurance Law, due to the Company's inability to establish a proper premium for such Insured.

**SERVICE OF SUIT** – Legal action against this Company as provided in the policy to which this endorsement is attached, shall commence within two years after the date on which the direct physical loss or damage occurred.

**ARSON REWARD COVERAGE** – Arson reward coverage as provided in any policy to which this endorsement is attached is declared to be null and void.

**AMENDED CONDITIONS FOR TERRORISM** –

The following sentence in the first paragraph of Exclusions Group I, Item 2f:

> However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to insured property.

Is replaced by:

> However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers the resulting direct loss or damage by fire to insured property.

The following paragraph 6 is deleted from the Valuation provision:

6.  On property that is damaged by fire and such fire is the result of terrorism, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) of the Policy and shall be subject to the limit(s) of liability for Terrorism, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the Limits of Liability clause in the Declarations section.

Business Interruption Exclusions 4 is replaced by:

> Any loss resulting from fire caused by or resulting from **terrorism** except as provided in the Terrorism coverage of this policy.

 

# TEXAS

# SPECIAL MANDATORY ENDORSEMENT

With respect to any insured location in the State of Texas this policy is amended:

**REQUIREMENTS IN CASE LOSS OCCURS**

1.  The Insured shall give immediate written notice to the Company of any loss, notify the police in case of loss by theft, protect the property from further damage, immediately separate the damaged and undamaged personal property, and put it in the best possible order.

2.  The Insured shall make reasonable and necessary repairs to protect the property, and keep an accurate record of repair expenses.

3.  The Insured shall furnish a complete inventory of the destroyed, damaged and undamaged property showing in detail the quantity, cost, actual cash value and loss amount claimed. All bills, receipts and related documents shall be attached to the inventory.

4.  Within 90 days unless such time is extended in writing by the Company, the Insured shall send to the Company a signed, sworn proof of loss.

5.  This proof of loss shall state to the best knowledge and belief of the Insured:

    a)  The time and origin of loss;

    b)  The interest of the Insured and all others in the property involved including all liens on the property;

    c)  All other contracts of insurance whether valid or not, covering any of the said property;

    d)  The actual cash value of each item of property and the amount of loss to each item;

    e)  The name of the occupancy and the occupancy of the building at the time of the loss; and

    f)  Any changes in the title, use, occupation, location, possession or exposures of said property since the issuing of this policy.

6.  The Insured shall furnish a copy of all the descriptions and schedules in all policies and, if required, a copy of all verified plans and specifications of any building, fixtures or machinery destroyed or damaged.

7.  If this policy provides replacement cost coverage and the Insured elects to make claim under the replacement cost coverage of this policy, this proof of loss shall also state, to the best knowledge and belief of the Insured, the replacement cost of the described property and the full cost of repair or replacement of loss without deduction for depreciation.

8.  The Insured, as often as may be reasonably required, shall:

    a)  Exhibit to any person designated by the Company all that remains of any property described in this policy;

    b)  Produce for examination all books of account, business records, bills, invoices and other vouchers or certified copies if originals are lost, and permit copies to be made; and

    c)  Submit to examinations under oath and sign and swear to them.



9. Within fifteen (15) days after the company receives written notice of claim, the Company shall:

   a) Acknowledge receipt of the claim; but, if the acknowledgement of the claim is not in writing, the Company will keep a record of the date, method and content of the acknowledgement;

   b) Begin any investigation of the claim; and

   c) Specify the information that the Insured shall provide in accordance with the above item a.

   The Company may request more information, if during the investigation of the claim such additional information is necessary.

10. After the Company receives the requested information, the Company shall notify the Insured in writing within fifteen (15) business days, or within thirty (30) days if the Company has reason to believe the loss resulted from arson, whether the claim will be paid or has been denied or whether more information is necessary.

11. If the Company does not approve payment of the claim or requires more time for processing the claim, the Company shall give the reasons for denying the claim, or give the reasons for requiring more time to process the claim.

12. But, the Company shall either approve or deny the claim within forty-five (45) days after requesting more time.

13. In the event of a weather related catastrophe as determined by the State Board of Insurance or major natural disaster as declared under the Texas Disaster Act of 1975, the claim handling deadlines imposed in this policy provision are extended for an additional fifteen (15) days.

14. "Business day" means a day other than Saturday, Sunday or holiday recognized by the State of Texas.

**LOSS PAYMENT**

1. If the Company notifies the Insured that payment of the claim or part of the claim will be made, the company shall make payment within five (5) business days after notification to the Insured.

2. If payment of the claim or part of the claim requires the performance of an act by the Insured, the Company shall make payment within five (5) business days after the date the Insured performs the act.

3. In the event of a weather related catastrophe as determined by the State Board of Insurance or major natural disaster as declared under the Texas Disaster Act of 1975, the claim handling deadlines imposed in this policy provision are extended for an additional fifteen (15) days.

4. "Business day" means a day other than Saturday, Sunday or holiday recognized by the State of Texas.

**SUIT AGAINST COMPANY -** No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this policy, and unless the same be commenced within two (2) years and one (1) day next after the cause of action accrues.

**CANCELLATION**

1. The Insured may cancel this policy by notice to this Company. Upon demand and surrender of this policy, the Company will refund the unearned premium determined by the customary short rate procedures.

2. Except as provided in 3 below, this company may not cancel this policy after the 60th day following the effective date of this policy.

3. This Company may cancel this policy at any time during the term of this policy for the following reasons:



  a. Fraud in obtaining coverage;

  b. Failure to pay premiums when due;

  c. An increase in hazard within the control of the Insured which would produce an increase in rate;

  d. Loss of this Company's reinsurance covering all or part of the risk covered by this policy, or;

  e. This Company being placed in supervision, conservatorship or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator or receiver.

**4.** This Company must deliver or mail to the First Named Insured under this policy, at the address shown on this policy, written notice of cancellation of this policy not less than the 10th day before the date on which the cancellation takes effect.

**5.** At the option of the Insured, this policy must be renewed at expiration, unless this Company delivers or mails to the First-Named Insured written notice of the nonrenewal of this policy at the address shown on this policy. The notice must be delivered or mailed not later than the 60th day before the date on which this policy expires. If notice is delivered or mailed later than the 60th day before the date on which this policy expires, the coverage shall remain in effect until the 61st day after the date on which the notice is delivered or mailed.

  a. Earned premium for any period of coverage that extends beyond the expiration date of this policy shall be computed pro rata based on the rate charged for this expired policy.

  b. The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

**6.** In notice to the Insured relating to cancellation or refusal to renew this Company must state the reason for the cancellation or nonrenewal.

**7.** This Company may not cancel or refuse to renew this policy solely because the Insured is an elected official.

## MORTGAGE INTERESTS AND OBLIGATIONS

**1.** This policy, as to the interest of the mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy; PROVIDED that the mortgagee shall notify the Company of any change of ownership or increase of hazard which shall come to the knowledge of said mortgagee, and unless permitted by this policy, it shall be noted hereon.

**2.** If the Insured fails to render proof of loss, such mortgagee, upon notice, shall render proof of loss in the form herein specified within ninety one (91) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit. If the Company shall claim that no liability existed as to the mortgagor or owner, it shall, to the extent of payment of loss to the mortgage, be subrogated to all the mortgagee's rights of recovery, but without impairing mortgagee's right to sue, or it may pay off the mortgage debt and require an assignment thereof and of the mortgage. Other provisions relating to the interests and obligations of such mortgagee may be added hereto by agreement in writing.

**3.** Failure upon the part of the mortgagee to comply with any of the foregoing obligations shall render the insurance under this policy null and void as to the interest of the mortgagee.

**4.** If this policy is cancelled, the Company will give the mortgagee specifically named in this policy a written notice of cancellation.

**5.** If the Company cancels this policy, the mortgagee will be given the same number of days' notice of cancellation as the Insured.



6.  If the Insured cancels this policy, the mortgagee will be given notice of cancellation to be effective on the date stated in the notice; however, the effective date of cancellation cannot be before the 10th day after notice is mailed.

7.  The Company will not give notice of cancellation to any successor or assignee of the mortgagee named in this policy.

8.  In the event of a foreclosure under a deed of trust, the lender may cancel this policy of insurance covering the property foreclosed upon and shall be entitled to any unearned premiums from this policy, provided the lender credits the amount of such unearned premiums against any deficiency owed by the borrower. Unearned premiums shall be determined by the customary short rate procedures.

**ADDITIONAL GENERAL CONDITION, A LIQUIDATED DEMAND -** A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. The provisions of this Article shall not apply to personal property.

**AFM**

**proVision**

# VIRGINIA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Virginia this policy is amended:

**CANCELLATION** - Written notice of cancellation must be sent to all Insureds by registered or certified mail.

**OTHER INSURANCE / EXCESS INSURANCE / UNDERLYING INSURANCE** – If there is other insurance covering the same loss or damage that is covered, and if the limits of the underlying insurance exceed the deductible that would apply under this policy, then this insurance will apply only as pro rata so that this Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not.

**BASIS OF VALUATION** – The Insured may submit claim based on the actual cash value of the property lost or damaged until repair or replacement has been completed.  The Insured may still claim for the additional coverage which replacement cost provides if notification of intention to do so is received by the company within SIX MONTHS after the loss or damage.

# EXHIBIT 2

STATE OF MARYLAND

# Proclamation

Declaration of State of Emergency and
Existence of Catastrophic Health Emergency — COVID-19

WHEREAS, an outbreak of disease ("COVID-19") caused by the novel coronavirus occurred in Hubei province, China, in late 2019, and has currently been detected in more than 89 countries, including the United States;

WHEREAS, COVID-19 is a severe respiratory disease, resulting in illness or death, caused by the person-to-person spread of the novel coronavirus, which was not previously found in humans;

WHEREAS, the novel coronavirus, as a viral agent capable of causing extensive loss of life or serious disability, is a deadly agent;

WHEREAS, the World Health Organization ("WHO") and the Centers for Disease Control and Prevention ("CDC") have declared the COVID-19 outbreak a "public health emergency of international concern";

WHEREAS, the Secretary of the U.S. Department of Health and Human Services has declared that COVID-19 creates a public health emergency;

WHEREAS, the CDC has issued guidance to all state and local governments, and all citizens, recommending preparedness to prevent community spread and guard against the potential of a COVID-19 pandemic;

WHEREAS, as of March 5, 2020, the CDC found that COVID-19 has infected individuals in 17 states, and resulted in a total of 177 confirmed and presumed positive cases in the United States;

1

WHEREAS,      the transmission of the novel coronavirus in the state is a threat to human health in all of Maryland;

WHEREAS,      the person-to-person spread modeled by the CDC and WHO indicates that extensive loss of life or serious disability is threatened imminently in all of Maryland because of the transmission in the state of novel coronavirus;

WHEREAS,      COVID-19 is a public health catastrophe and public emergency;

WHEREAS,      COVID-19 poses an immediate danger to public safety; and

WHEREAS,      the impending threat to Maryland by COVID-19 is a catastrophic health emergency requiring the State to deploy resources and implement the emergency powers of the Governor to protect the health and safety of Marylanders;

NOW, THEREFORE, I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE MARYLAND CONSTITUTION AND THE LAWS OF MARYLAND, INCLUDING BUT NOT LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, HEREBY PROCLAIM, EFFECTIVE IMMEDIATELY, THAT A STATE OF EMERGENCY AND CATASTROPHIC HEALTH EMERGENCY EXISTS WITHIN THE ENTIRE STATE OF MARYLAND.

Given Under My Hand and the Great Seal of the State of Maryland in the City of Annapolis, this 5th day of March, 2020.

Lawrence J. Hogan, Jr.
Governor

ATTEST:

John C. Wobensmith
Secretary of State

# EXHIBIT 3




## Executive Department

### ORDER
#### OF THE
### GOVERNOR OF THE STATE OF MARYLAND

## CLOSING CASINOS, RACETRACKS AND SIMULCAST BETTING FACILITIES

WHEREAS,     A state of emergency and catastrophic health emergency was proclaimed on March 5, 2020, to control and prevent the spread of COVID-19 within the state, and the state of emergency and catastrophic health emergency still exists;

WHEREAS,     COVID-19, a respiratory disease that spreads easily from person to person and may result in serious illness or death, is a public health catastrophe and has been confirmed in five Maryland counties;

WHEREAS,     To reduce the spread of COVID-19, the U.S. Centers for Disease Control and Prevention and the Maryland Department of Health recommend canceling large gatherings and social distancing in smaller gatherings;

WHEREAS,     The currently known and available scientific evidence and best practices support limitations on large gatherings and social distancing to prevent exposures and transmissions, and reduce the threat to especially vulnerable populations, including older individuals and those with chronic health conditions;

WHEREAS,     To reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, and to protect and save lives, it is necessary and reasonable that individuals in the state refrain from congregating; and

WHEREAS,     To protect the public health, welfare, and safety, prevent the transmission of the novel coronavirus, control the spread of COVID-19, and save lives, it is necessary to control and direct the occupancy and use of casino, racetrack, and simulcast betting facility buildings and premises in Maryland, and the movement of individuals to and from such buildings and premises;

NOW, THEREFORE, I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, INCLUDING BUT NOT

- 1 -

LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, DO HEREBY ORDER:

I.    The occupancy and use of the following buildings and premises (the "Gaming and Racing Facilities") are controlled by this Order:

a. MGM National Harbor
b. Live! Casino & Hotel
c. Horseshoe Casino Baltimore
d. Hollywood Casino Perryville
e. Ocean Downs Casino
f. Rocky Gap Casino Resort
g. Laurel Park
h. Pimlico Race Course
i. Timonium Race Course
j. Fair Hill Races
k. Rosecroft Raceway
l. Ocean Downs
m. All simulcast betting facilities in the State, to the extent not otherwise included in the buildings and premises listed above.

II.    All areas of the Gaming and Racing Facilities otherwise open to the general public for gaming, betting, wagering, and other similar activities (including, without limitation, video lottery facilities and table game areas) are hereby closed to the general public, effective 12:01 a.m. on March 16, 2020.

III.    Each law enforcement officer of the State or a political subdivision shall execute and enforce this Order.

IV.    A person who knowingly and willfully violates this Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

V.    This Order remains effective until the state of emergency has been terminated and the proclamation of the catastrophic health emergency has been rescinded, or until rescinded, superseded, amended, or revised by additional orders.

VI.    The effect of any statute, rule, or regulation of an agency of the State or a political subdivision inconsistent with this order is hereby suspended.

ISSUED UNDER MY HAND THIS 15TH DAY OF MARCH, 2020, AND EFFECTIVELY IMMEDIATELY.

Lawrence J. Hogan, Jr.
Governor

- 2 -

# EXHIBIT 4





### Executive Department

## ORDER

OF THE

### GOVERNOR OF THE STATE OF MARYLAND

NUMBER 20-03-19-01

## AMENDING AND RESTATING THE ORDER OF MARCH 16, 2020, PROHIBITING LARGE GATHERINGS AND EVENTS AND CLOSING SENIOR CENTERS, AND ADDITIONALLY CLOSING VARIOUS OTHER ESTABLISHMENTS

WHEREAS,        A state of emergency and catastrophic health emergency was proclaimed on March 5, 2020, to control and prevent the spread of COVID-19 within the state, and the state of emergency and catastrophic health emergency still exists;

WHEREAS,        COVID-19, a respiratory disease that spreads easily from person to person and may result in serious illness or death, is a public health catastrophe and has been confirmed in several Maryland counties;

WHEREAS,        To reduce the spread of COVID-19, the U.S. Centers for Disease Control and Prevention and the Maryland Department of Health recommend canceling large gatherings and social distancing in smaller gatherings;

WHEREAS,        The currently known and available scientific evidence and best practices support limitations on large gatherings and social distancing to prevent exposures and transmissions, and reduce the threat to especially vulnerable populations, including older individuals and those with chronic health conditions;

WHEREAS,        To reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, and to protect and save lives, it is necessary and reasonable that individuals in the state refrain from congregating;

WHEREAS,        To protect the public health, welfare, and safety, prevent the transmission of the novel coronavirus, control the spread of COVID-19, and save lives, it is necessary to control and direct the movement of individuals in Maryland, including those on the public streets;

WHEREAS,      It is further necessary to control and direct in Maryland the occupancy and use of buildings and premises, as well as places of amusement and assembly; and

WHEREAS,      the Coronavirus Response Team will continue to advise on related public health and emergency management decisions;

NOW, THEREFORE,  I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, INCLUDING BUT NOT LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, DO HEREBY ORDER:

I.      The Order of the Governor of the State of Maryland, dated March 12, 2020, entitled "Prohibiting Large Gatherings and Events and Closing Senior Centers," as amended on March 16, 2020, and entitled "Amending and Restating the Order of March 12, 2020, Prohibiting Large Gatherings and Events and Closing Senior Centers, and Additionally Closing Bars, Restaurants, Fitness Centers, and Theaters," is further amended and restated in its entirety as set forth herein.

II.      Social, community, spiritual, religious, recreational, leisure, and sporting gatherings and events ("large gatherings and events") of more than 10 people are hereby prohibited at all locations and venues, including but not limited to parades, festivals, conventions, and fundraisers.

III.      Planned large gatherings and events must be canceled or postponed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

IV.      All senior citizen activities centers (as defined in Section 10-501(i) of the Human Services Article of the Maryland Code) shall remain closed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

V.      <u>Restaurants and Bars</u>.

    a.  This Order controls the occupancy and use of restaurants, bars, and other similar establishments that sell food or beverages for consumption on-premises in Maryland ("Restaurants and Bars"). This Order does not apply to food or beverage services in health care facilities, which are expressly excluded from the definition of "Restaurants and Bars."

    b.  All Restaurants and Bars shall remain closed to the general public, except that, to the extent permitted by applicable law, and in accordance with any social-distancing recommendations of the Maryland Department of Health, food and beverages may be:

        i.  sold if such food or beverages are promptly taken from the premises, i.e.,

on a carry-out or drive-through basis; or

ii.  delivered to customers off the premises.

VI.  Fitness Centers.

a.  This Order controls the occupancy and use of fitness centers, health clubs, health spas, gyms, aquatic centers, and self-defense schools in Maryland ("Fitness Centers").

b.  All Fitness Centers shall remain closed to the general public, except that the portion of any Fitness Center that is licensed or otherwise permitted by applicable law, regulation, or order to provide child care services may remain open to the general public for the purpose of continuing to provide such child care services.

VII.  Theaters.

a.  This Order controls the occupancy and use of theatres in Maryland at which live performances occur or motion pictures are shown ("Theaters").

b.  All Theaters shall remain closed to the general public.

VIII.  Malls.

a.  This Order controls the occupancy and use of shopping centers in Maryland that have one or more enclosed pedestrian concourses ("Enclosed Malls").

b.  The following portions of Enclosed Malls are hereby closed to the general public, effective as of 5:00 p.m. on March 19, 2020:

i.  pedestrian concourses and other interior common areas open to the general public, including without limitation, food courts; and

ii.  retail establishments only accessible to the general public from enclosed pedestrian concourses or other interior areas.

c.  This paragraph VIII does not require closure of retail establishments attached to Enclosed Malls that are directly accessible from the outside.

IX.  Other Recreational Establishments.

a.  This Order controls the occupancy and use of the following establishments in Maryland ("Recreational Establishments"):

i.  bingo halls;
ii.  bowling alleys;
iii.  pool halls;
iv.  amusement parks;

- 3 -

     v.   roller and ice skating rinks; and

     vi.  any other establishment not listed above that is subject to the admission and amusement tax under Title 4 of the Tax-General Article of the Maryland Code.

  b.  All Recreational Establishments are hereby closed to the general public, effective as of 5:00 p.m. on March 19, 2020 (or shall remain closed, if closed by a prior Order).

X.    <u>Government Buildings and Facilities with Large Occupancy or Attendance</u>.

  a.  State and local government buildings and facilities with an expected occupancy or attendance of more than 10 people shall:

     i.  Promptly and conspicuously post in the building or facility a copy of the Maryland Department of Health recommendations for social distancing; and

     ii.  Provide all occupants and attendees with the capability to wash their hands.

  b.  A copy of this Order shall be made available to all occupants or attendees at any State or local government building and facility with an expected occupancy or attendance of more than 10 people.

XI.   Each law enforcement officer of the State or a political subdivision shall execute and enforce this Order.

XII.  A person who knowingly and willfully violates this Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

XIII.  This Order remains effective until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded, or until rescinded, superseded, amended, or revised by additional orders.

XIV.  The effect of any statute, rule, or regulation of an agency of the State or a political subdivision inconsistent with this order is hereby suspended.

XV.  The underlined paragraph headings in this Order are for convenience of reference only and shall not affect the interpretation of this Order.

ISSUED UNDER MY HAND THIS 19TH DAY OF MARCH, 2020, AND EFFECTIVELY IMMEDIATELY.

Lawrence J. Hogan, Jr.
Governor

- 4 -

# EXHIBIT 5

 

### Executibe Department

ORDER

OF THE

## GOVERNOR OF THE STATE OF MARYLAND

NUMBER 20-03-23-01

AMENDING AND RESTATING THE ORDER OF MARCH 19, 2020,
PROHIBITING LARGE GATHERINGS AND EVENTS AND CLOSING SENIOR
CENTERS, AND ADDITIONALLY CLOSING ALL NON-ESSENTIAL
BUSINESSES AND OTHER ESTABLISHMENTS

WHEREAS, A state of emergency and catastrophic health emergency was proclaimed on March 5, 2020, and renewed on March 17, 2020, to control and prevent the spread of COVID-19 within the state, and the state of emergency and catastrophic health emergency still exists;

WHEREAS, COVID-19, a respiratory disease that spreads easily from person to person and may result in serious illness or death, is a public health catastrophe and has been confirmed in several Maryland counties;

WHEREAS, To reduce the spread of COVID-19, the U.S. Centers for Disease Control and Prevention and the Maryland Department of Health recommend canceling large gatherings and social distancing in smaller gatherings;

WHEREAS, The currently known and available scientific evidence and best practices support limitations on large gatherings and social distancing to prevent exposures and transmissions, and reduce the threat to especially vulnerable populations, including older individuals and those with chronic health conditions;

WHEREAS, To reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, and to protect and save lives, it is necessary and reasonable that individuals in the state refrain from congregating;

WHEREAS, To protect the public health, welfare, and safety, prevent the transmission of the novel coronavirus, control the spread of COVID-19,

and save lives, it is necessary to control and direct the movement of individuals in Maryland, including those on the public streets;

WHEREAS,    It is further necessary to control and direct in Maryland the occupancy and use of buildings and premises, as well as places of amusement and assembly; and

WHEREAS,    the Coronavirus Response Team will continue to advise on related public health and emergency management decisions;

NOW, THEREFORE, I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, INCLUDING BUT NOT LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, DO HEREBY ORDER:

I.    The Order of the Governor of the State of Maryland, dated March 12, 2020, entitled "Prohibiting Large Gatherings and Events and Closing Senior Centers," as amended and restated on March 16, 2020, and further amended and restated on March 19, 2020 by Order Number 20-03-19-01, is further amended and restated in its entirety as set forth herein.

