IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE CORDISH COMPANIES, INC.
*Plaintiff,*

v.                                              Civil Action No. ELH-20-2419

AFFILIATED FM INSURANCE
COMPANY,
*Defendant.*

**MEMORANDUM OPINION**

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).  This insurance dispute

arises from financial losses sustained by The Cordish Companies, Inc. ("Cordish"), plaintiff, due

to the pandemic.

COVID-19 is caused by a highly contagious virus.  *See Coronavirus Disease 2019*

*(COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2,

2020), https://bit.ly/2XoiDDh.[1]  Since at least March of 2020, the nation has been "in the grip of

a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA*

*v. Hogan*, 461 F. Supp. 3d 214, 223 (D. Md. 2020).  As of August 16, 2021, COVID-19 has

infected more than 36 million Americans and caused over 620,000 deaths in this country.  *See*

---

[1] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is commonly known as the coronavirus, and it causes an illness known as COVID-19.  *See* ECF 4 at 5, ¶ 9; *see also Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed August 16, 2021).[2]

The pandemic has impacted almost every aspect of our lives.  As mitigation efforts began to take hold beginning in March 2020, efforts to thwart the spread of the virus included social distancing and avoidance of indoor spaces and public places.  Many businesses limited their operations or shut their doors entirely, often because of governmental orders of civil authority.  These efforts to stem the spread of COVID-19 took a huge "toll on businesses across the United States."  *Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*, No. 20-2171, 2021 WL 1945712, at *1 (E.D. Pa. May 14, 2021).  This included many of the commercial properties operated by Cordish.[3]

As a result of the losses that Cordish suffered during the pandemic, Cordish submitted a claim to its insurer, defendant Affiliated FM Insurance Company ("AFM" or "FM"), pursuant to an "all risk" business interruption insurance policy that it had purchased from AFM at a cost of about $2 million.  ECF 4, ¶ 8.[4] The policy covered 97 commercial properties. AFM denied Cordish's claim.

---

[2] Under F.R.E. 201, the Court may take judicial notice of publicly available data.

[3] "The Cordish Companies, Inc." is merely "a trade name or holding company" that "owns no assets and operates no businesses."  ECF 4 at 7 n.1.  But, it is the First Named Insured under the insurance policy in issue.

[4] An all-risk insurance policy is one that allocates risk to the insurer by covering all risks, except those specifically excluded.  7 STEVEN PLITT ET AL., COUCH ON INSURANCE § 101:7 (3d ed. 2021); *see also Goodman v. Fireman's Fund Ins. Co*., 600 F.2d 1040, 1042 (4th Cir. 1979) (describing "all-risk" policies as those that cover all fortuitous losses "absent express exclusion").

This suit followed.  *See* ECF 4 ("Complaint").[5]  Cordish asserts a claim for breach of contract and seeks a declaration that AFM "has a duty to indemnify Cordish under the Policy for the business interruption losses at the Covered Properties." *Id.* ¶ 140.  Cordish appended several exhibits to the suit.  These include a copy of the insurance policy in issue and related correspondence (ECF 4-2 at 1-125, the "Policy") as well as copies of various governmental emergency orders.  ECF 4-2 at 126-130; ECF 4-3 at 1-56.

AFM answered the Complaint. ECF 9.  Several months later, AFM moved to dismiss the Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 24. The motion is supported by a memorandum. ECF 24-3 (collectively, the "Motion" or "Motion to Dismiss"). Plaintiff opposes the Motion (ECF 28), supported by 16 exhibits. Defendant has replied. ECF 31. Plaintiff filed a "Motion for Leave to File a Surreply" (ECF 32), along with the proposed surreply. ECF 32-1 (collectively, the "Motion for Surreply"). Defendant opposes the Motion for Surreply. ECF 34.

In resolving the Motion to Dismiss, the Court does not write on a clean slate.  This case is one of many brought throughout the country by businesses against their insurance companies, alleging that the losses suffered during the pandemic are covered under business interruption insurance contracts. Indeed, since the filing of the reply, both sides have filed many notices of supplemental authority, bringing to the Court's attention decisions of other courts in some of these cases. *See* ECF 42; ECF 43; ECF 44; ECF 48; ECF 49; ECF 50; ECF 51; ECF 52; ECF 53.  After plaintiff responded to one of defendant's notices of supplemental authority (ECF 45), defendant

---

[5] Cordish filed suit in the Circuit Court for Baltimore City. ECF 4. AFM removed the case to federal court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332 and 1446. ECF 1 ("Notice of Removal").  Cordish is a Maryland corporation with its principal place of business in Baltimore, and AFM is incorporated in Rhode Island.  ECF 4, ¶¶ 22, 23.

moved to strike plaintiff's response. ECF 46 ("Motion to Strike"). Plaintiff opposes the Motion to Strike. ECF 47.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion for Surreply and the Motion to Strike. And, I shall construe the Motion as a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) and grant it.

## I. Factual Background[6]

### A. The Pandemic

Affiliates of Cordish develop and operate numerous entities throughout the United States, including casinos, dining and entertainment venues, retail malls, hotels, meeting and conference venues, and office and residential buildings. ECF 4, ¶ 2. As events began to unfold in March 2020 with regard to the coronavirus, many governmental authorities across the country issued orders prohibiting "customers, patrons, suppliers, vendors and employees" from accessing business properties, including many of Cordish's properties. *Id.* ¶ 10; *see id.* ¶ 42. In particular, Cordish alleges that the pandemic led to the issuance of "numerous orders of civil authority" that "prohibited access" to the covered Properties or closure of its properties. *Id.* ¶ 12; *see id.* ¶ 13.

For example, on March 5, 2020, Maryland Governor Lawrence Hogan, Jr. issued a Proclamation declaring a state of emergency due to the spread of SARS-Cov-2, the virus causing the COVID-19 disease. *Id.* ¶ 43; *see* ECF 4-2 at 126-27 ("State of Emergency Order"). Ten days

---

[6] Given the posture of the case, I must assume the truth of all factual allegations in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). However, the Court may "take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

In this Memorandum Opinion, I cite to the Court's electronic pagination. The electronic pagination does not always correspond to the page numbers that appear on the parties' written submissions.

later, in connection with the State of Emergency Order, Governor Hogan issued an order closing to the public 13 gaming and racing facilities, including casinos, racetracks, and simulcast betting facilities. ECF 4-2 at 129. This order pertained to some of Cordish's Covered Properties, including Live! Casino & Hotel in Hanover, Maryland and "Live! Casino Hotel" at "Horseshoe Casino Baltimore." *Id.* at 130. Governor Hogan subsequently issued additional orders closing, *inter alia*, bars, restaurants, theaters, and malls. *See* ECF 4-3 at 1-31.  And, on March 30, 2020, Governor Hogan issued a "stay at home" order that directed all persons in the State of Maryland to "stay in their homes or places of residence" except "to conduct or participate in Essential Activities" (defined in the order), and closing "Non-Essential Businesses" except for "Minimal Operations," which included allowing the presence of staff and owners to perform essential administrative functions. *See* Order of the Governor of the State of Maryland, Number 20-03-30-01 (Mar. 30, 2020).