II.   <u>Gatherings Large Than 10 Persons Prohibited</u>.

   a.  Social, community, spiritual, religious, recreational, leisure, and sporting gatherings and events ("large gatherings and events") of more than 10 people are hereby prohibited at all locations and venues, including but not limited to parades, festivals, conventions, and fundraisers.

   b.  Planned large gatherings and events must be canceled or postponed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

III.  <u>Closure of Non-Essential Businesses, Generally</u>.

   a.  This Order controls the occupancy and use of all businesses, organizations, establishments, and facilities that are <u>not</u> part of the critical infrastructure sectors identified by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (currently described at https://www.cisa.go v/identifying-critical-infrastructure-during-covid-19) (collectively, "Non-Essential Businesses").

   b.  All Non-Essential Businesses are hereby closed to the general public, effective as of 5:00 p.m. on March 23, 2020 (or shall remain closed, if closed by a prior Order).

c. All businesses, organizations, establishments, and facilities that are required to close pursuant to paragraph IV, pursuant to any other Order of the Governor of the State of Maryland or any other Order of a political subdivision, shall be and remain closed in accordance with paragraph IV or such other Order, as the case may be.

IV.   Closure of Certain Specific Businesses, Organizations, and Facilities.

a. *Senior Centers.* All senior citizen activities centers (as defined in Section 10-501(i) of the Human Services Article of the Maryland Code) shall remain closed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

b. *Restaurants and Bars.*

   i. This Order controls the occupancy and use of restaurants, bars, and other similar establishments that sell food or beverages for consumption on-premises in Maryland ("Restaurants and Bars"). This Order does not apply to food or beverage services in health care facilities, which are expressly excluded from the definition of "Restaurants and Bars."

   ii. All Restaurants and Bars shall remain closed to the general public, except that, to the extent permitted by applicable law, and in accordance with any social-distancing recommendations of the Maryland Department of Health, food and beverages may be:

      1. sold if such food or beverages are promptly taken from the premises, i.e., on a carry-out or drive-through basis; or

      2. delivered to customers off the premises.

c. *Fitness Centers.*

   i. This Order controls the occupancy and use of fitness centers, health clubs, health spas, gyms, aquatic centers, and self-defense schools in Maryland ("Fitness Centers").

   ii. All Fitness Centers shall remain closed to the general public, except that the portion of any Fitness Center that is licensed or otherwise permitted by applicable law, regulation, or order to provide child care services may remain open to the general public for the purpose of continuing to provide such child care services.

d. *Theaters.*

   i. This Order controls the occupancy and use of theatres in Maryland at which live performances occur or motion pictures are shown ("Theaters").

      ii.  All Theaters shall remain closed to the general public.

e.  *Malls*.

    i.  This Order controls the occupancy and use of shopping centers in Maryland that have one or more enclosed pedestrian concourses ("Enclosed Malls").

    ii.  The following portions of Enclosed Malls shall remain closed to the general public:

      1.  pedestrian concourses and other interior common areas open to the general public, including without limitation, food courts; and

      2.  retail establishments only accessible to the general public from enclosed pedestrian concourses or other interior areas.

    iii.  This paragraph IV.e does not require closure of retail establishments attached to Enclosed Malls that are directly accessible from the outside.

    iv.  Notwithstanding paragraph IV.e.ii, local governments may approve access by the general public to the following parts of Enclosed Malls:

      1.  retail establishments (a) that primarily sell groceries or pharmacy products, or (b) at which licensed professionals provide health care services; and

      2.  pedestrian concourses and other interior common areas, but solely to the extent necessary for the general public to access the retail establishments described in paragraph IV.e.iv.1.

f.  *Other Recreational Establishments*.

    i.  This Order controls the occupancy and use of the following establishments in Maryland ("Recreational Establishments"):

      1.  bingo halls;
      2.  bowling alleys;
      3.  pool halls;
      4.  amusement parks;
      5.  roller and ice skating rinks;
      6.  all golf courses (public and private), miniature golf establishments, and driving ranges;
      7.  social and fraternal clubs, including without limitation, American Legion posts, VFW posts, and Elks Clubs; and
      8.  any other establishment not listed above that is subject to the admission and amusement tax under Title 4 of the Tax-General Article of the Maryland Code.

ii. All Recreational Establishments are hereby closed to the general public, effective as of 5:00 p.m. on March 23, 2020 (or shall remain closed, if closed by a prior Order).

g. *Other Miscellaneous Establishments.*

    i. This Order controls the occupancy and use of the following establishments in Maryland:

        1. tattoo parlors;
        2. tanning salons;
        3. barber shops; and
        4. beauty salons and all other establishments that provide esthetic services, provide hair services, or provide nail services (as described in Title 5, Subtitle 2 of the Business Occupations Article of the Maryland Code).

    ii. The establishments listed in paragraph IV.g.i above are hereby closed to the general public, effective as of 5:00 p.m. on March 23, 2020.

V. <u>Specific Exclusions</u>.  For avoidance of doubt, this Order does not require the closure of:

    a. Any federal, State, or local government unit, building, or facility;
    b. Any newspaper, television, radio, or other media service; or
    c. Any non-profit organization or facility providing essential services to low-income persons, including, without limitation, homeless shelters, food banks, and soup kitchens.

VI. <u>Government Buildings and Facilities with Large Occupancy or Attendance</u>.

    a. State and local government buildings and facilities with an expected occupancy or attendance of more than 10 people shall:

        i. Promptly and conspicuously post in the building or facility a copy of the Maryland Department of Health recommendations for social distancing; and

        ii. Provide all occupants and attendees with the capability to wash their hands.

    b. A copy of this Order shall be made available to all occupants or attendees at any State or local government building and facility with an expected occupancy or attendance of more than 10 people.

VII. <u>General Provisions</u>.

    a. Each law enforcement officer of the State or a political subdivision shall execute and enforce this Order.

- 5 -

b. A person who knowingly and willfully violates this Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

c. This Order remains effective until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded, or until rescinded, superseded, amended, or revised by additional orders.

d. The effect of any statute, rule, or regulation of an agency of the State or a political subdivision inconsistent with this order is hereby suspended.

e. The underlined paragraph headings in this Order are for convenience of reference only and shall not affect the interpretation of this Order.

ISSUED UNDER MY HAND THIS 23RD DAY OF MARCH, 2020, AND EFFECTIVELY IMMEDIATELY.

Lawrence J. Hogan, Jr.
Governor

# EXHIBIT 6




Executive Department

ORDER

OF THE

GOVERNOR OF THE STATE OF MARYLAND

NUMBER 20-03-30-01

AMENDING AND RESTATING THE ORDER OF MARCH 23, 2020, PROHIBITING
LARGE GATHERINGS AND EVENTS AND CLOSING SENIOR CENTERS, AND
ALL NON-ESSENTIAL BUSINESSES AND OTHER ESTABLISHMENTS, AND
ADDITIONALLY REQUIRING ALL PERSONS TO STAY AT HOME

WHEREAS,     A state of emergency and catastrophic health emergency was proclaimed
on March 5, 2020, and renewed on March 17, 2020, to control and
prevent the spread of COVID-19 within the state, and the state of
emergency and catastrophic health emergency still exists;

WHEREAS,     COVID-19, a respiratory disease that spreads easily from person to
person and may result in serious illness or death, is a public health
catastrophe and has been confirmed throughout Maryland;

WHEREAS,     To reduce the spread of COVID-19, the U.S. Centers for Disease Control
and Prevention and the Maryland Department of Health recommend
canceling large gatherings and social distancing in smaller gatherings;

WHEREAS,     The currently known and available scientific evidence and best practices
support limitations on large gatherings and social distancing to prevent
exposures and transmissions, and reduce the threat to especially
vulnerable populations, including older individuals and those with
chronic health conditions;

WHEREAS,     To reduce the threat to human health caused by transmission of the novel
coronavirus in Maryland, and to protect and save lives, it is necessary
and reasonable that individuals in the state refrain from congregating;

WHEREAS,     To protect the public health, welfare, and safety, prevent the
transmission of the novel coronavirus, control the spread of COVID-19,

and save lives, it is necessary to control and direct the movement of individuals in Maryland, including those on the public streets;

WHEREAS,    It is further necessary to control and direct in Maryland the occupancy and use of buildings and premises, as well as places of amusement and assembly; and

WHEREAS,    the Coronavirus Response Team will continue to advise on related public health and emergency management decisions;

NOW, THEREFORE, I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, INCLUDING BUT NOT LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, DO HEREBY ORDER:

I.    The Order of the Governor of the State of Maryland, dated March 12, 2020, entitled "Prohibiting Large Gatherings and Events and Closing Senior Centers," as amended and restated on March 16, 2020, and further amended and restated on March 19, 2020 by Order Number 20-03-19-01, and further amended and restated on March 23, 2020 by Order Number 20-03-29-01, is further amended and restated in its entirety as set forth herein.

II.    <u>Stay-at-Home Order.</u>

    a.  All persons living in the State of Maryland are hereby ordered, effective as of 8:00 p.m. on March 30, 2020, to stay in their homes or places of residences ("Homes") except:

        i.  to conduct or participate in Essential Activities (defined below);

        ii.  staff and owners of businesses and organizations that are not required to close pursuant to paragraph IV or paragraph V below may travel:

            1.  between their Homes and those businesses and organizations; and

            2.  to and from customers for the purpose of delivering goods or performing services; and

        iii.  staff and owners of Non-Essential Businesses (defined below) may travel:

            1.  between their Homes and those Non-Essential Businesses for the purpose of engaging in Minimal Operations; and

            2.  to and from customers for the purpose of delivering goods.

    b.  As used herein, "Essential Activities" means:

- 2 -

    i.   Obtaining necessary supplies or services for one's self, family, household members, pets, or livestock, including, without limitation: groceries, supplies for household consumption or use, supplies and equipment needed to work from home, laundry, and products needed to maintain safety, sanitation, and essential maintenance of the home or residence;

    ii.   Engaging in activities essential for the health and safety of one's self, family, household members, pets, or livestock, including such things as seeking medical or behavior health or emergency services, and obtaining medication or medical supplies;

    iii.   Caring for a family member, friend, pet, or livestock in another household or location, including, without limitation, transporting a family member, friend, pet, or livestock animal for essential health and safety activities, and to obtain necessary supplies and services;

    iv.   Traveling to and from an educational institution for purposes of receiving meals or instructional materials for distance learning;

    v.   Engaging in outdoor exercise activities, such as walking, hiking, running, or biking, but only in compliance with paragraph III below and applicable social distancing guidance published by the U.S. Centers for Disease Control and Prevention ("CDC") and the Maryland Department of Health ("MDH");

    vi.   Travel required by a law enforcement officer or court order; or

    vii.   Traveling to and from a federal, State, or local government building for a necessary purpose.

III.   <u>Gatherings Large Than 10 Persons Prohibited</u>.

    a.   Social, community, spiritual, religious, recreational, leisure, and sporting gatherings and events ("large gatherings and events") of more than 10 people are hereby prohibited at all locations and venues, including but not limited to parades, festivals, conventions, and fundraisers.

    b.   Planned large gatherings and events must be canceled or postponed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

IV.   <u>Closure of Non-Essential Businesses, Generally</u>.

    a.   This Order controls the occupancy and use of all businesses, organizations, establishments, and facilities that are <u>not</u> part of the critical infrastructure sectors identified by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (currently described at

https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19)
(collectively, "Non-Essential Businesses").

b.  Subject to paragraph IV.c, all Non-Essential Businesses shall remain closed to the
general public.

c.  Staff and owners may continue to be on-site at Non-Essential Businesses for only
the following purposes ("Minimal Operations"):

    i.  Facilitating remote working (a/k/a/ telework) by other staff;

    ii.  Maintaining essential property;

    iii.  Preventing loss of, or damage to property, including without limitation,
preventing spoilage of perishable inventory;

    iv.  Performing essential administrative functions, including without
limitation, picking up mail and processing payroll;

    v.  Caring for live animals; and

    vi.  In the case of Non-Essential Businesses that are retail establishments,
continuing to sell retail products on a delivery basis.

d.  All businesses, organizations, establishments, and facilities that are required to
close pursuant to paragraph V, pursuant to any other Order of the Governor of the
State of Maryland or any other Order of a political subdivision, shall be and
remain closed in accordance with paragraph V or such other Order, as the case
may be.

V.  Closure of Certain Specific Businesses, Organizations, and Facilities.

a.  *Senior Centers*.  All senior citizen activities centers (as defined in Section 10-
501(i) of the Human Services Article of the Maryland Code) shall remain closed
until after termination of the state of emergency and the proclamation of the
catastrophic health emergency has been rescinded.

b.  *Restaurants and Bars*.

    i.  This Order controls the occupancy and use of restaurants, bars, and other
similar establishments that sell food or beverages for consumption on-
premises in Maryland ("Restaurants and Bars").  This Order does not
apply to food or beverage services in health care facilities, which are
expressly excluded from the definition of "Restaurants and Bars."

    ii.  All Restaurants and Bars shall remain closed to the general public, except
that, to the extent permitted by applicable law, and in accordance with any
social-distancing recommendations of MDH, food and beverages may be:

- 4 -

       1. sold if such food or beverages are promptly taken from the premises, i.e., on a carry-out or drive-through basis; or

       2. delivered to customers off the premises.

c. *Fitness Centers*.

    i. This Order controls the occupancy and use of fitness centers, health clubs, health spas, gyms, aquatic centers, and self-defense schools in Maryland ("Fitness Centers").

    ii. All Fitness Centers shall remain closed to the general public, except that the portion of any Fitness Center that is licensed or otherwise permitted by applicable law, regulation, or order to provide child care services may remain open to the general public for the purpose of continuing to provide such child care services.

d. *Theaters*.

    i. This Order controls the occupancy and use of theatres in Maryland at which live performances occur or motion pictures are shown ("Theaters").

    ii. All Theaters shall remain closed to the general public.

e. *Malls*.

    i. This Order controls the occupancy and use of shopping centers in Maryland that have one or more enclosed pedestrian concourses ("Enclosed Malls").

    ii. The following portions of Enclosed Malls shall remain closed to the general public:

       1. pedestrian concourses and other interior common areas open to the general public, including without limitation, food courts; and

       2. retail establishments only accessible to the general public from enclosed pedestrian concourses or other interior areas.

    iii. This paragraph V.e does not require closure of retail establishments attached to Enclosed Malls that are directly accessible from the outside.

    iv. Notwithstanding paragraph V.e.ii, local governments may approve access by the general public to the following parts of Enclosed Malls:

       1. retail establishments (a) that primarily sell groceries or pharmacy products, or (b) at which licensed professionals provide health care services; and

       2.  pedestrian concourses and other interior common areas, but solely to the extent necessary for the general public to access the retail establishments described in paragraph V.e.iv.1.

f. _Other Recreational Establishments_.

    i.  This Order controls the occupancy and use of the following establishments in Maryland ("Recreational Establishments"):

       1.  bingo halls;
       2.  bowling alleys;
       3.  pool halls;
       4.  amusement parks;
       5.  roller and ice skating rinks;
       6.  all golf courses (public and private), miniature golf establishments, and driving ranges;
       7.  social and fraternal clubs, including without limitation, American Legion posts, VFW posts, and Elks Clubs;
       8.  campgrounds; and
       9.  any other establishment not listed above that is subject to the admission and amusement tax under Title 4 of the Tax-General Article of the Maryland Code.

    ii.  All Recreational Establishments are hereby closed to the general public (including members, in the case of private clubs), effective as of 5:00 p.m. on March 30, 2020 (or shall remain closed, if closed by a prior Order).

g. _Other Miscellaneous Establishments_.

    i.  This Order controls the occupancy and use of the following establishments in Maryland:

       1.  tattoo parlors;
       2.  tanning salons;
       3.  barber shops; and
       4.  beauty salons and all other establishments that provide esthetic services, provide hair services, or provide nail services (as described in Title 5, Subtitle 2 of the Business Occupations Article of the Maryland Code).

    ii.  The establishments listed in paragraph V.g.i above shall remain closed to the general public.

VI.  <u>Specific Exclusions</u>.  For avoidance of doubt:

a.  This Order does not require the closure of, or prohibit the movement of any staff or volunteer traveling to, from, or in connection with their duties at any:

      i.  Any federal, State, or local government unit, building, or facility;

     ii.  Any newspaper, television, radio, or other media service; or

   iii.  Any non-profit organization or facility providing essential services to low-income persons, including, without limitation, homeless shelters, food banks, and soup kitchens.

b. Paragraph II of this Order does not apply to:

      i.  Persons whose homes or residences have become unsafe, such as victims of domestic violence; and

     ii.  Persons who are experiencing homelessness, but governmental and other entities are strongly encouraged to make shelter available for such persons to the maximum extent practicable, in a manner consistent with the social distancing guidelines of the CDC and MDH.

VII.  <u>Government Buildings and Facilities with Large Occupancy or Attendance</u>.

a. State and local government buildings and facilities with an expected occupancy or attendance of more than 10 people shall:

      i.  Promptly and conspicuously post in the building or facility a copy of the MDH recommendations for social distancing; and

     ii.  Provide all occupants and attendees with the capability to wash their hands.

b. A copy of this Order shall be made available to all occupants or attendees at any State or local government building and facility with an expected occupancy or attendance of more than 10 people.

VIII.  <u>General Provisions</u>.

a. Each law enforcement officer of the State or a political subdivision shall execute and enforce this Order.

b. A person who knowingly and willfully violates this Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

c. This Order remains effective until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded, or until rescinded, superseded, amended, or revised by additional orders.

d. The effect of any statute, rule, or regulation of an agency of the State or a political subdivision inconsistent with this order is hereby suspended.

e. The underlined paragraph headings in this Order are for convenience of reference

only and shall not affect the interpretation of this Order.

ISSUED UNDER MY HAND THIS 30TH DAY OF MARCH, 2020, AND
EFFECTIVE IMMEDIATELY.

Lawrence J. Hogan, Jr.
Governor

# EXHIBIT 7





### Executive Department

ORDER

OF THE

## GOVERNOR OF THE STATE OF MARYLAND

NUMBER 20-05-06-01

AMENDING AND RESTATING THE ORDER OF MARCH 30, 2020, PROHIBITING LARGE GATHERINGS AND EVENTS AND CLOSING SENIOR CENTERS, AND ALL NON-ESSENTIAL BUSINESSES AND OTHER ESTABLISHMENTS, AND ADDITIONALLY REQUIRING ALL PERSONS TO STAY AT HOME

| | |
|---|---|
| WHEREAS, | A state of emergency and catastrophic health emergency was proclaimed on March 5, 2020, and renewed on March 17, 2020, April 10, 2020, and May 6, 2020, to control and prevent the spread of COVID-19 within the state, and the state of emergency and catastrophic health emergency still exists; |
| WHEREAS, | COVID-19, a respiratory disease that spreads easily from person to person and may result in serious illness or death, is a public health catastrophe and has been confirmed throughout Maryland; |
| WHEREAS, | To reduce the spread of COVID-19, the U.S. Centers for Disease Control and Prevention and the Maryland Department of Health recommend canceling large gatherings and social distancing in smaller gatherings; |
| WHEREAS, | The currently known and available scientific evidence and best practices support limitations on large gatherings and social distancing to prevent exposures and transmissions, and reduce the threat to especially vulnerable populations, including older individuals and those with chronic health conditions; |
| WHEREAS, | To reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, and to protect and save lives, it is necessary and reasonable that individuals in the state refrain from congregating; |
| WHEREAS, | To protect the public health, welfare, and safety, prevent the transmission of the novel coronavirus, control the spread of COVID-19, |

and save lives, it is necessary to control and direct the movement of individuals in Maryland, including those on the public streets;

WHEREAS,     It is further necessary to control and direct in Maryland the occupancy and use of buildings and premises, as well as places of amusement and assembly; and

WHEREAS,     the Coronavirus Response Team will continue to advise on related public health and emergency management decisions;

NOW, THEREFORE, I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, INCLUDING BUT NOT LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, DO HEREBY ORDER:

I.     Administrative and Implementing Provisions.

    a.   The Order of the Governor of the State of Maryland, dated March 12, 2020, entitled "Prohibiting Large Gatherings and Events and Closing Senior Centers," as amended and restated on March 16, 2020, and further amended and restated on March 19, 2020 by Order Number 20-03-19-01, and further amended and restated on March 23, 2020 by Order Number 20-03-29-01, and further amended and restated on March 30, 2020 by Order Number 20-03-30-01 is further amended and restated in its entirety as set forth herein.

    b.   The Secretary of Health is hereby authorized to issue directives under this Order ("Secretary's Directives"), as the Secretary deems necessary, to monitor, treat, prevent, reduce the spread of, and suppress COVID-19 in relation to any activity permitted under this Order or any business, organization, establishment, or facility that is permitted by this Order to be open to the general public, which directives may include, without limitation, binding requirements and/or non-binding recommendations.

    c.   Political subdivisions are not prohibited from opening outdoor public spaces to the general public (such as parks, sports fields and courts, beaches, dog parks, and playgrounds), subject to the following:

        i.   The decision to do so shall be made after consultation with the health officer for the county in which the outdoor public space is located (or, in the case of outdoor public spaces located in Baltimore City, the Commissioner of Health for Baltimore City) (the "Local Health Officer").

        ii.   The Local Health Officer may issue such directives or orders as may be necessary to monitor, prevent, reduce the spread of, and suppress COVID-19 with respect to the use of the outdoor public space ("Health Officer

Directives").

  iii.  The political subdivision must require persons using the outdoor public space to comply with applicable Secretary's Directives, applicable Health Officer Directives, and applicable social distancing guidance published by the U.S. Centers for Disease Control and Prevention ("CDC") and the Maryland Department of Health ("MDH").