In sum, plaintiff claims that the damage caused by the virus and these executive orders "resulted in hundreds of millions of dollars in business interruption losses for Cordish…." ECF 4, ¶ 1.  As a result of these losses, plaintiff submitted a claim for business interruption losses under its Policy with AFM. *Id.* ¶ 112.[7] By letter of May 6, 2020, AFM denied coverage. *Id.* ¶ 114. In that letter, AFM averred, among other things, that the Contamination Exclusion bars coverage for losses claimed under the business interruption extensions. *Id.* ¶ 115. The parties then exchanged additional letters about the applicability of the Contamination Exclusion. *Id.* ¶¶ 116-118.

---

[7] Cordish did not include a copy of its claim or specify the date that it submitted the claim(s).

### B.  The Policy

Cordish purchased an "'all-risk' insurance policy" from AFM that provides up to $1,000,000,000 in coverage for business interruption losses and property damage with respect to 97 properties located throughout the country, including approximately 33 in Maryland ("Covered Properties"). *Id.* ¶ 4; *see* ECF 4-2. Coverage under the Policy was issued on March 10, 2020, for the period of February 28, 2020 to February 28, 2021. ECF 4-2 at 24.  As noted, the premium was almost $2 million.  ECF 4, ¶ 8.

The Policy provides coverage for losses from the interruption of Cordish's business, which is commonly known as business interruption coverage. Broadly, the Policy provides for a limit of liability of $1,000,000,000, and "covers property . . . against ALL RISKS OF PHYSICAL LOSS OR DAMAGE," except as otherwise excluded. ECF 4-2 at 26, 45 (capitals in original). Specifically, the Policy provides, *id.* at 26 (bold in original):

> This Company's total limit of liability, including any insured Business Interruption loss, will not exceed the Policy Limit of $1,000,000,000 as a result of any one **occurrence** subject to the respective sub-limits of liability shown elsewhere in this Policy.

Under the Policy, an occurrence is defined as "the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage …." *Id.* at 87.

Further, the Policy states, *id.* at 63-66 (emphasis in original):

> ### BUSINESS INTERRUPTION
>
> The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.
>
> ### A.  LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1. To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2. Used by the Insured;

3. While at a location or while in transit as provided by this Policy; and

4. During the Period of Liability as described elsewhere in this Policy.

Notably, the Policy does not define "physical loss or damage."

The "Business Interruption Coverage" includes coverage for rental income losses, *id.* at 65-66:

### B. **BUSINESS INTERRUPTION COVERAGE**

\*\*\*

3. **Rental Income**

The recoverable Rental Income loss is the actual loss sustained by the Insured of the following during the Period of Liability:

a) The fair rental value of any portion of the property occupied by the Insured;

b) Income reasonably expected from the rentals of unoccupied or unrented portions of such property;

c) The rental income from the rented portions of such property, according to bona fide leases, contracts or agreements, in force at the time of loss….

The Policy also includes sixteen "**BUSINESS INTERRUPTION COVERAGE EXTENSIONS**," of which three are relevant here: 1) the "Attraction Property" coverage; 2) the "Civil or Military Authority" coverage; and 3) the "Supply Chain" coverage. *Id.* at 68-75.

The "**Attraction Property**" coverage provides, *id.* at 68 (emphasis added):

7

This Policy covers Business Interruption Coverage loss incurred by the Insured during the Period of Liability *directly resulting from physical loss or damage of the type insured to property of the type insured* that attracts business to a **described location** and is within one (1) statute mile of the **described location**.

The provision on "**Civil or Military Authority**" coverage states, *id.* (emphasis added):

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** *provided such order is the direct result of physical damage of the type insured at a **location*** or within (5) statute miles of it.

And, the "**Supply Chain**" coverage provides, *id.* at 75 (emphasis added):

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability *directly resulting from physical loss or damage of the type insured to property of the type insured* at the premises of any of the following within the Policy's Territory:

> a) Direct suppliers, direct customers or direct contract service providers to the Insured;

> b) Any company under any royalty, licensing fee or commission agreement with the Insured; or

> c) Any company that is a direct or indirect supplier, customer or contract service provider of those described in a) above…

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions:

> a)  Civil or Military Authority…

In addition, the Policy provides coverage for losses caused by "Communicable Diseases." *Id.* at 51, 69; *see* ECF 4, ¶ 38.  The communicable disease provisions are subject to $500,000 sub-limits, for a combined total of $1,000,000.  ECF 4-2 at 28, 29. Although Cordish has not asserted any claims in this suit under either of these provisions, it asserts that the inclusion of the provision in the Policy evidences that "FM knows that viruses and communicable diseases result in physical loss or damage . . . ."

Of relevance here, the Policy contains various exclusions, including: 1) a contamination exclusion ("Contamination Exclusion"); and 2) a loss of market or loss of use exclusion ("Loss of Market Exclusion" or "Loss of Use Exclusion"), both of which apply to and limit the coverage of the provisions throughout the Policy. ECF 4-2 at 46-49. In the subsection titled "EXCLUSIONS," it states, in part, *id.* at 46-49:

> In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:
>
> **GROUP I:** This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to loss or damage:
>
> \*\*\*
>
> **GROUP II:** This Policy excludes the following, however, if physical damage not excluded by this Policy results, then only the resulting damage is insured:
>
> \*\*\*
>
> **GROUP III:** This Policy excludes:
>
> \*\*\*
>
> **3.** Loss of market or loss of use.
>
> \*\*\*
>
> **8. Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.

In the "Definitions" section of the policy, both contamination and contaminant are explicitly defined, *id.* at 86 (emphasis in original):

> **contaminant** means anything that causes **contamination**.
>
> **contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold, or mildew.

## II.    Motion for Surreply and Motion to Strike

As noted, plaintiff filed a Motion for Surreply (ECF 32), along with the proposed surreply. ECF 32-1. Defendant opposes the Motion for Surreply. ECF 34.

Local Rule 105.2(a) provides that a party is not permitted to file a surreply without permission of the court.  The filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2(a), but they are generally disfavored." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g.*, *Chubb & Son v. C & C Complete Servs., LLC,* 919 F. Supp. 2d 666, 679 (D. Md. 2013).  A surreply is ordinarily permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted). Conversely, a surreply is usually not permitted if the content is merely responsive to an issue raised in the opposition.  *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605-06 (D. Md. 2003).

In the Motion for Surreply, plaintiff contends that a surreply is necessary because defendant "raised for the first time another case against FM in this Court that involves a different FM insurance policy and relies on the findings in that case as if the facts…are the same in both cases." ECF 32 at 1. Thus, it asserts that it "will have no opportunity to contest FM's erroneous and misleading statements unless it is permitted to file a surreply." *Id.*

In my view, plaintiff is entitled to file the Surreply because defendant introduced a new case that it alleges is directly applicable to this case to support its argument as to sublimit caps. ECF 31 at 20 (citing *David S. Brown Enters. v. Affiliated FM Ins. Co.*, 509 F. Supp. 3d 460 (D. Md. Dec. 18, 2020)). In particular, AFM argues that its exact position as to the sublimit cap "was adopted by" the court in *David S. Brown Enters.*, 509 F. Supp. 3d 460. Although defendant's

averments are largely consistent with the allegations in the Motion, its introduction of this new case and the emphasis on the similarities between the two cases entitle Cordish to respond. Therefore, I shall grant the Motion for Surreply.