II.  <u>Stay-at-Home Order.</u>

 a.  All persons living in the State of Maryland are hereby ordered, effective as of 8:00 p.m. on March 30, 2020, to stay in their homes or places of residences ("Homes") except:

  i.  to conduct or participate in Essential Activities (defined below) or Permitted Outdoor Activities (defined below);

  ii.  staff and owners of businesses and organizations that are not required to close pursuant to paragraph IV or paragraph V below may travel:

   1.  between their Homes and those businesses and organizations; and

   2.  to and from customers for the purpose of delivering goods or performing services; and

  iii.  staff and owners of Non-Essential Businesses (defined below) may travel:

   1.  between their Homes and those Non-Essential Businesses for the purpose of engaging in Minimal Operations; and

   2.  to and from customers for the purpose of delivering goods.

 b.  As used herein, "Essential Activities" means:

  i.  Obtaining necessary supplies or services for one's self, family, household members, pets, or livestock, including, without limitation: groceries, supplies for household consumption or use, supplies and equipment needed to work from home, laundry, and products needed to maintain safety, sanitation, and essential maintenance of the home or residence;

  ii.  Engaging in activities essential for the health and safety of one's self, family, household members, pets, or livestock, including such things as seeking medical or behavior health or emergency services, and obtaining medication or medical supplies;

  iii.  Caring for a family member, friend, pet, or livestock in another household or location, including, without limitation, transporting a family member, friend, pet, or livestock animal for essential health and safety activities,

and to obtain necessary supplies and services;

    iv.  Traveling to and from an educational institution for purposes of receiving meals or instructional materials for distance learning;

    v.  Travel required by a law enforcement officer or court order; or

    vi.  Traveling to and from a federal, State, or local government building for a necessary purpose.

c.  As used herein, "Permitted Outdoor Activities" means the following, done in compliance with paragraph III below, applicable Secretary's Directives, Health Officer Directives, and social distancing guidance published by CDC and MDH:

    i.  Outdoor exercise activities, such as walking, hiking, running, biking, or individual and small group sports such as golfing, tennis, and similar activities;

    ii.  Outdoor fitness instruction;

    iii.  Recreational fishing, hunting, shooting, and archery;

    iv.  Recreational boating;

    v.  Horseback riding; and

    vi.  Visiting cemeteries.

III.    <u>Gatherings Larger Than 10 Persons Prohibited</u>.

a.  Social, community, spiritual, religious, recreational, leisure, and sporting gatherings and events of more than 10 people  ("large gatherings and events") are hereby prohibited at all locations and venues, including but not limited to parades, festivals, conventions, and fundraisers.

b.  Planned large gatherings and events must be canceled or postponed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

IV.    <u>Closure of Non-Essential Businesses, Generally</u>.

a.  This Order controls the occupancy and use of all businesses, organizations, establishments, and facilities that are <u>not</u> part of the critical infrastructure sectors identified by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (currently described at <u>https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19</u>) (collectively, "Non-Essential Businesses").

b. Subject to paragraph IV.c, all Non-Essential Businesses shall remain closed to the general public.

c. Staff and owners may continue to be on-site at Non-Essential Businesses for only the following purposes ("Minimal Operations"):

    i. Facilitating remote working (a/k/a/ telework) by other staff;

    ii. Maintaining essential property;

    iii. Preventing loss of, or damage to property, including without limitation, preventing spoilage of perishable inventory;

    iv. Performing essential administrative functions, including without limitation, picking up mail and processing payroll;

    v. Caring for live animals; and

    vi. In the case of Non-Essential Businesses that are retail establishments, continuing to sell retail products on a delivery basis.

d. All businesses, organizations, establishments, and facilities that are required to close pursuant to paragraph V, pursuant to any other Order of the Governor of the State of Maryland or any other Order of a political subdivision, shall be and remain closed in accordance with paragraph V or such other Order, as the case may be.

V.   <u>Closure of Certain Specific Businesses, Organizations, and Facilities</u>.

a. *Senior Centers*. All senior citizen activities centers (as defined in Section 10-501(i) of the Human Services Article of the Maryland Code) shall remain closed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

b. *Restaurants and Bars*.

    i. This Order controls the occupancy and use of restaurants, bars, and other similar establishments that sell food or beverages for consumption on-premises in Maryland ("Restaurants and Bars"). This Order does not apply to food or beverage services in health care facilities, which are expressly excluded from the definition of "Restaurants and Bars."

    ii. All Restaurants and Bars shall remain closed to the general public, except that, to the extent permitted by applicable law, and in accordance with any social-distancing recommendations of MDH, food and beverages may be:

        1. sold if such food or beverages are promptly taken from the premises, i.e., on a carry-out or drive-through basis; or

       2.  delivered to customers off the premises.

c.  *Fitness Centers*.

    i.  This Order controls the occupancy and use of fitness centers, health clubs, health spas, gyms, aquatic centers, and self-defense schools in Maryland ("Fitness Centers").

    ii.  All Fitness Centers shall remain closed to the general public, except that the portion of any Fitness Center that is licensed or otherwise permitted by applicable law, regulation, or order to provide child care services may remain open to the general public for the purpose of continuing to provide such child care services.

d.  *Theaters*.

    i.  This Order controls the occupancy and use of theatres in Maryland at which live performances occur or motion pictures are shown ("Theaters").

    ii.  All Theaters shall remain closed to the general public.

e.  *Malls*.

    i.  This Order controls the occupancy and use of shopping centers in Maryland that have one or more enclosed pedestrian concourses ("Enclosed Malls").

    ii.  The following portions of Enclosed Malls shall remain closed to the general public:

        1.  pedestrian concourses and other interior common areas open to the general public, including without limitation, food courts; and

        2.  retail establishments only accessible to the general public from enclosed pedestrian concourses or other interior areas.

    iii.  This paragraph V.e does not require closure of retail establishments attached to Enclosed Malls that are directly accessible from the outside.

    iv.  Notwithstanding paragraph V.e.ii, local governments may approve access by the general public to the following parts of Enclosed Malls:

        1.  retail establishments (a) that primarily sell groceries or pharmacy products, or (b) at which licensed professionals provide health care services; and

        2.  pedestrian concourses and other interior common areas, but solely to the extent necessary for the general public to access the retail

establishments described in paragraph V.e.iv.1.

f.  *Other Recreational Establishments*.

   i.  This Order controls the occupancy and use of the following establishments in Maryland ("Recreational Establishments"):

      1.  bingo halls;
      2.  bowling alleys;
      3.  pool halls;
      4.  amusement parks;
      5.  roller and ice skating rinks;
      6.  miniature golf establishments;
      7.  social and fraternal clubs, including without limitation, American Legion posts, VFW posts, and Elks Clubs; and
      8.  any other establishment not listed above that is subject to the admission and amusement tax under Title 4 of the Tax-General Article of the Maryland Code.

   ii.  All Recreational Establishments shall remain closed to the general public (including members, in the case of private clubs).

   iii.  Effective as of 7:00 a.m. on May 7, 2020, notwithstanding anything to the contrary elsewhere in this Order, the following establishments in Maryland may open to the general public, subject to paragraph III above and all applicable Secretary's Directives and physical distancing guidance published by CDC and MDH:

      1.  golf courses and driving ranges;
      2.  outdoor archery and shooting ranges;
      3.  marinas and watercraft rental businesses; and
      4.  campgrounds.

g.  *Other Miscellaneous Establishments*.

   i.  This Order controls the occupancy and use of the following establishments in Maryland:

      1.  tattoo parlors;
      2.  tanning salons;
      3.  barber shops; and
      4.  beauty salons and all other establishments that provide esthetic services, provide hair services, or provide nail services (as described in Title 5, Subtitle 2 of the Business Occupations Article of the Maryland Code).

   ii.  The establishments listed in paragraph V.g.i above shall remain closed to

the general public.

VI.   <u>Specific Exclusions</u>.  For avoidance of doubt:

    a.   This Order does not require the closure of, or prohibit the movement of any staff or volunteer traveling to, from, or in connection with their duties at any:

        i.   federal, State, or local government unit, building, or facility;
        ii.   newspaper, television, radio, or other media service; or
        iii.   non-profit organization or facility providing essential services to low-income persons, including, without limitation, homeless shelters, food banks, and soup kitchens.

    b.   Paragraph II of this Order does not apply to:

        i.   Persons whose homes or residences have become unsafe, such as victims of domestic violence; and

        ii.   Persons who are experiencing homelessness, but governmental and other entities are strongly encouraged to make shelter available for such persons to the maximum extent practicable, in a manner consistent with the social distancing guidelines of the CDC and MDH.

VII.   <u>Government Buildings and Facilities with Large Occupancy or Attendance</u>.

    a.   State and local government buildings and facilities with an expected occupancy or attendance of more than 10 people shall:

        i.   Promptly and conspicuously post in the building or facility a copy of the MDH recommendations for social distancing; and

        ii.   Provide all occupants and attendees with the capability to wash their hands.

    b.   A copy of this Order shall be made available to all occupants or attendees at any State or local government building and facility with an expected occupancy or attendance of more than 10 people.

VIII.   <u>General Provisions</u>.

    a.   Each law enforcement officer of the State or a political subdivision shall execute and enforce this Order.

    b.   A person who knowingly and willfully violates this Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

    c.   This Order remains effective until after termination of the state of emergency and

the proclamation of the catastrophic health emergency has been rescinded, or until rescinded, superseded, amended, or revised by additional orders.

d.  The effect of any statute, rule, or regulation of an agency of the State or a political subdivision inconsistent with this order is hereby suspended to the extent of the inconsistency.

e.  The underlined paragraph headings in this Order are for convenience of reference only and shall not affect the interpretation of this Order.

f.  If any provision of this Order or its application to any person, entity, or circumstance is held invalid by any court of competent jurisdiction, all other provisions or applications of the Order shall remain in effect to the extent possible without the invalid provision or application. To achieve this purpose, the provisions of this Order are severable.

ISSUED UNDER MY HAND THIS 6TH DAY OF MAY, 2020, AND EFFECTIVE IMMEDIATELY.

Lawrence J. Hogan, Jr.
Governor

# EXHIBIT 8



No. 202

E X E C U T I V E   O R D E R

**Declaring a Disaster Emergency in the State of New York**

    **WHEREAS**, on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern;

    **WHEREAS**, on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19;

    **WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue; and

    **WHEREAS**, New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors.

    **NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, hereby find, pursuant to Section 28 of Article 2-B of the Executive Law, that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately, and I do hereby declare a State disaster emergency for the entire State of New York. This Executive Order shall be in effect until September 7, 2020; and

    **IN ADDITION**, this declaration satisfies the requirements of 49 C.F.R. 390.23(a)(I)(A), which provides relief from Parts 390 through 399 of the Federal Motor Carrier Safety Regulations (FMCSR). Such relief from the FMCSR is necessary to ensure that crews are available as needed.

    **FURTHER**, pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety.

    **IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 6, 2020 the following:

Section 112 of the State Finance Law, to the extent consistent with Article V, Section 1 of the State Constitution, and to the extent necessary to add additional work, sites, and time to State contracts or to award emergency contracts, including but not limited to emergency contracts or leases for relocation and support of State operations under Section 3 of the Public Buildings Law; or emergency contracts under Section 9 of the Public Buildings Law; or emergency contracts for professional services under Section 136-a of the State Finance Law; or emergency contracts for commodities, services, and technology under Section 163 of the State Finance Law; or design-build or best value contracts under and Part F of Chapter 60 of the Laws of 2015 and Part RRR of Chapter 59 of the Laws of 2017; or emergency contracts for purchases of commodities, services, and technology through any federal GSA schedules, federal 1122 programs, or other state, regional, local, multi-jurisdictional, or cooperative contract vehicles;

Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, to the extent necessary to allow the purchase of necessary commodities, services, technology, and materials without following the standard notice and procurement processes;

Section 97-G of the State Finance Law, to the extent necessary to purchase food, supplies, services, and equipment or furnish or provide various centralized services, including but not limited to, building design and construction services to assist affected local governments, individuals, and other non-State entities in responding to and recovering from the disaster emergency;

Section 359-a, Section 2879, and 2879-a of the Public Authorities Law to the extent necessary to purchase necessary goods and services without following the standard procurement processes;

Sections 375, 385 and 401 of the Vehicle and Traffic Law to the extent that exemption for vehicles validly registered in other jurisdictions from vehicle registration, equipment and dimension requirements is necessary to assist in preparedness and response to the COVID-19 outbreak;

Sections 6521 and 6902 of the Education Law, to the extent necessary to permit unlicensed individuals, upon completion of training deemed adequate by the Commissioner of Health, to collect throat or nasopharyngeal swab specimens from individuals suspected of being infected by COVID-19, for purposes of testing; and to the extent necessary to permit non-nursing staff, upon completion of training deemed adequate by the Commissioner of Health, to perform tasks, under the supervision of a nurse, otherwise limited to the scope of practice of a licensed or registered nurse;

Subdivision 6 of section 2510 and section 2511 of the Public Health Law, to the extent necessary to waive or revise eligibility criteria, documentation requirements, or premium contributions; modify covered health care services or the scope and level of such services set forth in contracts; increase subsidy payments to approved organizations, including the maximum dollar amount set forth in contracts; or provide extensions for required reports due by approved organizations in accordance with contracts;

Section 224-b and subdivision 4 of section 225 of the Public Health Law, to the extent necessary to permit the Commissioner of Health to promulgate emergency regulations and to amend the State Sanitary Code;

Subdivision 2 of section 2803 of the Public Health Law, to the extent necessary to permit the Commissioner to promulgate emergency regulations concerning the facilities licensed pursuant to Article 28 of the Public Health Law, including but not limited to the operation of general hospitals;

Subdivision 3 of section 273 of the Public Health Law and subdivisions 25 and 25-a of section 364-j of the Social Services Law, to the extent necessary to allow patients to receive prescribed drugs without delay;

Section 400.9 and paragraph 7 of subdivision f of section 405.9 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals and nursing homes licensed pursuant to Article 28 of the Public Health Law ("Article 28 facilities") that are treating patients during the disaster emergency to rapidly discharge, transfer, or receive such patients, as authorized by the Commissioner of Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices, and to comply with the Emergency Medical Treatment and Active Labor Act (42 U.S.C. section 1395dd) and any associated regulations;

Section 400.11 of Title 10 of the NYCRR, to the extent necessary to permit Article 28 facilities receiving patients as a result of the disaster emergency to complete patient review instruments as soon as practicable;

Section 405 of Title 10 of the NYCRR, to the extent necessary to maintain the public health with respect to treatment or containment of individuals with or suspected to have COVID-19;

Subdivision d and u of section 800.3 of Title 10 of the NYCRR, to the extent necessary to permit emergency medical service personnel to provide community paramedicine, transportation to destinations other than hospitals or health care facilities, telemedicine to facilitate treatment of patients in place, and such other services as may be approved by the Commissioner of Health;

Paragraph 3 of subdivision f of section 505.14 of Title 18 of the NYCRR, to the extent necessary to permit nursing supervision visits for personal care services provided to individuals affected by the disaster emergency be made as soon as practicable;

Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals who meet the federal requirements for high complexity testing to perform testing for the detection of SARS-CoV-2 in specimens collected from individuals suspected of suffering from a COVID-19 infection;

Subdivision 4 of section 6909 of the Public Health Law, subdivision 6 of section 6527 of the Education Law, and section 64.7 of Title 8 of the NYCRR, to the extent necessary to permit physicians and certified nurse practitioners to issue a non-patient specific regimen to nurses or any such other persons authorized by law or by this executive order to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing, or to perform such other tasks as may be necessary to provide care for individuals diagnosed or suspected of suffering from a COVID-19 infection;

Section 596 of Title 14 of the NYCRR to the extent necessary to allow for rapid approval of the use of the telemental health services, including the requirements for in-person initial assessment prior to the delivery of telemental health services, limitations on who can deliver telemental health services, requirements for who must be present while telemental health services are delivered, and a recipient's right to refuse telemental health services;

Section 409-i of the Education Law, section 163-b of the State Finance Law with associated OGS guidance, and Executive Order No. 2 are suspended to the extent necessary to allow elementary and secondary schools to procure and use cleaning and maintenance products in schools; and sections 103 and 104-b of the General Municipal Law are suspended to the extent necessary to allow schools to do so without the usual advertising for bids and offers and compliance with existing procurement policies and procedures;

Article 7 of the Public Officers Law, section 41 of the General Construction Law, and section 3002 of the Public Health Law, to the extent necessary to permit the Public Health and Health Planning Council and the State Emergency Medical Services Council to meet and take such actions as authorized by law, as may be necessary to respond to the COVID-19 outbreak, without meeting quorum requirements or permitting the public in-person access to meetings, provided that any such meetings must be webcast and means for effective public comment must be made available; and

**FURTHER**, I hereby temporarily modify, for the period from the date of this Executive Order through April 6, 2020, the following laws:

Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law; Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations, to the extent necessary to provide the Governor with the authority to regulate traffic and the movement of vehicles on roads, highways, and streets.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

seventh day of March in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

# EXHIBIT 9



### The City of New York
### Office of the Mayor
New York, N.Y. 10007

## EMERGENCY EXECUTIVE ORDER NO. 100

March 16, 2020

## EMERGENCY EXECUTIVE ORDER

WHEREAS, on March 7, 2020, New York State Governor Andrew Cuomo declared a State disaster emergency for the entire State of New York to address the threat that COVID-19 poses to the health and welfare of New York residents and visitors; and

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect for a period not to exceed thirty (30) days or until rescinded, whichever occurs first; and

WHEREAS, on March 6, 2020, the New York State Commission of Correction issued a Chairman's Memorandum directing local correctional facilities to coordinate disease control and prevention efforts with their county and city health departments; and

WHEREAS, on March 14, 2020, the New York State Department of Correction and Community Supervision suspended visitation at all correctional facilities statewide until April 11, 2020; and

WHEREAS, when members of the public seek to visit individuals in custody, public health is imperiled by the person-to-person spread of COVID-19, which would be devastating to the health, safety and security of the individuals who live in, work in, and visit Department of Correction facilities; and

WHEREAS, the risk of community spread throughout New York City impacts the life and health of the public and public health is imperiled by the person-to-person spread of COVID-19; and

WHEREAS, the reduction of opportunities for the person-to-person transmission of COVID-19 in meetings and other gatherings is necessary to combat the spread of this disease; and;

WHEREAS, this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage; and

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. I hereby suspend:

a. Section 42 of the Charter, to the extent such section requires that all meetings of the City Council be held as provided in its rules, and that the City Council hold no less than two (2) stated meetings each month; and

b. Section 247 of the Charter, to the extent such section requires the City Council to hold hearings and submit and publish recommendations and findings regarding the preliminary budget no later than March 25, 2020.

§ 2. I hereby direct that the following laws and rules related to the Uniform Land Use Review Procedure, the landmarks designation processes and other procedures applicable to the City planning and land use review processes, to the extent they impose limitations on the amount of time permitted for the holding of public hearings, the certification of applications, the submission of recommendations, any required or necessary voting, the taking of final actions, and the issuance of determinations, are suspended, and that any such time limitations are tolled for the duration of the State of Emergency: sections 195, 197-d, and 3020 and subdivisions (b) through (h) of section 197-c of the Charter, sections 25-303, 25-306, 25-308, 25-309, 25-310 and 25-313 of the Administrative Code, and sections 1-05.5 and 1-07.5 of Title 2 and sections 2-02 through 2-07 of Title 62 of the Rules of the City of New York.

§ 3. I hereby direct, to the extent such laws and rules may be suspended consistent with State law, that the following laws and rules related to procurement are suspended to the extent necessary for the City to procure necessary goods, services and construction in response to the emergency: Chapter 13 of the New York City Charter; Chapter 9 of the Procurement Policy Review Board Rules; and Sections 6-101 through 6-107.1, 6-108.1 through 6-121, and 6-124 through 6-129 of the New York City Administrative Code.

§ 4. I hereby cancel the special election to be held on March 24, 2020 to fill the vacancy in the Office of Borough President of Queens and elect a Borough President to serve until December 31, 2020. This order shall not affect the primary and general elections scheduled pursuant to my January 2, 2020 proclamation of election.

§ 5. I hereby direct New York City Health and Hospitals Corporation ("NYC Health + Hospitals") to immediately move to cancel or postpone elective procedures system-wide and to cease performing such procedures within 96 hours of the issuance of this Order. NYC Health + Hospitals is directed to identify procedures that are deemed "elective" by assessing which

2

procedures can be postponed or cancelled based on patient risk considering the emergency need for redirection of resources to COVID-19 response.

§ 6. I hereby direct other hospitals and ambulatory surgery centers in New York City to immediately move to cancel or postpone elective procedures and to cease performing such procedures within 96 hours of the issuance of this Order. Hospitals and ambulatory surgery centers are directed to identify procedures that are deemed "elective" by assessing which procedures can be postponed or cancelled based on patient risk considering the emergency need for redirection of resources to COVID-19 response.

§ 7. I hereby direct all establishments – including restaurants, bars, cafes - that offer food or drink shall close until further notice, effective Monday, March 16, 2020 at 8:00 PM. To ensure sufficient access to food and/or drink, establishments serving food and/or drink (including restaurants, bars, and cafes) may remain open for the sole purpose of providing take-out or delivery service, provided the establishments do not exceed fifty percent of their occupancy or seating capacity while persons are waiting for take-out and that such persons follow social distancing protocols.

§ 8. Additionally, all entertainment venues, including those with seating capacity below 500, are hereby closed effective Monday, March 16, 2020 at 8:00 PM. Entertainment venues shall include, but not be limited to movie theaters, clubs, cinemas, theatres and concert venues.