I shall also grant defendant's Motion to Strike plaintiff's response to a notice of supplemental authority.  ECF 46.  About two months after the briefing concluded on the motion to dismiss, defendant filed ECF 42, titled "Notice Of Supplemental Authority." In substance, it is one paragraph in length. Notably, defendant merely brought to the Court's attention a relevant decision issued on March 19, 2021, *i.e.*, after the briefing was completed with regard to the motion to dismiss.  *Id.*  For the convenience of the Court, defendant submitted a copy of the relevant opinion. However, the submission was not substantive in any way. It included no analysis or interpretation. Thereafter, plaintiff also filed a notice of supplemental authority in the same style. ECF 43. And, defendant filed another notice, also in the same style. ECF 44.

Nevertheless, plaintiff responded to defendant's notices (ECF 42; ECF 44) with substantive argument, addressing the cases defendant brought to the Court's attention. ECF 45. Plaintiff's submission sparked the filing by defendant of a Motion to Strike ECF 45. *See* ECF 46.  In its Motion to Strike, defendant asserts that ECF 45 is "an improper surreply" rather than merely a notice of supplemental authority. ECF 46 at 1.

In its opposition to the Motion to Strike (ECF 47), plaintiff claims that in ECF 42 and ECF 44, defendant "submitted supplemental letters to the Court to support its motion to dismiss" and thus plaintiff "appropriately filed a response, showing that FM's contention is incorrect." ECF 47 at 1. That is not entirely accurate, however.

Defendant was entirely appropriate in the way it brought the relevant cases to my attention in both ECF 42 and ECF 44. The submissions were short, simple, and to the point, much like

plaintiff's submission in ECF 43. Plaintiff escalated the matter by wading into the waters, addressing the merits of the cases – a step that defendant never undertook. Accordingly, I shall grant the Motion to Strike.

### III.   Standards of Review

#### A.  Fed. R. Civ. P. 12

As noted, AFM originally filed an answer to the Complaint.  ECF 9.  Months later, it filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). ECF 24.  A Rule 12(b)(6) motion must be filed "before pleading if a responsive pleading is allowed." However, pursuant to Fed. R. Civ. P. 12(h)(2)(B), which governs the waiving and preserving of defenses, a defendant may also assert "[f]ailure to state a claim upon which relief can be granted" in "a motion under Rule 12(c)."  And, in its reply (ECF 31), defendant asserts that the Court may consider its Motion to Dismiss under Rule 12(c), seeking judgment on the pleadings.  Plaintiff seems to agree.  ECF 28 at 17-18.

Regardless of whether failure to state a claim for relief is asserted by way of a Rule 12(b)(6) motion or a Rule 12(c) motion, courts apply "the same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6)." *Burbach Broadcasting Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002).  A motion pursuant to Rule 12(b)(6) constitutes an assertion by the defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts

alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long*

*Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true,

the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, __ F. App'x __, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Id.* at 165. But, "in cases where the plaintiff attaches or incorporates documents for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of the document as true." *Id.* at 167.

As noted, plaintiff included two exhibits with the Complaint. ECF 4-2; ECF 4-3. Cordish also submitted 16 exhibits with its opposition to the Motion to Dismiss. ECF 28-2 to ECF 28-18. These exhibits include AFM's filings in several other federal cases (ECF 28-2, ECF 28-3; ECF 28-9); the cases that plaintiff cites in its opposition (ECF 28-4); the "COVID-19 Property & Casualty Business Interruption Data Call" report issued by the National Association of Insurance Commissioners (ECF 28-5); various articles from insurance trade publications describing insurance rate changes in light of the pandemic (ECF 28-6); a report published by the Consumer Federation of America, dated February 11, 2011 (ECF 28-7); an excerpt from a treatise titled "Commercial Property Coverage Guide" (ECF 28-8); and various scientific articles on the transmission of COVID-19 (ECF 28-10 – ECF 28-18).

The exhibits are all referenced in the Complaint or publicly available documents. Moreover, defendant has not contested the materiality or the authenticity of plaintiff's exhibits.

16

Accordingly, at this juncture, I may consider the exhibits, without converting the Motion to one for summary judgment.

## B.  Choice of Law

The parties assume, without discussion, that Maryland law applies to plaintiff's claims. ECF 24-3; ECF 28. "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

"[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004).  Because Maryland is the forum state, I must apply Maryland substantive law, including its choice of law rules, to determine which state's substantive law applies to the agreement.  *Small v. WellDyne, Inc.*, 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009).

As to the contract claim, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245

(2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)). The parties have not specified precisely where this last act occurred.

Plaintiff is a Maryland corporation with its principal place of business in Baltimore, Maryland. ECF 4, ¶ 22. AFM is a Rhode Island corporation. *Id.* ¶ 23. Cordish alleges that the Policy was sold to Cordish in Maryland. *Id.* ¶ 24. And, plaintiff claims that the "alleged wrongs occurred, in part, in Baltimore." *Id.* ¶ 25. Accordingly, I shall apply Maryland law with respect to plaintiff's claims. *Porter Hayden*, 116 Md. App. at 673, 698 A.2d at 1200 (observing that "[t]ypically, '[t]he *locus contractus* of an insurance policy is the state in which the policy is delivered and the premiums are paid'") (emphasis and citation omitted).

### C. Principles of Contract Construction in Maryland

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Connors v. Gov't Emps. Ins. Co*., 442 Md. 466, 480, 113 A.3d 595, 603 (2015); *Moscarillo v. Prof'l Risk Mgmt. Servs*., Inc., 398 Md. 529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006); *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003); *see also Travelers Indemnity Co. of Am. v. Jim Coleman Auto. of Columbia, LLC*, 236 F. Supp. 2d 513, 514 (D. Md. 2002). Accordingly, "'ordinary principles of contract interpretation apply.'" *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655, 796 A.2d 758,

772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co*., 363 Md. 540, 556, 769 A.2d 948, 957 (2001); *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766, 556 A.2d 1135, 1138 (1998).

Principles of contract law govern the Policy at issue. Therefore, the rights and obligations of the parties are determined by the terms of that contract, "unless a statute, regulation or public policy is violated thereby." *Columbia Town Ctr. Title Co. v. 100 Inv. Ltd. P'ship.*, 203 Md. App. 61, 97, 36 A.3d 985, 1006 (2012).

The insured party bears the burden of proving that coverage exists. *See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 490, 66 A.3d 615, 624 (2013); *White Pine Ins. Co. v. Taylor*, 233 Md. App. 479, 497, 165 A.3d 624, 633 (2017). If coverage is established, the burden shifts to the insurer to establish that a certain claimed loss falls within a policy exclusion. *Beebe-Lee*, 431 Md. at 490, 66 A.3d at 624; *see Finci v. Am. Cas. Co. of Reading*, 323 Md. 358, 394, 593 A.2d 1069, 1087 (1991); *White Pine Ins.*, 233 Md. App. at 497, 165 A.3d at 633. Because "'exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage.'" *Megonnell*, 368 Md. at 656, 796 A.2d at 772 (citation omitted).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'" *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co*., 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993)). The insurance policy, including endorsements, "must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined." *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)); *see*

*United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 495 (4th Cir. 1998); *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). "In general, the main insurance policy and an endorsement constitute a single insurance contract, and an effort should be made to construe them harmoniously." *Prince George's Cty. v. Local Gov't Ins. Trust*, 388 Md. 162, 173, 879 A.2d 81, 88 (2005).