§ 9. Additionally, all commercial gyms are closed effective Monday, March 16, 2020 at 8:00PM.

§10. I hereby authorize all agencies to continue enforcing Emergency Executive Order 99 and any additional limitations on large gatherings that may be imposed by the Governor of New York State pursuant to his powers under §29-a of the Executive Law.

§11. I hereby suspend Section 1-09 of Title 40 of the Rules of the City of New York to the extent that such section prevents the Department of Correction from engaging in emergency response measures in relation to the person-to-person transmission of COVID-19 in the City of New York.

§ 12. I hereby suspend Section 1-07 of Title 40 of the Rules of the City of New York to the extent that such section prevents the Department of Correction from engaging in emergency response measures in relation to the person-to-person transmission of COVID-19 in the City of New York.

§ 13. I hereby suspend Section 1-08 of Title 40 of the Rules of the City of New York to the extent that such section prevents the Department of Correction from engaging in emergency response measures in relation to the person-to-person transmission of COVID-19 in the City of New York.

§ 14. I hereby suspend Section 9-110 of the Administrative Code to the extent that such section prevents the Department of Correction from engaging in emergency response measures in relation to the person-to-person transmission of COVID-19 in the City of New York.

3

§ 15. I hereby suspend Section 1-15 of Title 40 of the Rules of the City of New York to the extent that such section applies to the aforementioned suspensions of sections 1-07, 1-08, and 1-09, in order to allow the Department of Correction to engage in emergency response measures in relation to the person-to-person transmission of COVID-19 in the City of New York.

§ 16. I hereby direct the Commissioner of the Department of Correction to take all appropriate steps to facilitate alternative methods for detainees to maintain contact with friends and family, communicate with media representatives, access the law library and legal counsel, and engage in congregate religious activities, including but not limited to providing, where possible, video and teleconference services, unlimited, free phone calls, and free stamps and letter-writing materials.

§ 17. I hereby direct that all older adult congregate centers operating within the City, whether publicly or privately owned or funded, shall be closed and all programs suspended for the duration of the state of emergency now in effect. In order to provide access to food for older adults, any such center may continue to operate to the extent necessary to prepare and distribute meals.

§ 18. I hereby direct all agency heads, including Emergency Management, the Department of Health and Mental Hygiene, Community Affairs, Fire, Police, Sanitation, Buildings and Transportation to take all appropriate and necessary steps to preserve public safety and the health of their employees, and to render all required and available assistance to protect the security, well-being and health of the residents of the City.

§ 19. In accordance with Executive Law § 24 and New York City Administrative Code 3-108, any person who knowingly violates the provisions in Sections 5 through 13 of this order shall be guilty of a class B misdemeanor.

§ 20. This Emergency Executive Order shall take effect immediately, and shall remain in effect for five (5) days unless it is terminated or modified at an earlier date.

Bill de Blasio,
MAYOR

# EXHIBIT 10

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2020-02602 DIVISION " G "          DOCKET ) )

CITY OF NEW ORLEANS

FILED: _____          _____

                                        DEPUTY CLERK

## MAYORAL PROCLAMATION TO PROMULGATE EMERGENCY ORDERS DURING THE STATE OF EMERGENCY DUE TO COVID-19

      **WHEREAS,** the United States has confirmed cases of individuals who have a severe acute respiratory disease ("COVID-19" ) caused by a novel coronavirus ("the virus") first detected in Wuhan, Hubei Province, People's Republic of China, which was first reported on December 31, 2019; and

      **WHEREAS,** as of March 15, 2020, the World Health Organization ("WHO") has reported more than 153,000 confirmed cases of COVID-19 in 143 countries, and 5,735 deaths from the virus, with the number of confirmed cases escalating dramatically over a short period of time; and

      **WHEREAS,** on March 11, 2020, the WHO declared the COVID-19 outbreak a pandemic; on January 31, 2020, the U.S. Department of Health and Human Services declared a Public Health Emergency for the United States; on March 11, 2020, Governor John Bel Edwards declared a state of emergency for the State of Louisiana; and on March 11, 2020, I declared a state of emergency in the City of New Orleans due to COVID-19; and

      **WHEREAS,** the Centers for Disease Control and Prevention ("CDC") has determined that the virus presents a serious public health threat, requiring coordination among state and local health departments to ensure readiness for potential health threats associated with the virus; and

      **WHEREAS,** the New Orleans Health Department, the Louisiana Department of Health, and other City partners have been working successfully and diligently to implement CDC guidelines and assist with the ongoing and developing threat of COVID-19; and

1

**WHEREAS,** on March 9, 2020, the first presumptive positive case of COVID-19 was announced in the State of Louisiana, in a hospital in the City of New Orleans; and

**WHEREAS,** as of March 15, 2020, there were 103 presumptive positive cases of COVID-19 in the State of Louisiana, 75 of which are in the City of New Orleans; and

**WHEREAS,** as of March 15, 2020, two cases of COVID-19 in the State of Louisiana and City of New Orleans have resulted in patient deaths; and

**WHEREAS,** there is reason to believe that COVID-19 may be spread amongst the population by various means of exposure, including the propensity to spread person to person and the propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances; and

**WHEREAS,** the direct and definite public health and safety threats of COVID-19, and the related threats to the health, safety, and welfare of the residents of the City of New Orleans, are now imminent and emergency action must be taken to mitigate the effects of COVID-19, prevent further deaths and injuries of persons, and preserve the lives and property of the people of the City of New Orleans; and

**WHEREAS,** the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721, *et seq.*, confers upon the Mayor of the City of New Orleans emergency powers to deal with emergencies and disasters, including those resulting from terrorist events, enemy attack, sabotage, or other hostile action, or from fire, flood, earthquake, or other natural or manmade causes, in order to ensure that preparations of this City will be adequate to deal with such emergencies or disasters, and in order to detect, prevent, prepare for, investigate, respond to, or recover from these events, and to preserve the lives and property of the people of the City of New Orleans; and

**WHEREAS,** La. R.S. 29:727(F) authorizes the Mayor to "control ingress and egress to and from the affected area, the movement of persons within the area, and the occupancy of premises therein", and to "suspend or limit the sale, dispensing, or transportation of alcoholic beverages . . ."; and

WHEREAS, the Centers for Disease Control and Prevention have provided mitigation strategies and guidance that communities with substantial COVID-19 community transmission should cancel gatherings of any size; and

WHEREAS, all residents of and visitors to Orleans Parish should take personal responsibility to prevent the further spread of COVID-19, including but not limited to, avoiding gatherings and practicing social distancing; and

WHEREAS, all businesses, colleges, and universities should scale down operations to prevent the further spread of COVID-19;

NOW THEREFORE, I, LATOYA CANTRELL, Mayor and Chief Executive Officer of the City of New Orleans and the Parish of Orleans, by virtue of the authority vested in me as the Mayor of the City of New Orleans by the Constitution and laws of the State of Louisiana and the Home Rule Charter and laws of the City of New Orleans, do hereby promulgate and issue the following orders, which shall be effective March 17, 2020, commencing at 6:00 a.m. and remain in effect until 6:00 a.m. on April 16, 2020, pursuant to La. R.S. 29:727 and my Mayoral Proclamation of a State of Emergency due to COVID-19 dated March 11, 2020.

1. All public and private gatherings shall be canceled or prohibited in non-emergency situations and where possible. In limited circumstances, personal gatherings should be limited to the number of persons in a reasonable household size. This shall not apply to healthcare facilities, pharmacies, grocery stores, corner stores, banks, gas stations, and other essential service providers. Loitering outside of any of these essential service providers shall be prohibited.

2. Bars, Health Clubs (e.g. gyms and fitness centers), Shopping Centers configured as malls (but not strip centers), Live Performance Venues, Reception Facilities, and other establishments where large gatherings routinely occur and/or where the risk of possible COVID-19 spread exists, shall cease operations.

3.  Restaurants, as defined in the Comprehensive Zoning Ordinance, shall limit their operations to take out and delivery only, including the sale of alcohol in accordance with City and State issued permits.

The City Attorney is directed to file this proclamation promptly in the office of the Clerk of Court.

**WITNESS** my hand in New Orleans, Louisiana this *16th* day of *March*, 2020.

LATOYA CANTRELL, MAYOR

# EXHIBIT 11



ERIC GARCETTI

MAYOR

## Public Order Under City of Los Angeles Emergency Authority

### Issue Date:   March 19, 2020 (Revised May 27, 2020)

**Subject:        SAFER AT HOME**

The novel coronavirus pandemic is a global emergency that is unprecedented in modern history.  Profoundly impacting our daily lives, it has inspired Angelenos to respond with courage, compassion, wisdom and resolve to overcome this crisis and help each other.

In a short period of time and at an unprecedented scale, residents in every community have embraced urgent social distancing best practices and aggressive hygienic precaution, not just to protect themselves, but to protect others. Angelenos understand with exceptional clarity that there is only one way to get through this difficult moment: together.

The City's recent emergency orders — curtailing large public gatherings; temporarily closing many government facilities; closing theaters, bars and entertainment venues; prohibiting restaurants from serving to dine-in customers while permitting take-out, delivery and drive-thru; and a ban on evictions of residential and commercial tenants who cannot pay rent due to financial impacts caused by COVID-19 — have been followed with a willing and generous spirit.

While we have previously taken strong action, now the City must adopt additional emergency measures to further limit the spread of COVID-19.

With this virus, we are safer at home.

Wherever feasible, City residents must isolate themselves in their residences, subject to certain exceptions provided below.  This Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time.



Under the provisions of Section 231(i) of the Los Angeles City Charter and Chapter 3, Section 8.27 of the Los Angeles Administrative Code, I hereby declare the following orders to be necessary for the protection of life and property in the City of Los Angeles, effective on Friday, April, 10, 2020 at 11:59 PM:

1.      Subject only to the exceptions outlined in this Paragraph and Paragraph 5 below, all persons living within the City of Los Angeles are hereby ordered to remain in their homes.  Residents of the City of Los Angeles who are experiencing homelessness are exempt from this requirement.  The City is working, along with partner government agencies and non-governmental organizations, to make more emergency shelters available for the unhoused residents of our City.  City of Los Angeles officials and contracted partners responsible for homelessness outreach shall make every reasonable effort to persuade such residents to accept, if offered, temporary housing or shelter, as the Health Officer of the County of Los Angeles recommends that sheltering individuals will assist in reducing the spread of the virus and will protect the individual from potential exposure by allowing the individual access to sanitation tools.  People at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

2.      Subject only to the exceptions outlined in this Paragraph and Paragraph 5 below, all businesses within the City of Los Angeles are ordered to cease operations that require in-person attendance by workers at a workplace.  Indoor Malls and Shopping Centers can open to no more than 50% of overall shopping center capacity.  To the extent that business operations may be maintained by telecommuting or other remote means, while allowing all individuals to maintain shelter in their residences, this Order shall not apply to limit such business activities.  A business that fails to cease operation despite not meeting an exception in this Paragraph or Paragraph 5 may be subject to having its water and power services shut off by the Department of Water and Power for not being in compliance with the Order.  The Deputy Mayor of Public Safety, or his written designee, may, after engagement with and a written warning issued to a noncompliant business, refer that business in writing to the Department of Water and Power to shut off water and power services pursuant to this order.  Upon receiving such a written referral, the Department of Water & Power is authorized to shut off water and power services to the noncompliant business operating in violation of the Order

3.      All public and private gatherings of any number of people occurring outside a residence are prohibited, except as to those exempted activities described in this Paragraph and Paragraph 5.  This provision does not apply to gatherings within a single household or living unit.

4.      All travel, including, without limitation, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit is prohibited, subject to the exceptions in Paragraph 5.

5.      Exceptions.  People may lawfully leave their residence while this Order is in effect only to engage in the following activities:

          (i) First 24-hour allowance.  This Order shall not apply, for a 24-hour period following the effective date above, to allow employees and business owners to access to their workplaces to gather belongings or address other administrative needs, so long

~~as social distancing requirements are followed. Such workplaces shall remain closed to the public in accordance with this Order.~~

(ii) <u>Essential Activities</u>.  To engage in certain essential activities, including, without limitation, visiting a health or veterinary care professional, obtaining medical supplies or medication, obtaining grocery items (including, without limitation, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh or frozen meats, fish, and poultry, any other household consumer products and products necessary to maintain the safety and sanitation of residences and other buildings) for their household or to deliver to others, or for legally mandated government purposes.  In addition, any travel related to (a) providing care for minors, the elderly, dependents, persons with disabilities, or other vulnerable persons; (b) returning to one's place of residence from outside the City; (c) travelling to one's place of residence located outside the City; (d) compliance with an order of law enforcement or court shall be exempt from this Order; (e) legally mandated government purposes; (f) attend a funeral with no more than 10 individuals present or manage after-death arrangements and burial; or (g) to participate in a vehicle-based parade or drive-thru events (hosts and participants of such activities must observe and comply with the Vehicle-Based Parade Protocol published by the Los Angeles County Department of Public Health); or (h) to participate in an in-person protests as long as attendance is limited to 25% of the relevant area's maximum occupancy, as defined by the relevant local permitting authority or other relevant authority, or a maximum of 100 attendees, whichever is less, and physical distancing of six feet between persons or groups of persons from different households is maintained at all times.  Persons engaging in these essential activities are required to maintain reasonable social distancing practices.  This includes maintaining a distance of at least six-feet away from others, frequently washing hands with soap and water for at least twenty seconds or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, not shaking hands and wearing a cloth face covering whenever there is or can be contact with others who are non-household members in both public and private places.  Young children who are at risk of suffocation and people with certain disabilities are not required to wear a face covering.

(iii) <u>Outdoor Activities</u>.  To engage in passive outdoor activity and recreation, provided that the individuals comply with social distancing requirements, including, without limitation, walking, running, cycling; use of scooters, roller skates, skateboards, or other personal mobility devices.  All individuals engaging in outdoor activities must wear a cloth face covering whenever there is or can be contact with others who are non-household members.  Young children who are at risk of suffocation, people with certain disabilities, and individuals engaging in water activities and certain sports specified in Los Angeles County Department of Public Health Protocols (such as tennis, pickleball and solo horseback riding) are not required to wear a face covering.  Golf is permitted; public and private courses may operate upon implementing the Los Angeles County Department of Public Health Reopening Protocol for Golf Courses.  Golf and tennis clubhouses, course restaurants and pro shops remain closed to public entry; pro shops may operate but can only conduct sales outside the storefront, and course restaurants can operate for take-out or delivery and cannot serve dine-in customers. Indoor and outdoor playgrounds for children, except those located within childcare centers, shall be closed for all purposes.  The City of Los Angeles, following the recommendations and

directives of the County Department of Public Health, shall cancel its recreational and cultural programming and close ~~its beaches, public beach parking lots, beach access points,~~ piers, ~~park trails, trail heads,~~ and park facilities. Beaches are open for active recreation, including swimming, surfing, running and walking; however, sunbathing, sitting, gatherings, youth camps, group sports and athletic competitions are not allowed. Visitors to beaches shall follow the Los Angeles County Department of Public Health Reopening Protocol for use of Public Beaches. Pools, hot tubs, and saunas that are in a multi-unit residence or part of a Homeowners' Association may open upon implementing the Los Angeles County Department of Public Health Protocols for Reopening of Swimming Pools in Shared Residential Facilities. Parks shall remain open for recreational activities while practicing social distancing and shall follow the Los Angeles County Department of Public Health Reopening Protocol for Use of Public Trails. "Recreation and cultural programming" refers to recreational and cultural activities, indoor and outdoor sports leagues, aquatics classes, instructional courses, and group sessions on City-owned and operated park land.  "Park facilities," which shall be closed to the public, refers to the City's Department of Recreation and Parks facilities, including: skate parks, basketball courts, ~~tennis courts,~~ volleyball courts, baseball fields, Venice Boardwalk (except as necessary to travel to an essential business), ~~Runyon Canyon,~~ Griffith Observatory, Travel Town, Griffith Park train rides and pony rides, the Cabrillo Marine Museum, Sherman Oaks Castle, EXPO Center, and aquatics facilities. Tennis and pickle ball courts, shooting and archery ranges, equestrian centers, model airplane areas, community gardens, and bike parks may operate upon implementing the required Los Angeles County Department of Public Health protocols found on paragraph 6. Census Centers located at Recreation and Parks facilities may remain open, provided strict adherence to social distancing practices.  Outdoor Museums, Open Air Galleries, Botanical Gardens and other Outdoor Exhibition Spaces may open upon implementing the Los Angeles County Department of Public Health Protocols for Opening for Outdoor Museums and Galleries.

(iv) <u>Work in Support of Essential Activities</u>.  To perform work providing essential products and services or to otherwise carry out activities specifically permitted in this Order.

(v) To care for or support a friend, family member, or pet in another household.

(vi) <u>Emergency Personnel</u>.  All first responders, gang and crisis intervention workers, public health workers, emergency management personnel, emergency dispatchers, law enforcement personnel, and related contractors and others working for emergency services providers are categorically exempt from this Order.

(vii) <u>Essential Activities Exempt</u>.  Certain business operations and activities are exempt from the provisions of this Order, on the grounds that they provide services that are recognized to be critical to the health and well-being of the City.  These include:

(a) All healthcare operations, including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, medical and scientific research, laboratories, healthcare suppliers, home healthcare services providers, veterinary care and pet day care providers ~~(excluding pet grooming and training)~~, mental and behavioral health providers and support groups, substance use providers and support groups, physical therapists and chiropractors, cannabis dispensaries, or

any related and/or ancillary healthcare services, manufacturers and suppliers. Behavioral health or substance use disorder support group meetings must implement the Los Angeles County Department of Public Health's Reopening Protocol for Substance Use Disorder and Mental Health Support Groups. Healthcare operations does not include fitness and exercise gyms and similar facilities.

      (b)     Grocery stores, water retailers, farm and produce stands, supermarkets, convenience stores, warehouse stores, food banks, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet food and medication supply, fresh or frozen meats, fish, and poultry, and other household consumer products necessary to maintain the safety, sanitation and essential operation of residences. This includes stores that sell beer, wine, and liquor.  However, the portions of liquor stores, wineries, breweries and tap rooms that provide tastings to the public are closed. Certified farmers markets may operate only if they are able to obtain written approval from the Bureau of Street Services (BSS) and only according to the guidelines and set forth by BSS.

      (c)     Agricultural and horticultural cultivation, including farming, livestock, and fishing.

      (d)     Organizations and businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including gang prevention and intervention, domestic violence, and homeless services agencies).

      (e)     Newspapers, television news, radio, magazine, podcast and journalism.

      (f)     Gas service stations, auto/motorcycle part supply, mobile auto/motorcycle repair operations, auto/motorcycle repair shops (including, without limitation, auto repair shops that operate adjacent to or otherwise in connection with an used or retail auto dealership), bicycle repair shops and related facilities.  Auto dealerships and motorcycle dealerships may open to the public, under the conditions required by and upon implementation of the Los Angeles County Department of Public Health Reopening Protocol for Car Dealerships.  Car washes are permitted to operate upon implementing the Los Angeles County Department of Public Health Reopening Protocol for Car Washes.

      (g)     Banks, credit unions, financial institutions and insurance companies, and pawn shops.

      (h)     Hardware and building supply stores, day labor centers, nurseries and horticulture wholesale distributors.

      (i)     Plumbers, electricians, custodial/janitorial workers, handyman services, funeral home workers and morticians, moving services, HVAC installers, carpenters, day laborers, landscapers, gardeners, exterminators, property managers and leasing agents, private security personnel and other service providers who provide services to maintain the safety, sanitation, and essential operation to properties and other essential activities discussed in this subsection.

      (j)     Businesses providing mailing and shipping services, boxes and packaging, and post office boxes.

      (k)     Educational institutions -- including public and private K-12 schools, colleges, and universities -- for purposes of facilitating distance learning or performing essential functions provided that social distancing of six-feet per person is maintained.

      (l)     Laundromats, dry cleaners, and laundry service providers.

(m)    Restaurants and retail food facilities that prepare and offer food to customers, but only via delivery service, to be picked up, or drive-thru.  For those establishments offering food pick-up options, proprietors are directed to establish social distancing practices for those patrons in the queue for pick-up.  This includes maintaining a distance of at least six-feet away from others.  Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and carry out basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or any other gathering site.  Cafeterias, commissaries, and restaurants located within hospitals, nursing homes, or similar facilities are also exempt from this Order.  Social distancing shall be maintained at a distance of at least six-feet away from others.

(n)    Businesses that supply or provide storage for retail goods and products needed for people to work from home.

(o)    Businesses that supply other essential businesses with the support, services, or supplies necessary to operate, provided that strict social distancing is maintained.  This section includes, without limitation, utility companies.

(p)    Individuals and businesses that ship, truck, transport, or provide logistical support to deliver groceries, food, goods, or services directly to residences, or businesses engaged in essential activities or essential infrastructure.

(q)    Airlines, taxis, ride sharing services, car rental companies, and other private transportation services providing transportation services necessary for essential activities and other purposes expressly authorized in this Order.

(r)    Home-based care for disabled persons, seniors, adults, or children.

(s)    Residential facilities and shelters for homeless residents, disabled persons, seniors, adults, children and animals.

(t)    Office-based businesses when teleworking is not possible, including professional services, such as legal, leasing and real estate transactions, payroll or accounting services, when necessary to assist in the permitting, inspection, construction, transfer and recording of ownership of housing, and when necessary to achieve compliance with legally mandated activities.  Housing units and real property may be shown, provided that appointments and other residential viewings occur virtually or, if a virtual viewing is not feasible, by appointment with no more than two visitors at a time residing within the same household or living unit and one individual showing the unit.  However, such in-person visits are not permitted when a tenant occupant is still residing in the residence, unless the owner first obtains the tenant's written consent.

(u)    Childcare facilities providing services that enable employees exempted in this Order to work as permitted.  To the extent possible, childcare facilities must operate under the following mandatory conditions:

(1) Childcare must be carried out in stable groups of 10 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).

(2) Children shall not change from one group to another.