The court bears responsibility for ascertaining the scope and limitations of an insurance policy. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Mitchell v. Md. Cas. Co.*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991). As the Maryland Court of Appeals has explained, judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *Callaway*, 375 Md. at 279, 825 A.2d at 1005.

Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997); *accord Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's*, 788 F.3d 375, 379 (4th Cir. 2015). In other words, when interpreting an insurance policy's terms, the court interprets the policy "as a whole, according words their usual, everyday sense, giving force to the intent of the parties, preventing absurd results, and effectuating clear language." *Kapiloff*, 155 F.3d at 495. The test for that "usual, everyday sense" is "what meaning a reasonably prudent layperson would attach to the term." *See Pacific Indem. Co.*, 302 Md. at 387, 488 A.2d at 488.

Where the insurance policy is unambiguous, the meaning of the terms is determined by the court as a matter of law. *Clendenin Bros. Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006); *see Pa. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 118 (4th Cir. 2012). "'If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said.'" *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013)). And, "'a court has no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta*, 363 Md. at 557, 769 A.2d at 1138).

A contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 306, 753 A.2d 533, 537 (2000); *see Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran v. Norkunas*, 398 Md. 1, 17, 919 A.2d 700, 710 (2007); *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 183 Md. App. 710, 723, 963 A.2d 253, 260 (2009).

If a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole*, 359 Md. at 305, 753, A.2d at 537. Maryland courts "'will ordinarily avoid interpreting contracts in a way that renders its provisions superfluous.'" *Calomiris v. Woods*, 353 Md. 425, 442, 727 A.2d 358, 366 (1999) (quoting *State Highway v. Bramble*, 351 Md. 226, 237, 717 A.2d 943, 948 (1998)). Nor may the court "accept an interpretation that would nullify" one phrase "to substitute it with a contradictory formulation." *Calomiris*, 353 Md. at 442, 727 A.2d at 366. And, the court should give effect to each contract clause so that "'a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless

21

no other course can be sensibly and reasonably followed.'" *Muhammad v. Prince George's Cty. Bd. of Educ.*, 246 Md. App. 349, 364, 228 A.3d 1170, 1179 (2020) (citation omitted), *cert. denied*, 471 Md. 81, 238 A.3d 273 (2020).

In the absence of "an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning.'" *Md. Cas. Co. v. Blackstone Intern. Ltd*., 442 Md. 685, 695, 114 A.3d 676, 681 (2015) (quoting *Mitchell*, 324 Md. at 56, 595 A.2d at 475). However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Ins. Co*., 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Dutta*, 363 Md. at 556, 769 A.2d at 957.

Notably, "'unlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'" *Capital City*, 788 F.3d at 379 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co*., 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Megonnell*, 368 Md. at 655, 796 A.2d at 771; *Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros*., 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d at 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer."). In other words, where ambiguous language remains,

22

the court "construe[s] that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Connors*, 442 Md. at 481-83, 113 A.3d at 603-05 (emphasis in original) (quoting *Megonnell*, 368 Md. at 655, 796 A.2d at 772); *see Columbia Town Center Title Co.*, 203 Md. App. at 97, 36 A.3d at 1006.

## IV.   Discussion

### A.

In order to recover, Cordish must establish that it is entitled to coverage under the terms of the Policy. *See Beebe-Lee*, 431 Md. at 490, 66 A.3d at 624. Cordish asserts coverage under the "Rental Income coverage" provision and three business interruption coverage extensions:   1) Attraction Property; 2) Civil Authority; 3) Supply Chain.

AFM has moved to dismiss the suit, claiming that Cordish's claimed losses are not subject to coverage under the Policy. According to defendant, the business interruption coverage is barred by the policy's "Contamination Exclusion" and "Loss of Use Exclusion." ECF 24-3 at 3. AFM maintains that Cordish's business interruptions were not the direct result of physical loss or damage, which is a requirement for coverage under the Policy. *Id.*

Cordish vigorously disputes AFM's position. Plaintiff contends that COVID-19 causes physical loss or damage to property, so it is entitled to coverage for business interruption losses. ECF 28 at 44-47.  According to Cordish, neither the "Contamination Exclusion" nor the "Loss of Use Exclusion" applies.  *Id.* at 19-37.

### B.

Both the Rental Income coverage and the Attraction Property extension are triggered by "loss incurred…directly resulting from physical loss or damage of the type insured to property." ECF 4-2 at 65-66, 68. Thus, both provisions unambiguously limit coverage to losses incurred

"directly" as a result of "physical loss or damage" to the insured properties. Accordingly, the Court must determine whether plaintiff's allegations, based on COVID-19 and the related closure orders, constitute "physical loss or damage" under the Policy.

According to plaintiff, the SARS-CoV-2 virus is a "physical substance" that "causes physical loss or damage to property." ECF 4, ¶ 26; *see also id.* ¶¶ 27-32. "In addition to being transmitted by interpersonal contact," plaintiff claims that the virus can "remain on surfaces of objects or materials" for up to twenty-eight days, suggesting that individuals can contract COVID-19 through contact with such surfaces. ECF 4, ¶ 28; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (updated July 14, 2021), https://bit.ly/2XoiDDh.[8] Further, according to plaintiffs, there "have been hundreds of thousands of confirmed cases of COVID-19 in proximity to the Covered Properties, and the number of cases and geographic presence" of the virus "continues to grow and spread." *Id.* ¶ 32.

AFM insists that the presence of COVID-19 does not constitute "physical loss or damage" because the virus does not cause physical alteration of property. ECF 24-3 at 20. Further, defendant contends that "no business interruption was a 'direct result' of physical loss or damage." *Id.* at 26.

---

[8] At this juncture, the Court must assume the truth of the allegations in the Complaint. Nevertheless, the contention that surfaces are a serious source of spreading the virus has been largely debunked. The Centers for Disease Control and Prevention has explained: "People can be infected with SARS-CoV-2 through contact with surfaces. However, based on available epidemiological data and studies of environmental transmission factors, surface transmission is not the main route by which SARS-CoV-2 spreads, and the risk [of surface transmission] is considered to be low. The principal mode by which people are infected with SARS-CoV-2 is through exposure to respiratory droplets carrying infectious virus. In most situations, cleaning surfaces using soap or detergent . . . is enough to reduce risk." *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.

Even assuming the truth of the allegation, however, plaintiff's claim does not fall within the scope of the Policy, for the reasons discussed, *infra*.