(3) If more than one group of children is cared for at one facility, each group shall be in a separate room.  Groups shall not mix with each other.

(4) Childcare providers shall remain solely with one group of children.

(v)    Hotels, motels, shared rental units and similar facilities.

(w)   Military/Defense Contractors/FFRDC (Federally Funded Research and Development Centers). For purposes of this Order, essential personnel may leave their residence to provide any service or perform any work deemed essential for national security including, without limitation, defense, intelligence, and aerospace development and manufacturing for the Department of Defense, the Intelligence Community, and NASA and other federal government, and or United States Government departments and agencies. Essential personnel include prime, sub-prime, and supplier contractor employees, at both the prime contract level and any supplier level at any tier, working on federal United States Government contracts, such as contracts for national intelligence and national security requirements.

(x)   Businesses that manufacture retail goods. These businesses must also implement the County of Los Angeles Reopening Protocol for Warehousing, Manufacturing and Logistic Establishments.

(y)   Retail stores may operate, after implementing the County of Los Angeles Department of Public Health Protocols for Retail Establishments Opening for In-person Shopping. Indoor malls and shopping centers can open to no more than 50% of overall shopping center capacity and must adopt the County Department of Public Health Protocols for Shopping Center Operators.

(z)   Places of worship, provided that the gathering of congregants is limited to the lower of 25% of the total maximum occupancy (or occupant load) assigned for that building on its Certificate of Occupancy or as determined by Section 1004 of the 2019 California Building Code, or 100 people. Faith-based organizations holding in-person services must follow the Los Angeles County Department of Public Health Places of Worship Protocols, including requiring face coverings during services and celebrations except for young children or others with impaired breathing or other at-risk conditions.

(viii)   <u>Government Employees</u>. This Order does not apply to employees of government agencies working within the course and scope of their public service employment. Employees of the City of Los Angeles shall follow any current or future directives issued by the Mayor.

(ix)   <u>Essential Infrastructure</u>. Individuals may leave their residences to provide any services or goods or perform any work necessary to to build, operate, maintain or manufacture essential infrastructure, including without limitation construction of public health operations, commercial, office and institutional buildings, residential buildings and housing; airport operations, food supply, concessions, and construction; port operations and construction; water, sewer, gas, electrical, oil extraction and refining; roads and highways, public transportation and rail; solid waste collection, removal, and recycling; flood control and watershed protection; internet and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, phone retail sales and servicing, and web-based services); and manufacturing and distribution companies deemed essential to the supply chains of the industries referenced in this Paragraph, provided that they carry out those services and that work in compliance with social distancing practices as prescribed by the Centers for Disease Control and Prevention and the Los Angeles County Department of Public Health, to the extent possible.

(x)   Non-Essential Businesses. Businesses regarded under this Order as "non-essential" may be permitted to conduct minimum basic operations including

inventory, security, custodial services, payroll and employee benefits processing, and any reasonable activity designed to maximize the ability for its employees to work remotely from their homes. Any Non-Essential Businesses conducting minimum basic operations, as allowed for in the paragraph, shall keep its doors closed and locked to the public at all times and shall post a sign on its main entrances stating that the business is closed to the public.

6.     <u>Public Notice of Social Distancing Protocols for Certain Public-Facing Essential Businesses</u>.  The City of Los Angeles has adopted all safety protocols developed by the County of Los Angeles Department of Public Health. All individuals, except young children at risk of suffocation and people with certain disabilities, engaging in the permitted activities described below must wear face coverings and adopt social distancing requirements. All businesses described below must require workers and customers to wear face coverings and adopt the County Public Health protocols, which are available for download at https://www.lamayor.org/COVID19Orders. For relevant businesses, (i) the protocols notice must be posted at or near the entrance to the facility so that it is easily viewable by the public and employees; and (ii) copies of the protocols must be provided to each employee performing work at the facility; and (iii) the business must provide evidence of its implementation of the protocols to any authority enforcing this Order upon demand.  The required protocols include:

a)     The owner, manager, or operator of any business described in Paragraph 1 of the April 7, 2020 Worker Protection Order (Revised May 7, 2020), shall prepare and post by no later than 11:59 p.m. on April 15, 2020, a the County's Social Distancing Protocol for each of their facilities within the City of Los Angeles.

b)     The owner, manager, or operator of any permitted retail business described in Paragraph 5 (vii)(y) of this Order must implement the County's Protocols for Retail Establishments Opening for In-person Shopping.

c)     The owner, manager, or operator of any permitted auto dealer described in Paragraph 5 (vii)(f) of this Order must implement the County's Car Dealership Protocols.

d)     The owner, manager, or operator of any permitted public and private golf courses described in Paragraph 5 (iii) of this Order must implement the County's Golf Courses Protocols.

e)     All hikers and visitors of trails described in Paragraph 5 (iii) of this Order must adopt the County's Trail Use Protocols.

f)     All visitors to beaches described in Paragraph 5 (iii) of this Order must adopt the County's Beach Protocols.

g)     All visitors to bike parks described in Paragraph 5 (iii) of this Order must adopt the County's Bike Park Protocols.

h)     All visitors to community gardens described in Paragraph 5 (iii) of this Order must adopt the County's Community Gardens Protocols.

i)      All visitors to equestrian centers described in Paragraph 5 (iii) of this Order must adopt the County's Equestrian Centers Protocols.

j)      All visitors to model airplane areas described in Paragraph 5 (iii) of this Order must adopt the County's Model Airplane Protocols.

k)      All visitors to tennis and pickleball courts described in Paragraph 5 (iii) of this Order must adopt the County's Tennis Pickleball Courts Protocols.

l)      All operators and participants of substance use disorder and mental health support groups described in Paragraph 5(vii)(a) and (d) must adopt the County's Substance Use Disorder and Mental Health Support Groups Protocols.

m)      All outdoor shooting facilities described in Paragraph 5 (iii) of this Order must adopt the County's Outdoor Shooting Facility Protocols.

n)      The owner, manager, or operator of any permitted warehouse business described in Paragraph 5 (vii)(n), or any permitted logistics business described in Paragraph 5 (vii)(p), or any permitted manufacturing business described in Paragraph 5 (vii)(y) must adopt the County's Reopening Protocol for Warehousing, Manufacturing and Logistic Establishments

o)      The owner, manager, or operator of a car wash described in Paragraph 5(vii)(f) must adopt the County's Reopening Protocol for Car Washes

p)      All hosts and participants of vehicle-based parades or drive thru events must adopt the County's Protocol for Vehicle Based Parades or Drive Thru Events.

q)      The owner, manager, or operator of a place of worship or faith-based organization hosting in-person services must adopt the County's Protocol for Places of Worship Protocols.

r)      The owner, manager, or operator of office-based businesses must adopt the County's Office-Based Worksites Protocol.

s)      The owner, manager, or operator of shopping centers or malls must adopt the County's Shopping Center Operators Protocol.

t)      The operator of pools, hot tubs, and saunas that are in a multi-unit residence or part of a Homeowners' Association must adopt the County's Protocols for Reopening of Swimming Pools in Shared Residential Facilities.

u)      The owner, manager or operator of Outdoor Museums, Open Air Galleries, Botanical Gardens and other Outdoor Exhibition Spaces must adopt the County's Protocols for Opening for Outdoor Museums and Galleries.

7.      To the extent that this Order is in conflict with earlier Orders, this Order shall supersede the others.

8.      Failure to comply with this Order shall constitute a misdemeanor subject to fines and imprisonment.  I hereby urge the Los Angeles Police Department and the City Attorney to vigorously enforce this Order via Sections 8.77 and 8.78 of the Los Angeles Administrative Code.

9.      If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision shall not affect the validity of the remaining portions or applications of this Order.

This order shall be in place during the local emergency period, and it may be amended or rescinded as warranted according to local public health conditions.

_____
Eric Garcetti, MAYOR

Dated: <u>May 27, 2020</u> at Los Angeles, California
Time: <u>   4:00 p.m.   </u>

Filed with the City Clerk
Date: _____
Time: _____
By: _____

# EXHIBIT 12



OFFICE OF THE MAYOR
SAN FRANCISCO

LONDON N. BREED
MAYOR

## EIGHTH SUPPLEMENT TO MAYORAL PROCLAMATION DECLARING THE EXISTENCE OF A LOCAL EMERGENCY DATED FEBRUARY 25, 2020

**WHEREAS**, California Government Code Sections 8550 et seq., San Francisco Charter Section 3.100(14) and Chapter 7 of the San Francisco Administrative Code empower the Mayor to proclaim the existence of a local emergency, subject to concurrence by the Board of Supervisors as provided in the Charter, in the case of an emergency threatening the lives, property or welfare of the City and County or its citizens; and

**WHEREAS**, On February 25, 2020, the Mayor issued a Proclamation (the "Proclamation") declaring a local emergency to exist in connection with the imminent spread within the City of a novel (new) coronavirus ("COVID-19"); and

**WHEREAS**, On March 3, 2020, the Board of Supervisors concurred in the Proclamation and in the actions taken by the Mayor to meet the emergency; and

**WHEREAS**, On March 4, 2020, Governor Gavin Newsom proclaimed a state of emergency to exist within the State due to the threat posed by COVID-19; and

**WHEREAS**, On March 6, 2020, the Local Health Officer declared a local health emergency under Section 101080 of the California Health and Safety Code, and the Board of Supervisors concurred in that declaration on March 10, 2020; and

**WHEREAS**, On March 6, 2020, the City issued public health guidance to encourage social distancing to disrupt the spread of COVID-19 and protect community health; and

**WHEREAS**, On March 7, 2020, the Local Health Officer ordered certain City facilities not to hold non-essential group events of more than 50 people for the two weeks from the date of the order and prohibited visitors from Laguna Honda Hospital; and

**WHEREAS**, On March 7, 2020, the Department of Human Resources issued guidance to minimize COVID-19 exposure risk for City employees who provide essential services to the local community, in particular during the current local emergency; and

**WHEREAS**, On March 11, 2020, March 13, 2020, March 17, 2020, March 18, 2020, and March 23, 2020, the Mayor issued supplements to the Proclamation, ordering additional measures to respond to the emergency; and

I

OFFICE OF THE MAYOR
SAN FRANCISCO



LONDON N. BREED
MAYOR

**WHEREAS**, On March 16, 2020, the City's Health Officer issued a stay safe at home order, Health Officer Order No. C19-07 (the "Stay Safe At Home Order"), requiring most people to remain in their homes subject to certain exceptions including obtaining essential goods such as food and necessary supplies, and requiring the closure of non-essential businesses, through April 7, 2020, and on March 31, 2020, the Health Officer extended the Stay Safe At Home Order through May 3, 2020; and

**WHEREAS**, On March 19, 2020, the Governor issued Executive Order N-33-20 and the California Public Health Officer issued a corresponding order requiring people to stay home except as needed subject to certain exceptions; and

**WHEREAS**, There are currently 434 confirmed cases of COVID-19 within the City and there have been 7 COVID-19-related deaths in the City; there are more than 9,500 confirmed cases in California, and there have been 204 COVID-19-related deaths in California; and

**WHEREAS**, This order and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time; and

**WHEREAS**, On March 17, 2020, the Mayor issued the Third Supplement to the Emergency Proclamation, which contained an order prohibiting meetings of City boards, commissions, and advisory bodies, other than the Board of Supervisors, through April 7, 2020, unless authorized by the Mayor or the Board of Supervisors; given the extension of the Stay Safe At Home Order through May 3, 2020, it is necessary to continue the restrictions on meetings of these bodies through May 3, 2020; and

**WHEREAS**, On March 18, 2020, the Mayor issued the Fourth Supplement to the Emergency Proclamation, imposing a temporary moratorium on eviction for non-payment of rent by commercial tenants directly impacted by the COVID-19 crisis, and it is necessary to clarify how the moratorium is intended to apply; and

**WHEREAS**, The Mayor proclaims that the conditions of extreme peril exist and continue to warrant and necessitate the existence of a local emergency,

2

OFFICE OF THE MAYOR
SAN FRANCISCO



LONDON N. BREED
MAYOR

**NOW, THEREFORE,**

I, London N. Breed, Mayor of the City and County of San Francisco, proclaim that there
continues to exist an emergency within the City and County threatening the lives,
property or welfare of the City and County and its citizens;

**In addition to the measures outlined in the Proclamation and in the Supplements to
the Proclamation dated March 11, March 13, March 17, March 18, March 23,
March 27, and March 31, 2020, it is further ordered that:**

(1)  Section 5 of the Third Supplement to the Emergency Proclamation dated March 17,
2020, is revised and replaced as follows: From March 18, 2020 through May 3, 2020,
City policy and advisory bodies shall not hold public meetings, unless the Board of
Supervisors, acting by written motion, or the Mayor or the Mayor's designee directs
otherwise, based on a determination that a policy body has an urgent need to take action
to ensure public health, safety, or essential government operations.  This order applies to
all City commissions, boards, and advisory bodies other than the Board of Supervisors
and its committees.

(2)  The Fourth Supplement to the Emergency Proclamation dated March 18, 2020 (the
"Fourth Supplement"), imposing a temporary moratorium on eviction for non-payment of
rent by commercial tenants directly impacted by the COVID-19 crisis, is amended as
follows:

(a)  Notwithstanding the word "eviction" in subsection (d) of the Fourth
Supplement, the moratorium applies to all attempts to recover possession of a unit due to
non-payment, including situations where the tenant is occupying the unit on a month-to-
month periodic tenancy, holdover basis, or similar arrangement, and including where the
landlord has the right to terminate or not renew the agreement at the landlord's discretion.
In such situations, if a tenant misses a payment due to COVID-19, the moratorium
against recovering possession due to non-payment shall apply, unless the landlord can
demonstrate an alternative, non-pretextual reason for recovering possession of the unit
(e.g., turning the unit over to a new tenant under a previously executed agreement,
planned renovations, or previous agreement to turn over the unit vacant to a new owner).

(b)  The moratorium is also intended to cover security deposits.  The moratorium
does not prohibit a landlord from drawing from an existing security deposit, in the event

OFFICE OF THE MAYOR
SAN FRANCISCO



LONDON N. BREED
MAYOR

the tenant has missed a rent payment and the agreement allows the landlord to deduct rent from the security deposit.  However, a landlord may not require a tenant described in subdivision (a) of the Fourth Supplement to increase the security deposit.  If an existing agreement contains a provision requiring a tenant to replenish a security deposit that the landlord has drawn from, the landlord shall not attempt to recover possession of the unit due to the tenant's inability to replenish the security deposit, if the tenant was unable to do so because of the financial impacts of COVID-19.  In such event, the landlord and tenant shall follow the notice and cure requirements set forth in subdivisions (c) and (d) of the Fourth Supplement with regard to replenishment of the security deposit.  Any failure to replenish a security deposit as set forth in an existing agreement shall not be a basis to recover possession of the unit until six months after the moratorium expires.  Notwithstanding the foregoing, landlords are discouraged from using tenants' security deposits to cover missed rent payments during the moratorium.

(c)  The foregoing provisions are incorporated into the Fourth Supplement as though set forth directly therein, and shall expire at the same time that the Fourth Supplement expires.  If the Fourth Supplement is renewed, the foregoing provisions shall also renew.

DATED: April 1, 2020

_____
London N. Breed
Mayor of San Francisco

n:\govern\as2020\9690082\01437996.doc

4

# EXHIBIT 13



**DALLAS COUNTY**

## AMENDED ORDER OF COUNTY JUDGE CLAY JENKINS
Safer At Home Order
DATE AMENDED ORDER ISSUED: April 23, 2020

WHEREAS, pursuant to Texas Government Code Section 418.108, Dallas County Judge Clay Jenkins issued a Declaration of Local Disaster for Public Health Emergency on March 12, 2020, due to a novel coronavirus now designated SARS-CoV2 which causes the disease COVID-19;

WHEREAS, on March 12, 2020, Judge Jenkins issued an Order in furtherance of his authority to protect the safety and welfare of the public by slowing the spread of the virus;

WHEREAS, the on-going evaluation of circumstances related to the virus and the updated recommendations of the Centers for Disease Control and the Texas Department of State Health Services warrant the March 12, 2020 Order of County Judge Clay Jenkins be amended;

WHEREAS, on March 16, 2020, President Trump acknowledged the gravity of the COVID-19 pandemic, releasing strict new guidelines to limit people's interactions, including that Americans should avoid groups of more than 10 people;

WHEREAS, on March 19, 2020, the Dallas County Commissioners Court issued an Order of Continuance of Declaration of Local Disaster for Public Health Emergency that affirmed the activation of the Dallas County Emergency Management Plan and extends the Declaration of Local Disaster until 11:59 p.m. on May 15, 2020, unless rescinded by order of the Commissioners Court.

WHEREAS, on March 24, 2020, the World Health Organization indicated that the United States has the potential to become the center of the COVID-19 pandemic;

WHEREAS, this Emergency Order is necessary because of the propensity of the virus to spread person to person and also because the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time;

WHEREAS, this Emergency Order is necessary to protect the lives, health, welfare, and safety of the County's residents from the devastating impacts of this pandemic;

THEREFORE, the March 12, 2020, Order of County Judge Clay Jenkins is hereby AMENDED as follows:

Summary: The virus that causes 2019 Coronavirus Disease (COVID-19) is easily transmitted through person to person contact, especially in group settings, and it is essential that the spread of the virus be slowed to protect the ability of public and private health care providers to handle the influx of new patients and safeguard public health and safety. Because of the risk of the rapid spread of the virus, and the need to protect the most vulnerable members of the community, this Order requires all individuals anywhere in Dallas County to shelter in place – that is, stay at home – except for certain essential activities and work to provide essential business and government services or perform essential public infrastructure construction, including housing. This Order

1

 **DALLAS COUNTY**

takes effect Noon on April 23, 2020 and will continue through 11:59 p.m. on May 15, 2020, subject to the limited exceptions and under the terms and conditions more particularly set forth below.

**UNDER THE AUTHORITY OF TEXAS GOVERNMENT CODE SECTION 418.108, DALLAS COUNTY JUDGE CLAY JENKINS ORDERS:**

1. Effective as of Noon on April 23, 2020, and continuing until 11:59 p.m. on May 15, 2020:

    (a) All individuals currently living within Dallas County are ordered to shelter at their place of residence. For the purposes of this Order, residences include hotels, motels, shared rentals, and similar facilities. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably as possible maintain social distancing of at least six feet from any other person when they are outside their residence. All persons may leave their residences only for Essential Activities, Reopened Services, or to provide or perform Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 2.

    (b) All businesses operating within Dallas County, except Essential Businesses and Reopened Services as defined in below in Section 2, are required to cease all activities at facilities located within the County except Minimum Basic Operations as defined in Section 2. For clarity, businesses may continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e. working from home). To the greatest extent possible, all Essential Businesses shall comply with the Social Distancing Rules attached, including maintaining six feet social distancing for both employees and the general public.

    (c) Employees of Essential Businesses and Reopened Services, whose physical presence at the workplace is not essential to operations, are directed to use telecommuting to the fullest extent possible.

    (d) All public or private gatherings of any number of people occurring outside a single household or living unit are prohibited, except as otherwise provided herein. Nothing in this Order prohibits the gathering of members of a household or living unit.

2. Definitions:

    a. For purposes of this Order, individuals may leave their residence only to perform any of the following "**Essential Activities**":

        i. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (for example, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies need to work from home).

        ii. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others (for example, food, pet supply, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.



**DALLAS COUNTY**

6. Employees must maintain at least 6 feet separation from one another.

iv. All Reopened Services providing services through Retail-to-Go shall comply with the following conditions:

1. All payments shall be done over the phone or internet if possible, and contact shall be minimized if remote payment is not available.

2. Purchased items shall be delivered by the employee to the backseat or trunk of the customer's vehicle whenever possible to minimize physical contact with the customer.

3. Employees must wash or sanitize their hands after each interaction with a customer, and whenever possible, must disinfect any item that came into contact with the customer.

v. All Reopened Services providing services through delivery to a customer's residence or business shall comply with the following conditions:

1. All payments shall be done over the phone or internet if possible, and contact shall be minimized if remote payment is not available.