Cordish counters that case law establishes that "there need not be structural damage for there to be 'physical loss or damage.'" ECF 28 at 35 (citing *Nat'l Ink & Stitch, LLC v. State Auto Prop. & Cas. Ins. Co.*, 435 F. Supp. 3d 679, 681 (D. Md. 2020)). According to plaintiff, contamination of a structure by the virus may qualify as a physical loss even if it does not physically alter the structure of the building. ECF 28 at 35. Thus, argues plaintiff, communicable diseases like COVID-19 can cause physical damage. ECF 28 at 35, 41 (citing ECF 4, ¶¶ 13-14, 32-33, 53-54, 56, 83-86, 89, 92, 95, 98-99, 105-6, 108, 110-11).

As noted, the Policy does not define "physical loss or damage" and, to my knowledge, no Maryland State court has opined on the meaning of this precise phrase in a reported opinion. However, in a recent case in this District involving a business interruption claim arising from the pandemic, Judge Bennett construed the phrase "direct physical loss or damage." He observed: "There is sufficient guidance from Maryland state courts, this Court, and other federal district courts applying the same basic principles of contract law to almost identical insurance policy provisions to guide this Court's analysis." *Bel Air Auto Auction, Inc. v. Great N. Ins. Co.*, __ F. Supp. 3d __, 2021 WL 1400891, at *7 (D. Md. Apr. 14, 2021). Relying on that guidance, I conclude that the phrase is unambiguous and bars coverage here.

As mentioned, the analysis of a contract begins with its plain language. The inclusion of the modifier "physical" in the phrase "physical loss or damage" unambiguously requires some form of material alteration to the property that has experienced "loss or damage." *See* Merriam–Webster Online Dictionary (defining "physical" as "having a material existence", "perceptible especially through the senses and subject to the laws of nature," or "of or relating to material things"); Black's Law Dictionary (10th ed., 2014) (defining "physical" as "of, relating to, or involving material things; pertaining to real, tangible objects"; "of, relating to, or involving

someone's body as opposed to mind"); 10A STEVEN PLITT ET AL, COUCH ON INSURANCE § 148:46 (3d ed. 2021) ("Couch") (stating that the "requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude [from coverage] alleged losses that are intangible or incorporeal").

The term "physical," as used in the Policy, "clearly indicates that the damage must affect the good itself, rather than the Plaintiff's use of that good." *M Consulting and Export, LLC v. Travelers Cas. Ins. Co. of Am.*, 2 F. Supp. 3d 730, 736 (D. Md. 2014).  In *Bel Air Auto Auction, Inc.*, 2021 WL 1400891, at *7, Judge Bennett concluded that under Maryland law "[d]irect physical loss or damage to property does not include loss of use unrelated to tangible, physical damage."  He added that "the phase requires tangible, physical losses to property, or, at the very least, permanent dispossession of the property rendered unfit or uninhabitable by physical forces." *Id.*

Indeed, physical damage is "'a distinct, demonstrable, physical alteration of the property.'" *Newchops Restaurant Comcast LLC v. Admiral Indem. Co.*, 507 F. Supp. 3d 616, 623 (E.D. Pa. 2020) (citation omitted).   Direct physical loss occurs when a structure has been rendered "uninhabitable and unusable."  *Port Auth. of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3rd Cir. 2002).  *See*, *e.g.*, *Bluegrass Oral Health Ctr. v. Cincinnati Ins. Co*., No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) (finding that "the great weight of decisions recently considering" the meaning of "direct physical loss or damage" in "the midst of the current pandemic have reached the same conclusion," *i.e.*, that the phrase requires some physical damage, rather than mere loss of use).

Economic loss alone is not sufficient to trigger coverage; physical alteration to the property is necessary.  *See* Couch § 148:46 (explaining that property insurance claims are precluded "when

the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable physical alteration of the property"); *Hartford Ins. Co. of Midwest v. Mississippi Valley Gas Co.*, 181 F. App'x 465, 470 (5th Cir. 2006) ("The requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." (citation omitted)); *see also Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp. 3d 834, 841 (N.D. Cal. 2020) (noting that "numerous courts outside the Ninth Circuit have found that some outside physical force must have induced a detrimental change in the property's capabilities before a plaintiff alleging loss of use can establish a "direct physical loss of property"); *Turek Enter., Inc. v. State Farm Mut. Auto. Ins. Co.*, 484 F. Supp. 3d 492, 502 (E.D. Mich. 2020) (concluding that "direct physical loss" is unambiguous and requires a showing of "tangible damage" to property).

Construing the phrase "physical loss or damage" in the broader context of the Policy further supports the position that the covered property must have suffered some tangible harm to qualify for coverage. For example, the "Period of Liability for Business Interruption Coverage" runs "from the time of physical loss or damage of the type insured" to when the "lost or damaged property could be *repaired or replaced* and made ready for production or business operations or services . . ." ECF 4-2 at 67 (emphasis added). The idea that the property may be "repaired or replaced" is consistent with the view that the damage contemplated by the Policy must be physical in nature. *See Tria WS LLC v. American Automobile Ins. Co.*, 530 F. Supp. 3d 533, 540 (E.D. 2021) ("The terms 'repair,' 'rebuild,' and 'replace' strongly suggest that the insured property must have suffered some negative change in its physical condition rendering the property unsatisfactory

and requiring restoration."); *Michael Cetta, Inc. v. Admiral Indem. Co.*, 506 F. Supp. 3d 168, 177 (S.D.N.Y. 2020) ("The idea that the premises will be 'repaired, rebuilt or replaced' suggests the occurrence of material harm that then requires a physical fix."); *see also Hair Studio 1208, LLC*, 2021 WL 1945712, at *9 ("'If there is no requirement that physical loss of or physical damage to the property be involved, the definition of the time for paying the claim makes no sense.'") (quoting *Real Hospitality LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288, 295 (S.D. Miss. 2020)).

### C.

As mentioned, Cordish also maintains that plaintiff is entitled to coverage due to contamination of its properties.  Here, the Complaint alleges that "SARS-CoV-2…and COVID-19 cause physical loss or damage of the type insured under the Policy." ECF 4, ¶ 9. According to the Complaint, the virus can remain viable on surfaces for up to twenty-eight days, "making property impacted by SARS-CoV-2 dangerous and potentially fatal," *id.* ¶ 28, and not functional "for the purpose of generating business income." *Id.* ¶ 36.  Cordish also states that there "have been hundreds of thousands of confirmed cases of COVID-19 in proximity to the Covered Properties…" *Id.* ¶ 32.  Based on those allegations, plaintiff maintains that its Covered Properties suffered "business interruption losses directly resulting from physical loss or damage caused by" the virus. *See, e.g.*, *id.* ¶ 83.

But, for plaintiff to recover under the Attraction Property and Rental Income coverage provisions, the properties must have been physically or structurally altered or rendered uninhabitable and unusable by the virus.  To be sure, plaintiff was not allowed to operate certain businesses during the pandemic.  Nevertheless, Cordish does not allege that the properties were physically or structurally altered or rendered unusable.  Contamination qualifies as physical loss

or damage only if it renders the subject property unusable or uninhabitable.  *See Port Auth. of N.Y. & N.J.*, 311 F.3d at 235-36.