2. Purchased items shall be delivered by an employee or third-party carrier and delivered to the customer's residence or business. The employee or third-party carrier may not enter the customer's house or business.

vi. All Reopened Services providing services through delivery by mail shall comply with the following conditions:

1. All payments must be done over the phone or internet.

2. Purchased items shall be delivered by mail without customer contact.

c. For purposes of this Order, "**Essential Businesses**" means:

i. **Essential Healthcare Operations**. Healthcare Operations includes but is not limited to hospitals, clinics, dentists, chiropractors, physical therapy, optometry offices, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, mental health providers, substance abuse service providers, blood banks, medical research, laboratory services, certified doulas, or any related and/or ancillary healthcare services. Home-based and residential-based care for seniors, adults, or children are also considered healthcare operations. Healthcare operations also includes veterinary care and all health and welfare services provided to animals. This exemption shall be viewed broadly to avoid any impacts to the delivery of healthcare. Healthcare operations do not include fitness and exercise gyms, personal training, gymnastics studios, and similar facilities. Healthcare operations do not include elective medical, surgical, and dental procedures as established in accordance with Subsection 1(e) of this Order.

ii. **Essential Governmental Functions**. All services provided by local governments needed to ensure the continuing operation of the government agencies to provide for the health, safety and welfare of the public. Each governmental body will determine its Essential Governmental Functions

4



**DALLAS COUNTY**

and identify the employees and/or contractors necessary to the performance of those functions. Further, nothing in this order shall prohibit any individual from performing or accessing "Essential Governmental Functions." All Essential Governmental Functions shall be performed in compliance with social distancing requirements of six feet, to the extent possible. This Order does not apply to Federal or State Government.

iii. **Essential Critical Infrastructure.** All public and private facilities and assets, including both physical and cyber systems, and other functions and sectors vital to the security, governance, and public health, safety of Dallas County. Critical infrastructure includes, but is not limited to, utilities such as electricity, gas, water and wastewater, roads and highways, public transportation, solid waste and recycle collection and removal, oil refining, roads and highways, public transportation, defense and national security-related operations, and manufacturing operations suppling essential items to Essential Businesses, Essential Governmental Functions, and Critical Infrastructure. All manufacturers and distributors shall comply with the Rules for Manufacturers and Distributors set out in Exhibit C. Critical Infrastructure employers should implement screening precautions to protect employees and all activity shall be performed in compliance with social distancing guidelines attached.  For reference, the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0, can be found here: https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce

iv. **Stores that Sell Groceries and Other Essential Supplies**. Grocery stores, supermarkets, warehouse stores, big-box stores, bodegas, liquor stores, convenience stores, and farmers' markets that sell food products and household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products. The sale of self-service food items is prohibited. Stores that sell groceries and other essential supplies shall comply with the Rules for Essential Retail Establishments set out in Exhibit A.

v. **Restaurants**. Restaurants with or without drive-in or drive-through services and microbreweries, micro-distilleries, or wineries may only provide take out, delivery, or drive-through services as allowed by law. In-person service is prohibited. Customers may order and pay inside, but are prohibited from waiting inside the restaurant for their food. All food must be brought outside to customers. To allow for increased access to restaurants, this Order hereby suspends all laws and regulations prohibiting people from walking in a drive-through.

vi. **Food Cultivation**. Food cultivation, including farming, fishing, and livestock.

vii. **Delivery of Groceries and Essential Supplies**. Businesses that ship or deliver groceries, food, hygiene products, and essential supplies directly to



**DALLAS COUNTY**

residences or essential businesses. All businesses that deliver groceries and essential supplies shall comply with the rules set out in Exhibit E.

viii. **Transportation**. Operation, maintenance, and repair of airlines, taxis, and other private transportation providers (such as Uber and Lyft) that provide transportation services necessary for the performance of essential activities and essential travel.

ix. **Gas Stations and Businesses Needed for Transportation**. Gas stations, auto dealers, auto-supply stores, auto-repair, and bicycle repair. Gas stations and convenience stores are prohibited from selling self-service food items. Gas stations and businesses needed for transportation shall comply with the Rules for Essential Retail Establishments set out in Exhibit A.

x. **Critical Trades**. Plumbers, electricians, exterminators, janitors, lawn care services, pool cleaners, maintenance and security, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operations of residences, Essential Businesses, Essential Government Functions, and Critical Infrastructure. Critical Trade does not include discretionary maintenance or improvements. Union representatives and their staff for the purpose of performing critical labor union functions, including the maintenance of health and welfare funds and checking on the well-being and safety of members.

xi. **Construction**. Construction for public works, residential, commercial, and schools. Elective additions and maintenance are prohibited. Protecting construction worker from the spread of COVID19 is extremely important for their safety and for public health, all construction sites must follow the COVID-19 Safety Recommendations issued by the Construction Industry Safety Coalition, including, but not limited to, the Rules for Construction Industry set out in Exhibit B. Failure to strictly comply with this Order can result in penalties described below. Additionally, the general contractor and non-compliant subcontractor can be removed from the essential business list.

xii. **Professional Services**. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities or services necessary to avoid imminent harm to a client. Real estate and inspection services, so long as they comply with the rules set out in Exhibit F.

xiii. **Financial Institutions**. Banks and related depository financial institutions, credit unions, insurance companies, title companies, payroll and accounting services. Check cashing businesses and pawnshops so long as they comply with the rules set out in Exhibit D. A copy of Exhibit D must be prominently displayed in each establishment in English and Spanish and a copy must also be provided to each customer in the customer's preferred language.

xiv. **Information Technology Services/Telecommunications Services**. IT and IT services and their essential service vendors, including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services, and



**DALLAS COUNTY**

critical manufacturing, as well as telecommunications services, internet access and broadband/communications services.

xv. **Essential Retail.** Laundromats, dry cleaners, and laundry service providers, hardware stores, and related facilities. Firearm and ammunition suppliers and retailers for purposes of safety and security. Hardware stores and business that sell electrical, plumbing, and other materials necessary to support Essential Businesses, and Essential Government Functions, and Critical Infrastructure. Essential retail establishments shall comply with the Rules for Essential Retail Establishments set out in Exhibit A.

xvi. **Fabric Stores.** Stores that sell fabric, for the sole purpose of selling fabric and supplies necessary for the creation of fabric cloth coverings and masks and supplies necessary for home schooling students. Stores that sell fabric shall comply with the Rules for Essential Retail Establishments set out in Exhibit A.

xvii. **Hotels and Motels.** Hotels and motels, to the extent used for lodging or delivery or carry-out food services.

xviii. **Short-Term Rentals.** Short-term rental of all or part of a residential property to a person who is not a permanent resident is prohibited. Within the meaning of this Order, a "permanent resident" is a person who has the right to use or possess a room at the residential property for at least 30 consecutive days, so long as there is no interruption of payment for the period. This Order does not prohibit short-term rental to hospital employees or other licensed healthcare professionals, military personnel, law enforcement personnel, government employees, or Dallas County residents who need a place to self-quarantine away from their family and/or roommates. Renters currently occupying short-term rental properties shall be permitted to complete the current rental contract but are required to follow the requirements of this order

xix. **Providers of Basic Necessities to Economically Disadvantaged Populations.** Businesses or organizations that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals.

xx. **Essential Services Necessary to Maintain Essential Operations of Residences or Other Essential Businesses.** . Businesses or services that supply other Essential Businesses, Essential Government Services, and Critical Infrastructure with the support or supplies needed to operate; including but not limited to mail, shipping and delivery services, warehouse/distribution and fulfillment, storage, moving services, janitorial services, laundry services, computer, audio or video electronics, sanitary equipment, and medical equipment.. To the extent possible, services shall be provided in compliance with Social Distancing Rules attached, including distancing of six feet and routine use of hand sanitizer. All employers that are common carriers, motor carriers, private carriers, shippers, delivery services, moving companies and contract carriers that

7



**DALLAS COUNTY**

load or unload cargo, supplies, equipment or goods at any point located in Dallas County shall comply with the rules set out in Exhibit E.

xxi. **Supplies to Work From Home and Home School Students.** Businesses that supply products needed for people to work from home and stores that sell supplies necessary for home schooling students.  Stores that sell supplies for people to work from home shall comply with the Rules for Essential Retail Establishments set out in Exhibit A.

xxii. **Public and Private Education**. All schools are closed to in-person classroom attendance and shall not recommence before the end of the 2019-2020 school year. Public and private educational institutions may operate in-person only for the purposes of facilitating distance learning or performing essential functions, provided compliance with the Social Distancing Rules is maintained.

xxiii. **News Media**. Newspapers, television, radio, and other media services.

xxiv. **Childcare Services**. Childcare facilities providing services or community service providers offering childcare services  under the following mandatory conditions:

1. Childcare services shall only be provided to employees of Essential Businesses;
2. Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day);
3. Children shall not change from one group to another;
4. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other;
5. Childcare providers shall remain solely with one group of children.

xxv. **Animal Care Services**. Animal shelters, veterinary care,  and pet food and supply stores. Grooming, if necessary for the health and wellbeing of the animal. Pet daycare, but only for employees of Essential Businesses. To the greatest extent possible, all services must be performed in compliance with social distancing requirements of six feet. Pet food and supply stores shall comply with the Rules for Essential Retail Establishments set out in Exhibit A.

xxvi. **Religious and Worship Services**. The Office of the Dallas County Judge and the Health Authority strongly encourage religious and worship services be provided by audio, video, and teleconference whenever possible and that all individuals follow all CDC and County Social Distancing Guidelines including the six feet social distancing rule.

xxvii. **Funeral Services**. Funeral, mortuary, cremation, burial, cemetery, and related services, provided that social distancing of six feet per person is maintained to the greatest extent possible.

d. For purposes of this Order, **Minimum Basic Operations** means the following, provided that employees comply with the Social Distancing Rules:



**DALLAS COUNTY**

      i. The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

      ii. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

    e. **Covering of Nose and Mouth**:  Because an infected person can transmit the COVID-19 virus to others before showing any symptoms, the covering of a person's nose and mouth is necessary to help slow the spread of the virus. Effective at 11:59 p.m. on April 17, 2020, to the greatest extent possible all persons over the age of two (2) shall wear some form of covering over their nose and mouth, such as a homemade mask, scarf, bandana or handkerchief, when patronizing an Essential Business or using public transportation pursuant to the rules outlined in Exhibit G. Parents and Guardians of children under 10 shall be responsible for appropriately masking children pursuant to this Order. To the greatest extent possible, all non-medical employees who work at an Essential Businesses or perform services that are exempt under this Order must wear face coverings over their noses and mouths while performing their work. An owner or operator of an Essential Business may refuse admission or service to any individual who fails to wear face covering. Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus. The enforcement provisions set forth in Section 3 of this Order shall not apply to any violation of this provision or Exhibit G and no law enforcement officer shall stop, detain, or arrest any person based on any such violation.

3. The Dallas County Sheriff's Office, the Dallas County Fire Marshal's Office, and other peace officers, are hereby authorized to enforce this Order. A violation of this order may be punishable through criminal or civil enforcement. A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days.

4. Any manufacturer who retools their business for the purpose of manufacturing and producing ventilators, masks, personal protective equipment, or any supply necessary for Essential Healthcare Operations may apply for an "essential business" exemption under this Order. Apply for a business exemption at https://www.dallascounty.org/covid-19/ways-to-help.php under the "Apply for an Essential Business Exemption" tab.

5. All Coronavirus Aid, Relief, and Economic Security Act (CARES Act) Recovery Payments to individuals shall be exempt from "garnishment" as that term is described in Chapter 63 of the Texas Civil Practice and Remedies Code, except for garnishment for child support payments. All CARE Act Payments shall remain exempt from garnishment when deposited into an account in a financial institution. This provision is enacted to ensure Dallas County residents can use their CARES Act Recovery Payments for their housing, food, medical and other essential needs during the COVID-19 emergency period.

6. All public, private, and commercial laboratories operating within Dallas County and performing COVID-19 testing shall report by 5:00 p.m. each day for the prior 24-hour period:



**DALLAS COUNTY**

    a. The number of COVID-19 tests performed; and

    b. The number of positive COVID-19 tests.

Reports shall be made to Dallas County Judge Clay Jenkins at Clay.Jenkins@dallascounty.org and Dallas County Health and Human Services Director Dr. Philip Huang at Philip.Huang@dallascounty.org. Reporting laboratories shall not provide names or any other identifiable health information that could be used to identify an individual patient.

7. Door-to-door solicitation creates an unnecessary face-to-face situation for residents who are home in greater numbers due to the closure of schools and businesses, potentially endangering the health of residents. Under this Order, door-to-door solicitation is prohibited, including the leaving of written materials on the door or mailbox of a residence. This provision does not apply to any business in the grocery supply chain or any non-profit providing community resources for those effected by the coronavirus. Nothing in this Order prohibits utility companies or government agencies from contacting individuals at their residences to perform their normal business functions.

8. Employers shall not implement any rules making a negative COVID-19 test or a note from a healthcare provider a requirement before a COVID-19 recovered employee can return to work.

9. Under this Order, no person shall sell any of the following goods or services for more than the regular retail price the person charged for the goods or services on March 16, 2020, except where an increased retail price is the result of increased supplier or other costs (including the loss of supplier supporting funds):

    a. groceries, beverages, toilet articles, and ice;

    b. restaurant, cafeteria, and boarding-house meals; and

    c. medicine, pharmaceutical and medical equipment, and supplies.

10. Grocery stores, supermarkets, warehouse stores, hospitals, and medical facilities are experiencing high levels of demand for a large number of products, requiring more deliveries from manufacturers and distribution centers to serve their customers. A number of Texas cities and local associations have implemented restrictions on delivery hours to stores to mitigate truck noise and traffic. Due to the need to deliver products as quickly and efficiently as possible during this critical timeframe, this Order hereby suspends all delivery hour restrictions for transport to or from any entity involved in the selling or distribution of food products, medicine, or medical supplies in Dallas County for the next 60 days.

11. Due to increased demand for bath or toilet tissue resulting from stock up buying and individuals who purchase for resale, a mandatory limit on toilet paper sales is instituted until the supply chain meets the demand or two weeks, whichever comes first. All sales of bath or toilet tissue occurring in Dallas County are limited to the greater of: (a) twelve (12) rolls per purchase or (b) one (1) package per purchase. This provision does not apply to the sale of bath or tissue paper to a government organization or essential business.

12. Due to the public health emergency, the Office of the Dallas County Judge hereby advises the Dallas County Justices of the Peace to suspend eviction hearings and writs of



# DALLAS COUNTY

possession for at least the next 60 days to prevent renters from being displaced. Nothing in the moratorium relieves tenants of liability for unpaid rent. Landlords should cap late fees for delayed payment of rent at fifteen dollars ($15) per month.

13. If someone in a household has tested positive for coronavirus, the household is ordered to isolate at home. Members of the household cannot go to work, school, or any other community function, except for workers included in Essential Healthcare Operations who may continue to work in accordance with CDC guidance.

14. Nursing homes, retirement, and long-term care facilities are instructed by this Order to prohibit non-essential visitors from accessing their facilities unless to provide critical assistance or for end-of-life visitation.

15. Public and private schools and institutions of higher education are instructed by this Order to provide a safety plan to Dallas County Office of Homeland Security and Emergency Management 72 hours before students return to a classroom setting.

16. Additionally, the Office of the Dallas County Judge and the Health Authority instructs all employees to remain at home if sick. Employees of private businesses and nonprofits with six (6) or more employees in the City of Dallas can use their paid sick leave when they are sick or to care for sick family members.

17. This Order shall be in effect until 11:59 p.m. on April 30, 2020, or until it is either rescinded, superseded, or amended pursuant to applicable law.

18. The County of Dallas must promptly provide copies of this Order by posting on the Dallas County Health and Human Services website. In addition, the owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public asking for a copy. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remaining portions or applications of this Order.

**IT IS SO ORDERED**

**CLAY JENKINS**
**DALLAS COUNTY JUDGE**

 **DALLAS COUNTY**

# EXIBIT A

## Rules for Essential Retailers

**Reason for Rules**. The purpose of these rules is to outline the steps that every employer and employee must take to reduce the risk of exposure to COVID-19. The rules describe how to prevent worker exposure to coronavirus and protective measures to be taken in all establishments.

**Definition of Essential Retailers.**

1. <u>Stores that Sell Groceries and Other Essential Supplies</u>. Grocery stores, supermarkets, warehouse stores, big-box stores, bodegas, liquor stores, convenience stores, and farmers' markets that sell food products and household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products.
2. <u>Gas Stations and Businesses Needed for Transportation</u>. Gas stations, auto dealerships, auto-supply stores, auto-repair, and bicycle repair.
3. <u>Other Essential Retailers</u>. Stores that sell supplies necessary for the creation of fabric cloth coverings and masks and supplies necessary for home schooling students. Pet food and supply stores. Laundromats, dry cleaners, and laundry service providers, hardware stores, and related facilities. Firearm and ammunition suppliers and retailers for purposes of safety and security. Hardware stores and business that sell electrical, plumbing, and other materials necessary to support Essential Businesses, and Essential Government Functions, and Critical Infrastructure.

**Safety Rules for All Essential Retailers**. All employers involved in essential retail activity must follow the requirements set forth in the rules below:

1. All employees must take their temperature at their residence before going to an Essential Retailer. If an employee has a temperature above 99.6 degrees Fahrenheit, then they are prohibited from going to work and must remain at their residence;
2. To the greatest extent possible and as equipment becomes available, an Essential Retailer must implement a system whereby supervisors must check the temperature of all employees with a forehead thermometer before the employee begins work. If an employee has a temperature above 99.6 degrees Fahrenheit, then they are not permitted to work and must be sent home immediately;
3. Gatherings during meals or breaks are prohibited;
4. Employees must keep a 6 foot distance between people at all times, unless the work being performed requires multiple individuals for the safety of the employees;
5. Employers must allow non-essential personnel to work from home when possible;
6. Employers must provide soap and water, or hand sanitizer if no soap or water is available, in the workplace, including all restrooms and food preparation areas. Ensure that adequate supplies are maintained;

 **DALLAS COUNTY**

7. Employees must wash their hands for at least twenty (20) seconds before beginning work, before any food preparation, before and after the use of shared items, after any meal or restroom breaks, and immediately prior to the end of the work shift.
8. Rest breaks of at least fifteen (15) minutes for every four (4) hours worked must be provided so employees may follow hygiene guidelines;
9. There shall be no adverse action taken against an employee who has, due to possible exposure to coronavirus, (1) been quarantined or advised to self-quarantine; (2) have not reported to work because the employee has a temperature of 99.6 degrees or higher; and (3) requested to use paid sick leave under the employer's policy; and
10. Employers must designate both a member of management as the COVID-19 Safety Monitor and a senior hourly worker (that is not a member of management) as the COVID-19 Vice Safety Monitor at each store to have the authority to work together to enforce these rules. Employers in unionized workplaces should consult with the employee's representatives on this designation.

**General Rules for Essential Retailers**.
1. Employers shall implement an organized line system where employees, customers, and other persons are not less than six feet apart at all times;
2. To the greatest extent practicable, designate shopping times for at risk populations (seniors, pregnant people, and people with underlying health conditions);
3. To the greatest extent possible, implement a system to restrict the number of customers who are physically present at an Essential Retailer so that six foot spacing may be maintained;
4. Employers shall implement purchase limits on high-demand items (toilet paper, soap, hand sanitizer). These purchase limits do not apply to a government organization or essential business;
5. To the greatest extent possible, employers shall offer pick up services or delivery services of grocery items and other essential supplies; and
6. Self-service food stations are prohibited. Self-service stations are defined as items that customers use common serving utensils to serve themselves, including but not limited to, salad bars, hot dog stands, self-service bulk food items, and other related food items. This section does not apply to self-checkout stations, so long as the checkout stations are cleaned at least every 30 minutes.

**Enforcement**. A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days. Additionally, any essential retailer who fails to strictly comply with these rules can be removed from the essential business list and prohibited from operating in Dallas County.



**DALLAS COUNTY**

# EXHIBIT B

## Rules for the Construction Industry

**Reason for Construction Rules**. The purpose of these rules is to outline the steps that every employer and employee must take to reduce the risk of exposure to COVID-19. The rules describe how to prevent worker exposure to coronavirus, protective measures to be taken on the jobsite, and cleaning and disinfecting procedures.

**Construction as Critical Infrastructure.** The Order classified construction for public works, residential, commercial, and schools as critical infrastructure. Elective additions and maintenance are prohibited.

**Requirements for Construction**. All employers involved in construction activity must follow the requirements set forth in the COVID-19 Safety Recommendations issued by the Construction Industry Safety Coalition, including the rules below:

1. All workers and contractors (hereafter referred to as "workers") must take their temperature at their residence. If a worker has a temperature above 99.6 degrees Fahrenheit, then they are prohibited from going to work and must remain at their residence;
2. To the greatest extent possible, implement a system whereby supervisors must check the temperature of all workers and contractors with a forehead thermometer before the worker begins work. If n worker or contractor has a temperature above 99.6 degrees Fahrenheit, then they are to be sent home immediately;
3. To the greatest extent possible, shift work must be implemented such that each shift shall have no more than fifty percent (50%) of the workers who were on shift on March 16, 2020. Once assigned to a shift, workers shall not change from one shift to another;
4. To the greatest extent possible, limit crossover of subcontractors;
5. Gatherings during meals or breaks are prohibited;
6. Workers must keep a 6 foot distance between people at all times, unless the work being performed requires multiple individuals for the safety of the workers;
7. Workers must not use a common water cooler. Employers shall provide individual water bottles or instruct workers to bring their own;
8. Employers must allow non-essential personnel to work from home when possible;
9. Employers must provide soap and water and hand sanitizer in the workplace, including all restrooms. Ensure that adequate supplies are maintained;
10. If running water is available at the site, workers must wash their hands for at least twenty (20) seconds before beginning work, when they remove gloves, and before and after the use of shared items such as tools or multi-user devices, before and after any meal or restroom breaks, and when their shift or work time ends.
11. Rest breaks of at least fifteen (15) minutes for every four (4) hours worked must be provided so workers may follow hygiene guidelines;
12. Employers must provide one (1) working flushing toilet for every fifteen (15) workers on site or one (1) outdoor portable toilet for every 10 workers on site;
13. There shall be no adverse action taken against a worker who has, due to possible exposure to coronavirus, (1) been quarantined or advised to self-quarantine; (2) have not

14

 **DALLAS COUNTY**

reported to work because the worker has a temperature of 99.6 degrees or higher; and (3) requested to use paid sick leave under the employer's policy; and

14. Employers must designate a COVID-19 safety monitor on each site who has the authority to enforce these rules;

**Enforcement.** A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days. Additionally, any general contractor or subcontractor who fails to strictly comply with these rules can be removed from the essential business list and prohibited from operating in Dallas County.

 **DALLAS COUNTY**

# EXHIBIT C

## Rules for Manufacturers and Distributors

**Reason for Rules**. The purpose of these rules is to outline the steps that every employer and employee must take to reduce the risk of exposure to COVID-19. The rules describe how to prevent worker exposure to coronavirus, protective measures to be taken on the jobsite, and cleaning and disinfecting procedures.

**Definition of Critical Manufacturers and Distributors.** This Order defines Critical Manufacturing and Distribution as the industries listed in the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0.