The Third Circuit's decision in *Port Auth. of N.Y. & N.J.*, 311 F.3d 226, is instructive. There, the plaintiffs sought to recover from their insurers, alleging the property was contaminated by asbestos.  The court addressed whether the presence of asbestos constituted "direct physical loss or damage," as required under the first-party policies. The court explained that, "[i]n ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure." *Id.* at 235 (quoting Couch, § 148:46).  It noted that damage by "sources unnoticeable to the naked eye," such as fire, water, and smoke, may trigger coverage, but "must meet a higher threshold" to do so. *Id.* at 235.  The court concluded that the "mere presence" of asbestos did not render the structures unusable or uninhabitable, nor was there any indication of an imminent threat of asbestos contamination. *Id.* at 236.  It reasoned, *id.*:

> When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner. However, if asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss.[] The structure continues to function—it has not lost its utility.

*See also Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95, 100 (E.D. Pa. 2020) (concluding that there was no direct physical loss of or damage to property from the virus where the property remained "inhabitable and usable").

*Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52 (1968), is also noteworthy.  There, the Supreme Court of Colorado determined that a direct physical loss had occurred when the insured, acting upon the orders of the fire department, closed the church building because gas had infiltrated the soil underneath it. *Id.* at 37-38, 437 P.2d at 54-55. The court clarified that "the so-called 'loss of use' of the church premises, standing alone, d[id] not in

and of itself constitute a 'direct physical loss.'" *Id.* at 39, 437 P.2d at 55. Rather, the direct physical loss resulted from the "accumulation of gasoline around and under the church building," which made further use of the building highly dangerous. *Id.*

Plaintiff relies on *Nat'l Ink & Stitch, LLC*, 435 F. Supp. at 681, to support its argument that a virus can constitute physical loss or damage. But, the facts of that case are distinguishable. There, the court held that a ransomware attack constituted physical damage because the plaintiff "sustain[ed] a loss of its data and software," was "left with a slower system, which appear[ed] to be harboring a dormant virus," and was "unable to access a significant portion of software and stored date." *Id.* at 686. In other words, the "software was rendered *entirely unusable* by the ransomware attack." *Id.* at 685 (emphasis added). In contrast, the Complaint does not allege that Cordish's properties sustained any alteration or change, much less one that rendered them unusable as a result of the virus.

Indeed, plaintiff does not allege that the virus was actually present at any of its properties; that anything about its properties has changed since March 2020; or that its properties were rendered uninhabitable or unusable by the virus. Nor does Cordish allege the need to make repairs or changes to its properties as a result of damage caused by the virus.  In other words, even if the virus was, in fact, present at the Covered Properties, the Complaint does not allege any facts supporting the conclusion that the coronavirus compromised the physical integrity of the structures or otherwise harmed the structures or destroyed or nearly eliminated their functionality. *Compare Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826-27 (3rd Cir. 2005) (reversing summary judgment in favor of the insurer as to a property claim under a homeowners' insurance policy, because of a dispute of material fact as to whether a water well contaminated by bacteria rendered the property useless or uninhabitable, or otherwise nearly eliminated or destroyed its

functionality).  As the Court observed in *Ralph Lauren Corp. v. Factory Mut. Inc. Co.*, No. 20-10167, 2021 WL1904739, at \*3 n.6 (D. N.J. May 12, 2021): "Although the Virus can harm humans, it does not physically alter structures and therefore does not result in coverable property loss or damage."

To be sure, "factual allegations drive the analysis of a motion to dismiss, [but] courts are not required to set aside common sense." *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 883 (S.D.W. Va. 2020);  *see 15 Oz Fresh & Healthy Food LLC v. Underwriters at Lloyd's London Known as Syndicates AML 2001*, 20-23407, 2021 WL 896216, at \*6 (S.D. Fla. Feb. 22, 2021) ("Plaintiff also alleges that its losses are attributable, at least in part, to the 'presence of COVID-19.' Such conclusory allegations are insufficient.") (citation omitted).  Here, the structures are intact.  Surfaces exposed to the virus can be cleaned.

Numerous courts have rejected claims similar to what Cordish has advanced, explaining that the virus does not cause physical alteration of property because it can be cleaned and eliminated from surfaces. *See, e.g., Barbizon Sch. of San Francisco, Inc. v. Sentinel Ins. Co. LTD*, 20-cv-08578-TSH, 2021 WL 1222161, at \*9 (N.D. Cal. Mar. 31, 2021) (noting that the "virus does not threaten the structures covered by property insurance policies, and can be removed from surfaces with routine cleaning and disinfectant"); *Kevin Barry Fine Art Assocs. v. Sentinel Ins. Co.*, 513 F. Supp. 3d 1163, 1171 (N.D. Cal. 2021) (noting that "[e]ven if KBFA had included allegations regarding the virus being present on and damaging the property, they would not be plausible" and citing cases in which there was no coverage because the coronavirus can be cleaned from surfaces and surfaces can be disinfected); *Terry Black's Barbeque, LLC v. State Auto. Mut. Ins. Co.*, 514 F. Supp. 3d 896, 907 (W.D. Tex. 2020) (determining that the presence of the virus alone does not constitute physical loss or damage to property "because the virus can be eliminated"

and "does not threaten the structures covered by property insurance policies"); *Uncork & Create LLC*, 498 F. Supp. 3d at 883 (noting that "even when present, COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant"); *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1202 (D. Kan. 2020) ("[E]ven assuming that the virus physically attached to covered property, it did not constitute the direct, physical loss or damage required to trigger coverage because its presence can be eliminated."); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020) (holding that "the presence of the virus itself, or of individuals infected [with] the virus, at Plaintiffs' business premises or elsewhere do not constitute direct physical losses of or damage to property"); *Mama Jo's, Inc. v. Sparta*, No. 17-cv-23362-KMM, 2018 WL 3412974, *9 (S.D. Fla. 2018) (presence of construction debris and dust from road work did not constitute physical loss of or damage to covered property; "[t]he fact that the restaurant needed to be cleaned more frequently does not mean Plaintiff suffered a direct physical loss or damage"), *aff'd*, 823 F. App'x 868 (11th Cir. 2020).

Further, Cordish argues that the coverage provision for "Communicable Disease – Property Damage" indicates that a loss from virus contamination constitutes physical loss or damage. ECF 28 at 35. However, the inclusion of a separate provision on damage caused by communicable diseases actually supports the insurer's argument. If the Policy provided that communicable diseases cause physical loss or damage, then it would not have had to include a separate provision for coverage based on communicable disease. Moreover, the modifier "property damage" used in the provision's heading is distinguishable from the phrase "*physical* loss or damage" used in the business interruption provision. In particular, "property damage" omits the modifier "physical," which, as discussed *supra*, imposes a requirement of some form of material or tangible alteration

in order to trigger coverage. Without that modifier, "property damage" denotes coverage for a broader range of damage.  As mentioned, Maryland law requires the Court to give effect to each clause of a contract, such that "'a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'"  *Muhammed*, 246 Md. App. at 364, 228 A.3d at 1179 (citation omitted).