**Rules for Manufacturers and Distributors**. All employers involved in critical manufacturing and distribution activity must follow the requirements set forth in the rules below:

1. All employees must take their temperature at their residence before going to work at a manufacturing or distribution center. If a worker has a temperature above 99.6 degrees Fahrenheit, then they are prohibited from going to work and must remain at their residence;
2. To the greatest extent possible and as equipment becomes available, employers must implement a system whereby supervisors check the temperature of all employees before the employee begins work. If an employee has a temperature above 99.6 degrees Fahrenheit, then they are not permitted to work and must be sent home immediately;
3. Gatherings during meals or breaks are prohibited;
4. Employees must keep a six (6) foot distance between people at all times, unless the work being performed requires multiple individuals for the safety of the employees;
5. To the extent practicable, employers shall adjust shift timing to allow for greater physical distance between employees;
6. Employers must allow non-essential personnel to work from home when possible;
7. Employers must provide soap and water, or hand sanitizer if no soap or water is available, in the workplace, including all restrooms. Employers shall ensure that adequate supplies of soap and hand sanitizer are maintained;
8. Employees must wash their hands for at least twenty (20) seconds before beginning work, before any food preparation, before and after the use of shared items, after any meal or restroom breaks, and immediately prior to departing the work site.
9. Employers shall discourage employees from sharing work tools when possible.
10. Rest breaks of at least fifteen (15) minutes for every four (4) hours worked must be provided so employees may follow hygiene guidelines;
11. There shall be no adverse action taken against an employee who has, due to possible exposure to coronavirus, (1) been quarantined or advised to self-quarantine; (2) have not reported to work because the worker has a temperature of 99.6 degrees or higher; and (3) requested to use paid sick leave under the employer's policy; and
12. Employers must designate both a member of management as the COVID-19 Safety Monitor and a senior hourly employee (that is not a member of management), or a non-management

 **DALLAS COUNTY**

employee if an hourly employee is not available, as the COVID-19 Vice Safety Monitor at each site to have the authority to work together to enforce these rules. Employers in unionized workplaces should consult with the employee's representatives on this designation.

**Enforcement**. A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days. Additionally, any manufacturer and distributor who fails to strictly comply with these rules can be removed from the essential business list and prohibited from operating in Dallas County.



**DALLAS COUNTY**

# EXHIBIT D

## Rules for Financial Institutions

**Reason for Rules**. The purpose of these rules is to outline the steps that every employer and employee must take to reduce the risk of exposure to COVID-19. The rules describe how to prevent worker exposure to coronavirus, protective measures to be taken on the jobsite, and cleaning and disinfecting procedures.

### 1. <u>Check Cashing Businesses</u>

**Application**. For the purpose of this Order, "Check Cashing Business" means a person or entity that for compensation engages, in whole or in part, in the business of cashing checks, drafts, money orders, traveler's checks or other instruments for the transmission or payment of money. This Order does not apply to a retail seller engaged primarily in the business of selling consumer goods, including consumables, to retail buyers that cash checks or issue money orders as a service to its customers that is incidental to its main purpose or business.

**Interest and Fees.** Fees shall not exceed 2% of the amount of the check, draft, or money order, or $2, whichever is greater. Interest on a loan or advance of money shall not exceed 15% per annum of the total amount of the advance, provided that total fees associated with the loan do not exceed $75, regardless of the name or type of charge. A check cashing business may charge only those charges expressly authorized in this Order in connection with a loan or advance issued.

**Safety Rules.** All check cashing businesses must follow the requirements set forth in the rules below:
  a) All employees must take their temperature at their residence before going to work. If an employee has a temperature above 99.6 degrees Fahrenheit, then they are prohibited from going to work and must remain at their residence;
  b) To the greatest extent possible and as equipment becomes available, employers must implement a system whereby supervisors must check the temperature of all workers and contractors with a forehead thermometer before the worker begins work. If a worker has a temperature above 99.6 degrees Fahrenheit, then they are to be sent home immediately;
  c) Employees must keep a 6 foot distance between people at all times, unless the work being performed requires multiple individuals for the safety of the workers;
  d) Employers shall restrict the number of customers physically present in the store to only those people necessary to complete the transaction as determined by the customer. All other individuals must remain outside the store while the transaction is completed;
  e) Employers must allow non-essential personnel to work from home when possible;
  f) Employers must provide soap and water, or hand sanitizer if no soap or water is available, in the workplace, including all restrooms and food preparation areas. Employers must ensure that adequate supplies are maintained;
  g) Employees must wash their hands for at least twenty (20) seconds before beginning work, before any food preparation, before and after the use of shared items, after any meal or restroom breaks, and immediately prior to the end of the work shift;



**DALLAS COUNTY**

h) Rest breaks of at least fifteen (15) minutes for every four (4) hours worked must be provided so workers may follow hygiene guidelines; and

i) There shall be no adverse action taken against a worker who has, due to possible exposure to coronavirus, (1) been quarantined or advised to self-quarantine; (2) have not reported to work because the worker has a temperature of 99.6 degrees or higher; and (3) requested to use paid sick leave under the employer's policy.

## 2. Pawnshops

**Application**. These rules apply to all locations or premises at which a pawnbroker regularly conducts business.

**Interest and Fees**. Interest on a loan of money extended pursuant to a pawn transaction shall not exceed 15% per annum of the total amount of the advance, provided that total fees associated with the loan do not exceed $75, regardless of the name or type of charge. A pawnshop may charge only those charges expressly authorized in this Order in connection with a pawnshop loan.

**Minimum Term Length**. A pawnshop shall hold the goods pledged as collateral for at least 120 days after the end of the Emergency Declaration issued by Judge Jenkins or the end of the Emergency Declaration issued by Governor Abbott, whichever is later.

**Safety Rules**. All pawnshops must follow the requirements set forth in the rules below:

a) All employees must take their temperature at their residence before going to work. If an employee has a temperature above 99.6 degrees Fahrenheit, then they are prohibited from going to work and must remain at their residence;

b) To the greatest extent possible and as equipment becomes available, employers must implement a system whereby supervisors must check the temperature of all workers and contractors with a forehead thermometer before the worker begins work. If a worker has a temperature above 99.6 degrees Fahrenheit, then they are to be sent home immediately;

c) Employees must keep a 6 foot distance between people at all times, unless the work being performed requires multiple individuals for the safety of the workers;

d) Employers shall restrict the number of customers so that only one customer is physically present in the store at a time;

e) Employers must allow non-essential personnel to work from home when possible;

f) Employers must provide soap and water, or hand sanitizer if no soap or water is available, in the workplace, including all restrooms and food preparation areas. Employers must ensure that adequate supplies are maintained;

g) Employees must wash their hands for at least twenty (20) seconds before beginning work, before any food preparation, before and after the use of shared items, after any meal or restroom breaks, and immediately prior to the end of the work shift;

h) Rest breaks of at least fifteen (15) minutes for every four (4) hours worked must be provided so workers may follow hygiene guidelines; and

i) There shall be no adverse action taken against a worker who has, due to possible exposure to coronavirus, (1) been quarantined or advised to self-quarantine; (2) have not reported to

 **DALLAS COUNTY**

work because the worker has a temperature of 99.6 degrees or higher; and (3) requested to use paid sick leave under the employer's policy.

### 3) <u>Enforcement</u>

**Enforcement**. A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days. Additionally, any financial institution who fails to strictly comply with these rules can be removed from the essential business list and prohibited from operating in Dallas County.

 **DALLAS COUNTY**

# EXHIBIT E

## Rules for Common Carriers, Shipper, Delivery Services, and Related Companies

**Reason for Rules.** The purpose of these rules is to outline the steps that every employer and employee must take to reduce the risk of exposure to COVID-19. The rules describe how to prevent worker exposure to coronavirus, protective measures to be taken on the jobsite, and cleaning and disinfecting procedures.

**Definition of Common Carriers.** All employers which are common carriers, motor carriers, private carriers, shippers, delivery services, moving companies and contract carriers which load or unload cargo, supplies, equipment or goods at any point located in Dallas County.

**Rules for Common Carriers.** All employers involved in trucking, shipping, delivery and moving services, and related industries must follow the requirements set forth in the rules below:

1. All employees must take their temperature at their residence before going to work. If a worker has a temperature above 99.6 degrees Fahrenheit, then they are prohibited from going to work and must remain at their residence;
2. To the greatest extent possible and as equipment becomes available, employers must implement a system whereby supervisors check the temperature of all employees before the employee begins work. If an employee has a temperature above 99.6 degrees Fahrenheit, then they are not permitted to work and must be sent home immediately;
3. Gatherings during meals or breaks are prohibited;
4. Employees must keep a six (6) foot distance between people at all times, unless the work being performed requires multiple individuals for the safety of the employees;
5. To the extent practicable, employers shall adjust shift timing to allow for greater physical distance between employees, including coordination between dispatch and scheduling so that there is no overlap between crews traveling to different locations;
6. Employers must allow non-essential personnel to work from home when possible;
7. Employers must provide soap and water, or hand sanitizer if no soap or water is available, in the workplace, including all restrooms. Employers shall ensure that adequate supplies of soap and hand sanitizer are maintained. Hand sanitizer must be available in each vehicle;
8. Workers must wash their hands for at least twenty (20) seconds before beginning work, before any food preparation, before and after the use of shared items, after any meal or restroom breaks, and immediately prior to the end of the work shift;
9. Employers must ensure that employees use gloves when handling shared tools or equipment (such as dollies, dock plates, and controls) and that employees wash their hands for at least 20 seconds after handling such tools or equipment;
10. To the greatest extent possible, drivers and other personnel should stay in their vehicles while the vehicles are being loaded and unloaded, unless required for employee safety;



**DALLAS COUNTY**

11. To the greatest extent possible, receipts, bills of lading, acknowledgements and other such documentation should be electronic so as minimize the need for personnel to physically sign and exchange documents;

12. Rest breaks of at least fifteen (15) minutes for every four (4) hours worked must be provided so workers may follow hygiene guidelines;

13. There shall be no adverse action taken against a worker who has, due to possible exposure to coronavirus, (1) been quarantined or advised to self-quarantine; (2) has not reported to work because the worker has a temperature of 99.6 degrees or higher; and (3) requested to use paid sick leave under the employer's policy; and

14. Employers must designate both a member of management and an employee who is not a member of management COVID-19 safety monitors at each of the business's warehouses, yards or other locations who have the authority to work together to enforce these rules. Employers in unionized workplaces should consult with the employee's representatives on this designation.

**Enforcement**. A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days. Additionally, any common carrier or related business who fails to strictly comply with these rules can be removed from the essential business list and prohibited from operating in Dallas County.



**DALLAS COUNTY**

# EXHIBIT F

## Rules for Real Estate Agents

**Reason for Rules**. The purpose of these rules is to outline the steps that every Agent/Employee must take to reduce the risk of exposure to COVID-19. The rules describe how to prevent exposure to coronavirus and protective measures to be taken in all real estate showing.

**Definition of Real Estate Activity.** For the purposes of this Order, real estate activity includes any activity governed by the Texas Real Estate License Act, the Inspector Act, the Residential Service Company Act, and the Timeshare Act.

**Safety Rules for All Real Estate Agents/Employees**. All realtors and their employees involved in essential real estate activity must follow the requirements set forth in the rules below:

1. Open Houses are prohibited;
2. All realtors and their employees (hereafter referred to as "realtors") must take their temperature at their residence prior to any real estate showing. If an agent has a temperature above 99.6 degrees Fahrenheit, they are prohibited from participating in any real estate showings and must remain at their residence;
3. Realtors and clients must travel to showings in separate vehicles;
4. Realtors, clients, and homeowners must follow the six-foot social distancing rule at all times;
5. Realtors and staff should limit in person contact and conduct business remotely as much as possible;
6. Realtors must wear a protective mask and provide new, unused protective masks to clients when touring a site;
7. Employers must designate a COVID-19 safety monitor at each real estate office who has the authority to enforce these rules;

**Enforcement**. A violation of this Order is a misdemeanor punishable by a fine not to exceed $1,000 and/or confinement in jail for a term not to exceed 180 days. Additionally, any realtor who fails to strictly comply with these rules can be removed from the essential business list and prohibited from operating in Dallas County.

 **DALLAS COUNTY**

# EXHIBIT G

## Guidance on Covering Nose and Mouth

A significant percentage of individuals with the COVID-19 virus lack symptoms. Because an infected person can transmit the virus to others before showing any symptoms, the covering of a person's nose and mouth when visiting an Essential Business is necessary to help prevent the spread of COVID-19. This is consistent with the findings of the CDC and Dallas County Health Authority.

Staying home is the best way to help reduce the spread of the virus, but if an individual must leave their place of residence to visit an Essential Business, wearing a fabric face mask shall be used as outlined in this Order.  Wearing a face covering is not a substitute for maintaining 6-feet social distancing and hand washing, as these remain important steps to slowing the spread of the virus. The face coverings recommended are not surgical masks or N-95 respirators, which are critical supplies that must continue to be reserved for healthcare workers and first responders.

**The public in general and Essential Business employees shall comply with the following:**

    **A.** To the greatest extent possible, all persons over the age of two (2) shall wear some form of covering over their nose and mouth, such as a homemade mask, scarf, bandana or handkerchief, when:
        **1)** patronizing an Essential Business; and
        **2)** using public transportation, taxis, or ride shares.
    **B.** <u>This section shall not apply to persons that are</u>:
        **1)** riding in a personal vehicle;
        **2) that are alone in a separate single space;**
        **3) that are in the presence only of other members of their household or residence;**
        **4)** engaging in outdoor activity;
        **5)** eating; or
        **6)** when wearing a covering poses a greater mental or physical health, safety or security risk such as anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the cover without assistance.

Children under the age of two (including infants) should not wear cloth face coverings. Those between the ages of two and nine should use them but under adult supervision to ensure that the child can breathe safely and avoid choking or suffocation. Children with breathing problems should not wear a face covering. Parents and Guardians of children under 10 shall be responsible for appropriately masking children pursuant to this Order.

All COVID-19 Suspected Positives, those currently being tested, and untested individuals with cough and/or fever, and household members of same category of individuals shall not leave their residence without a mask or cloth face covering to prevent the spread to others.

 **DALLAS COUNTY**

To the greatest extent possible, all individuals working for an Essential Business must wear a mask or cloth face covering whenever in public and whenever performing job duties in the presence of others. To the greatest extent possible, employers shall provide employees with a mask or face covering. An owner or operator of an Essential Business may refuse admission or service to any individual who fails to wear face covering.

Medical grade (N95) and surgical masks should be reserved and used only by medical professionals and first responders. Cloth face coverings are not intended for use by healthcare workers, first responders, and others whose work requires close contact with people who are ill.

Cloth coverings should be made in accordance with CDC Guidance, which can be found here: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html



**DALLAS COUNTY**

# DCHHS Social Distancing Rules

**1) Vulnerable Populations: Limit Outings**
- Vulnerable populations include people who are:
    - 60 years old and older.
    - People with certain health conditions such as heart disease, lung disease, diabetes, kidney disease and weakened immune systems.
- For vulnerable populations, don't go to gatherings unless it is essential. Stay home. Avoid people who are sick.

**2) Workplace and Businesses: Minimize Exposure**
- Suspend nonessential employee travel.
- Ensure employees practice social distancing and do not work within six feet of one another.
- Urge essential employees to stay home when they are sick and maximize flexibility in sick leave benefits.
- Do not require a doctor's note for employees who are sick.
- Maximize telecommuting options.
- Persons who need to be at work to provide essential services of great benefit to the community must take steps in their workplace to minimize risk.

**3) Cancel Non-essential Events**
- Cancel non-essential events.
- Do not attend any events or gatherings if sick.
- For events that aren't cancelled, we recommend:
    - Having hand washing capabilities, hand sanitizers and tissues available.
    - Frequently cleaning high touch surface areas like counter tops and hand rails.
    - Finding ways to implement social distancing.

**4) Schools: Safety First**
- Do not have your child attend school if sick.
- If you have a child with chronic health conditions, consult the child's doctor about school attendance.
- Schools should equip all classrooms with hand sanitizers and tissues.
- Recommend rescheduling or cancelling events that are not essential.
- Explore remote teaching and online options to continue learning.
- Schools should develop a plan for citywide school closures, and families should prepare for further closures.

**5) Transit: Cleaning and Protection**
- Increase cleaning of vehicles and high touch surface areas.
- Provide hand washing/hand sanitizers and tissues in stations and on vehicles.
- Ensure social distancing practices are implemented to the full extent possible.

 **DALLAS COUNTY**

**6) Health Care Settings: Avoid as possible, protect the vulnerable**
- Long-term care facilities should have a COVID-19 plan in accordance with CDC or state guidelines.
- Long-term care facilities should restrict all visitation except for certain compassionate care situations, such as end of life situations.
- The general public should avoid going to medical settings such as hospitals, nursing homes and long-term care facilities, even if you are not ill.
- If you are ill, call your health care provider ahead of time, and you may be able to be served by phone.
- Do not visit emergency rooms unless it is essential.
- Follow guidance and directions of all facilities.

**7) Everyone: Do your part**
The best way for all Dallas County residents to reduce their risk of getting sick, as with seasonal colds or the flu, still applies to prevent COVID-19:
- Wash hands with soap and water for at least 20 seconds.
- Cough or sneeze into your elbow or a tissue. Throw the tissue in the trash.
- Stay home if you are sick.
- Avoid touching your face.
- Try alternatives to shaking hands, like an elbow bump or wave.
- If you have recently returned from a country, state or region with ongoing COVID-19 infections, monitor your health and follow the instructions of public health officials and CDC guidance.

You can also prepare for the disruption caused by an outbreak. Preparedness actions include:
- Prepare to work from home if that is possible for your job, and your employer.
- Make sure you have a supply of all essential medications for your family.
- Prepare a child care plan if you or a caregiver are sick.
- Make arrangements about how your family will manage school closures.
- Plan for how you can care for a sick family member without getting sick yourself.
- Take care of each other and check in by phone with friends, family and neighbors that are vulnerable to serious illness or death if they get COVID-19.
- Keep common spaces clean to help maintain a healthy environment for you and others. Frequently touched surfaces should be cleaned regularly with disinfecting sprays, wipes or common household cleaning products.

# EXHIBIT 14

**AFM**

Affiliated FM Insurance Company
One Cowboys Way,
Frisco, TX 75034
T: 972 731 1821  F: 972 731 1808
E: grace.bonilla@fmglobal.com

May 6, 2020

Mrs. Melissa Frank                                                    Via Email: mfrank@cordish.com
Risk Management
The Cordish Companies, Inc.

Reference:      Insured:        The Cordish Companies, Inc.
                Location(s):    Multiple locations
                Policy No:      SS987
                Date of Loss:   1-March-2020
                Description:    Impact associated with COVID-19
                Claim ID:       501279

Dear Mrs. Frank:

This will acknowledge our receipt of your April 22, 2020 correspondence and attachments regarding the above referenced matter.

To date we have received and initiated our review of the information included in your letter and the following documents included within the referenced correspondence.

- The Cordish Companies, Inc locations list of locations
- Maryland COVID-19 Government Orders- Internet Links
- Kentucky COVID-19 Government Orders- Internet Links
- Virginia COVID-19 Government Orders- Internet Links
- Missouri COVID-19 Government Orders- Internet Links
- Texas COVID-19 Government Orders- Internet Links
- New Jersey COVID-19 Government Orders- Internet Links
- Delaware COVID-19 Government Orders- Internet Links
- COVID-19 Government Orders- Internet Links
- Michigan COVID-19 Government Orders- Internet Links
- New York COVID-19 Government Orders- Internet Links

We thank you for sending these to us. Although you stated that our request for information outlined in our April 13, 2020 correspondence is not relevant to the Cordish Company's ("Cordish's") losses or its current claim under the applicable terms of the Affiliated FM Insurance Company Policy No.: SS987 ("Policy"), we respectfully disagree and if it is your intent to pursue a Communicable Disease Claim we appreciate your cooperation in providing the information received to date and await the current outstanding information outlined in Appendix A.

 As you are aware, the initial notification to us from your broker representative, stated the following: *"Cause: This is a notice of loss associated with SARS-COV-2, COVID-19, and issues and events relating thereto for all locations covered by the policy and under all relevant parts of the policy. Losses are ongoing and continue to develop"*. Therefore, we believe the requested information is relevant in order to continue our investigation of this claim in order to determine policy coverage application.  Once we have had the opportunity to complete our review of the submitted documents, the information outlined in your correspondence and the current outstanding information outlined in Appendix A, we will contact you promptly to advise you of our determination of Policy coverage application and/or the need for any further documentation/information.

CLAIM ID: 501279
Page 2



Your letter also states  that Cordish is not claiming losses under the Communicable Disease provisions in the Policy at this time but rather have "*sustained and is continuing to sustain losses covered under other provisions of the policy, including but not limited to the following Business Interruption Coverage Extensions: (1) Attraction Property; (2) Civil or Military Authority; and (3) Supply Chain.*"

The Policy contains Additional Coverages for Attraction Property, Civil or Military Authority and Supply Chain. The Additional Coverages cited in your letter do not apply without physical loss or damage of the type of insured. In addition, we note that the Policy excludes coverage for contamination. The presence of a virus, pathogen or disease causing or illness causing agent such as COVID-19 is a form of contamination as defined in the Policy, which is excluded. The relevant provisions, in part, are set forth below:

> **Group III:**  This Policy excludes:

* * *

> **8. contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

The Policy defines contamination under DEFINITIONS on Page 42:

> **contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

***

The Attraction Property provision cited in your letter, which is outlined on page 24 of the Policy states, in part, as follows:

## 1.  Attraction Property

> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location."**

***

The presence and/or presumptive presence of COVID-19 at an insured location or within one (1) statute mile would not constitute "physical loss or damage of the type insured" as required under this provision. Accordingly, the Policy's Attraction Property provision (and other Policy provisions requiring physical loss or damage of the type insured) do not respond based on the information presented.

Other Policy coverages cited in your letter, such as the Civil or Military Authority provision, do not apply without physical loss or damage of the type insured.  For example, the Policy states, in part, as follows:

***

CLAIM ID: 501279
Page 3



### 1. Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

\*\*\*

The presence of COVID-19 at an insured location would not constitute "physical damage of the type insured" as required under this provision. Accordingly, the Policy's Civil or Military Authority provision (and other Policy provisions requiring physical loss or damage of the type insured) do not respond based on the information presented.

Other Policy Coverages cited in your letter, such as Supply Chain, do not apply without physical loss or damage of the type insured. For example, the Policy states in part, as follows:

\* \* \*

### 16. Supply Chain

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory...