Analogizing SARS-CoV-2 to hazardous substances, *see* ECF 28 at 37-40, does not alter the Court's conclusion. *Compare, e.g., Moody v. Hartford Fin. Grp., Inc.*, 513 F. Supp. 3d 496, 506 (E.D. Pa. 2021) ("Neither the presence of the virus nor an imminent threat thereof ... has 'nearly eliminated or destroyed' the property's functionality or rendered it 'useless or uninhabitable.'") *with TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 701, 708-09 (E.D. Va. 2010) (finding that a building suffered a "direct physical loss" because it had been rendered uninhabitable by toxic gases released by a product), *aff'd*, 504 F. App'x 251 (4th Cir. 2013). Moreover, even if the presence of the virus destroyed the functionality of Cordish's properties, those claims would be barred by the Policy's Contamination Exclusion, as discussed *infra*.

Numerous cases have rejected contamination by the virus as a basis to trigger insurance coverage that is subject to a requirement of physical damage.  *See*, *e.g.*, *Bel Air*, 2021 WL 1400891, at *11 ("Particles of a virus are akin to asbestos, or are perhaps more similar to a layer of dust or debris, which courts have held is insufficient to establish physical damage or loss."); *Rococo Steak, LLC v. Aspen Specialty Ins. Co.*, 515 F. Supp. 3d 1218, 1223 (M.D. Fla. 2021) (granting motion to dismiss, stating that "like the coating of dust and debris in [*Mama Jo's Inc.*, 823 F. App'x at 879], the surfaces allegedly contaminated by COVID-19 seem to only require cleaning to fix"); *Compare Hardinger*, 131 F. App'x at 825 (indicating that the presence of E. coli in a residential water well could constitute a direct physical loss where the "functionality" of the

property is "nearly eliminated or destroyed," or when the bacteria renders the property "useless or uninhabitable"); *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 15-01932, 2016 WL 3267247 (D. Or. June 7, 2016) (finding physical loss or damage to property when wildfire smoke infiltrated a theater and rendered it unusable for its intended purpose); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 12 Civ. 4418, 2014 WL 6675934, at *8 (D.N.J. Nov. 25, 2014) (holding that a juice plant incurred "physical loss of or damage to" its facility when ammonia gas was discharged into the plant's air and rendered the facility "unfit for occupancy").

Nor do the executive orders mandating closure constitute physical loss or damage. The overwhelming majority of federal courts to consider similar claims have concluded that neither the presence of the virus in the buildings, nor the governmental orders associated with COVID-19, caused or constitute physical loss or damage to property for purposes of insurance coverage. *See, e.g.*, *Kim-Chee LLC v. Philadelphia Indem. Ins. Co.*, __F. Supp. 3d __, 2021 WL 1600831, at *3 (W.D.N.Y. Apr. 23, 2021) ("In an unbroken line of trial court decisions, federal courts applying New York law have ruled that the closure of businesses due to the suspected presence of the virus or due to New York State executive orders do not qualify as direct physical loss or damage."); *Rococo Steak*, 515 F. Supp. 3d at 1215 ("[N]either physical contamination by COVID-19 nor a decrease in business constitutes direct physical loss or damage."); *Mohawk Gaming Enterprises, LLC v. Affiliated FM Ins. Co.*, __ F. Supp. 3d__, 2021 WL 1419782, at *5 (N.D.N.Y Apr. 15, 2021) ("Indeed, numerous courts around the country—including those that have applied New York law—have routinely held that the mere presence or spread of the novel coronavirus is insufficient to trigger coverage when the policy's language requires physical loss or physical damage."); *Protégé Rest. Partners LLC v. Sentinel Ins. Co., Ltd.*, 517 F. Supp. 3d 981, 987-88 (N.D. Cal. 2021) ("Every California court that has addressed COVID-19 business interruption claims to date

has concluded that government orders that prevent full use of a commercial property or that make the business less profitable do not themselves cause or constitute "direct physical loss of or physical damage to" the insured property.") (collecting cases); *O'Brien Sales & Mktg., Inc. v. Transp. Ins. Co.*, 512 F. Supp. 3d 1019, 1024 (N.D. Cal. 2021) (stating that "'the presence of the virus itself, or of individuals infected with the virus, at [plaintiff's] business premises or elsewhere [does] not constitute direct physical loss of or damage to property.'") (citation omitted); *see also, e.g.*, *Northwell Health, Inc. v. Lexington Ins. Co.*, __F. Supp. 3d __, 2021 WL 3139991, at *5 (S.D.N.Y. July 26, 2021); *Nguyen v. Travelers Cas. Ins. Co. of Am.*, __F. Supp. 3d __, 2021 WL 2184878, at *11 (W.D. Wash. May 28, 2021); *Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, 527 F. Supp. 3d 1142, 1148-49 (N.D. Cal. 2021); *Moody*, 513 F. Supp. 3d at 505-06; *Promotional Headwear Int'l*, 504 F. Supp. 3d at 1202; *but see Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 799–801 (W.D. Mo. 2020) (concluding that plaintiffs had "plausibly alleged that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable"); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 378 (E.D. Va. 2020) (same).

## D.

As indicated, plaintiff also asserts coverage under the Civil Authority and Supply Chain coverage extensions. In particular, the Civil Authority coverage extension provides coverage when an "action of civil authority ... prohibits access" to Covered Property, "provided such order is the direct result of physical damage of the type insured at [plaintiff's property] or within (5) statute miles of it." ECF 4-2 at 68. The Civil Authority coverage, therefore, does not require Cordish to have suffered direct physical loss.  However, it is still dependent upon physical damage to surrounding property.

The Supply Chain coverage extension covers losses "directly resulting from physical loss or damage of the type insured to property…at the premises of," among other things, "[d]irect suppliers, direct customers or direct contract service providers…." *Id.* at 75. The coverage is "extended to include" Civil Authority coverage. *Id.* Thus, it is triggered by physical loss or damage to suppliers and others. *Id.*

> Cordish asserts, ECF 28 at 21-22:
>
> Although Cordish's Properties have been impacted and damaged by COVID-19, that is not the predominant cause of the company's business interruption losses. Cordish's losses are not from a spill resulting in contamination at its properties, or the "cost" due to such contamination. Rather Cordish's losses are caused by the impact of the coronavirus away from the insured premises and the resulting orders of civil authority that have prohibited access to the Properties.

The Complaint includes a list of its properties that were required to close as a result of governmental orders.  But, it does not allege with any specificity what nearby locations or vendors actually suffered physical loss or damage, so as to bar access to Cordish's properties.  Nevertheless, plaintiff posits that it suffered losses that are covered under both provisions because, "as a direct result of physical damage from [the virus] either at or within five miles of Covered Properties," government orders prohibited access to Covered Properties. ECF 4, ¶ 89. However, these provisions depend on physical loss or damage to *some* property, and COVID-19 did not cause such loss or damage. *See Nguyen*, 2021 WL 2184878, at \*14 (noting that "where the Civil Authority provision incorporates the requirement for physical loss or damage to a neighboring building, there is no coverage because the Court has already found COVID-19 does not cause such loss or damage").