\* \* \*

Please note that the Policy contains Additional Coverages for Communicable Disease – Property Damage and Communicable Disease – Business Interruption, subject to all Policy terms and conditions.  COVID-19 meets the Policy's definition of a "communicable disease."  Other key conditions of the Communicable Disease coverage are the actual not suspected presence of a communicable disease at a location owned, leased or rented by the insured, access to which has been limited, restricted or prohibited for more than 48 hours by an order of an authorized governmental agency or a decision of an officer of the Insured as a result of such presence.  Pertinent sections of the Policy are excerpted below:

\* \* \*

### 5. Communicable Disease – Property Damage

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a) Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

CLAIM ID: 501279
Page 4



   b)  Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

\* \* \*

**3.   Communicable Disease - Business Interruption**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

   a)  An order of an authorized governmental agency regulating such presence of **communicable disease**; or

   b)  A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

\* \* \*

The Policy includes a Communicable Disease Property Damage sublimit of $500,000 annual aggregate and a Communicable Disease Business Interruption sublimit of $500,000 annual aggregate for a 12 Month Period of Liability.

To obtain coverage under the Communicable Disease coverages set forth above, a described location owned, leased or rented by the Insured must have the actual not suspected presence of communicable disease. In your notice letter, you have not reported any confirmed case of COVID-19 at any Insured location (s) that are owned, leased or rented by Cordish.  If you become aware of any employee(s) or other individual(s) who were at such a location who have tested positive for COVID-19, or any other information that the virus was present at an Insured location, please advise us, as we will need to request certain additional detailed information to assist with our investigation.  If any of the foregoing should change or is incorrect, or you become aware of additional information that may affect our understanding of the facts, please feel free to contact us so we can consider any such additional information. Once you have identified the locations for which a claim is being made, additional information will be needed.

Consequently, based on the limited information provided at this time, the coverage potentially available under our Policy for losses arising from COVID-19 is found in our Communicable Disease coverages, assuming the conditions of those coverages are satisfied.  As discussed above, to the extent that Cordish believes that it has sustained physical loss or damage from other causes of loss, please provide further information so that we may investigate those causes of loss.  Based on the above, please advise whether or not Cordish plans to reconsider making claim under the Communicable Disease provisions of the Policy.

In addition, your letter references various locations in various jurisdictions that may have been impacted by the Coronavirus.  Customarily, each jurisdiction would recommend that we have a separate file for each

CLAIM ID: 501279
Page 5



loss location and communicate separately on each loss, including but not limited to statutory notices and proof of loss requirements. Each of these jurisdictions may have loss handling requirements that differ.

To streamline communication and adjustment of these COVID-19 related losses, we intend to establish a single claim file, encompassing all the locations referenced, which identifies your corporate office as controlling loss location. This will allow us to communicate with you more efficiently on these losses, instead of having to correspond with you separately for each location. Considering the volume of the losses you are reporting, we believe this approach makes the most sense. We received your verbal response and agreement to this approach; however, we have not received your written assent. A simple reply in the affirmative will suffice so we can proceed.

Neither this letter nor our investigation waives any right or duties of either party under the Affiliated FM Insurance Company Policy No.: SS987. Anything done or to be done by AFM, or on its behalf, in connection with the above described matter, including but not limited to, any investigation into the cause or amount of loss or other matter relative thereto, shall not waive, invalidate, forfeit or modify any of its rights under the policies issued by it.

We would like to thank you for your cooperation in this matter. In the interim, should you have any questions or comments, please feel free to contact us.

Sincerely,

*Grace M. Bonilla*

Grace M. Bonilla
Loss Adjuster
Dallas Claims Operations

Cc: John Kramer
Affiliated FM Insurance Company
John.Kramer@fmglobal.com

Cc: Brad Wantz
Lockton Insurance Brokers, LLC
Bwantz@lockton.com

CLAIM ID: 501279
Page 6



## Appendix A

The Cordish Companies, Inc. ("Cordish's") responses to Affiliated FM Insurance Company request for information dated April 13, 2020.

   1.   Please identify each location owned, leased or rented by The Cordish Companies, Inc. which had the actual, not suspected, presence of COVID-19.

Cordish's response*: The presence of COVID-19 is known to be widespread throughout the United States, including specifically the areas of the properties owned, leased, or rented by the Company and the vicinity of those properties.*

Although you have provided us with the above answer, your answer does not respond to our question. Therefore, we request that you please identify each location owned, leased or rented by Cordish, which had the actual, not suspected, presence of COVID-19.

   2.   How did you determine that the location(s) identified above had the actual presence of COVID-19?

Cordish's response*: The number of cases documented to date by the CDC—over 32,000 in Pennsylvania, over 31,000 in Michigan, over 18,000 in Texas, over 13,000 in Maryland, over 5,000 in Missouri, and nearly 3,000 in Kentucky—demonstrate the presence of COVID-19 in the vicinity of the Company's covered locations. See ttps://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-inus.html*

Although you have provided us with the above answer, your answer does not respond to the question. Therefore, we request that you please identify how you determined that the location(s) identified above had the actual presence of COVID-19.

   3.   Have the identified location(s) been tested for COVID-19? If yes, please provide copies of the test reports.

Cordish's response*: None of the locations have been tested for COVID-19 at this time.  It is our understanding that the limited testing resources are for individuals seeking medical care and that tests able to identify COVID-19 on surfaces will not be available for commercial purposes for some time.*

   4.   Have the location(s) been cleaned due to the presence of COVID-19? If yes, please provide copies of contractor invoices and service report(s), cleanup, removal or disposal costs incurred and any documents confirming that the location was cleaned.

Cordish's response*: Prior to government orders closing the properties, the Company took steps to protect employees and guests from COVID-19 at its locations where the Company is responsible for cleaning, such as increasing the frequency and extent of cleaning services and making hand sanitizer more readily available. On information and belief, the Company's third-party tenants who are not named insureds under the policy have taken similar steps. We have not yet determined the total expense for these efforts. Also, we anticipate further cleaning expenses when the properties are permitted to reopen.*

   5.   Have any employees (including outside workers, subcontractors, etc.) and others who were in the location(s) been tested for COVID-19? Please answer only "yes" or "no."

Cordish's response*: Given the prevalence of COVID-19 as noted above, we are confident the answer is "yes," but we do not have specific information of any such tests at this time. To the extent reasonably*

CLAIM ID: 501279
Page 7



*necessary, we will supplement this response upon request and in the event of our receipt of any specific responsive information.*

As your answer to our question is Yes. Once any of the requested information is available, please forward it to our attention for review and comment.

6. Have any of these individuals tested positive for COVID-19? Please answer only "yes" or "no."

Cordish's response*: See the response to Question No. 5*

As your answer to question No. 5 is Yes. Once any of the requested information is available, please forward it to our attention for review and comment.

7. Please request and provide the employee's or other person's test results (with all personal identifying information redacted).

Cordish's response*: See the response to Question No. 5.*

As your answer to question No. 5 is Yes, please provide the employee's or other person's test results (with all personal identifying information redacted) for our review and comment.

8. For each employee who tested positive, please provide the date of the employee's positive test result.

Cordish's response*: See the response to Question No. 5.*

As your answer to question No. 5 is Yes, once any of the requested information is available, including the date of the employee's positive test result, please forward it to our attention for review and comment.

9. For each employee who tested positive, please provide support to establish when the employee was present at the location(s). This may include, but is not limited to, information such as payroll records and building entry data. Please redact identifying personal information of the employee(s) if required.

Cordish's response*: See the response to Question No. 5.*

As your answer to question No. 5 is Yes, once any of the requested information is available, please forward it to our attention for review and comment.

**EXHIBIT 15**


**THE CORDISH COMPANIES**

VIA EMAIL

May 15, 2020

Grace M Bonilla
Affiliated FM Insurance Company
One Cowboys Way
Frisco, TX  75037
grace.bonilla@fmglobal.com

Re:   The Cordish Companies, Inc.
       Policy No. SS987 (the "Policy")
       <u>Your Claim No. 501279</u>

Dear Ms. Bonilla:

I write in response to FM's letter dated May 6, 2020, denying coverage for the above-referenced claim, except possibly under the Policy's Communicable Disease coverage.  Cordish disagrees with the factual and legal analysis contained in your letter. In particular, we take issue with FM's position that: (1) the "contamination" exclusion bars coverage; and (2) the coronavirus does not cause "physical loss or damage of the type insured" as needed to trigger coverage.

First, the analysis of the "contamination" exclusion in FM's denial letter improperly ignores critical language in that provision.  Specifically, FM's letter: (1) omits the lead-in language stating that "the following exclusions apply *unless otherwise stated*"; and (2) ignores the fact that the "Group I" exclusions broadly apply to loss or damage "caused by or resulting from" the enumerated perils or risks in that group, whereas the "Group III" exclusions narrowly apply only to certain conditions of property and not to loss or damage caused by such conditions of property – especially if such conditions are away from Cordish's property.  The terms omitted from FM's denial letter are critical to analyzing the coverage under the Policy for Cordish's losses and claim. FM cannot ignore them or try to rewrite the policy in a wrongful attempt to graft the broad terms of the Group I exclusions onto the much narrower exclusions in Group III.

Second, it is simply duplicitous for FM to sell us a policy with a coverage extension entitled "Communicable Disease – Property Damage" and then turn around and deny our claim on the grounds that "[t]he presence of COVID-19 at [a particular] location would not constitute 'physical damage of the type insured' as required under" the various provisions pursuant to which Cordish is seeking coverage.

Cordish hopes that FM will reconsider its incorrect analysis on this important claim.  But unless we hear otherwise, we understand FM's letter to be a

601 East Pratt Street, 6th Floor
Baltimore, MD 21202        800.733.5444
                           info@cordish.com

cordish.com



THE
CORDISH
COMPANIES

denial of coverage under all provisions of the Policy except possibly the Communicable Disease Coverage. Based on that denial, it is our understanding that there is no need to submit a proof of loss within 90 days of the date of loss, at least with respect to claims under provisions of the Policy other than the Communicable Disease coverage. If you have a different understanding please advise at your earliest convenience.

Sincerely,

Melissa Frank

Cc:    David Cordish
       Keith Hudolin, Esq.
       Brad Wantz

601 East Pratt Street, 6th Floor
Baltimore, MD 21202

800.733.5444
info@cordish.com

cordish.com



**THE CORDISH COMPANIES**

denial of coverage under all provisions of the Policy except possibly the Communicable Disease Coverage.  Based on that denial, it is our understanding that there is no need to submit a proof of loss within 90 days of the date of loss, at least with respect to claims under provisions of the Policy other than the Communicable Disease coverage. If you have a different understanding please advise at your earliest convenience.

Sincerely,

Melissa Frank

Cc:     David Cordish
        Keith Hudolin, Esq.
        Brad Wantz

# EXHIBIT 16



Affiliated FM Insurance Company
One Cowboys Way,
Frisco, TX 75034
T: 972 731 1821  F: 972 731 1808
E: grace.bonilla@fmglobal.com

June 1, 2020

Mrs. Melissa Frank                                          Via Email: mfrank@cordish.com
Risk Management
The Cordish Companies, Inc.

Reference:      Insured:          The Cordish Companies, Inc.
                Location(s):      Multiple locations
                Policy No:        SS987
                Date of Loss:     1-March-2020
                Description:      Impact associated with COVID-19
                Claim ID:         501279

Dear Mrs. Frank:

This will acknowledge our receipt of your letter dated May 15, 2020 received via email on May 18, 2020
and the e-mail on May 26, 2020.

This also confirms our telephone conversation on May 26, 2020. Based on our conversation we understand
that you would like to understand whether The Cordish Companies, Inc. need to submit a Sworn Proof of
Loss for the above referenced losses. During our conversation, we did not discuss policy application of any
of the Policy Provisions quoted in your May 15, 2020 letter.

We also would like to take this opportunity to clarify a couple of assertions included in your letter dated
May 15, 2020 and correspondence dated May 26, 2020 that are incorrect. Your assertion that Affiliated FM
Insurance Company (AFM) is "*denying coverage for the above reference claim, except possibly under the
Policy's Communicable Disease coverage*" is incorrect. Please note that Affiliated FM Insurance Company
("AFM') has not denied coverage for The Cordish Companies Inc.'s claim.  As stated in AFM's 6-May-
2020 letter, AFM is continuing its investigation of The Cordish Companies claim and has not provided its
determination of policy coverage application for this matter. Rather, AFM has provided The Cordish
Companies with the coverages and provisions of the Policy that may apply to the claim presented by The
Cordish Companies, based upon the information made available and presently known by AFM.

As stated in our 6-May-2020 letter, the AFM policy does not consider the presence of COVID-19, or the
virus that causes it, to be "physical loss or damage of the type insured." In addiion, the policy specifically
excludes contamination. The Policy definition for contamination, which includes but is not limited to a
virus, was previously outlined along with the exclusion provisions in our letter of May 6, 2020.  Since the
presence of the virus is not physical loss or damage of the type insured and contamination conditions are
excluded, the conditions for physical loss or damage of the type insured have not been met based on the
information provided to date.  Therefore,  as previously advised, the Attraction Property, Civil or Military
Authority, Supply Chain provisions do not apply and the coverage potentially available under our Policy
for losses arising from COVID-19 is found in our Communicable Disease coverages, assuming the
conditions of those coverages are satisfied.

You have also stated that "*FM cannot ignore them or try to rewrite the policy wrongful attempt to graft the
broad terms of the Group I exclusions onto the much narrower exclusions in Group III*". Please note that
AFM is not ignoring or trying to rewrite the Policy language. In fact, the Policy contains three groups of
exclusions that are outlined in your Policy as Group I, Group II and Group III. The Policy does include the
following as outlined in the Declarations section of the Policy:

CLAIM ID: 501279
Page 2



***

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

It is not AFM's intention to narrow any of the exclusions within the Policy, but to apply the terms, conditions, limitations and exclusions as stated in the Policy. We have not pointed out to you any Group I or Group II exclusions as we have not found any of them to be potentially applicable to The Cordish Companies' loss based upon the limited information provided to AFM at this time. We have cited the Group III Exclusion 8 as it is potentially applicable to the Cordish Companies' loss given the definition of contamination as contained in the Policy.

As outlined above, because COVID-19 is a virus, pathogen and/or disease causing or illness causing agent, it constitutes "contamination" as that term is defined in the Policy which is specifically excluded. Except for the limited coverage provided for the actual presence of Communicable Disease, the presence of COVID-19 at an insured location is excluded.

In addition, please note that the use of Property Damage in the title of the Communicable Disease coverage provision indicates that the coverage is afforded under the Property Damage section of the Policy. Additional coverage for Communicable Disease is also provided in the Business Interruption section of the Policy and its title is noted as Communicable Disease – Business Interruption. Coverage under a Policy provision is determined by the specific wording of the provision as applied to the facts of a particular loss, not by the Policy titles and subheadings.

The terms and conditions of the Communicable Disease coverages do not require physical loss or damage for recovery thereunder. As stated in our 6-May-2020 letter, Communicable Disease – Property Damage and Communicable Disease – Business Interruption are Additional Coverages subject to their specific terms and conditions as listed within these specific provisions. The requirements for the Communicable Disease – Property Damage and Communicable Disease – Business Interruption Additional Coverage are the actual not suspected presence of a communicable disease at a location owned, leased or rented by The Cordish Companies, access to which has been limited, restricted or prohibited by order of either an authorized governmental agency regulating such presence of communicable disease or a decision of an Officer of the Insured, subject to a qualifying period of 48 hours. Unlike most other policy coverages, this provision does not require "physical loss or damage" to respond.

Consequently, based on the limited information provided at this time, we reaffirm our position that the coverage potentially available under our Policy for losses arising from COVID-19 is found in our Communicable Disease coverages, assuming the conditions of those coverages are satisfied. And, to the extent that the Cordish Companies believes that it has sustained physical loss or damage from other causes of loss, please provide further information so that we may investigate those causes of loss.

Based on the above, please advise whether or not The Cordish Companies plans to reconsider making claim under the Communicable Disease provisions of the Policy. We included an additional request for information in our previous letter outlining information/documentation that will allow us to continue our loss investigation to determine policy coverage liability. At this time, we have not received any of the requested documentation, for your reference, we have included the request for information in Appendix A below which also includes the preliminary answers provided. We look forward to receiving this information/documentation at your earliest opportunity.

Regarding your question to have Affiliated FM Insurance Company provide in writing either that no proof of loss is required or that the time for submitting a proof of loss is extended, please note that the policy states the following on page 33:

CLAIM ID: 501279
Page 3



\*\*\*

## I.    REQUIREMENTS IN CASE OF LOSS

The Insured will:

**1.** Give immediate written notice to this Company of any loss.

**2.** Protect the property from further loss or damage.

**3.** Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

**4.** Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by this Company. The proof of loss must state the knowledge and belief of the Insured as to:

   **a)** The time and origin of the loss.

   **b)** The Insured's interest and that of all others in the property.

   **c)** The **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   **d)** Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   **e)** By whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

**5.** Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

**6.** Further, the Insured, will as often as may be reasonably required:

   **a)** Exhibit to any person designated by the Company all that remains of any property;

   **b)** Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   **c)** Produce for examination at the request of the Company:

      **i)** All books of accounts, business records, bills, invoices and other vouchers; or

      **ii)** Certified copies if originals are lost,

At such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

CLAIM ID: 501279
Page 4



To the extent that The Cordish Companies, Inc. is claiming the reference losses under the communicable disease and/or one of the other policy provisions within the policy, a Sworn Proof of Loss is required. If The Cordish Companies intends to submit a claim for consideration under the terms and conditions of the Affiliated FM Insurance Company Policy No.: SS987, the Requirements in Case of Loss must be met. We have attached a blank copy of the Sworn Proof of Loss for your reference.

In addition, as outlined in Mr. Casillas letter dated May 27, 2020 Affiliated FM Insurance Company is agreeable to extending the time in which The Cordish Companies, Inc. has for filing Proof of Loss for the above captioned loss for an additional ninety (90days) up to and including 28-August-2020.

Neither this letter nor our investigation waives any right or duties of either party under the Affiliated FM Insurance Company Policy No.: SS987. Anything done or to be done by AFM, or on its behalf, in connection with the above described matter, including but not limited to, any investigation into the cause or amount of loss or other matter relative thereto, shall not waive, invalidate, forfeit or modify any of its rights under the policies issued by it.

We would like to thank you for your cooperation in this matter. In the interim, should you have any questions or comments, please feel free to contact us.

Sincerely,

*Grace M. Bonilla*

Grace M. Bonilla
Loss Adjuster
Dallas Claims Operations

Cc: John Kramer
Affiliated FM Insurance Company
John.Kramer@fmglobal.com

Cc: Brad Wantz
Lockton Insurance Brokers, LLC
Bwantz@lockton.com

CLAIM ID: 501279
Page 5



## Appendix A

The Cordish Companies, Inc. ("Cordish's") responses to Affiliated FM Insurance Company request for information dated April 13, 2020.

1) Please identify each location owned, leased or rented by The Cordish Companies, Inc. which had the actual, not suspected, presence of COVID-19.

Cordish's response: *The presence of COVID-19 is known to be widespread throughout the United States, including specifically the areas of the properties owned, leased, or rented by the Company and the vicinity of those properties.*

Although you have provided us with the above answer, your answer does not respond to our question. Therefore, we request that you please identify each location owned, leased or rented by Cordish, which had the actual, not suspected, presence of COVID-19.

2) How did you determine that the location(s) identified above had the actual presence of COVID-19?

Cordish's response: *The number of cases documented to date by the CDC—over 32,000 in Pennsylvania, over 31,000 in Michigan, over 18,000 in Texas, over 13,000 in Maryland, over 5,000 in Missouri, and nearly 3,000 in Kentucky—demonstrate the presence of COVID-19 in the vicinity of the Company's covered locations. See ttps://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-inus.html*

Although you have provided us with the above answer, your answer does not respond to the question. Therefore, we request that you please identify how you determined that the location(s) identified above had the actual presence of COVID-19.

3) Have the identified location(s) been tested for COVID-19? If yes, please provide copies of the test reports.

Cordish's response: *None of the locations have been tested for COVID-19 at this time. It is our understanding that the limited testing resources are for individuals seeking medical care and that tests able to identify COVID-19 on surfaces will not be available for commercial purposes for some time.*

4) Have the location(s) been cleaned due to the presence of COVID-19? If yes, please provide copies of contractor invoices and service report(s), cleanup, removal or disposal costs incurred and any documents confirming that the location was cleaned.

Cordish's response: *Prior to government orders closing the properties, the Company took steps to protect employees and guests from COVID-19 at its locations where the Company is responsible for cleaning, such as increasing the frequency and extent of cleaning services and making hand sanitizer more readily available. On information and belief, the Company's third-party tenants who are not named insureds under the policy have taken similar steps. We have not yet determined the total expense for these efforts. Also, we anticipate further cleaning expenses when the properties are permitted to reopen.*

5) Have any employees (including outside workers, subcontractors, etc.) and others who were in the location(s) been tested for COVID-19? Please answer only "yes" or "no."

CLAIM ID: 501279
Page 6



Cordish's response: *Given the prevalence of COVID-19 as noted above, we are confident the answer is "yes," but we do not have specific information of any such tests at this time. To the extent reasonably necessary, we will supplement this response upon request and in the event of our receipt of any specific responsive information.*

As your answer to our question is Yes. Once any of the requested information is available, please forward it to our attention for review and comment.

6)   Have any of these individuals tested positive for COVID-19? Please answer only "yes" or "no."

Cordish's response: *See the response to Question No. 5*

As your answer to question No. 5 is Yes. Once any of the requested information is available, please forward it to our attention for review and comment.

7)   Please request and provide the employee's or other person's test results (with all personal identifying information redacted).

Cordish's response: *See the response to Question No. 5.*

As your answer to question No. 5 is Yes, please provide the employee's or other person's test results (with all personal identifying information redacted) for our review and comment.

8)   For each employee who tested positive, please provide the date of the employee's positive test result.

Cordish's response: *See the response to Question No. 5.*

As your answer to question No. 5 is Yes, once any of the requested information is available, including the date of the employee's positive test result, please forward it to our attention for review and comment.

9)   For each employee who tested positive, please provide support to establish when the employee was present at the location(s). This may include, but is not limited to, information such as payroll records and building entry data. Please redact identifying personal information of the employee(s) if required.

Cordish's response: *See the response to Question No. 5.*

As your answer to question No. 5 is Yes, once any of the requested information is available, please forward it to our attention for review and comment.