Other courts considering similar civil authority provisions have come to the same conclusion. *See, e.g.*, *Aggie Invs., LLC v. Cont'l Cas. Co.*, 21-cv-0013, 2021 WL 1550479, at \*5 (E.D. Tex. Apr. 20, 2021) ("But the civil authority actions here were taken to prevent the

anticipated threat of COVID-19—not because there was structural alterations or property damage at other premises."); *Select Hospitality, LLC v. Strathmore Ins. Co.*, __ F. Supp. 3d __, 2021 WL 1293407, at \*4 (D. Mass. Apr. 7, 2021) (denying coverage under civil authority provision because "the mere presence of the COVID-19 virus does not constitute property damage and Select does not identify any specific property to have been damaged"); *Chief of Staff, LLC v. Hiscox Ins. Co. Inc.*, __F. Supp. 3d__, 2021 WL 1208969, at \*1-\*2 (N.D. Ill. Mar. 31, 2021) (finding no coverage under the civil authority section because the "other property," like the premises covered by the policy, had not suffered physical damage, as required by the plain language of the policy); *Selery Fulfillment, Inc. v. Colony Ins. Co.*, 525 F. Supp. 3d 771, 780 (E.D. Tex. 2021) ("The 'causal link' between property damage and the civil authority action is too attenuated or even nonexistent. Therefore, Selery cannot use the Civil Authority provision to plausibly state a claim."); *Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.*, 503 F. Supp. 3d 251, 257 (E.D. Pa. 2020) (stating that plaintiff "did not close because of damage to a nearby premise or because there was some dangerous physical condition at another nearby premise. It closed because the Shutdown Orders applied to its own operations. Its shutdown and resulting losses fall outside the scope of the Civil Authority coverage."); *Gerleman Mgmt., Inc. v. Atlantic States Ins. Co.*, 506 F. Supp. 3d 663, 671 (S.D. Iowa 2020) (concluding that civil authority provision was not triggered because plaintiffs failed to allege direct physical loss or damage to another property).

In sum, plaintiff has not plausibly alleged "physical loss or damage" to its property or to nearby property, so as to trigger coverage under any of the asserted provisions of the Policy.

## E.

The conclusion that the requirement of "physical loss or damage" forecloses coverage is determinative. *See, e.g., Geragos & Geragos Engine Co. No. 28, LLC v. Hartford Fire Ins. Co.*,

CV 20-4647-GW-MAAx, 2020 WL 7350413, at *4 (C.D. Cal. Dec. 3, 2020) ("Because the Court finds that G&G has not suffered any 'direct physical loss of or physical damage to' its property, the Court ... does not reach the issue of whether the virus exclusion applies."); *First Watch Rests., Inc. v. Zurich Am. Ins. Co.*, 519 F. Supp. 3d 1056, 1061 (M.D. Fla. 2021) ("Since First Watch cannot show coverage ... the Court does not address whether the contamination exclusion, or any exclusion, is applicable."). But, in addition, defendant argues that by "its plain and unambiguous text, the contamination exclusion [in the Policy] excludes" Cordish's business interruption claims. ECF 24-3 at 6.   Cordish counters that the exclusion does not apply, claiming that AFM is attempting to "re-write the Policy." ECF 28 at 19. Because the parties spend extensive time contesting the applicability of the Policy's Contamination Exclusion, I shall briefly consider their contentions.

The Contamination Exclusion provides, in part, ECF 4-2 at 49: "This Policy excludes . . . Contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." "Contamination," in turn, is defined as "any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew." *Id.* at 86.

Among other things, the parties vigorously disagree over the significance in the provision of the word "cost" as opposed to "loss." Cordish posits that the Contamination Exclusion applies only to "cost" due to contamination, "such as the rental of alternate space." ECF 28 at 22-24. Thus, argues Cordish, the Contamination Exclusion does not apply to its claims because it "is seeking coverage for the business interruption 'loss' measured mainly by its revenue shortfalls." *Id.* at 23.

38

In contrast, AFM contends that the exclusion's reference to the "inability to use or occupy property" unambiguously excludes *losses* due to contamination caused by COVID-19, including Cordish's loss of income. ECF 31 at 8.

Again, starting with the plain reading of the provision, it is clear that plaintiff's interpretation does not hold up. In particular, plaintiff's focus on the word "cost" as limiting the applicability of the entire exclusion would require the Court to ignore other portions of the provision.  *See Thor*, 2021 WL 1226983, at *4 ("Plaintiff's reading of the exclusion could tend to render certain aspects of the exclusion meaningless."); *see also Ralph Lauren*, 2021 WL 1904739, at *4 n.8 (citing *Thor* to make the same point).

The Policy excludes "*[c]ontamination*, *and* any cost due to contamination." ECF 4-2 at 49 (emphasis added). The first two words of the exclusion—"[c]ontamination, and"—must be given effect. *Calomiris*, 353 Md. at 442, 727 A.2d at 366 (noting that Maryland courts "will ordinarily avoid interpreting contracts in a way that renders its provisions superfluous") (internal citation omitted); *see also Stanley v. State*, 390 Md. 175, 183-84, 887 A.2d 1078, 1082-83 (2005) (explaining that the use of the word "and" between requirements unambiguously commands that all of the requirements must be established) Therefore, the exclusion must be read to encompass more than just "any cost due to contamination." And, contamination must mean something more than contamination-related "costs." Indeed, the Policy defines "contamination" as "any condition of property due to the actual or suspected presence of any…bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew." ECF 4-2 at 86.

In addition, following the phrase "contamination, and any cost due to contamination," the provision provides two examples of losses that fall within its purview: 1) "the inability to use or occupy property"; and 2) "any cost of making property safe or suitable for use or occupancy." *Id.*

at 49. Plaintiff's interpretation would render meaningless the phrase "the inability to use or occupy property." Although these examples might be "illustrative, not exclusive," as plaintiff argues, ECF 28 at 23, that does not render them meaningless. And, "inability to use or occupy property" is precisely the claim for which Cordish seeks coverage.

In my view, regardless of any other costs that may be excluded under the provision, the exclusion can only be read as barring plaintiff's claims. *See Boscov's Department Store, Inc., v. American Guarantee & Liability Ins. Co.*, No. 5:20-CV-03672-JMG, 2021 WL 2681591, at *9 (E.D. Pa. June 30, 2021) (finding that identical contamination exclusion unambiguously barred plaintiff's business interruption claims due to COVID-19).

## V.    Conclusion

In *Uncork and Create*, 498 F. Supp. 3d at 884, the court aptly stated:

> In short, the pandemic impacts human health and human behavior, not physical structures. Those changes in behavior, including changes required by governmental action, caused the Plaintiff economic losses. The Court is not unsympathetic to the situation facing the Plaintiff and other businesses. But the unambiguous terms of the business interruption coverage in the Policy do not provide coverage for solely economic losses unaccompanied by physical property damage.

*See also Johnson v. Hartford Fin. Servs. Grp., Inc.*, 510 F. Supp. 3d 1326, 1337 (N.D. Ga. 2021) ("COVID-19 hurts people, not property.").

For the foregoing reasons, the Motion (ECF 24) is granted.  An Order follows, consistent with this Memorandum Opinion.


Date: August 31, 2021                                    _____/s/_____

                                                         Ellen L. Hollander
                                                         United States District Judge